

1  BAKER MARQUART LLP
     Jaime Marquart (Bar No. 200344)
2     jmarquart@bakermarquart.com
     Ryan Baker (Bar No. 214036)
3     rbaker@bakermarquart.com
     Christian Anstett (Bar No. 240179)
4     canstett@bakermarquart.com.com
   10990 Wilshire Blvd., Fourth Floor
5  Los Angeles, California 90024
   Telephone:  (424) 652-7800
6  Facsimile:   (424) 652-7850

7  Attorneys for All Plaintiffs

8

9                UNITED STATES DISTRICT COURT

10              CENTRAL DISTRICT OF CALIFORNIA

11                          CV11-09437 P(AGRx)

12  ALKIVIADES DAVID, SUGAR HILL        CASE NO.:_____
    MUSIC, SOLID PRODUCTIONS,
13  STEVEN BATIZ, TONY BELL,            COMPLAINT FOR:
    DETRON BENDROSS, DERRICK
14  BRAXTON, REGINALD BROOKS,           (1) INDUCEMENT OF COPYRIGHT
    ELIJAH BROWN, HORACE                INFRINGEMENT;
15  BROWN, OSCAR BROWN, LUTHER
    CAMPBELL, JONATHAN                  (2) CONTRIBUTORY COPYRIGHT
16  CARLTON, SOLOMON CONNER,            INFRINGEMENT; and
    DAYQUAN DAVIS, DOUGLAS
17  DAVIS, KAREEM DAVIS,                (3) VICARIOUS COPYRIGHT
    SOLAMIN DAVIS, EMMANUEL             INFRINGEMENT
18  RAMONE DEANDA, DREW
    CARTER, NACOLBIE EDWARDS,           JURY TRIAL DEMANDED
19  VANCITO EDWARDS  JOHN
    FLETCHER, WILLIE FINCH,  ISAAC
20  FREEMAN, JR., DARRYL GIBSON,
    JALIL HUTCHINS, EMANON
21  JOHNSON, KEITH JONES, ORAN
    "JUICE" JONES, TARSHA JONES,
22  NAILAH LAMEES, DANA
    MCCIEESE, BARRY MOODY, JEFF
23  REDD, QUAME RILEY, ANTHONY
    ROBINSON, NICHOLAS SANCHEZ,
24  JONATHAN SHINHOSTER,
    DIAMOND SMITH, REMINISCE
25  SMITH, GERALD SPENCE, CHRIS
    STOKES, IRENE STOKES, JUANITA
26

27

28

AMENDED COMPLAINT

STOKES, WILLIAM TENNYSON
AND THE TENNYSON ESTATE,
CARL THOMAS, JEFF THOMKINS,
RONDELL TURNER, RICKY
WALTERS, KEVIN WILLIAMS,
YOLANDA WHITAKE, JOSEPH
WILLIAMS, RAHEEM WILLIAMS,
CASE WOODWARD, ATTRELL
AND JARRETT CORDES,
MITCHELL GRAHAM

      Plaintiffs,

    vs.

CBS INTERACTIVE INC., CNET
NETWORKS, INC.

      Defendants.

      Plaintiffs, for their Complaint against Defendants CBS Interactive Inc. ("CBS Interactive") and CNET Networks, Inc. ("CNET," collectively with CBS Interactive, the "Defendants"), allege as follows:

## SUMMARY OF THE ACTION

      1.    Over the last decade, countless websites and "file sharing" or peer-to-peer ("P2P") software programs – from Napster, in 2001, to LimeWire in 2010 – have been sued into oblivion because a multitude of courts have found that they were essentially engines of infringement, designed with the specific aim of knowingly encouraging, inducing and/or assisting others in direct copyright infringement of artists' works, and profiting thereby. As a result of these lawsuits, an overwhelming number of these file-sharing sites are now completely inactive and their founding companies are bankrupt. Yet, for most if not all of this time, one

1  particular group of businesses – led by Defendants CBS Interactive and CNET –
2  have knowingly and willingly participated in and profited mightily from the same
3  massive infringement that engendered large copyright suits against Napster and
4  LimeWire and that ultimately crippled them financially.  And they have done so
5  with impunity.  In fact, because they owned a number of the most heavily-visited
6  sites in the world for downloading software of all types, Defendants did more to
7  further this massive infringement than Napster or LimeWire ever could by falsely
8  legitimizing it and popularizing it to the masses.  As recently as 2010, one could
9  access a legitimate portion of Defendants' sites and download non-infringing,
10  licensed software such as Quickbooks accounting software or Adobe Acrobat, and
11  could *during the same shopping session* download the LimeWire infringement
12  engine, which was clearly intended to be downloaded for infringing purposes.  This
13  ambiguity worked even further to Defendants' advantage by making it seem to the
14  casual consumer that a Limewire download had the same legitimacy as a download
15  of licensed office software. In essence, Defendants have taken music piracy from the
16  dorm room to the board room.  Thus, while other companies faced heavy statutory
17  penalties and went bankrupt, and music labels banded together to levy practically
18  unconscionable penalties on unemployed college students and housewives,
19  Defendants quietly made billions by inducing those same individuals to break the
20  law, by providing them the software to do it, and then by giving even the least
21  computer-savvy a step-by-step guide as to how to do it.  No one has held Defendant
22  accountable for this.  Until now.

23       2.     For over a decade, Defendants have shamelessly distributed a vast array
24  of P2P software programs ("P2P clients") to the global public for free, including the
25  now notorious LimeWire software as well many of the most popular and
26  controversial P2P clients, including KaZaa, Morpheus, BitComet, AudioGalaxy and
27  Frostwire. At all times, Defendants knew that these P2P clients were used primarily
28  for purposes of copyright infringement and in many cases were actually designed

-3-

1  specifically to facilitate, conceal and promote copyright infringement. Indeed, much
2  of the P2P software distributed by Defendants includes features designed and
3  intended exclusively for purposes of facilitating infringement and avoiding
4  enforcement.    For example, one BitTorrent client presently distributed by
5  Download.com, BitComet, includes a built-in feature that automatically allows users
6  to search for media on the Pirate Bay.  As the name suggests, the Pirate Bay is a
7  Swedish website that is literally built to steal. It is described by *The Los Angeles*
8  *Times* as "one of the world's largest facilitators of illegal downloading" and "the
9  most visible member of a burgeoning international anti-copyright or pro-privacy
10  movement." Defendants' widespread distribution of BitComet and similar programs
11  has helped the Pirate Bay become the 88th most popular website in the world as of
12  July 2011.

13      3.    Defendants furthered the massive infringement carried out through the
14  P2P applications they distributed and popularized by providing detailed reviews that
15  included information regarding the suitability of the clients for copyright
16  infringement as well as instructions and tips on how to use the P2P software to
17  infringe.  On cnet.com, Download.com, and other CBS Interactive-owner websites,
18  the Defendants offered videos, articles, and other media that instructed how to use
19  P2P software to locate pirated copies of copyrighted works and remove electronic
20  protections placed on digital music files in order to prevent infringement.

21      4.    If copyright law ever allowed Defendants to play the part of innocent
22  purveyor of seemingly legitimate copying and "sharing" tools (and it is questionable
23  that it ever would have here), modern copyright jurisprudence certainly will afford
24  Defendants any such relief.    Defendants are decidedly *not* innocent parties
25  distributing a technology meant for legal means that just happens to be used by a
26  few malevolent wrongdoers to infringe.  *See, e.g.,* Sony Corp. of America v.
27  Universal City Studios, Inc., 464 U.S. 417, 104 S. Ct. 774 (1984).  Nor is this a case
28  where a defendant simply linked users to a website where infringement occurred or

1   for which it provided advertising and had no feasible means of preventing the
2   infringement. *See, e.g.,* Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701 (9th Cir.
3   2007).   Here, Defendants directly provided users that they knew to be actively and
4   unlawfully copying Plaintiffs' works with the tools necessary to accomplish that
5   infringement, along with instructions on how to most effectively use those tools.
6   But they did not even stop there – Defendants actually encouraged the infringement
7   in web postings, videos and radio shows.   Defendants are also not innocent third
8   parties only tenuously connected to infringement; rather, they have actively
9   distributed a vast array of software, based upon various different technologies, but
10  all with the object of promoting infringement. *See, e.g.,* Metro-Goldwyn-Mayer
11  Studios, Inc. v. Grokster, Ltd., 125 S. Ct. 2764 (2005).   By their own independent
12  acts, Defendants intentionally encouraged a particular, infringing form of use by the
13  users of the "file sharing" platforms Defendants distributed.   *See, e.g.,* Arista
14  Records LLC v. Lime Group LLC, 2011 WL 1742029 (2011); Columbia Pictures
15  Industries, Inc. v. Fung, 2009 WL 6355911 (C.D. Cal).   Far from being innocent
16  purveyors of "sharing" technologies co-opted by an international piracy community,
17  Defendants were in fact among the architects and developers of that international
18  piracy community and received billions in profits from their efforts.

19          5.      The underlying irony in this case is that, despite its endemic
20  inducement of the infringement of Plaintiffs' songs, Defendants' parent, CBS, does
21  not hesitate to cast itself as a defender of intellectual property rights when it
22  concerns its own financial interests.   For example, Defendants' parent company,
23  CBS, routinely harasses individuals and small websites which post small portions of
24  its own programming with "cease and desist" letters threatening crushing litigation.
25  When that does not work, it does not hesitate to sue.   For, example CBS has sued a
26  company owned by one of the Plaintiffs in this case, claiming that the website's
27  mere streaming of a portion of its U.S. news broadcasts has caused "loss of control
28  over the distribution of plaintiff's broadcast signals and copyrighted programming,"

1 | and asking for an order barring the website from streaming the shows.  Of course, in
2 | that case CBS ignored the relevant legal distinction between that conduct and the
3 | conduct alleged herein -- namely, that Section 111 of the Copyright Act authorizes
4 | "secondary transmissions of copyrighted works embodied in primary transmissions"
5 | and so is in no way like Defendants' promotion of file-sharing technology.  Still,
6 | CBS's hypocrisy could not be clearer.  CBS's and its subsidiaries' conduct in this
7 | instance goes beyond mere inducement to infringe; CBS's selective ignorance of
8 | copyright laws through CNET combined with its readiness to abuse the same laws
9 | and its superior market power to put smaller companies out of business for
10 | legitimate, protected rebroadcasts of its own programs, constitutes unfair and/or
11 | anti-competitive business practices as well.   Though it is referenced in this
12 | Complaint only to add context and foundation to the claims here, this latter point is
13 | the subject of an investigation being conducted by smaller re-broadcasters such as
14 | plaintiff Alki David's FilmOn into potential additional actions for anti-competitive
15 | claims and/or unfair business practices on the part of CBS and/or its affiliates.

