1  dBAKER MARQUART, LLP
     Jaime Marquart (Bar No. 200344)
2     jmarquart@bakermarquart.com
     Ryan Baker (Bar No. 214036)
3     rbaker@bakermarquart.com
     Christian Anstett (Bar No. 240179)
4     canstett@bakermarquart.com.com
   10990 Wilshire Blvd., Fourth Floor
5  Los Angeles, California  90024
   Telephone:   (424) 652-7800
6  Facsimile:    (424) 652-7850

7  Attorneys for All Plaintiffs

8

9                    UNITED STATES DISTRICT COURT

10                   CENTRAL DISTRICT OF CALIFORNIA

11

| 12 | ALKIVIADES DAVID, SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS  JOHN FLETCHER, WILLIE FINCH,  ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER, DIAMOND SMITH, REMINISCE SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA | Case No. CV11-9437 DSF (JCx)_____<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT** |
|---|---|

| | |
|---|---|
| 1 | STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM |

1  STOKES, WILLIAM TENNYSON
   AND THE TENNYSON ESTATE,
2  CARL THOMAS, JEFF THOMKINS,
   RONDELL TURNER, RICKY
3  WALTERS, KEVIN WILLIAMS,
   YOLANDA WHITAKE, JOSEPH
4  WILLIAMS, RAHEEM WILLIAMS,
   CASE WOODWARD, ATTRELL
5  AND JARRETT CORDES,
   MITCHELL GRAHAM
6
7              Plaintiffs,
8        vs.
9  CBS INTERACTIVE INC., CNET
   NETWORKS, INC.
10
11             Defendants.
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-2-
OPPOSITION TO MOTION TO DISMISS

# INTRODUCTION

CBS's Motion to Dismiss is, at best, a premature motion for summary judgment. The Plaintiffs' complaint alleges that CBS engaged in massive inducement of copyright infringement through its websites CNET.com and Download.com. With a calculated, decade-long business model to promote copyright infringement, CBS is doing actionable harm. At this stage, these allegations must be taken as true.

Through its websites CNET.com and Downloads.com, CBS amassed huge profits through the international distribution of *hundreds of millions* of various software programs designed to distribute stolen music and other intellectual property. Defendants induced third-parties to infringe Plaintiffs' copyrights on a massive scale. CBS not only knew that these programs were being used primarily to infringe copyrights, they actively encouraged people to use the software to steal music. It is not the content, but the *intent*, that differentiates CBS's conduct from protectable speech.

# LEGAL STANDARD

Under Federal Rule of Civil Procedure 8(a), Plaintiffs are required to provide "a short plain statement of the claim showing that the pleader is entitled to relief." FRCP 8(a). The purpose of 8(a) is just to "give the defendant fair notice of what … the claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007). When considering a motion to dismiss under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." *Daniel v. County of Santa Barbara*, 288 F.3f 375, 380 (9th Cir. 2002). In order to survive a motion to dismiss, the complaint need contain "only enough facts to state a claim for relief that is plausible on its face." *Twombly*, 127 S. St. at 1974. Dismissal under rule 12(b)(6) is proper only where there is either a "lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Baliestreri v. Pacifica*

*Police Department*, 901 F. 2d 696, 699 (9th Cir. 1988). Although the Supreme Court in *Twombly* imposed a plausibility standard, "[t]his is not an onerous burden. 'Specific facts are not necessary; the statement need only give the defendant[s] fair notice of what … the claim is and the grounds upon which it rests." *Johnson v. Riverside Healthcare System, LP*, 534 F.3d 1116, 1122 (9th Cir. 2008).

Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider facts or material outside of the complaint. **Cite**. "The Rule 8 standard contains a powerful presumption against rejecting pleadings for failure to state a claim." *Giligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997). Thus, it is only under extraordinary circumstances that dismissal is proper under Rule 12(b)(6). *United States v. Redwood City*, 640 F.2d 963, 966 (9th Cir. 1981). In order to survive a motion to dismiss, a claim for contributory infringement/inducement, plaintiff may allege that defendant created a business model that encouraged users to commit infringement. *Disney Enterprises, Inc. v. Hotfile Corp.*¸798 F.Supp.2d 1303, 1310 (S.D. Fla. 2011) (claim properly plead where defendant understood that a consequence of its business model encouraged users to infringe copyright).