16 |      6.     Defendants' willingness to talk out of both sides of their mouth with
17 | respect to intellectual property rights – at once fiercely defending intellectual
18 | property rights when it benefitted them and targetting a laissez faire pro-
19 | infringement community when it was more profitable to do so -- is illustrated by the
20 | conduct of CNET's co-founder and former CEO, Shelby Bonnie.  Bonnie served on
21 | CNET's Board of Directors until March 2007 and was an executive and Board
22 | member at CNET from 1993 to 2006.  As discussed below, during Mr. Bonnie's
23 | tenure with CNET, CNET made a fortune distributing millions of copies of
24 | Limewire and other file-sharing software designed to infringe, providing how-to
25 | guides on using file-sharing software for infringement, thereby targeting *and*
26 | growing a community of piracy.  In 2005, Mr. Bonnie also began to serve on the
27 | Board of Directors for Warner Music Corporation, a position he held until 2010.  In
28 | 2006, the RIAA, of which Warner Music Corporation is one of the most influential

1   members, instituted the massive litigation against Limewire that resulted in the 2010
2   Kimba Woods injunction.   During the course of that litigation, Warner Music
3   Corp.'s CEO, Edgar Bronfman Jr., was an outspoken critic of LimeWire and
4   claimed LimeWire caused "devastating" damages to Warner Music Group.
5   Bronfman has been quoted by Bloomberg as stating that he hoped the 2005 Supreme
6   Court ruling against Grokster would see LimeWire shut down voluntarily rather
7   than remain active: "When LimeWire kept operating it frustrated me greatly.  It was
8   devastating frankly."   Yet, while Bronfman pursued litigation against LimeWire
9   through the RIAA, the co-founder (and for a time still-Board member) Bonnie also
10   served on Warner Music Group's Board.  In fact, Warner Music Group recently
11   received a $12 million payment from LimeWire LLC as part of the $105 Settlement
12   negotiated by the RIAA in the LimeWire litigation.

13       7.      As the Courts and private entities such as the RIAA and MPAA have
14   found ways to limit the infringement wrought by P2P systems through extensive and
15   expensive litigation and other security measures, Defendants have continued to
16   promote and distribute the "next wave" of P2P technology designed specifically to
17   provide the newest and most effective way of defeating the efforts to prevent this
18   massive infringement – at all times knowing that the "new" P2P clients and
19   technologies they distributed were being used primarily for the same purposes of
20   continuing and furthering the massive infringement scheme as previous versions.
21   When courts have found specific software publishers or applications that Defendants
22   distributed liable for indirect infringement, Defendants have at best been minimally
23   reactive and have taken the most minimal steps necessary to foster the illusion of
24   compliance with the law.  In reality, Defendants know they are aiding and inducing
25   the same old offense, they are just making it harder for the infringer to get caught.
26   For example, after a recent court decision in 2010 holding LimeWire liable for
27   copyright infringement on a virtually unprecedented scale, Defendants stopped
28   distributing LimeWire and some of its more popular sister Gnutella applications

-7-

1  from its website. Defendants, however, continued to promote and distribute
2  extremely popular BitTorrent P2P clients that Defendants knew were, in light of
3  LimeWire's court-ordered demise, the new "next wave" of preferred P2P
4  infringement. Defendants were aware that massive users of LimeWire simply
5  shifted their infringing activities from the LimeWire network to the BitTorrent
6  network. In addition, even after the LimeWire decision, Defendants promoted and
7  sold programs that accessed and used the vast Gnutella network created by
8  LimeWire that survived the court decision.[1]

9      8.    As described more fully below, Defendants' essential role in the
10 massive infringement of Plaintiffs' works renders Defendants liable for that
11 infringement on any of the three doctrines of indirect or secondary liability as
12 articulated and developed in recent precedents concerning P2P technology.
13 Defendants at all times had the ability to control the actions of the direct infringers
14 by refusing to distribute and otherwise promote the software platforms Defendants
15 knew were the engines of the infringers' massive infringement. Defendants at all
16 times also could have ceased their efforts to instruct users as to the means of
17 copyright infringement through this new software, but, in naked pursuit of the
18 dramatic profits they made from that distribution, Defendants chose not to do so.
19 Defendants are also subject to contributory liability, because they had ongoing and
20 specific knowledge of the massive infringement carried out through the P2P
21 software and materially contributed to that infringement by distributing and
22 promoting the software, providing instruction as to its use and relative efficacy for
23 purposes of infringement and ensuring the direct infringers had access to the most

24

25     [1] As Defendants were and are well aware, after the litigation concerning Napster
and other P2P applications, P2P software developers switched to design strategies
26 that made the networks nearly impossible to disassemble after they were created to
27 ensure that the massive copyright infringement could continue even as Courts found
specific P2P applications indirectly liable for infringement.

28

1   recent and least detectable infringing technologies.  In addition, Defendants induced
2   direct infringement by clearly and purposefully targeting and catering their services
3   to the P2P infringement community.  In fact, on information and belief, Defendants
4   specifically encouraged CNET editors to promote and encourage P2P software and,
5   in general, the culture of copyright infringement that evolved in the P2P community.
6   Defendants' promotion of this massive piracy culture has been continuous and long-
7   running – in fact, Defendants publicized and promoted digital piracy even before the
8   advent of modern P2P software and then played a major role in promoting the
9   explosion of piracy caused after Defendants publicized Napster and the rest of the
10  first wave of P2P programs.

11          9.      Defendants have been the main distributor of several of the most
12  prominent P2P software platforms.  Defendants promoted these P2P systems in
13  order to directly profit from wide-scale copyright infringement.  For example,
14  Internet users downloaded more then *220 million* copies of LimeWire software from
15  Defendants' website, Download.com, prior to its belated removal from Defenants'
16  website after a federal injunction effectively shut LimeWire down.  This consisted
17  of 95 percent or more of all copies of LimeWire that were downloaded until
18  LimeWire was shut down by Court Order.  Download.com also was and is a major
19  source for other P2P software applications, including Audiogalaxy, KaZaa,
20  Grokster, Morpheus (174 million downloads), Phex, BitComet and FrostWire (32
21  million downloads).  Defendants received massive amounts of revenue from P2P
22  providers pursuant to a "Pay Per Download" program and also from advertising
23  revenues generated by advertisements placed on the download screens for P2P
24  software.  Defendants' business model has been so dependent upon P2P and file
25  sharing applications that entire pages of Download.com are designed specifically to
26  list and categorize these software offerings.  In fact, Defendants were well aware
27  that these software applications were used overwhelmingly to infringe when they
28

1  first partnered with LimeWire and other P2P providers, but ignored this fact in
2  exchange for a steady stream of income.

3          10.    Defendants furthered and enabled the massive P2P piracy scheme by
4  shepherding users from old technologies facing legal trouble to the most recent and
5  hardest to detect P2P technology.  For example, after the court order against the
6  early P2P platform Napster, on March 29, 2001, CNET published an article titled
7  "You Don't Need Napster to Keep the Music Playing."  The article notes that
8  "music lovers" should be feeling "besieged" because "teams of supervillains" such
9  as the RIAA were "working hard to prevent you from sharing your favorite music
10 online."  The article asks whether, after Napster becomes a fee-based service,
11 "downloaders hungry for free music find MP3s outside of the famous feline file-
12 sharing application."  CNET's "PowerDownloader" laments that it "may be too late
13 to save Napster" but suggests various P2P alternatives to Napster that "will let you
14 download and share music to your heart's content."  PowerDownloader then
15 suggests LimeWire and the Gnutella application Bearshare as viable P2P
16 alternatives to Napster.

17         11.    CNET often attempts to cast itself as merely a "news" outlet that
18 publishes articles concerning technology and consumer electronics.  However,
19 particularly with respect to the infringing file-sharing software it distributed and
20 promoted, CNET was most certainly not a neutral "journalist" passively and
21 objectively reporting on new technology.  To the contrary, CNET abandoned all
22 plausible claims to any kind of "news" function – which legitimate function might
23 entail, for example, merely reporting on how Bittorrent and LimeWire were being
24 used for infringement by others – and instead chose to target the infringement
25 community, actively distribute and promote the infringing file-sharing software, and
26 profit heavily from doing so.  Inducing infringement, not reporting on it, was
27 Defendants' business model. As described further below, Defendants' words and
28

1   deeds show a clear purpose to cause and profit from third-party acts of infringement.

2   As the United States Supreme Court held in its groundbreaking *Grokster* opinion:

3       Inducement liability goes beyond [encouraging a particular consumer to infringe copyright], and the distribution of a product can itself give rise to

4       liability where evidence shows that the distributor intended and encouraged the product to be used for infringement. In such a case, the culpable act is not

5       merely the encouragement of the infringement but also the distribution of the tool intended for infringing use. 545 US 940.

6   In this case, Defendants' culpable acts included, among others described in detail

7   below, both the distribution of the infringing tool and the promotion of their

8   infringing uses. This is not the function of legitimate journalism.

9       12.   As in the *Grokster* opinion, here Defendants' unlawful objective is

10   unmistakable and "goes beyond distribution as such and shows a purpose to cause

11   and profit from third-party acts of infringement." Id at 941.   As the district court

12   noted on remand in the *Grokster* case, "Plaintiffs need not prove … specific actions,

13   beyond product distribution, that caused specific acts of infringement.   Instead,

14   Plaintiffs need prove only that … [Defendants] distributed and product with the

15   intent to encourage infringement." 454 F Supp 2d 966, 984 (CD Cal 2006).  There

16   is no doubt that there is evidence of infringement on a massive scale here.  There is

17   also <u>overwhelming</u> evidence of Defendants unlawful objective and intent to

18   encourage infringement.  Through the articles and reviews described in detail below

19   that provided instructional manuals for using P2P software to infringe copyrights,

20   Defendants broadcasted (and continue to broadcast) a message designed to induce

21   others to infringe copyrights.  In addition to that direct evidence, there is a mountain

22   of evidence from which an unlawful objective is clearly and readily inferred.

23   Defendants' promotional efforts, advertising efforts, actual advertising and

24   communications expressed (and continue to express) an intent to target the illegal,

25   infringing part of the P2P community.    In particular, throughout its history,

26   Defendants have targeted former users of prior, "dead" infringing technologies like

27   Napster and actively promoted the "next wave" of new, as-of-yet not shut down,

28   technologies. As Defendants and the world are well aware, a significant part of the

P2P file-sharing community exists with the sole purpose of finding new ways to infringe after old technologies are ruled by courts to be illegal and shut down. This community was not only encouraged and aided in its purpose through Defendants' distribution network, it became among Defendants' most loyal (and most profitable) group of customers. Defendants' intent to target this infringing group is at least implicit, if not explicit, in the reviews and "file-sharing smackdowns" published by CNET, and on information and belief was an express goal clearly articulated in internal communications and advertising designs. Defendants <u>never</u> took any affirmative steps to diminish the use of P2P software for infringement (aside from the self-serving action of ceasing to distribute certain technologies <u>after</u> they were held infringing by a court and the posting of meaningless and ineffectual messages). In addition, Defendants' business model depended on the high-volume distribution of file-sharing software that was overwhelmingly used for infringement. Defendants furthermore provided instructions on how to use the software it distributed for infringing purposes, such as how to locate and download copyrighted material. The software products distributed by defendant were developed and designed to ensure their use for infringing purposes. Defendant was aware of these design goals and indeed, touted and promoted features of the programs designed for infringement. At times under the guise of "editorial comment," and the additional promotion of certain technologies, Defendants also took active steps to protest and frustrate the enforcement efforts of copyright holders.