### A. **Plaintiffs Have Pleaded a Claim for Inducement of Infringement**

In an opinion by Justice Souter, the United States Supreme Court held that "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." *Metro-Goldwyn-Mayer Studios v. Grokster*, 545 U.S. 913, 125 S. Ct. 2764 (2005) ("*Grokster*"). The Court further explained that, while "mere knowledge" of potential or actual infringing uses would not be sufficient to subject a distributor to liability, nor would ordinary acts incident to product distribution such as offering customers technical support or product updates. Rather, "the inducement rule, instead, premises liability on purposeful, culpable expression and conduct, and thus

does nothing to compromise legitimate commerce or discourage innovation having a lawful purpose." Id. At 937.  Under the doctrine of inducement liability, the distribution of a product "can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used to infringe.  In such a case, the culpable act is not merely the encouragement of infringement but also the distribution of the tool intended for infringing use." *Grokster* at 940 n. 13; Fung at *10.  Notably absent from the Supreme Court's formulation of the standard (and any subsequent courts') is any requirement that the product distributor also have manufactured, owned or designed the product.  Nor is there any requirement that the defendant induce or encourage *specific* customers to infringe *specific* copyrights.

The unlawful objective to promote infringement can be shown by a number of means.  "The classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." Id. At 937; see also Fung at *10.  In *Grokster*, the Supreme Court focused on three different facts from which a reasonable factfinder could infer the intent to foster infringement: 1) the defendant's own communications and advertising designs evinced an intent to target Napster users, a community well-known for infringement; 2) defendants' business model depended on high-volume use of software which was overwhelmingly infringing; and 3) Defendants' failure to design filtering tools.  These facts supported an inference of defendants' unlawful objective.  On remand, the District Court considered other facts in finding defendants' intent to induce infringement, including "the staggering scale of infringement" occurring through the software products; technical assistance provided by defendants to users for the playback of copyrighted content, and affirmative steps taken by defendants to assure that their products would be capable of infringing use. *Metro-Goldwyn-Mayer Studios v. Grokster*, *Ltd*. 454 F.Supp. 2d 966, 985-92 ("*Grokster IV*").

The *Fung* case further elaborated the kind of factual evidence that supported a finding of the "classic instance of inducement," statements that "broadcast a

message designed to stimulate others to commit violations." *Groskter III* at 938, *Fung* at * 12.  In Fung, the Defendant posted messages on his website urging website users to "try" PeerGuardian, a software program that can be used to frustrate copyright enforcement against file sharers.  Evidence also existed that *Fung* Defendants "promoted their users' infringing activities by consciously fostering a community that encouraged-indeed celebrated, copyright infringement."  The defendant in Fung also "engaged in a broad campaign of encouraging copyright infringement" by simply making personal statements on his websites and in interviews that copyright infringement "may not necessarily be stealing" and that the community of infringers were thieves, but their theft was justified because they were not stealing directly from artists.  Fung's personal statements "provide probative evidence regarding Fung's intent in creating … websites *to aid other's infringement*." *12.  Finally, Fung provided a wide range of practical advice instructing website users on how to infringe copyrights electronically, by for example providing assistance to users for playing copyrighted films extracted from his website; providing links to possible search queries that would enable users to find certain copyrighted works; linking to websites that would allow users to burn DVDs of copyrighted works; and providing technical advice on using bittorrent software. *Fung* at *5.

      Here, Plaintiffs' complaint abounds with detailed factual allegations regarding both CBS's distribution of software designed to promote infringement and CBS's intent to induce infringement.  Among other things, Plaintiffs have alleged:

- CBS's distribution of more than 220 million copies (over 95% of all downloaded copies of the program) of the file-sharing software Limewire recently effectively shut down by Court Order (Complaint ¶ 9);
- CBS's distribution of over a hundred million BitTorrent software programs that CBS knew were specifically designed for and marketed

toward illegal file-sharing of copyrighted music (Complaint ¶¶ 100-104);

- CBS's communications and marketing efforts designed to target members of the illegal file-sharing community to promote new software tools designed to infringe copyrights available for download on its website (Complaint ¶ 10, 12)

- CBS's offering advice, tutorials and recommendations regarding the most efficacious software tools to use for infringement, as well as explicit and implicit exhortations to users to use the file-sharing software distributed by CBS for illegal file-sharing; (Complaint ¶¶ 121-149);