13.     Nothing about Defendants' promotion of P2P and digital piracy is accidental or incidental. Defendants made conscious business decisions to find ways to profit from the massive copyright infringement taking place over P2P networks, and indeed did their best to popularize and expand P2P networks in order to increase their profits. Defendants' activities vis a vie P2P software is especially egregious, given that CBS' Defendants own the rights to a massive catalog of television programming and other intellectual property that has been and continues

-12-

1  to be persistently infringed over the same P2P networks it helped assemble and
2  grow through CNET and Download.com.   Defendants made a cynical decision to
3  attempt to recapture whatever profits lost through the infringement arising from P2P
4  networks by profiting from the popularity of those networks through Download.com
5  and CNET P2P revenues.   By helping construct, expand and preserve the P2P
6  networks, Defendants did much more than "recoup" their (self-inflicted) losses from
7  digital piracy, but rather directly and massively profited from the infringement of <u>all</u>
8  the artists whose work was illegally shared on P2P networks.   Defendants never
9  offered to share any of the income made from their promotion of infringement with
10 Plaintiffs or anyone other copyright owners whose work was persistently infringed
11 by P2P systems distributed and promoted by Defendants.

12        14.     Plaintiffs are artists who work in the fields of music and film.   They
13 wrote, produced, distributed, sold and/or licensed songs, movies and other
14 copyrighted works that have been infringed by Defendants, including without
15 limitation through Defendants' distribution and promotion of P2P software that has
16 been used to copy and distribute Plaintiffs' works.   Defendants must compensate
17 Plaintiffs for the damages they caused and be ordered to cease future infringement.

18                          **JURISDICTION AND VENUE**

19        15.     The Court has subject matter jurisdiction over the claims asserted
20 herein pursuant to 28 U.S.C. §§ 1331 and 1338(a).

21        16.     The Court has personal jurisdiction over Defendants because each
22 resides and/or may be found in California, does systematic and continuous business
23 in California, and has performed acts directed at and causing harm in California
24 which give rise to this Complaint.

25        17.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and
26 28 U.S.C. § 1400(a).

27

28

COMPLAINT

1

**PARTIES**

2

**Plaintiffs**

3       18.   Plaintiffs are the legal and beneficial owners of copyrighted works that

4   have been infringed by Defendants.

5       19.   Plaintiff Alkiviades David is a citizen of the United Kingdom and

6   resident of the State of California.

7       20.   On information and belief, Plaintiff Sugar Hill Music is or was at

8   relevant times a corporation organized under the laws of the State of New York with

9   offices in New York and California.

10      21.   Plaintiff Solid Productions is a resident of the State of California with

11   its principal place in Los Angeles, California.

12      22.   Plaintiff Steven Batiz, professionally known as DJ CMS, is a citizen

13   and resident of the State of New York.

14      23.   Plaintiff Tony Bell, professionally known as TC Izlam, is a citizen and

15   resident of the State of California.

16      24.   Plaintiff Detron Bendross is a citizen and resident of the State of

17   Florida.

18      25.   Plaintiff Derrick Braxton is a citizen and resident of the State of New

19   York.

20      26.   Plaintiff Reginald Brooks is a member of the hip hop group High

21   Council and a citizen and resident of State of New York.

22      27.   Plaintiff Elijah Brown, professionally known as DJ Chipman, is a

23   citizen and resident of the State of Florida.

24      28.   Plaintiff Horace Brown is a citizen and resident of the State of New

25   York.

26      29.   Plaintiff Oscar Brown is a citizen and resident of the State of New

27   York.

28

-14-

30.     Plaintiff Luther Campbell is a citizen and resident of the State of Florida.

31.     Plaintiff Jonathan Carlton, professionally known as Lord Piff, is a citizen and resident of the State of New York.

32.     Plaintiffs Attrell and Jarrett Cordes, professionally know as PM Dawn, are citizens and residents of New Jersey.

33.     Plaintiff Solomon Conner is a member of the hip hop group H-Town and is a citizen and resident of the State of Texas.

34.     Plaintiff Dayquan Davis, professionally known as Droptop Slim, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

35.     Plaintiff Douglas Davis, professionally known as Doug E Fresh, is a citizen and resident of the State of New York.

36.     Plaintiff Kareem Davis, professionally known as Manson Batez, is a citizen and resident of the State of New York.

37.     Plaintiff Solamin Davis, professionally known as Trips, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

38.     Plaintiff Emmanuel Ramone DeAnda is a member of the R&B group Pretty Ricky and a citizen and resident of the State of Florida.

39.     Plaintiff Drew Carter, professionally known as Grandmaster Dee, is a citizen and resident of the State of New York.

40.     Plaintiff Nacolbie Edwards, professionally known as GLAM.I.ROCK, is a citizen and resident of the State of California.

41.     Plaintiff Vancito Edwards, professionally known as Dr. Luv, is a citizen and resident of the State of New York.

42.     Plaintiff John Fletcher, professionally known as Ecstasy, is a citizen and resident of the State of New York.

43.     Plaintiff Willie Finch, professionally known as Chill Will, is a citizen and resident of the State of North Carolina.

44.     Plaintiff Isaac Freeman, Jr., professionally known as Fat Man Scoop, is a citizen and resident of the State of New York.

45.     Plaintiff Darryl Gibson, professionally known as Positive K, is a citizen and resident of the State of South Carolina.

46.     Plaintiff Mitchell Graham, professionally known as Peso 131, is a citizen and resident of New York.

47.     Plaintiff Jalil Hutchins is a member of the hip hop group Whodini and is a citizen and resident of the State of Georgia.

48.     Plaintiff Emanon Johnson, professionally known as Emanon, is a citizen and resident of the State of New York.

49.     Plaintiff Keith Jones, professionally known as DJ Alamo, is a citizen and resident of the State of New York.

50.     Plaintiff Oran "Juice" Jones is a citizen and resident of the State of Texas.

51.     Plaintiff Tarsha Jones, professionally known as Miss Jones, is a citizen and resident of the State of New Jersey.

52.     Plaintiff Nailah Lamees, professionally known as Nicole Lyles, is a citizen and resident of the State of California

53.     Plaintiff Dana McCleese, professionally known as Dana Dane, is a citizen and resident of the State of New York.

54.     Plaintiff Barry Moody, professionally known as Barry Bee, is a citizen and resident of the State of New York.

55.     Plaintiff Jeff Redd is a citizen and resident of the State of New York.

56.     Plaintiff Quame Riley, professionally known as Lil' Vicious, is a citizen and resident of the State of New York.

57.     Plaintiff Anthony Robinson, professionally known as Pretty Tone Capone, is a citizen and resident of the State of New York.

58.     Plaintiff Nicholas Sanchez, professionally known as Nick Gleamz, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

59.     Plaintiff Jonathan Shinhoster, professionally known as "J-Shin," is a citizen and resident of the State of Florida.

60.     Plaintiff Diamond Smith, professionally known as "Baby Blue," is a member of the R&B group Pretty Ricky and a citizen and resident of the State of Florida.

61.     Plaintiff Reminisce Smith, professionally known as Remy Ma, is a citizen and resident of the State New York.

62.     Plaintiff Gerald Spence, professionally known as Jerry Hubcap, is a citizen and resident of the State of New York.

63.     Plaintiff Chris Stokes is a citizen and resident of the State of California.

64.     Plaintiff Irene Stokes, professionally known as Mama, is a citizen and resident of the State of California.

65.     Plaintiff Juanita Stokes is a citizen and resident of the State of California

66.     On information and belief, William Tennyson is deceased and the Tennyson Estate is located in the State of Georgia.

67.     Plaintiff Carl Thomas is a citizen and resident of the State of New York

68.     Plaintiff Jeff Thomkins, professionally known as JT Money, is a citizen and resident of the State of Florida.

69.     Plaintiff Rondell Turner, professionally known as Ron Brownz, is a citizen and resident of the State of New Jersey.

70.     Plaintiff Ricky Walters, professionally known as Slick Rick, is a citizen and resident of the State of New York.

1    71.    Plaintiff Kevin Williams, professionally known as DJ Kev-Ski, is a
2    citizen and resident of the State of New York.

3    72.    Plaintiff Yolanda Whitaker, professionally known as Yo Yo, is a
4    citizen and resident of the State of California.

5    73.    Plaintiff Joseph Williams, professionally known as Just-Ice, is a citizen
6    and resident of the State of New York.

7    74.    Plaintiff Raheem Williams, professionally known as Amen, is a citizen
8    and resident of the State of New York.

9    75.    Plaintiff Case Woodward, professionally known as Case, is a citizen
10   and resident of the State of New York.

11                              **Defendants**

12   76.    Defendant CBS Interactive, Inc. is a Delaware corporation with its
13   principal place of business at 235 Second Street, San Francisco, California 94105.

14   77.    Defendant CNET Networks, Inc. is a Delaware corporation and a fully-
15   owned subsidiary of CBS Interactive.  CNET's principal place of business is 235
16   Second Street, San Francisco, California 94105.

17   78.    Each Defendant acted in concert with each other and as the principal,
18   agent, or joint venture of, or for, other Defendants with respect to the acts,
19   violations, and common course of copyright infringement alleged by Plaintiffs.

20                                **FACTS**

21                       **P2P File Sharing Systems**

22   79.    P2P file sharing networks are systems which allow users to connect to
23   one another and transfer files located on each other's hard drives.  In order to
24   participate in these networks, each user must download and install on the user's
25   computer a software program—commonly known as a "client"—that facilitates the
26   file transfers. Examples of P2P clients include Napster, Aimster, KaZaa, Morpheus,
27   Grokster and LimeWire.

28

80.     P2P clients provide an interface for users to search and obtain copies of files located on their respective file sharing networks.  Depending on which P2P client is employed, users can filter results by type of file (*e.g.*, audio or video), file name, artist and other identifying information.  Many P2P clients, including those found liable in some of the most infamous copyright infringement cases of the past decade, are (or were) specifically designed to locate music files by name of the song or artist and are (or were) targeted at audiences well-known for their desire to infringe copyrights.

81.     File sharing networks depend on users to actually "share" their files.  P2P clients are specifically designed to facilitate this process.  In most cases, the client automatically searches a user's computer for "shareable" files, typically audio and video files.  Clients also often penalize users with slower download speeds or other decreased functionality if they do not share "enough" files with other users on the network.  The purpose of this functionality is clear: users must share files if they wish to enjoy the full benefits of the P2P network, and the client will make all files available for sharing unless the user specifically opts out of this option.