- The business model of CBS's websites depended on the high volume distribution of file-sharing software to generate substantial revenues by, among other things, generating fees from file-sharing software publishers for listings, advertising revenue from file-sharing software publishers, advertisement revenue from non-file-sharing software publishers (thereby monetizing the traffic on CBS's website created by its hosting of file-sharing software), and CBS's "Pay Per Download" program[1] ; (Complaint ¶¶ 12-13; 105-119);

---

[1] In a footnote, CBS argues that Plaintiffs allegations in ¶ 110 that CBS financially benefited from a "pay per download" program that Plaintiffs' "speculative allegation" is "simply wrong." Of course, there is nothing improper about allegations made on information and belief (and Defendants do not suggest that Plaintiffs did not have a good faith basis for making such an allegation and, more importantly, despite have repeatedly made assertions like this has never offered to supply any kind of evidence supporting their blanket claim – Plaintiffs intend and will seek this information during discovery).

- CBS's distribution of file-sharing software incorporating design features that facilitated infringement and defeat efforts of copyright holders to enforce their rights; (Complaint ¶ 2, 102-103);
- CBS's knowledge of the staggering scale of the infringement it induced (Complaint 103).

1. **CBS's "Substantive Requirements" Of Inducement Liability Have no Basis In Law and No Policy Justification**

Defendants have simply invented out of whole cloth several novel and absurd-on-their face "requirements" for an inducement of infringement claim.[2] As discussed above, these requirements are contrary to the clear, unambiguous elements of inducement liability articulated in *Grokster* and *Fung* – Grokster requires that plaintiffs plead that defendants distributed a device with the object of promoting its use to infringe copyright, as shown by clear expression or "other affirmative steps" taken to foster infringement. Plaintiffs have so pleaded. In attempt to manufacture a new standard for inducement liability, defendants misrepresent and mis-read cases.

   **a. Plaintiffs' Cite the Wrong Standard For Inducement Liability**

Although their argument is vague and somewhat hard to follow, CBS apparently argues that the Complaint fails to state a claim for inducement because: 1) CBS neither invented nor owned the file-sharing software it distributed and promoted for purposes of infringement; and 2) CBS did not know that Plaintiffs' specific songs were being infringed on the P2P networks accessed and created by the software CBS distributed. As discussed above, these are simply not elements of an inducement claim as is obvious from the very cases cited by CBS.

---

[2] Defendants are no doubt aware of how thin and intellectually dishonest their arguments with respect to inducement liability are, and chose to bury the argument near the end of their 25-page brief

CBS files to cite a single case holding that a party must have owned or designed a product it distributed and promoted for purposes of infringement in order to be secondarily liable for the infringement accomplished through use of that product. The *Perfect 10-Amazon* case cited by CBS does not so hold – the portion of that opinion excerpted in CBS' brief (Google not held liable because it had not "promoted *the use of its search engine* specifically to infringe copyrights") was italicized and emphasized by CBS, not the 9th Circuit. As CBS well knows, the issue of whether a party could be liable for distribution of a product designed or owned by another party was not before the 9th Circuit. Rather, in that case, the entity distributing the product also happened to own the product: Google's own search engine was the product alleged to be used for infringement. For that reason, *Perfect 10* is not an "announcement" or elaboration of the substantive requirements of inducement liability. Rather, the 9th Circuit merely held that plaintiffs had failed to allege that Google induced infringement <u>at all</u>. *Ludvarts, LLC* is exactly the same – the Court simply found that plaintiffs' failed to allege <u>any</u> evidence of intent to induce infringement ("Here, however, Plaintiffs have not alleged that Defendants' networks was designed with the "object of promoting" infringement of Plaintiffs' copyright; nor have Plaintiffs alleged a "clear expression," "other affirmative steps," or "specific acts" taken by Defendants that actively encourage or induce infringement. *Id.* at 546, 942. Plaintiffs have also not alleged that Defendants undertook "any substantial promotional or advertising efforts to encourage [infringing activity]"). At * 3. That case clearly does not stand for the proposition CBS wishes it did, and does not hold restrict inducement liability to the owners or designers of a product.