82.     As Napster's one-time success proved, there is a large demographic of internet users who seek to obtain free copies of their favorite music regardless of copyrights.   The sheer size of this group demonstrated that P2P clients could generate massive revenues if they designed a user experience that expressly catered to copyright infringement, thereby drawing users to their advertisements and pay services.  When Napster was shut down due to court-ordered injunction, numerous P2P clients stepped in to fill the void, a fact well known and highlighted by Defendants to their users.  These P2P clients, including but not limited to Aimster, Grokster, KaZaa, Morpheus and LimeWire, actively marketed themselves to Napster's former customers, a task that Defendants aided at every step.  Now that LimeWire has been shut down, another generation of P2P clients based on the BitTorrent technology, including BitComet, BitTorrent and uTorrent, have stepped

1   in to fill the void left by LimeWire – again, a fact well known to Defendants and its

2   users. Here again, the BitTorrent clients are actively marketing themselves to the

3   same infringement community that used LimeWire and other Gnutella clients and

4   here again, these clients have received Defendants' aid at every step.

5   **LimeWire and the Gnutella Network**

6   83.   To use just the most recent P2P client found liable for copyright

7   infringement, the LimeWire began providing its P2P network in or around August

8   2000. In order to attract users to their service, LimeWire  advertised on other P2P

9   networks and made statements comparing LimeWire's user experience to other file

10  sharing clients. Above and beyond mere advertisements, LimeWire  specifically

11  designed its client to be highly efficient at finding and downloading copies of

12  copyrighted sound recordings.

13  84.   There were two forms of the LimeWire software (updated in several

14  versions over the years, each of which was made available on Download.com). The

15  first was "LimeWire Basic," a free version of the P2P client.  The second was

16  "LimeWire PRO," which sold for approximately $19 and ostensibly provided

17  purchasers with faster downloads.  Both forms of LimeWire were compatible with

18  each other, and users could share files with each other no matter which form of

19  LimeWire they possessed.

20  85.   When a user first installed LimeWire, the program automatically

21  searched their hard drive for media files and made them available for other users to

22  download via the P2P network.  In order to ensure that the maximum number of

23  files were "shareable" at any given time, LimeWire was designed to automatically

24  open when a user started their computer. This meant that turning on one's computer

25  automatically logged the user into the P2P network and made the selection of files

26  across that network as vast as possible.

27  86.   Another method that LimeWire employed to ensure the maximum

28  amount of available files—thereby increasing LimeWire's reputation as a desirable

1  copyright infringement tool—was to maximize the number of available shared files
2  by automatically saving them in a "shared" folder on the user's hard drive. If a user
3  turned off this feature or opted to have their files saved in a non-shared folder, they
4  were labeled a "freeloader" by the LimeWire software and ran the risk of being
5  refused future downloads by other users who could choose to block sharing with
6  freeloaders. LimeWire actively discouraged freeloaders on its website, stating, for
7  example, "If you're not sharing enough files, users with certain connection
8  preferences won't let you connect to them for downloading. For this reason, we
9  recommend all LimeWire users share generously with one another." In other words,
10  share files or you will not be able to infringe as easily.

11       87.   LimeWire also designed its interface to maximize users' ability to
12  quickly locate and obtain copies of copyrighted materials. Users could search by
13  music genre, song name, artist name or album name. When searches yielded
14  multiple sources for the same copyrighted materials, LimeWire displayed the
15  connection speed of each source (*i.e.*, how fast that user's internet connection was)
16  so that the searching user could choose the fastest download option. Using these
17  features in combination, LimeWire users were able to locate and download
18  copyrighted sound recordings in the shortest amount of time possible.

19       88.   On May 25, 2010, in the United States District Court for the Southern
20  District of New York, Judge Kimba Wood found LimeWire liable for massive
21  copyright infringement. Later that same year, Judge Wood permanently enjoined
22  LimeWire from all further infringement activities. In doing so, the Court found that,
23  among other things:

24       •     LimeWire "intentionally encouraged direct infringement" by its users;
25       •     the LimeWire software application was used "overwhelmingly for
26  infringement" and allowed for infringement on a "massive scale";
27       •     LimeWire and its principals knew about "the substantial infringement
28  being committed" by LimeWire users;

-21-

1          •     LimeWire marketed itself to Napster users, who were known copyright

2          infringers, and promoted LimeWire's infringing capabilities to those users;

3          •     LimeWire employed a business model that depended on mass

4          infringement, relying on "massive user population generated by" the

5          LimeWire software's "infringement-enabling features"; and

6          •     LimeWire "actively assisted infringing users" in their infringement

7          efforts and tested the LimeWire client software by searching for copyrighted

8          material.

9          89.    It was only *after* the order issued by judge Kimba Wood in *Arista*

10 *Records LLC v. Lime Group LLC*, 2010 WL 4256219 (S.D.N.Y.)(stipulated

11 injunction) – which required LimeWire to disable the "searching, downloading,

12 uploading, file trading … and/or all functionality" of the software and ordered

13 LimeWire to do its best to disable copies of the software already on the market –

14 that Defendants removed LimeWire and certain other popular Gnutella applications

15 from their websites. However, even then, Defendants *at the very least* were grossly

16 negligent in their efforts to cleanse their web sites of Gnutella-based applications,

17 and vestigial references to Gnutella-based applications and even references to

18 LimeWire-based technology remain on Download.com. Ironically, on October 26,

19 2010, CNET reported on the injunction against LimeWire in an article by Greg

20 Sandoval titled "Judge slaps Lime Wire with permanent injunction." A commenter

21 on that article noted "Limewire is So 2001. All the real Pirates moved on to bt

22 [Bittorrent] or slsk [soulseek, another P2P technology]."

23          90.    Of the many P2P clients that remain in existence, most include features

24 nearly identical or identical to those found in LimeWire. Phex, as just one example,

25 is an open source, multiplatform, spyware free Gnutella client. The publisher's

26 description available on Download.com emphasizes its suitability for file-sharing

27 activities: "You can search for, download, and share all types of file formats … it is

28 compatible with LimeWire, BearShare, Morpheus and all other P2P Gnutella

1 | clients." Phex users continue to trade copyrighted material, including works
2 | belonging to Plaintiffs, over the Gnutella network constructed and promoted by
3 | Defendants and others.

4 | ### BitComet and the BitTorrent Network(s)

5 | 99. BitTorrent is another kind of P2P file-sharing protocol developed after
6 | the Gnutella protocol. As with Gnutella and P2P protocols, BitTorrent users
7 | download content directly from the computer of other users and not directly from a
8 | centralized server. Unlike other earlier protocols, however, BitTorrent introduced a
9 | novel method of downloading content. BitTorrent works by downloading discrete
10 | pieces or parts of a digital file from a number of other computers simultaneously.
11 | That is, the file being shared is not downloaded from a central server or even a
12 | specific peer node as in the Gnutella network. Rather, BitTorrent allows users to
13 | join a "swarm" of hosts to download and upload from each other at the same time.
14 | A user who wants to upload a file first creates a small "torrent" file that describes
15 | the content they wish to share and then distributes that torrent by conventional
16 | means such as email or making it available for download from a website. Then, the
17 | user makes the content-containing file itself available by acting as a "seed." Those
18 | who obtain the torrent descriptor file can then give it to their BitTorrent nodes
19 | which, acting as peers, download it by connecting to the seed and/or other peers.
20 | The file being distributed is divided into segments called pieces. As each peer
21 | receives a new piece of the ultimate file it becomes a potential source of that piece
22 | to other peers, thereby freeing the original seed of the need to transfer a copy of the
23 | file to every user who wants a copy. By this means, BitTorrent spreads the task of
24 | distributing a digital file among all users who want that file. Using BitTorrent, it is
25 | possible for the original seed to send out only one single copy of the file itself but
26 | thereby enable an unlimited number of distributions to other users. BitTorrent
27 | technology relies on a number of mechanisms to accomplish the download of a
28 | given file, including: 1) a software application that users use to download the

1   content called a client; 2) "torrent websites" which allow users to search for and
2   then download the torrents they desire; and 3) servers, known as "trackers," which
3   manage the download process. In a BitTorrent system, the downloading of content
4   occurs from multiple sources at the same time, thereby allowing for larger
5   downloads to be completed more efficiently. BitTorrent clients and trackers work in
6   tandem to allow users to visit a torrent site, download digital files, keep track of
7   those downloaded files, as well as discover additional persons from which to
8   download the file.

9       100. BitTorrent has become an extremely popular means of transferring files
10  over the Internet. It is now one of the most common protocols for transferring large
11  files and numerous BitTorrent clients are available for a variety of computing
12  platforms. By some estimates, approximately 50% of all Internet traffic is
13  BitTorrent activity. BitTorrent has also been widely adopted among digital pirates
14  and has become one of the preferred means of digital piracy, particularly in the
15  wake of the recent court decision shutting down LimeWire and impacting the
16  Gnutella network. A simple Google search of "torrent music" yields a half billion
17  results and page after page of websites providing copyrighted music and movies via
18  torrent. Features of the BitTorrent technology readily lend itself to illegal file-
19  sharing. For example, the sharing of numerous discrete portions of files makes it
20  harder for ISPs to track and block file-sharing activity. Many BitTorrent clients are
21  specifically designed to locate music files, disguise the download of copyrighted
22  material and were targeted at notorious copyright-infringing audiences.

23       101. Through its website Download.com, Defendants have been one of the
24  premier distributors of BitTorrent software. The programs uTorrent, Frostwire and
25  BitTorrent have collectively been downloaded approximately a hundred million
26  times from Download.com. The PC-version of uTorrent was downloaded over
27  90,000 times in the first week of October 2011. Defendants have actively promoted
28  the download of BitTorrent clients. For example, at the bottom of the

1  Download.com web-page containing a link to download uTorrent , CNET provides
2  an section called "MORE POPULAR P2P & FILE-SHARING SOFTWARE
3  DOWNLOADS." The five programs listed in this section on October 5, 2011 were
4  all BitTorrent protocols: uTorrent, BitTorrent, BitComet, Frostwire and Movie
5  Torrent. The section provides links to the download page for each application, as
6  well as a link that invites users to "See all P2P & File-Sharing Software
7  downloads." BitComet's website displayed and still displays a "Download Now"
8  button directly linking to Download.com. Even Defendants removed certain
9  popular Gnutella clients from its website in the aftermath of the court decision
10 concerning LimeWire, it has continued to provide nearly unrestricted access to the
11 BitTorrent applications that were designed for the same infringing purposes as the
12 Gnutella clients and continue the massive program of piracy carried out by those
13 applications.