CBS's characterization of inducement liability cannot account for the result in *Fung*. In *Fung*, the Defendant neither owned nor designed the software used to carry out the infringement. Rather, Fung's sites allowed users to search and download various "torrent" files of copyrighted works. Importantly, these torrent

files did not themselves contain the actual copyrighted content searched for. *Fung* at *2. Nor could the torrent files by themselves download the copyrighted content. Rather, the torrent files allowed a type BitTorrent software client to download the copyrighted content from a network based on information embedded in the torrent file. The torrent files at issue were "open source" coded and not *owned* by anyone let alone by Fung. There was no allegation that the *Fung* defendant created (or even distributed) the BitTorrent software, nor did he even create the torrent files themselves. Rather, the Defendants' websites "collect[ed], receive[d], index[ed] and made available" torrent trackers. The District Court, however, *granted summary judgment* on Plaintiffs' inducement claim, because defendant had distributed tools (torrent files) used for infringement while promoting and facilitating copyright infringement.

    CBS does not even try to suggest any kind of policy reason that might support allowing a company to massively distribute P2P software it knows is used to infringe copyright on a equally massive scale and then promote and encourage the use of that software for infringement without fear of secondary liability for inducement. Indeed, there could be no conceivable legitimate commercial objective for such activity – and that the entity did not design or own the software it distributed to millions around the globe does not somehow mysteriously legitimize the distribution and inducement.

    It is not the case that a defendant know of the specific songs infringed on a P2P network in order to be secondarily liable for the infringement of that song. In *Grokster*, the Supreme Court expressly found that a generalized knowledge that a P2P program was used primarily to download massive numbers of copyrighted files sufficed for an inducement claim: "it is uncontested that [Grokster and Streamcast] are aware that users employ their software primarily to download copyrighted files, <u>even if the decentralized networks fail to reveal which files are being copied, and when</u>." 545 U.S. 922. Further, Defendants' fictional requirement makes no sense in

the context of inducement liability: inducement liability is not premised on inducing a particular customer to infringe a particular copyright.  Rather, inducement liability "goes beyond that" and holds that the distribution of a product itself can give rise to liability where the distributor intended and encouraged the product distributed to be used to infringe.  *Columbia Pictures, Inc.*, 2009 WL 6355911 at *10 fn 19 (citing *Grokster*, 545 U.S. at 940 n. 13).  The complaint is replete with allegations that Defendants were aware of massive infringement taking place through the software they distributed and encouraged and promoted to be used for purposes of infringement.  See, e.g., Complaint ¶¶ 1-3, 5, 7, 8.  CBS' improper "specific knowledge" requirement makes no sense in the context of the real inducement standard: it would be strange to require an entity designing or distributing software designed primarily to infringe copyrights to have specific knowledge that a particular plaintiffs' copyrights were among the millions of copyrights being infringed by this software in order for liability to attach.  If that were the case, the kind of decentralized network design employed by BitTorrent and other P2P platforms that effectively blinded software designers and distributors to the specific files being shared on P2P networks would fully insulate such designers and distributors from inducement liability.  As *Grokster* makes clear, such is not the law.

      **b.**    **<u>Plaintiffs have alleged Purposeful Expression and Conduct</u>**

Although a finding of contributory infringement requires that a defendant have knowledge of infringement, "the defendant need only have known of the direct infringer's activities, and need not have reached the legal conclusion that those activities infringed a copyrighted work."  *Jalbert v. Grautski*, 554 F. Supp. 2d 57, 68 (D. Mass. 2008) (quoting Paul Goldstein, Goldstein on Copyright § 8.1).

CBS also claims that Plaintiffs have not alleged the "requisite malicious intent necessary

to render Defendants liable for the unlawful acts of users of P2P software." There is no "malicious intent" requirement for inducement liability, and, as discussed above, Plaintiffs have properly plead all required elements of an inducement claim. Again, CBS argues here by inventing substantive legal requirements not found in case law and emphasizing irrelevant (from legal and policy perspective) factual differences between it and the defendants in *Grokster* and *Perfect 10*.

CBS again claims that there is a legal requirement that Defendants must promote their "own" service or product in order for liability to attach and claim this is a "fatal" defect in the Complaint. CBS cites no case so-holding. CBS also claims that its websites are "advertising-supported information and location tools" like Google and the Amazon "product search engine" in the *Perfect 10-Amazon* case. CBS's linguistic contortions strain credulity – one of the CBS websites at issue here is named **Downloads.com**, and, as the name implies, was and is a massive distributor of software on the Internet and decidedly not a mere "product search tool." Users can (and do) download software *directly from* CBS websites or via a button labeled "DOWNLOAD NOW" linking users directly to websites to download P2P clients designed for infringing purposes. Plaintiffs have allegedly that Defendants own websites were "intended for infringement" – the sites were indented to distribute millions of copies of infringement tools and also broadcast encouragement for their infringing uses. The principal object of CBS' scheme as alleged in the Complaint was to foster infringement.