14     102. At all times, Defendants were aware that BitTorrent clients were
15 designed for and marketed toward the illegal downloading of copyrighted music.
16 Defendants have known about BitTorrent's use for massive infringement since the
17 very inception of the technology. On January 5, 2005, CNET News staff writer
18 John Borland penned an article entitled "A New Hope for BitTorrent?" The article
19 concerns changes to the BitTorrent protocol specifically enacted to respond to
20 litigation initiated by copyright-owners. "Just weeks after legal attacks crippled the
21 popular BitTorrent file-swapping community, an underground programmer from its
22 ranks has stepped forward to announce new software designed to withstand future
23 onslaughts." The article remarked on the "shifting loyalties … now familiar
24 phenomenon in the peer-to-peer world, as lawsuits from the record industry or
25 Hollywood studios have repeatedly driven users away from once-popular [peer to
26 peer networks] … in each case, new services have eagerly risen to take their place,
27 despite legal risks" (emphasis added). The litigation initiated by copyright holders
28 against BitTorrent "raise[d] the potential of mass migration for millions of people

-25-

1   around the world who have grown accustomed to using the technology to download
2   movies, TV shows, music and software." At that time, BitTorrent was "uniquely
3   vulnerable" to legal attacks from copyright owners, because it has required that links
4   to torrents be posted on websites. The article notes that BitTorrent responded to the
5   threat of litigation by transforming BitTorrent "into a decentralized, searchable
6   network similar to KaZaa or eDonkey." Defendants knew, then, that BitTorrent's
7   very network architecture reflected a conscious decision to shield copyright
8   infringement from legal process. Defendants were also aware that, after
9   BitTorrent's architecture re-design and decentralization, the network remained a
10  massive engine of software infringement. In 2008, the publisher's description of
11  BitComet available on CNET.com stated that "BitComet's software client allows
12  you to quickly download high-quality digital content such as video, music & games
13  … it leverages a community of over 70 million users to securely deliver files to your
14  PC faster than anything else out there." A June 18, 2007 news article available on
15  CNET, stated "while the technology remains a really great way to take the burden
16  off servers and put it onto the user, it <u>remains a hotbed for piracy of music, movies,</u>
17  <u>software, and other intellectual property</u>" (emphasis added).

18      103. BitComet and uTorrent incorporate a number of features designed to
19  facilitate and enable copyright infringement:

20      • BitComet recently introduced a VIP feature that adds support for
21          "Anonymous Downloads." The service expands BitComet's paid
22          subscription service which provides for accelerated downloading of
23          copyrighted content. In April of this year, BitComet expanded the
24          service to include an option to download all torrents anonymously, in
25          order to facilitate the downloading of copyrighted material. The
26          "anonymous" downloads are handled by BitComet's own servers
27          exclusively, hiding the IP address of the user. A "BitComet
28          Spokesman" explained the VIP service to the Website Torrentfreak (the

1     self proclaimed website where "breaking news, BitTorrent and

2     copyright collide"): "If VIP members enable anonymous downloads

3     our remote servers will initiate all peer and tracker communications

4     and download the data on behalf of the VIP member, so the member's

5     actual IP address isn't shared with any of the peers or trackers."

6     BitComet provides VIP plans for $4.99 for a 10 GB plan and a 100 GB

7     plan for $19.99.

8     • uTorrent contains a feature that allows users to enable a "Protocol

9     Encryption" that allows users to circumvent restrictions designed in

10     part to prevent piracy. Some Internet Service Providers ("ISPs")

11     actively interfere with P2P activities by reducing their bandwidth

12     requirements. This causes uTorrent and other file sharing download

13     speeds to become slow. To avoid this, uTorrent and other clients

14     developed an encryption protocol to prevent ISPs from identifying

15     BitTorrent traffic.

16     • The Publisher's Description of BitComet available on Download.com

17     notes that BitComet incorporates an "IP Filtering" function. IP

18     filtering is a software feature that protects copyright infringers by

19     blocking the IP addresses of entities such as the RIAA and MPAA that

20     conduct investigations of P2P networks looking for users sharing

21     copyrighted files without permission. IP Filtering software helps

22     pirates evade detection by maintaining a list of the IP addresses used to

23     conduct these investigations while still allowing pirates to

24     communicate and exchange files with "safe" IP addresses.

25     • The BitComet website contains a section listing popular torrent

26     websites that are ranked by the number of votes they have received

27     from BitComet users. Each torrent website contains a short

28     description. These descriptions unabashedly advertise the availability

of copyrighted material.  The website "I Love Torrents" is described as "top quality torrents, one of the 1st to get all the very latest movie and audio torrents."  "GunNer TorRemTs" provides BitComet users with "Anything u want, anything u need!  Just visit us and we promiss you won't be disappointed."  Many of the torrent sites are located in foreign jurisdictions notorious as digital piracy havens.

- Like LimeWire, uTorrent employs various methods to ensure the maxiumum amount of available files (and thereby increasing uTorrent's reputation as a desirable copyright infringement tool) by encouraging users to "seed" files.  According to uTorrent's website, "Seeding is where you leave your BitTorrent client open after you've finished your download to help distribute it (you distribute the file *while* downloading, but it's even more helpful if you continue to distribute the full file even after you have finished downloading.)  Chances are that most of the data you got was from seeds, so help give back to the community!  It doesn't require much – uTorrent will continue seeding until the torrent is removed ... Proper practice is to seed until the ratio of upload:download is at least 1:1."  After downloading a file, uTorrent automatically makes the user a "seed" for other downloads.  On information and belief, both uTorrent and BitComet employ various measures to discourage users from "leeching" (downloading files without making them available for upload).

104.    Defendants continue to provide numerous BitTorrent clients for download and remains an active advocate of the primary uses of the software for infringement.  An October 2, 2011 user review of Version 3.0 of uTorrent posted on Download.com listed as a "con" of the program that "Legal issues for uploading

-28-

1  copy-right protected material (no way around it if you download it)." In fact, CNET
2  provides a link to a third-party website to download a BitTorrent client named
3  "Offsystem Anonymous Torrent Download." Next to the Download button,
4  Download.com displays a screenshot from the application showing the P2P
5  application in operation. In the screenshot, a number of copyrighted music files are
6  readily visible, including Black Sabbath's "The Wizard," "Lay All Your Love on
7  Me" by Erasure, "I'll be a long time" by the Offspring and even the software
8  program Microsoft Office 2007. CNET's sister site ZDNet.com describes the
9  program as a "next generation" P2P platform even more undetectable than existing
10  BitTorrent technology: "The idea of the Offsystem is to be [sic] online storage
11  solution all over the world by a constantly growing peer-to-peer network: Upload a
12  file into the Offsystem in Asia, turn off the computer and download it from the
13  Offsystem network with another machine in America a few weeks later. The file
14  will still be available in the Offsystem. That is the library of the future for any kind
15  of media and allows anonymous downloading of files. No tracking of the IP is
16  possible, as only blocks are shared, not files." Offsystem promises a new kind of
17  P2P system that guarantees anonymity to its users.

18  **Defendants' Participation In And Profiteering From Infringement**

19      105. Download.com, found at http://download.cnet.com, is one of
20  Defendants' stable of websites. As the name implies, Download.com offers
21  programs and applications for download. In addition to this service, the site also
22  provides reviews written by CNET editors, allows program-specific comments from
23  users, and is organized in such a way as to maximize a user's ability to find and
24  obtain copies of the program or application they desire.

25      106. Software publishers must be approved to have their software listed on
26  Download.com. In order to do so, they first go through an application process on
27  Upload.com, found at https://upload.cnet.com. On this site, Defendants advertise
28  that software publishers should "[p]romote your software on the *largest distribution*

-29-

1    *network in the world.*" As they further state, "Upload.com is the central destination
2    to submit and promote your software on CNET Download.com and other sites in our
3    growing distribution network."

4       107. After a software publisher creates a developer account, which requires
5    Download.com staff approval, they may submit their program for review. In this
6    application, the publisher categorizes the program and fills out a detailed
7    explanation of its features and purpose. After reviewing this application,
8    Download.com's staff decides whether to permit the program on Download.com and
9    where to place it on the website.

10      108. As developers release new versions of their software, they must also
11    update their application to Download.com. Included in this update are explanations
12    of new features, new functionality, improvements in user interface and experience,
13    and any other difference between the new and previous version. As with the initial
14    application, the Download.com staff reviews and decides whether to allow the
15    listing.

16      109. At each step in the initial application and subsequent update process,
17    Download.com possessed the ability to refuse to list the publisher's software,
18    thereby conferring upon Download.com the ability to supervise and control any
19    infringing activity taking place on its website. If Download.com staff did not
20    believe the software should be accepted, they could either outright refuse to list it or
21    mandate changes to the program itself. At no point was Download.com obligated to
22    list programs submitted for approval to Upload.com. Further, Download.com was
23    within its full rights to *remove* listings at its discretion. Defendants also could have
24    simply stopped reviewing the software being used to carry out large-scale
25    infringement in ways that informed users of the best and least detectable ways of
26    downloading copyrighted material, deleted user comments or reviews that also
27    highlighted infringing uses of software and declined to publish materials that
28    encouraged the "wild west" mentality of the pirate community. The only thing

1  preventing Download.com from publishing and disseminating information that
2  enabled copyright infringement was Defendants' own policy of promoting and
3  profiting from such infringement.

4      110. Defendants generate revenue from Download.com in several ways.
5  First, software publishers have the option to pay for a "Basic" or "Premium" listing
6  package on Upload.com. Although there is also a "Free" option, the former two
7  types of package offer increased benefits for a monthly subscription fee.[2] Second,
8  companies may advertise directly with Download.com and seek to place their ads on
9  popular download listings. Third, Defendants advertise their other websites on
10  Download.com, driving traffic and revenue to those sites. Fourth, Defendants offer
11  a program called Pay-Per-Download ("PPD"), which they push heavily on
12  Upload.com and which offers several unique options.

13      111. PPD is described as a "performance-based program that allows you to
14  increase downloads by up to 150 percent, while maintaining control of your costs."
15  Participants in the program obtain a "top-five 'sponsored' listing" for their product
16  in their respective Download.com category, out-of-category promotional rotation on
17  Download.com pages, including on "post-download pages and other placements in
18  [Defendants'] network," and 10 additional keywords to enable Download.com users
19  to find the publisher's program. Participants also have the option to pay only for
20  initiated downloads from unique users and the ability to choose "the bid amount and
21  monthly spending cap for your campaign."

22      112. PPD is designed to offer adaptable advertising options for software
23  publishers and generate strong cash flow for Defendants. On information and belief,
24  several P2P client publishers, including LimeWire , used and use the PPD program

25  ——————————————

26    [2]  In the past, Defendants also offered different listing packages, including
27  "Silver" and "Platinum" packages. These packages offered increased benefits akin
    to their current iterations, the Basic and Premium Upload.com accounts.
28

1   and generated substantial revenues for Defendants.  In 2009 alone, Juniper Research
2   estimated that Defendants generated $10 billion in revenues from the PPD program.
3   At the time, LimeWire was and had been Download.com's top download for years.
4   Several other P2P clients were variously in Download.com's "Top" downloads in
5   the same period.

6          113.  Defendants also derived substantial revenues from advertisements of
7   which they were aware on Download.com and other CBS Interactive websites that
8   urged users to infringe copyrights by downloading P2P clients from Download.com.
9   In May 2011, for example, users who searched for LimeWire, FrostWire, KaZaa,
10  LuckyWire, and other P2P clients on Download.com found advertisements saying
11  "Download Music for Free," "Free Music Download," and "Download Music Free,"
12  "100% Free Music Downloads," and "Download Free MP3s."  Substantively similar
13  advertisements were available and prevalent on Download.com and other CBS
14  Interactive websites from at least 2000 through the present, and they generated
15  substantial revenues for Defendants from users who were seeking copyright
16  infringement tools.