CBS also implausibly argues that the Complaint does not allege knowledge of infringement, because P2P services prior to *Grokster* had not been "prohibited" or held liable for secondary infringement and none of the P2P software currently available on CBS websites has been definitively adjudicated as infringing. CBS's position seems to be that it cannot be liable for inducing infringement absent a court order finding a software client liable for secondary infringement. CBS cites no legal authority or policy justification for this rule and such a rule contradicts the bases for

-12-
OPPOSITION TO MOTION TO DISMISS

inducement liability: distribution of an infringing technology and inducement. CBS also cannot seriously insist that it was unaware of the massive <u>and illegal</u> infringement carried out by the software it distributed. For example, in paragraph 138, the Complaint quotes from an article written by a writer for a CBS website titled "Dave's Top 9 Ways for File-Sharing Music Lovers to Break the Law." In that article, CBS ridiculed a legal notice a P2P client provided regarding copyright infringement by asking, "What the &%$# else are people using file sharing programs for?" CBS also cannot pretend to be unaware with the legal issues concerning P2P software and infringement (and its own parallel potential liability for the distribution of such programs). In Paragraphs 141 and 142, the Complaint describes how CBS recommended that members of the pirate community use "alternative" P2P programs after Napster's legal troubles, claiming that, due to their decentralized network architecture, these programs were "impervious to the legal attacks now threatening the free-music phenomenon." CBS recommended that users shift their illegal file-sharing activities to other programs distributed by CBS, not that users cease their illegal activities. Even after the Limewire decision, CBS continued to provide for download software functionally equivalent and based on the same source code as Limewire, and used primarily for the same infringing purposes as Limewire. Even if knowledge that a particular software program was "known to be unlawful at the time" (there is no such requirement), based on the allegations in the Complaint this would be a factual issue that could not be decided on a motion to dismiss.

**No Legitimate First Amendment Interests Are Implicated by the Complaint**

The "central premise" of the Supreme Court's decision in *Grokster III* is that "a defendant's statements can be probative of an intent to induce infringement." *Fung* at *13; *Grokster III*, 545 U.S. 913. The defendant's statements themselves are not the activity prohibited by the doctrine of inducement liability but are just evidence of the culpable intent to induce infringement which is the underlying

wrongful act. *Id.* Such statements are not protected by the First Amendment:

> The first amendment does not provide a defense to a criminal charge simply because the actor uses words to carry out his illegal purpose. Crimes … frequently involve the use of speech as part of the criminal transaction … To the extent … that [the defendant] appears to contend that he is immune from search or prosecution because he uses printed words in encouraging and counseling others in the commission of a crime, we hold expressly that the first amendment does not provide a defense as a matter of law to such conduct.

*United States v. Barnett*, 667 F.2d 835, 842 (9th Cir. 1982). Secondary copyright liability is "sensitive" to First Amendment concerns and generally regulates only *intentional* behavior. *Fung* at *13; (citing *Grokster*, 545 U.S. at 937). Here, the present case involves *conduct* not expression.

CNET and download.com do provide some technology news, product reviews and publish reporting, opinions and descriptions on matters of public concern.[3] This lawsuit does not concern that behavior. This lawsuit concerns Defendants' distribution of infringing P2P platforms and widespread, blatant inducement of its audience to induce copyright. Plaintiffs' lawsuit in no way abrogates the culpable intent requirement imposed by the Supreme Court in *Grokster* – as described above, here the *gravamen* of Plaintiffs' allegations is Defendants' knowing distribution of P2P software and deliberate inducement, not its reporting or distribution of, say, antivirus software. The fact that Defendants engage in a number of legitimate, legal and perhaps even socially useful behaviors in addition to inducing infringement does not immunize them for liability for secondary infringement. At all times,

---

[3] Defendants' attempt to cast itself as a purveyor of "software location tools" is unpersuasive. Downloads.com *still* advertises itself as providing "free software downloads."

Defendants were free to either stop distributing P2P software or at least stop advocating that this software be used to steal music. Here, there is absolutely no risk that secondary liability would thwart or even chill socially beneficial and legal activity – especially where Defendants' culpable intent to induce infringement is so readily apparent.