17         114.  At all relevant times, Defendants possessed the right and ability to
18  prevent these advertisements and/or require that they not urge users to infringe
19  copyrights. As CBS Interactive states in its "Advertiser Acceptance Policy," "CBS
20  Interactive reserves the right to: (a) refuse any advertising/advertisers; ... (c) take
21  down ads it deems inappropriate; and (d) make changes or additions to this policy."
22  It further states that "Final and ongoing approval of all creative material [*i.e.*,
23  advertisements] is at the sole discretion of CBS Interactive."  Despite this control
24  and review, however, Defendants never opted to ban advertisements calling for
25  infringement and, instead, supported these ads because they drew in substantial
26  revenue. At all times relevant to this dispute, Defendants were aware that the ads on
27  Download.com and its affiliate websites promoted copyright infringement via
28  LimeWire, BitTorrent and other P2P clients.

-32-

1    115. Additionally, due to P2P clients' popularity, publishers of other types
2    of software advertised heavily on P2P download screens, thus generating additional
3    revenue streams for Defendants due to P2P client listings on Download.com.

4    116. Download.com hosted copies of LimeWire for download on its servers.
5    It also has variously hosted other such notorious infringers as Napster, Morpheus,
6    KaZaa, BearShare, BitTorrent and uTorrent. Today, even after the United States
7    District Court's recent infringement findings and permanent injunction against
8    LimeWire, Download.com *still* hosts and promotes download links for P2P clients it
9    knows are meant for copyright infringement. Upon information and belief,
10   Defendants have generated and continue to generate substantial fees from the P2P
11   client publishers themselves and advertisers who wish to have their programs listed
12   on P2P client download screens. Defendants also generate revenues by cross-
13   promoting their websites on P2P client download screens.

14   117. Because the Defendants own the "largest [download] distribution
15   network in the world," they were particularly valuable partners in the dissemination,
16   promotion, and popularity of the biggest P2P copy infringement tools from the past
17   decade. LimeWire, which was one of Download.com's top downloaded programs
18   for the past 10 years, owed its success to the distribution and promotion it received
19   through Download.com. Upon information and belief, approximately 95 percent of
20   LimeWire downloads occurred via Download.com. Download.com has provided
21   BitComet for download since November 10, 2009. As of October 24, 2011,
22   BitComet was listed as the third most popular "P2P and File-Sharing Software
23   downloads" with 39,298 downloads – trailing only uTorrent and BitTorrent in terms
24   of popularity. It seems that, in the wake of LimeWire's court-ordered demise,
25   Defendants are determined to ensure that the bit torrent family of programs become
26   the latest go-to programs of choice for copyright infringement.

27   118. In fact, LimeWire's own website displayed a "Download Now" button
28   from CNET that redirected users *to* Download.com when they attempted to

-33-

1  download the client. Other infamous P2P client publishers like BitComet include(d)
2  similar "Download Now" buttons that redirected users from their home websites to
3  Download.com. As Defendants explained in advertisements for the "CNET Button
4  Program" (as it was called), this created a useful symbiotic relationship between the
5  P2P publishers and CNET:

6      [T]he [Download Now] button will allow visitors to download your program
7      quickly and easily and increase your exposure to users on CNET Networks.
8      Users frequently zero in on and download software found on CNET
9      Download.com's Most Popular lists. By placing Download Now buttons on
10     your site that direct users to your product details page on CNET
11     Download.com, you will increase the number of people who click the
12     Download Now button on the product details page. This, in turn, will
13     increase your count on our Most Popular list. Once your software appears on
14     these lists, more users will see your title and download it. And, in effect, the
15     more traffic you send to CNET, the more likely you are to increase your
16     visibility on these valuable pages.

17     119.  Due at least in part to the CNET Button Program, LimeWire and other
18  P2P clients specifically designed and promoted for copyright infringement increased
19  their count on Download.com's "Most Popular" list, thereby further increasing their
20  exposure to Defendants' users.   With Defendants' help—including measures
21  discussed below and throughout this Complaint—the P2P clients' success fed on
22  itself and bolstered LimeWire, BitComet and other P2P clients' popularity for years.
23  The P2P clients' success, in turn, benefited Defendants tremendously in terms of
24  revenues, exposure, and opportunities to cross-promote other CBS Interactive
25  websites.

26     120.  At all relevant times, Defendants not only knew that LimeWire,
27  BitComet and other P2P clients were meant and designed for copyright
28  infringement, they also worked with the publishers of these programs to maximize

-34-

1   infringement.   For each version of LimeWire, for example, Download.com staff
2   corresponded with the LimeWire representatives regarding the features in the client
3   program.   These features demonstrated that LimeWire was explicitly designed for
4   copyright infringement.   For example, LimeWire (a) included search capabilities
5   that focused on music title, artist, music genre, and other identifying factors of
6   copyrighted sound recordings; (b) provided a "preview" function for the audio
7   player so users could confirm that audio files they wished to download were the
8   actual files they were searching for; (c) punished users who did not share enough
9   files; and (d) in later versions, included a copyright filter but set the default upon
10  installation to "off."   Nevertheless, Download.com did not refuse to list LimeWire
11  on its site and did not require that LimeWire include filters or other protections
12  against copyright infringement.     Other P2P clients underwent a similarly-
13  streamlined approval process for their infringement software.

14        121.   Although the Defendants' distribution was critical to the infringing P2P
15  systems' success, that was not the extent of their involvement.   Defendants also
16  actively promoted the P2P clients on Download.com, explained how users could
17  infringe copyrights to the greatest degree possible, and specifically demonstrated the
18  P2P clients' infringing purpose.   Defendants took all of these steps with the intent to
19  encourage and promote copyright infringement.

20        122.   One way that Defendants promoted copyright infringing P2Ps was to
21  write "reviews" of the program and apply a rating on a five star scale.   These
22  reviews discussed the program's functionality, features, strengths, and weaknesses.
23  In many instances, they also discussed the purpose of the program and advertised to
24  user demographics already known for copyright infringement that the programs
25  were meant to serve as replacements for other copyright infringement tools.
26  LimeWire and BitComet similarly posted self-serving and targeted explanations of
27  their programs on Download.com in order to promote their product.

28

123. For example, the Defendants posted a "CNET Editors' Review" on LimeWire on February 12, 2009. CNET editor Seth Rosenblatt noted from the start that LimeWire was a "post-Napster clone" that had evolved into a "leading role as the quintessential Gnutella [protocol] client." He also noted that "LimeWire is the highest-profile P2P application." At the time Defendants posted this review, they knew that LimeWire was embroiled in a lawsuit accusing it of massive copyright infringement, that Napster users were largely interested in copyright infringement, and that several other P2P clients that Download.com hosted over the years and promoted had already been shut down for their own infringement. Nevertheless, the Defendants did not issue a warning that users should refrain from using LimeWire to infringe copyrights. Instead, they pointed out that it was a useful Napster replacement and gave it four-and-a-half stars out of five.

124. Similarly, although Defendants now include a "CNET Editors' note" above its "CNET Editors' review" of BitComet that provides a lukewarm statement that "CBS Interactive does not encourage or condone the illegal duplication or distribution of copyrighted content." Defendants are clearly talking out of both sides of their mouth, as the CNET editors review essentially does the opposite of what the editors' note expressly says CNET does not do, i.e. encourage and condones the illegal duplication of copyrighted material. In its review of BitComet, the CNET editors again highlight features of the program obviously designed to enable infringement, such as "including [BitComet's] links to torrent-aggregating Web sites." Again, as discussed above, here "torrent aggregating websites" is really a euphemism for "websites notorious for allowing the illegal downloading of copyrighted material" – BitComet links users directly to notorious hubs of illegal downloading activity like the Pirate Bay. CNET awarded the program three and half stars (a "very good") and stated "Overall, we think BitComet is worth trying and could become a major torrent app in the future."

125.   Download.com users who commented on LimeWire demonstrated that they understood that Defendants were encouraging them to commit infringement. As one user stated, LimeWire's main "Pro" was "free music all day long."  Another simply stated that it was "music for free."   Another was more detailed, stating "Huge peer base - you can literally find anything you could imagine. No song is impossible." Similar user comments exhibiting the same understanding were posted in response to the many iterations and versions of LimeWire that Download.com hosted for the past decade. Download.com users who commented on BitComet also demonstrated the same understanding. For example, on July 19, 2011 a user said a "Pro" of BitComet was: "Since I mostly download music, I find everything quick and easy to find and download either full albums or singles with no problem ... I always recommend [BitComet] to everyone who wants to get music or anything that requires downloading."  This same user titled his review of BitComet "Easy for me to use and download content."

126.   Furthermore, as part of their review process, the Defendants tested the software that they reviewed and, in the case of P2P clients, *infringed copyrights to do so*. They then posted details of this infringement on CBS Defendant websites to encourage users to download the clients and infringe themselves.

127.   For example, in a "First Look" video that Download.com posted to its website, Defendants reviewed LimeWire 5 and demonstrated how it worked to Download.com users. The video shows a close up of the LimeWire search screen as the CNET reviewer enters "Nine Inch Nails," a popular band, and then shows the search results, which include many of the band's copyrighted songs.  Later in the video, as the viewer looks at a screen demonstrating another sample search, they see a list of copyrighted works from artists including Will.I.Am, Usher, Trick Daddy, Nas, Ray Styles, and many others.  Several non-video LimeWire reviews exhibited the same usage and encouragement, displaying screenshots Download.com editors took as they tested the application.  These screenshots regularly displayed search

1   results with well-known bands whose songs were avilable on the LimeWire
2   network.  For example, in a review for LimeWire "Classic" for Mac—a version of
3   the client designed to run on Mac computers—the screenshot shows search results
4   with bands such as Led Zeppelin, Offspring, Paul Revere & The Raiders, Queens of
5   the Stone Age, Seether, Temple of the Dog, and Van Halen.

6       128.  In another "First Look" video, this time for FrostWire, the CNET
7   reviewer, Mr. Rosenblatt, discusses how the client is a "fork" of the LimeWire PRO
8   code and again zooms in on the search bar while he enters "Nine Inch Nails,"
9   thereafter showing the results for this search, which again include an extensive list
10  of the band's copyrighted songs.  The video review mentions several times that
11  FrostWire operates the same as LimeWire, and produces the same results.  In
12  making this comparison, Defendants appealed to LimeWire's users in the same way
13  LimeWire  appealed to Napster's users, and to the same effect.

14      129.  In a November 7, 2008 review of MP3 Rocket, described as yet another
15  "LimeWire source code fork," the Defendants attached screenshots of the P2P client
16  in action to demonstrate its features.   These screenshots, which remained on
17  Download.com until at least December 2010, showed search hits and available files
18  for download from artists including Madonna, Lady Gaga, Alicia Keys, Usher,
19  Michael Jackson, Rihanna, Queen, Eminem, Omarion, Dire Straits, Gorillaz, Pink,
20  50 Cent, and many others.