Defendant references other internet based companies like Facebook, Twitter and Wikipedia supported by advertising that offer "commentary, evaluation and user tips" on P2P services and claims that, under Plaintiffs theory of liability, these services would be liable for secondary infringement for "providing truthful information and links" to P2P services. Not so. Plaintiffs are not, at present, aware that these other Internet companies and services deliberately and consciously induced users to violate copyrights via P2P in the way that CNET and Downloads.com did. To the extent that other companies made statements evidencing the intent to induce infringement while distributing P2P software, Plaintiffs maintain they would then be liable for secondary infringement. CBS certainly does not identify any statements or other evidence that these other companies did anything of the sort. As discussed above, that Defendants did not know the identity of the direct infringers or the identity of the copyright owner victim also does not immunize Defendants from liability here – Defendants knew that a massive number of "unknown persons" were stealing a massive amount of music.

Completely lacking from CBS's Motion to Dismiss is any policy or other justification for allowing a website or company to actively broadcast a message designed to stimulate others to infringe copyrights. Nor does CBS explain why holding it liable for broadcasting such messages while simultaneously distributing software designed for infringement would have any negative impact on entities or services engaged in legitimate business.

**B.     Plaintiffs Have Pleaded a Cause of Action for Contributory Infringement**

### 1. Plaintiffs Have Plead Constructive Knowledge

CBS argues that, under existing Ninth Circuit precedent, a cause of action for contributory infringement requires pleading actual knowledge of specific acts of infringement of Plaintiffs' work. This argument re-hashes the same arguments that Napster unsuccessfully attempted to advance in the *Fonovisia v. Napster, Inc.* case and that the Ninth Circuit rejected. 2002 WL 398676.[4] In that case, like CBS, Napster argued that the *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001) required actual knowledge of specific acts of infringement for computer systems operators. Id. At *5. As the *Fonovisia* court explains, *A&M Records* did no such thing. For starters, *A&M Records* itself found that "[T]he evidentiary record here supported the district court's finding that plaintiff's would likely prevail in establishing that Napster *knew or had reason to know* of its users' infringement of plaintiffs' copyrights." 239 F.3d at 1021. The court found that Napster had constructive knowledge because: (1) Napster executives have record industry experience; (2) they have enforced intellectual property rights in other instances; (3) Napster executives have downloaded copyrighted songs from the system; and (4) they have promoted the site with "screen shots listing infringing files." Id.; *Fonovisia* at *5.

In *Fonovisia*, the 9th Circuit also explained why the statement in *A&M Records* that "absent specific information which identifies infringing activity, a computer systems operator cannot be held liable for contributory infringement merely because of the structure of the system allows for exchange of copyrighted material." *Fonovisia* at * 6 (citing *A&M Records*, 239 F.3d at 1021). The language does not remove constructive knowledge as a basis for liability, but rather deals with

---

[4] Although unpublished, *Fonovisia* has been cited by a number of federal courts for principles of secondary liability, including *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F.Supp.2d 1197 (C.D. Cal. 2007).

the specific situation where secondary liability is predicated solely on a computer system's architecture. Where liability is predicated solely on a system's architecture, the concerns of *Sony Corp. v. Universal City Studios, Inc.* that the system might have substantial non-infringing uses come into play. In that situation, actual knowledge of infringement is required to safeguard the *Sony Corp.* policy rationales. *Fonovisia* at *6-7. However, where secondary liability is premised on *conduct* (as opposed to system architecture), "a range of conduct … may give rise to constructive or actual knowledge."

Here, as CBS acknowledges, Plaintiffs plead both actual and constructive knowledge. Complaint ¶ 161.

CBS's cases are inapposite. The contributory infringement holding in *UMG Recordings, Inc. v. Shelter Capital (Veoh)*, 667 F.3d 1022 (9th Cir. 2011) does not address the knowledge requirement for contributory infringement (although it does contain an extensive discussion of the knowledge requirement in the DMCA safe harbor provision – a doctrine clearly not relevant here). In *Perfect 10, Inc. v. Amazon, Inc.*, 508 F.3d 1146, the issue of actual versus constructive knowledge was not before the court. There, the plaintiff had sent notices to Google that its search engine linking had violated its copyrights. Therefore, the Court did not even consider whether plaintiff could establish Google's constructive knowledge. Nor does Footnote 11 of that case support CBS's position either, it states: "Google's activities do not meet the 'inducement' test explained in *Grokster* because Google has not promoted the use of its search engine specifically to infringe copyrights." 508 F.3d at 1171. This quotation is more relevant to Plaintiffs' inducement claim, but Plaintiffs have clearly plead that CBS promoted software specifically for purposes of infringement.