21      130.  In a November 11, 2009 review of LuckyWire, which was described as
22  "almost exactly like LimeWire," the "CNET staff" noted that "[i]f you've seen
23  LimeWire, you've seen LuckyWire; they're virtually indistinguishable."  In order to
24  compare the two programs, the CNET staff constructed an "informal experiment"
25  where "we chose a song—Nirvana's 'Heart-Shaped Box,' if you're curious—and
26  downloaded the same copy of it from Gnutella using both LimeWire and
27  Luckywire."  After comparing the download speed results from both applications,
28

-38-

1    the staff concluded that LuckyWire was "worth giving [] a try," and concluded their
2    review by saying, *We recommend this program to all users.*"

3    131. In a November 24, 2009 review of ZapShares (that was recently
4    removed from Download.com), the CNET staff described the application as "an
5    innovative program that seeks to protect users from copyright infringement lawsuits
6    resulting from peer-to-peer file sharing. ... The program is based on the theory that
7    the people who tend to get sued for copyright infringement are the ones who make
8    files available for download, not the ones who do the downloading. ZapShares
9    protects users by making sure that file sharing is disabled in their peer-to-peer
10   software; files can come in, but they can't go out." After describing how this
11   process works, the CNET staff then went on to say, *We downloaded a song with
12   LimeWire* while ZapShares was running." They then opined on the "fairness" of
13   using ZapShares, considering the model upon which P2P networks operate is
14   massive, unchecked copyright infringement:

15           We will leave it to you to decide whether it's fair that some users on a P2P
16           network are assuming all of the legal liability to provide files to other users
17           who aren't sharing the risk; after all, if everyone uses a program like
18           ZapShares, there wouldn't be any content on P2P networks to begin with. If
19           your conscience allows it, ZapShares appears to be a good way to keep your
20           downloaded files to yourself.

21   Again—incredibly—the CNET staff concluded their review by saying, *"We
22   recommend this program to all users.*"

23   132. Older reviews further demonstrate Defendants' long-running call to
24   their users to infringe copyrights. In one of the earliest LimeWire reviews, dated
25   November 28, 2001, CNET reviewer Justin Eckhouse explained how he used the
26   program to search for songs by the band, Radiohead. A similar review of KaZaa,
27   one of LimeWire's competitors, dated September 24, 2002 displayed a screenshot of
28   the program wherein the reviewer showed how he used the program to search for

1 | songs by REO Speedwagon, a well-known band.  The same review noted that users
2 | had the ability to flag, as undesirable, "a particularly bad cut of a Britney Spear
3 | video" found on the network, the implication of which was that users could, should,
4 | and would download such copyrighted works for free from the network.

5 |      133.   Other reviews, articles, and materials posted on the Defendants'
6 | websites from throughout the decade noted the difference between various file-
7 | sharing applications and directed users toward the P2P clients that would provide
8 | them access to the most copyrighted works.  For example, in a December 12, 2001
9 | review of AudioGalaxy, CNET reviewer Justin Eckhouse noted that Audiogalaxy
10 | was designed to promote independent artists and unknown bands because it
11 | "employs copyright restrictions to keep you from downloading most popular songs."
12 | Accordingly, he recommended to users "if you thrive on the mainstream [music]
13 | beat, turn to LimeWire or KaZaa."

14 |      134.   The message from Defendants' many videos, reviews, and screen shots
15 | of P2P clients in action was (and is) that LimeWire and similar applications are
16 | really great at infringing copyrights.  Furthermore, as their call to conscience in the
17 | ZapShares review indicated, Defendants discouraged Download.com users from
18 | impeding the strength and vitality of the rampant infringement made possible by
19 | P2P clients available through Download.com.

20 |      135.   Defendants also provided various newsletters and articles that cross-
21 | compared and recommended downloading P2P clients that were better at
22 | infringement than others.  For example, one newsletter the Defendants provided on a
23 | monthly basis was called the "File-sharing smackdown."  This newsletter compared
24 | results from the most popular P2P clients—determined by looking at the most
25 | popular downloads on Download.com—and made recommendations on each
26 | client's ability to download copyrighted works for CNET users.  As CNET
27 | columnist Eliot Van Buskirk noted in his initial post, the purpose of the newsletter
28 | was to "settle arguments" over which was the best file-sharing service.  In order to

1  do so, he and a fellow CNET employee cross-compared eight different P2P clients,
2  including LimeWire, KaZaa, Morpheus, BearShare, AudioGalaxy, by "[running]
3  searches for 18 band names using each of these clients." The bands included
4  Britney Spears, The Strokes, The Beatles, Run DMC, Metallica, Radiohead, Johnny
·5  Cash, and several other well-known artists.

6        136.  The "File-sharing smackdown" continued for years, each time
7  comparing results based on searches for well-known artists. A running
8  commonality in almost every version of this newsletter and others—including the
9  similarly-named "File-sharing blowout"—was that LimeWire was one of the test
10 subjects. Indeed, from 2001 through the present—the entire time Defendants kept
11 the newsletter on their websites and cross-linked to it in reviews or posts regarding
12 P2P clients, or in articles regarding file-sharing in general—LimeWire was
13 mentioned again and again as one of the top infringement tools available.

14       137.  CNET's promotion of various file-sharing applications directly
15 impacted the behavior of P2P users. For example, on October 9, 2008, a user of the
16 P2P application FrostWire posted a comment on a user-forum available on
17 FrostWire's website responding to the question "[Poll] how did you first hear about
18 FrostWire": "I was using LimeWire Pro, and read a review about FrostWire on C
19 Net. I changed to Frostwire."

20       138.  Another example of the Defendants' encouragement to infringe comes
21 from Download.com's affiliate site, ZDNet.com. In an article entitled "Dave's Top
22 9 Ways for File-sharing Music Lovers to Break The Law," ZDNet highlighted
23 various infringement tools and noted that "If file-sharing has a future, it's peer-to-
24 peer, a la Gnutella [*i.e.*, LimeWire's protocol]. Bypass the central server with open
25 source software like this, and there's nobody to sue, nobody to shutdown." In the
26 same article, ZDNet dismissively ridiculed a legal notice one P2P client provided
27 regarding copyright infringement by rhetorically asking, "What the &%$# else are
28 people using these file sharing programs for?" Another ZDNet article discussing the

1   Gnutella protocol compared it to Napster and noted that a large user base is "a giant
2   factor when you're considering file-sharing tools," the implication of which was that
3   a larger user base meant more copyrighted songs available for free download. This
4   message was repeated in various articles and reviews throughout the years.

5          139.   Gnutella's decentralized network was also specifically and repeatedly
6   stressed as useful for copyright infringement because it meant that the network
7   could not be shut down.   In an August 5, 2000 review of Gnutella, for example,
8   CNET reviewer R. Scott Macintosh noted that the Gnutella network, unlike Napster,
9   was decentralized.  As he further explained, "[N]o matter how the legal wrangles
10  over copyright violations impact companies such as Napster, Gnutella—and similar
11  software—will undoubtedly survive."

12         140.   Defendants also provided several "how to" guides for many different
13  P2P clients that encouraged infringement, including LimeWire itself.  For example,
14  CNET provided a guide called "Search Gnutella and LimeWire Effectively."  It also
15  provided a guide on Gnutella, pitching the guide as the "scoop on how to download,
16  install, and use this open-source variation of Napster."  Another guide was entitled
17  "How-To Use Gnutella Effectively."  In yet another, they offered a "CNET Tip" on
18  how to get around firewalls when using Gnutella and still obtain the files users
19  wanted, a problem "with any file-sharing program."

20         141.   Defendants also offered guides on *Napster* and, after it became clear
21  Napster was in serious legal trouble, how to find a Napster "replacement."
22  Regarding the former, Defendants offered guides explaining how to use Napster and
23  that a user needed "a lack of morals" to use the service, or should "take care not to
24  break the law (too often)."  Regarding the latter, Defendants provided a guide called
25  "Find an Alternative to Napster."  As Defendants pitched this guide: "Worried that
26  Napster's servers will be shut down some day?  Don't despair.  Lots of apps are
27  looking to fill the void, some of which are impervious to the legal attacks now
28  threatening the free-music phenomenon.  Find the best choices in our tutorial."  Of

1    course, the "best choices" were all available via Download.com and directly
2    benefited Defendants.

3         142.  This latter theme—*i.e.*, helping CBS Defendant users find Napster
4    "alternatives"—arose again and again on Defendants' websites.  As noted
5    previously, Download.com's most recent available LimeWire review *still* references
6    its "post-Napster clone" origins.  Several articles that remain available on CBS
7    Interactive websites today also question, discuss, and, most importantly, *recommend*
8    the "next Napster," "Napster clone[s]," and Napster "improvements."  In the days
9    when LimeWire and other Gnutella clients first entered the scene, the  Defendants'
10   promotion of these P2P services was crucial to their taking hold, and Defendants'
11   recommendations propelled several P2P clients to prominence.

12        143.  For example, Defendants provided a how-to guide for Morpheus that
13   not only explained how to infringe using the service, but also noted that a larger user
14   base made the file-sharing service more valuable.  After observing that MusicCity,
15   Morpheus' parent organization, seemed to be waving a "big red flag in front of the
16   RIAA saying, 'Sue me!  Sue me!'", Defendants pitched their guide by saying, "Will
17   this program be the next Napster?  Only if you try it out.  Learn to use Morpheus."

18        144.  Defendants also provided a guide to Scour Exchange that noted it was
19   signing deals with Hollywod studios and artists to promote approved files, but that
20   "the community of Scour Exchange users continue to share copyright-protected
21   materials without permission."  In this guide, Defendants pointed out that Scour
22   Exchange's user agreement put the responsibility for determining which files were
23   copyrighted on the users, but followed that up with "This is a standard disclaimer
24   among the file-sharing programs and, *truthfully, one that is currently ignored by*
25   *most users*." Defendants then urged their users to click the link for the next page of
26   the guide, "Now Go Get Those MP3's!" thus encouraging their users to obtain
27   materials on a network they just admitted was used primarily for copyright
28   infringement.

145.   Actively promoting LimeWire and similar products as infringement tools, however, was not the extent of Defendants' encouragement.   They also actively recommended *against* users downloading and employing P2P clients that prevented infringement.   For example, in a February 1, 2002 version of the "smackdown" newsletter entitled "File-sharing smackdown, part *deux*," Mr. Van Buskirk noted that the first "winner" of his smackdown, Audiogalaxy, had apparently implemented copyright restrictions as a "token effort to appease the big record companies."   As he explained, "Unfortunately, this smackdown isn't about pleasing anyone except for MP3 downloaders, so obstructing these files pretty much disqualifies Audiogalaxy from the contest. ... Overall, I can't recommend a program to the general populace that blocks access to the songs most people want."   The program that did receive Mr. Buskirk's recommendation?   LimeWire, with *Morpheus and Grokster* as a "close second."