CBS's proposed novel interpretation of the knowledge requirement is bad policy. Requiring actual knowledge of the infringement of specific works, in the words of the 9th Circuit: "would give rise to strategic ignorance of monstrous

proportions" and would allow CBS and P2P systems operators "unprecedented shelter from the reach of the Copyright Act." *Fonovisa* at *9. This is especially true here where, as documented extensively in Plaintiffs' Complaint, CBS knew of *and encouraged* the massive infringement carried out through software it distributed and promoted for infringement. If liability could only exist after Plaintiffs notified CBS that their specific copyrights were being infringed on the networks constructed with the software it distributed (which is the practical upshot of CBS's articulation of the knowledge requirement), it would encourage CBS to engage in the "worst form of willful blindness." *Id*.

Finally, to the extent that CBS have articulated the correct pleading standard for contributory liability, Plaintiffs should be granted leave to amend to allege specific acts of infringement of their works.

### C. Plaintiffs Have Plead a Cause of Action for Vicarious Infringement

Plaintiffs articulation of the vicarious liability standard leaves out an important basis for vicarious liability. The necessary level of control required for vicarious liability may be present either through a "right and ability" to control the direct infringement *or* by "pervasive participation" in the "formation and direction" of the direct infringers. *Fonovisa, Inc. v. Cherry Auction Inc.*, 76 F.3d 259, 263 (9th Cir. 1996) (citing *Gershwin Pub. Corp. v. Columbia Artists Mgmt Inc.*, 443 F.2d 1159, 1163 (2nd Cir. 1971)). In *Gerswhin*, ASCAP brought a copyright infringement action against Columbia Artists Management, Inc. (CAMI) for musical compositions performed at concerts sponsored by local community concert associations promoted by CAMI. CAMI was an industry association that created local nonprofit organizations to produce concerts, and also managed its own artists. While the court found that CAMI lacked "formal power to control" either the local associations it created or the artists it managed, it was nonetheless vicariously liable for the infringement on account of its "pervasive participation in the formation and direction" of the local associations and their programming. 443 F.2d at 1163.

Among other things, CAMI created the market for and advertised the performances, and derived substantial financial benefit from the conduct of the primary infringers.

Plaintiffs' allegations here resemble the situation in *Gerswhin* – Plaintiffs have alleged that CBS created several vast networks for infringement, promoted direct infringement on those networks, instructed users how to use those networks for infringement, and benefitted financially from these activities. It is likely that P2P software publishers looked to CNET and Download.com to provide guidance as to what infringement-preventing procedures or policies were necessary in order for a program to be distributed commercially (CBS's answer: None). Given CBS's alleged importance in the distribution and ongoing viability of P2P networks, CBS clearly had a "pervasive participation" in the formation and direction of pirate computer networks. For this reason, all of the cases cited by CBS have no application here – the search engines, credit processing systems and wireless carrier defendants in those cases were not alleged to have the same pervasive, central role in online piracy as Plaintiffs allege CBS to have played.

The amount of control necessary to support a finding of vicarious liability is "fact specific." *Adobe Systems Inc. v. Canus Productions, Inc.*, 173 F.Supp.2d 1044, 1053 (2001). Even if CBS were correct on the standard of supervision and control necessary for vicarious liability, plaintiffs have not yet discovered the true nature of the relationship (contractual or otherwise) between CBS and the software publishers / P2P networks that CBS promoted and distributed over the Internet. It is possible, for example, that the contractual arrangement between CBS and these entities gives CBS significant power to regulate or control the network activity of software it distributes – even with respect to the removal of certain files and/or blocking certain users. For this reason, these claims cannot be adjudicated in a motion to dismiss (unlike, say, the Google or Visa defendants, whose standard user agreement contracts were readily and publicly available at that stage in the litigation).

June 4, 2011                              Respectfully submitted,

                                   By /s/
                                      Jaime Marquart
                                      Ryan Baker
                                      BAKER MARQUART
                                      10990 Wilshire Blvd., Fourth Floor
                                      Los Angeles, California 90024
                                      (424) 652-7811
                                      (424) 652-7850k (facsimile)

                                      Attorneys for Plaintiffs