146.   Download.com staff also acknowledged in public interviews that they knew P2P clients hosted on their site were intended for copyright infringement.   In an interview discussing LimeWire, for example, Mr. Rosenblatt, the editor who wrote some of the previously-mentioned LimeWire reviews, noted that file sharing is primarily used for copyright infringement.   And in a February 21, 2010 video reviewing CNET's top 5 downloads for the week, a CNET editor drolly deadpans after seeing LimeWire at number one: "What a surprise...LimeWire."

147.   To this day, Download.com still hosts and promotes P2P clients for copyright infringement.   As noted previously, Defendants continued to provide a download for FrostWire after the injunction was entered against LimeWire.   FrostWire is, of course, the open source version of LimeWire that Download.com pointed out was "practically indistinguishable" from its willfully infringing cousin.   In the wake of the injunction against LimeWire, FrostWire became an increasingly popular substitute for P2P infringement due to its close similarity to LimeWire.   Seeing the writing on the wall for LimeWire-like applications, the most recent

version of FrostWire has re-styled itself as a torrent-based P2P client and no longer accesses the Gnutella network.  As both its publishers and Defendants are well aware, the new torrent-based version of FrostWire continues to serve primarily as a means of direct infringement just like its previous versions did.  Consistent with its policy of guiding P2P users to the "next wave" of P2P clients in the wake of legal decisions shutting down P2P technologies found to be infringing, Download.com still distributes the torrent-based version of FrostWire.  Over 30,000 copies of the most recent version of FrostWire were downloaded from Download.com the second week of October 2011.

148.   Further, as Download.com's users demonstrate with their comments, they continue to understand that the Defendants are encouraging them to infringe copyrights with Frostwire and similar reviews.   For example, regarding the Gnutella-based version of FrostWire available after the injunction entered against LimeWire (and prior to FrostWire's most recent torrent incarnation), users pointed out on Download.com, "Frostwire is basically LimeWire replaced! … I'm glad that this is a lot like LimeWire because then I don't have to learn anything new." Although the Defendants now include a belated, stock warning against copyright infringement on their website, this tepid disclaimer fools no one.  Download.com users understand and are encouraged by the real messages promoted not two lines under this and similar disclaimers: download this P2P client because it will enable you to infrigne copyrights and obtain free music.

149.  Plaintiffs' copyrighted works were and are available on P2P file sharing networks developed, distributed, and promoted by Defendants.  Defendants accordingly are liable for copyright infringement.

## COUNT 1

## INDUCEMENT OF COPYRIGHT INFRINGEMENT

150.   Plaintiffs incorporate as if set forth herein the allegations made in Paragraphs 1 through 149.

-45-

151.   Individuals using P2P client software that Defendants distributed and promoted, including LimeWire, BitComet and others, have directly infringed and are directly infringing Plaintiffs' copyrights by, for example, creating unauthorized reproductions of Plaintiffs' copyrighted works and distributing copies of such works to the public in violation of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. §§ 106, 501.

152.   Defendants are liable for inducing the copyright infringement of Download.com users.   Defendants distribute and promote several P2P clients, including but not limited to the LimeWire client and current offerings such as FrostWire, BitComet, and Phex.   In distributing and promoting these P2P clients, Defendants inform and informed their users that the clients were optimized for the unauthorized copying and transmission of copyrighted sound recordings, thereby actively facilitating, encouraging and enticing Download.com users to engage in the infringement.

153.   Defendants have induced and continue to induce infringement by, for example, aiming to satisfy a known source of demand for copyright infringement, including the market comprising users of other infringing services that were shut down or compelled to block access to Plaintiffs copyrighted works, such as Napster, Morpheus, Grokster, KaZaA, and now LimeWire.

154.   Defendants further have induced and continue to induce infringement by, for example, continuing to provide downloads for P2P that clients that fail to block or diminish access to infringing material even though there are technological means to do so – means that are known to Defendants and the P2P client publishers, and some of which have been employed by P2P clients who operate legally.

155.   Defendants further have induced and continue to induce infringement by, for example, building and maintaining a business model to profit directly from the demand for infringing P2P clients.

-46-

1  156. Defendants' infringement is and has been willful, intentional,
2 purposeful, in disregard of the rights of Plaintiffs, and has caused substantial
3 damage to Plaintiffs.

4  157. As a direct and proximate result of Defendants' infringement, Plaintiffs
5 are entitled to damages and their costs, including reasonable attorneys' fees,
6 pursuant to 17 U.S.C. § 505. Defendants' conduct has caused, and unless enjoined
7 by the Court, will continue to cause Plaintiffs great and irreparable injury that
8 cannot be fully compensated or measured in money. Plaintiffs have no adequate
9 remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs therefore also are entitled to
10 injunctive relief to prohibit further infringement of Plaintiffs' copyrights.

11           **COUNT 2**

12    **CONTRIBUTORY COPYRIGHT INFRINGEMENT**

13  158. Plaintiffs incorporate as if set forth herein the allegations made in
14 Paragraphs 1 through 157.

15  159. Individuals using P2P client software that Defendants distributed and
16 promoted, including LimeWire, BitComet, Phex and others, have directly infringed
17 and are directly infringing Plaintiffs' copyrights by, for example, creating
18 unauthorized reproductions of Plaintiffs' copyrighted works and distributing copies
19 of such works to the public in violation of Plaintiffs' exclusive rights under the
20 Copyright Act, 17 U.S.C. §§ 106, 501.

21  160. Defendants are liable as contributory infringers for the copyright
22 infringement committed via P2P client software that Defendants distributed,
23 including LimeWire and others. Defendants have knowledge of the massive
24 infringement that has occurred and continues to occur through P2P client software
25 that they created, distributed and promoted, and Defendants have caused, enabled,
26 facilitated, and materially contributed to that infringement.

27  161. Defendants' knowledge of infringement is both actual and constructive.
28 Examples of this knowledge include written and oral statements by Defendants and

user comments posted on Download.com; express comparisons of P2P clients to other notorious and illegally-operated P2P systems; and features of P2P clients Defendants discussed with the software publishers that demonstrated the client was optimized for finding and distributing popular sound recordings. All of these facts directly and circumstantially exhibit Defendants' awareness that the overarching purpose and use of P2P clients they distributed and continue to distribute is to infringe Plaintiffs' copyrighted works.

162. Defendants have caused, enabled, facilitated and materially contributed to the infringement complained of herein. Defendants have, in addition to the actions detailed above, provided the tools and instruction for infringement via P2P clients they distribute; directly and indirectly promoted the infringement via P2P clients they distribute; directly profited from their distribution of P2P clients; and refused to exercise their ability to stop the infringement made possible by their distribution.

163. Defendants' infringement is and has been willful, intentional, purposeful, and in disregard of the rights of Plaintiffs, and has caused substantial damage to Plaintiffs.

164. As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to damages and their costs, including reasonable attorneys' fees, pursuant to 17 U.S.C. § 505. Defendants' conduct has caused, and unless enjoined by the Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs therefore also are entitled to injunctive relief to prohibit further infringement of Plaintiffs' copyrights.

## COUNT 3

### VICARIOUS COPYRIGHT INFRINGEMENT

165. Plaintiffs incorporate as if set forth herein the allegations made in Paragraphs 1 through 164.

1      166. Individuals using P2P client software that Defendants distributed,
2 including LimeWire, Phex, BitComet and others, have directly infringed and are
3 directly infringing Plaintiffs' copyrights by, for example, creating unauthorized
4 reproductions of Plaintiffs' works and distributing copies of such works to the
5 public in violation of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C.
6 §§ 106, 501.

7      167. Defendants are liable as vicarious infringers for the copyright
8 infringement committed via P2P client software that Defendants distributed and
9 promoted, including LimeWire and others as noted above. At all times relevant to
10 this action, Defendants (i) have had the right and ability to control and/or supervise
11 the infringing conduct of P2P client software publishers and individual users (either
12 by direct contractual relation and/or as a matter of practical control), including
13 without limitation through their ability to cut off distribution of P2P clients and
14 listing on Download.com any and all versions of the software and Defendants'
15 ability to cease publishing articles promoting and instructing users on the use of P2P
16 software for infringement; and (ii) have had a direct financial interest in, and derived
17 substantial financial benefit from, the infringement of Plaintiffs' copyrighted works
18 via P2P clients that Defendants distributed.

19      168. Defendants have derived direct and substantial benefit from
20 infringement in several ways, including without limitation (i) fees and revenues
21 earned from downloads of P2P clients from Download.com, (ii) advertising
22 revenues generated from encouraging Download.com users to seek out and
23 download P2P clients from Download.com, and (iii) cross-promotion on P2P client
24 download pages for other sites in Defendants' stable of websites.

25      169. Defendants' infringement is and has been willful, intentional,
26 purposeful, and in disregard of the rights of Plaintiffs, and has caused substantial
27 damage to Plaintiffs.

28

1       170.  As a direct and proximate result of Defendants' infringement, Plaintiffs

2 are entitled to damages and their costs, including reasonable attorneys' fees,

3 pursuant to 17 U.S.C. § 505. Defendants' conduct has caused, and unless enjoined

4 by the Court, will continue to cause Plaintiffs great and irreparable injury that

5 cannot be fully compensated or measured in money. Plaintiffs have no adequate

6 remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs therefore also are entitled to

7 injunctive relief to prohibit further infringement of Plaintiffs' copyrights.

8                                **PRAYER FOR RELIEF**

9       WHEREFORE, Plaintiffs respectfully pray for the following relief:

10       a.     For damages, including without limitation, actual and statutory

11 damages, for Defendants' infringements of Plaintiffs' copyrights;

12       b.     For injunctive relief requiring that Defendants and Defendants' agents,

13 servants, employees, officers, attorneys, successors, licensees, partners, and assigns,

14 and all persons acting in concert or participation with each or any of them, cease

15 infringing, whether directly or indirectly, and cease causing, enabling, facilitating,

16 encouraging, promoting, inducing, contributing to, and participating in the

17 infringement of, any of Plaintiffs' respective copyrights;

18       c.     For pre-judgment and post-judgment interest;

19       d.     For Plaintiffs' costs and disbursements in this action, including

20 reasonable attorneys' fees; and

21       e.     For such other and further relief as the Court deems proper and just.

22

23

24

25

26

27

28

November 14, 2011

Respectfully submitted,

By _____

Jaime Marquart
Ryan Baker
BAKER MARQUART LLP
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
(424) 652-7811
(424) 652-7850k (facsimile)

Attorneys for Plaintiffs

COMPLAINT

1                  **DEMAND FOR JURY TRIAL**

2        Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by

3 jury.

4 [DATE], 2011                 Respectfully submitted,

5

6

7

8                 By_____

                   Jaime Marquart

9                    Ryan Baker

                   BAKER MARQUART LLP

10                    10990 Wilshire Blvd., Fourth Floor

                   Los Angeles, California 90024

11                    (424) 652-7811

12                    (424) 652-7850k (facsimile)

13                    Attorneys for Plaintiffs

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COMPLAINT