1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                     ---

4     THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

5

6

7  Alkiviades David,               )

8               Plaintiff,    )

9                       )

10  vs.                   )  Case No.

11                    )  CV 11-9437-DSF(Jcx)

12  CBS Interactive, Inc., et al.,  )

13              Defendants.   )

14  _____ )

15

16

17         REPORTER'S TRANSCRIPT OF PROCEEDINGS

18            Los Angeles, California

19              Monday, July 2, 2012

20

21

22  Pamela A. Batalo, CSR, FCRR, RMR
     Official Reporter

23  Roybal Federal Building
     255 East Temple Street

24  Room 181-I
     Los Angeles, California  90012

25  (213) 687-0446

```
 1    APPEARANCES:

 2

 3      FOR PLAINTIFF:         BAKER MARQUART LLP

 4                             BY:  JAIME W. MARQUART

 5                                  CHRISTIAN A. ANSTETT

 6                             10990 WILSHIRE BOULEVARD

 7                             FOURTH FLOOR

 8                             LOS ANGELES, CA 90024

 9

10      FOR DEFENDANTS:        KENDALL BRILL KLIEGER

11                             BY:  RICHARD B. KENDALL

12                                  LAURA W. BRILL

13                             10100 SANTA MONICA BOULEVARD

14                             SUITE 1725

15                             LOS ANGELES, CA 90067

16

17

18

19

20

21

22

23

24

25
```

```
 1              Los Angeles, California, Monday, July 2, 2012

 2                            2:09 p.m.

 3                              -oOo-

 4              THE CLERK:  Calling Item No. 7, CV 11-9437-DSF(Jcx),

 5    Alkiviades David vs. CBS Interactive, Inc., et al.

 6              THE COURT:  Counsel, while you are setting up, excuse

 7    me for a moment.  I seem to have left that file in chambers.

 8                         (Off the Record)

 9              THE COURT:  You may be seated.  Thank you.  I'm sorry.

10              All right.  Counsel, your appearances.

11              MR. MARQUART:  Good afternoon, your Honor.  Jaime

12    Marquart and Christian Anstett on behalf of plaintiffs.

13              MR. KENDALL:  Good afternoon, your Honor.  Richard

14    Kendall and Laura Brill on behalf of defendants.

15              THE COURT:  Good afternoon.

16              We have three different aspects here to look at:  The

17    vicarious liability; the contributory liability, which is

18    material contribution and inducement; and then there was another

19    issue, which was lack of registration of copyrights for, I think

20    it was, 19 of the plaintiffs, and I didn't see any response to

21    that particular issue.

22              Did plaintiffs have a position?

23              MR. MARQUART:  May I approach the lectern?

24              THE COURT:  Yes.

25              MR. MARQUART:  Your Honor, today we, after meeting and
```

1   conferring pursuant to Rule 26(f) regarding parties, among other

2   things, amended our Form A0121 to list an additional number of

3   works for at least 14 out of the 19 that were identified to us

4   by counsel during that meet and confer effort, among others.

5   Five still remain.  We are attempting to hunt down applications

6   for those.  Given the nature of this coalition, we're working

7   through an intermediary, and it's not been easy to contact

8   everyone, so as to those five, we still at this point do not

9   have proof nor have we amended our form to contain copyright

10  registration for them.

11         We would seek the Court's guidance as to whether

12  registration -- we certainly have good faith reason to believe

13  that they have works or are aware of those works, but as to the

14  actual registration of those works, we would seek the Court's

15  guidance as to whether an amendment of the plaintiffs should we

16  required or whether we should dismiss, perhaps without

17  prejudice, pursuant to looking that up should be required.

18         THE COURT:  Did you want me to research that for you?

19         MR. MARQUART:  No, your Honor.  We actually have and

20  the Ninth Circuit's rule -- your Honor actually had an opinion

21  in 2005 which pointed out in a footnote -- it was the Kimball

22  opinion, I believe.

23         THE COURT:  I don't remember what I ordered last week,

24  Counsel.

25         MR. MARQUART:  Okay.  Well, I'll get you the cite if

1   you need it, but you pointed out in the footnote that the Ninth

2   Circuit had not yet decided whether registration or a mere

3   application was required, and the Ninth Circuit has since

4   decided that an application is enough to confer jurisdiction.

5           I would also point out that in Judge Kimball Wood's

6   opinion in the *LimeWire* matter, it's pointed out and observed

7   that it's -- cases of this nature are, by definition, moving

8   targets.  There are new works constantly being distributed by

9   the plaintiffs.  There are new plaintiffs that may possibly be

10  added.  The Court has its own rules for deadlines for adding

11  those plaintiffs.  And our argument would be that we're

12  certainly comfortable with dismissal without prejudice of the

13  five parties for which we do not yet have proof subject to their

14  amending and subject to, of course, all of the risks that come

15  along with amending later and the damages that are then

16  available to those plaintiffs for amending later.

17          THE COURT:  Well, I'm not sure the moving target

18  really applies here for people who have actually sued but for

19  whom you can't even find an application, but I will leave it to

20  you to decide what course you want to attempt and perhaps you

21  can confer with Mr. Kendall and Ms. Brill about that and work

22  something out.

23          MR. MARQUART:  Gladly, your Honor.

24          THE COURT:  With regard to the more substantive

25  issues, why don't you briefly explain to me, so I have a little

1  bit more clearly in mind, exactly what it is -- well, first of

2  all, you mentioned a coalition.  I don't know what that means.

3  I have individual plaintiffs here.

4          MR. MARQUART:  Yes, your Honor.  I was simply

5  referring loosely to the fact that the plaintiffs are united in

6  this cause against CBS Interactive as artists whose works have

7  been infringed through inducement, vicarious liability, and

8  contributory infringement liability.

9          THE COURT:  Well, the suggestion seemed to me to be

10 that it was difficult to communicate with all of them

11 individually, and I will caution you that each of them is your

12 client and it's your obligation to communicate with them about

13 whatever needs to be done, so if you don't have a satisfactory

14 line of communication, it's going to cause you many headaches

15 later on.

16         MR. MARQUART:  I appreciate that, your Honor.  My

17 understanding was that I was communicating with an authorized

18 agent of each of the parties, to clarify.  But I just wanted to

19 point out that the practicalities of working through the

20 authorized agent presented an additional obstacle.

21         THE COURT:  Well, at the moment I'll leave that on

22 your shoulders to deal with, but at some future point if it

23 causes a problem for the Court or timing and preparation for

24 anything that may turn out to be an issue, that you'll need to

25 be more concerned with.

1        With regard to the, as I say, the substance -- why

2   don't you just tell me briefly what you believe is happening

3   here and how this operation works which, as I understand it, is

4   now really, although we've been referring to defendants -- is

5   really now one entity because CBS Interactive has taken over the

6   CNET operation; is that correct?

7        MR. MARQUART:  That's correct, your Honor.  And so

8   I'll refer at times to Download.com, which is a website that's

9   undisputedly operated by CNET.  Likewise CNET.com contains the

10  same content and references the same content.

11       What's happening here -- and I'd like to start by

12  pointing out that we're obviously very well aware of opinions

13  that deal with liability for Google, for example, or Visa, and

14  this case is very, very different.  I'll start with inducement

15  because I think it's the simplest and most obvious claim for

16  what's happening here.

17       What's happening here is very different from a mere

18  passive search engine that we would call infringement neutral in

19  its own content.  It simply allows a user to search for

20  something and Google would claim *we can't be responsible for*

21  *what people use us to search for and then do*.

22       Likewise, Visa provides a very important function as

23  it was noted in the *Visa* opinion, which is processing payments.

24  They process payments very passively.  They don't in any way

25  induce others to process more payments for infringement than

1   otherwise, nor do they encourage anyone to use their processing

2   to induce infringement.  They simply allow or facilitate in an

3   infringement-neutral manner.

4          What has happened here and what the *Grokster* opinion

5   focuses on is there has been an expression of a specific intent

6   to induce others to come to CNET and to use that website to

7   download tools from which then they can induce copyright -- or,

8   rather, infringe copyrights, and that is inducement.

9          The best source in a 12(b)(6) motion is the Complaint,

10  and so I point your Honor specifically to Paragraphs 121 through

11  151 of the Complaint, and I'll read a couple of those out loud

12  for the Court.

13          THE COURT:  Only if you do it slowly.

14          MR. MARQUART:  Sure, your Honor.

15          Let me know when you're ready, your Honor --

16          THE COURT:  Well, I'm ready.  It's my court reporter

17  who can't type at the speed of light --

18          MR. MARQUART:  Okay.

19          THE COURT:  I listen more quickly than she types.

20          MR. MARQUART:  I think we just caused another problem

21  for her by talking over one another.  I apologize.

22          I'll read from page -- Paragraph 127 which is page 37

23  of the Complaint.  It begins, *For example in a,* quote,

24  *first-look video that Download.com posted to its website,*

25  *defendants reviewed LimeWire 5 and demonstrated how it worked to*

*Download.com users.  The video shows a close-up of the LimeWire*

*search screen as the CNET reviewer enters,* quote, *Nine Inch*

*Nails,* close quote, *a popular band and then shows the search*

*results which include many of the band's copyrighted songs.*

      *Later in the video, as the viewer looks at the screen*

*demonstrating another sample search, they see a list of*

*copyrighted works from artists including Will.I.Am, Usher, Trick*

*Daddy, Nas, Ray Stiles, and many others.*

      The paragraphs that follow -- and these, by the way,

your Honor, are videos produced by CNET employees and agents.

These are not user-generated content.  These are produced by

agents of CNET.  The paragraphs that follow go on -- and

incidentally, what's happening in these videos is direct

infringement.  They're downloading the software, and they're

showing screen shots, and they are saying say you're a fan of

Nine Inch Nails and you want to download one of their songs,

let's type it in.  Here we go.  Click, download, and there you

go.  So they're literally showing direct infringement on behalf

of -- their own agents are directly infringing and showing

others how to download them.

      They've been very successful in doing that.  They've

induced over two hundred million downloads of LimeWire software

and other related software.  The paragraphs that follow,

Paragraphs 128 through 131, talk about another aspect of their

inducement which is the -- I believe it was called the -- yeah.

1    *The file-sharing smackdown*, your Honor, wherein two CNET

2    employees take, I believe it was, 18 popular songs and use

3    different P2P software to attempt to download those songs and

4    then compare for the users in a live format which is recorded

5    and then available on the website and is still, as we understand

6    it -- still available but certainly was available during the

7    relevant periods.  They record which of the P2P software

8    downloaded those infringed -- those protected works fastest.

9         So in doing that, they again have generally and

10   specifically directly infringed those 18 works, but more

11   generally -- and it's not necessary that it be specifically --

12   have intended to induce any user to use the works to do that.

13        There are no, as I recall -- no videos but certainly

14   if there any, it is a very, very small, small minority of videos

15   wherein, for example, a CNET editor says, *Say your friend has a*

16   *file that's open source and he wants you to download that,* that

17   doesn't exist, your Honor.  Every single one of the comments by

18   CNET editors that we could find -- and I'll challenge defendants

19   to point to others, but I can assure you it's a minority if they

20   do.  Every single one of these editorials were geared toward

21   infringing copyrights of known protected works.

22        Also the throughout the history of CNET, it has shown

23   a pattern of when Napster gets busted by the courts, they remove

24   Napster.  Then they go to LimeWire.  When LimeWire -- when

25   Kendall Woods' opinion came out and LimeWire was judged to be an

1   infringer, they removed LimeWire.  And then there is CNET

2   editorials and there are even podcasts that talk about

3   BitTorrent technology, the next wave of how to get around this.

4           CNET is geared toward infringing copyright.  It

5   doesn't matter how the cat is skinned, your Honor, and that's

6   not required under the law after the *Grokster* opinion.

7           THE COURT:  Well, I agree that inducement is the

8   easiest, so why don't you move on to the other aspects of the

9   case.

10          MR. MARQUART:  Certainly, your Honor.  As to the other

11  two, I want to start with an opinion in the Central District by

12  the late Honorable Florence Marie Cooper.

13          THE COURT:  Well, let me tell you before you do

14  that -- first of all, the late Honorable Florence Marie Cooper

15  was a dear friend of mine, but we had very differing opinions on

16  a lot of things, and to cite an opinion of hers means no more to

17  me or any of my colleagues than if I were to walk across the

18  hall to my friend, the Honorable Judge Klausner and say, *Hey,*

19  *Gary, what do you think?*

20          So, A, you should keep that in mind when citing

21  district court opinions, and, B, no district court opinion in

22  the Ninth Circuit or elsewhere is an opinion of the circuit in

23  which that district court sits and it should not be cited as

24  such.

25          MR. MARQUART:  I understand, your Honor, and I'm about

1    to address part of that concern.

2            THE COURT:  All right.

3            MR. MARQUART:  The first part was I was simply paying

4    respect to Judge Cooper.

5            The second part of your concern is that this opinion

6    is quoting directly from the *Grokster* case.  I'm citing it as an

7    example of the Central District observing the *Grokster* opinion

8    and applying it in a new instance.

9            THE COURT:  Well, as I say, you can cite whatever you

10   want so long as there's no rule against it, but it is a lot more

11   persuasive to me if you would just cite the *Grokster* case

12   because when I see a district court decision, I really don't pay

13   nearly as much attention to it as you would hope, even if the

14   district court opinion is mine.

15           MR. MARQUART:  I understand.

16           THE COURT:  So --

17           MR. MARQUART:  I understand.

18           This particular opinion, before I cite *Grokster*, was

19   decided under Rule 8 and also pertains to the notice pleading

20   standard and has quite a bit to say about the notice pleading

21   standard and the minimum standard that it is, so in that

22   instance, it's also instructive.

23           For what it's worth, at the risk of violating your

24   admonishment, it is 2006 WL 5383789, and it's -- I'm reading

25   from page 3.

1    I will now, your Honor, cite the *Metro-Goldwyn-Mayer*

2    *Studios vs. Grokster LTD*, which is 125 SCT 27642776, Note 1.

3    And it states, quote, *One infringes contributorily by*

4    *intentionally inducing or encouraging direct infringement and*

5    *infringes vicariously by profiting from direct infringement*

6    *while declining to exercise a right to stop or limit it.*

7    So I'll start with the later.  After *Grokster* it's

8    clear that *control* means the ability to stop or limit

9    infringement.  Defendants own papers have admitted, in conceding

10   that they have removed the offensive LimeWire content, that they

11   had the ability to stop and limit it at any point.

12   The issue in the Google case was that their search

13   algorithms were such that it was very, very difficult for them

14   to be able to do it.  And again -- this is still related -- they

15   didn't have a motive that was infringement biased.  They were

16   infringement neutral.

17   In this instance, not only in the LimeWire instance,

18   but throughout history -- Napster first, then Grokster, then

19   LimeWire -- the defendants have shown the ability -- which is

20   alleged in the Complaint and I'm happy to point out the

21   paragraphs.  They've shown the ability to stop or to limit the

22   infringing activity.  And I believe that this issue of control

23   is really where the action's at in defendants' motion.

24   I want to add, though, that we've also alleged on

25   information and belief that they have direct contractual

 1   relationships, but, your Honor, they've got that information.

 2   We don't have that.  That's an issue for discovery, but

 3   certainly it's not required when control has been alleged.

 4        THE COURT:  Well, maybe I misunderstood what they were

 5   saying, but obviously they can remove -- I shouldn't say

 6   *obviously* because I don't know how all this works very well, but

 7   they can say, *Okay, we're not going to have LimeWire here*

 8   *available for download anymore,* but that doesn't mean that

 9   nobody can download copyrighted material using LimeWire.  It

10   just means it can't be done by getting it through CNET.

11        MR. MARQUART:  That's right, but the cases focus on

12   the defendants' ability to stop its contribution, and it's also

13   noted in the Complaint that 95 percent of all of the downloads

14   of LimeWire came from Download.com so it's a significant effect.

15        Let me --

16        THE COURT:  Are they using Download.com to download

17   it, to download the copyrighted material, or do they get

18   LimeWire itself from Download.com and then --

19        MR. MARQUART:  They get -- what they do is they go to

20   Download.com.  They search for peer-to-peer software.  They

21   immediately get all sorts of links with tutorials as to which

22   software are better by CNET agents telling them how to download

23   those tools and then instructing them, as they themselves

24   directly infringe, how to use those tools to infringe.

25        And our contention is -- there's a lot made about this

1   secondary versus tertiary offense.  There's no evidence in any

2   of the authority, *Grokster* or otherwise, in any of the

3   authority, including the remanded *Grokster* opinion from 2007,

4   that suggests that it matters what level you're at.  What

5   matters is the intent.  Again, I'm going back to inducement.

6           Sticking to the point of vicarious, what matters is

7   their ability to stop or limit the infringement.  Clearly if

8   they're able to stop or limit 95 percent of the LimeWire

9   downloads, as they did, then they're able to stop or limit users

10  from using LimeWire to infringe.

11          THE COURT:  But I'm still not understanding how they

12  do that.  If -- if the -- if I wanted to do that, I would

13  download LimeWire itself to my computer; right?

14          MR. MARQUART:  Right.

15          THE COURT:  And then I would find somebody who wants

16  to share a copyrighted item, and my computer and that person's

17  computer would communicate.  Do we need Download.com for

18  something?  Do we use Download.com for something?

19          MR. MARQUART:  Well, Download.com is providing

20  instructions as to how to use it.

21          THE COURT:  Yes.  But once I know how to use it, then

22  what?  There's a lot of things people teach me.  I don't need to

23  go back --

24          MR. MARQUART:  I will concede that once LimeWire is

25  downloaded, there is no need to access Download.com any longer

1    unless one needs instruction as to how to do it.  I think we've

2    already covered that.  That's inducement.

3            But if I may, I want to read in the record what is

4    alleged as to vicarious liability and control.  This is

5    Paragraph 167 of the Complaint on page 49:  Quote, *Defendants*

6    *are liable as vicarious infringers for the copyright*

7    *infringement committed via P2P client software that defendants*

8    *distributed and promoted, including LimeWire and others as noted*

9    *above.  At all times relevant to this action, defendants/I have*

10   *had the right and ability to control and/or supervise the*

11   *infringing conduct of P2P client software publishers and*

12   *individual users, either by direct contractual relation or as a*

13   *matter of practical control, including, without limitation,*

14   *through their ability to cut off distribution of P2P clients and*

15   *listing on Download.com any and all versions of software and*

16   *defendants' ability to cease publishing articles promoting and*

17   *instructing users on the use of P2P software for infringement.*

18           And of course we allege they've had a direct financial

19   interest and that's been alleged throughout the Complaint.  I

20   don't think there's any dispute about that allegation.

21           So, your Honor, clearly I just simply do not believe

22   that the law requires under the element of control that

23   Download.com actually, in every instance the infringement is

24   occurring after a download of LimeWire, participate meaningfully

25   in that particular instance.  Clearly they provided both the

means and the instruction and in fact encouraged and profited

thereby for users to download the tool, and once that happens,

it sets in motion a network of events, a network of songs that

include millions and millions of protected works and sets forth

a sequence of events whereby users are now sharing protected

works which Download.com is very well aware of.

THE COURT:  What more does vicarious liability, if

there is such, give you than inducement?

MR. MARQUART:  I would concede, your Honor, that the

damages -- in our mind, the damage theories are the same.  In

fact, there's an open question as to -- and many cases -- many

of the cases in the circuit are confused sometimes, various

versions of secondary liability, particularly contributory

inducement and inducing copyright infringement -- sorry --

contributory infringement.  A lot of courts look at those as one

and the same.

The damages model would be absolutely the same.  The

difference is that we haven't yet discovered what I pointed out

which was either by direct contractual relation and/or as a

matter of practical control.

Your Honor is taking issue with the practical control,

as I understand your question, but we don't -- we've alleged on

information and belief that there's direct contractual

relations, and we do in fact believe that there were particular

relationships.  We talk about a pay-per-download system that was

a separate contract whereby individual LimeWire-type
participants could pay and achieve a higher rank in the search
listing and then would pay per download, sort of the way that
Google's AdSense worked, but again that was in an
infringement-neutral setting.

So there a number of different facts that we believe
weren't appropriate under Rule 8(a) or Rule 12(b)(6) that need
to be discovered as to that element of control, and we would
suggest that this is a premature motion for summary judgment.

THE COURT:  All right.  Is there anything else you
want to say?  I'm not sure you've addressed material
contribution, although everything kind of runs together here.

MR. MARQUART:  Yes, your Honor, I do want to address
that.  Thank you.

Just to be clear, the elements of contributory
infringement do differ slightly.  Reading again from -- at the
risk of citing the opinion that cites the opinion, I will read
from *Newborn vs. Yahoo, Inc.* which is 391 F.Supp.2d, 181, 185
through 86.

*A claim for contributory copyright infringement must*
*allege, one, direct infringement by a third party; two,*
*knowledge by the defendant that third parties were directly*
*infringing; and, three, substantial participation by the*
*defendant in the infringing activities.*

So I think the materiality concern deals with that

1   third prong there.  It's been described in different ways, but

2   the Complaint alleges again that 95 percent of the downloads for

3   LimeWire occurred through Download.com; that people came to

4   Download.com and CNET for advice as to how to infringe; and that

5   once there, CNET participated by literally showing them how

6   their own paid editors could download this content on the fly,

7   showing them their own direct infringement, and telling them to

8   go and do it.  And in our mind, all of it does bleed together,

9   we agree, and the bases of damages are very similar once

10  liability is determined.  But in our mind, that clearly

11  satisfies the materiality requirement or, as I had quoted,

12  substantial participation by the defendant in the infringing

13  activities.

14          THE COURT:  All right.  Thank you.  And before I let

15  you go, you mentioned something about an amendment for at least

16  14 or 15 of the plaintiffs.  What do you plan to do with that so

17  I can --

18          MR. MARQUART:  Yes, your Honor.  That was not an

19  amendment to the Complaint.  That was an amendment for

20  plaintiffs who already are named in the Complaint who are among

21  those 19 pointed out to us, and that was filed today, and so it

22  should be in the Court's files.  I do have an extra copy if you

23  would like me to provide it, but it's in the Court's record now.

24          THE COURT:  All right.  Well, if you filed anything,

25  there should be a mandatory paper chambers copy.  We used to

1    call it a *courtesy copy* but we discovered that lawyers weren't

2    really all that courteous so now we call it mandatory --

3              MR. MARQUART:  Well, I'm both courteous and aware of

4    the mandate.

5              THE COURT:  All right.  Thank you.

6              Mr. Kendall or Ms. Brill?

7              MR. KENDALL:  Your Honor, the theory of this case is

8    an unprecedented one.  The argument is that a tertiary actor

9    that is in the business of maintaining a directory with some

10   editorial comment associated with that directory can be liable

11   at two removes from infringement that takes place.  And there's

12   no case that's been cited by my learned opponent that's anything

13   like this.  So what we're left to do is reason from precedents

14   that are pretty far from the facts that we have here.

15             And I'll say at the beginning that as the Court's

16   comments indicate, there's more crispness with respect to the

17   vicarious infringement and contributory infringement theories of

18   liability which, in my view, makes them easier for us to succeed

19   on this motion than there is for inducement.  But I believe when

20   you look hard at the precedents and the analysis in the cases

21   and the policies that underlie that analysis, the same

22   conclusion would be true of inducement.

23             But if I may, let me start with vicarious

24   infringement.  Vicarious infringement is a common law doctrine

25   that emerged from traditional vicarious liability.  And

vicarious liability in the typical tort context depends on one

party's control of the alleged tort-feasor.  Control is the key

point and so it's been in the area of vicarious liability for

infringement.

Now, we have two cases in this circuit which has been

the leading circuit, in fact, I think really the only circuit

that has been faced with cases and has needed to address claims

against tertiary actors, those being the credit card companies

in the *Visa* case and Google and Amazon in the *Amazon* case.

So the *Visa* case states the rule pretty clearly:  *For

vicarious liability, a plaintiff must allege that the defendant

has first the right and ability to supervise the infringing

conduct,* and that, of course, is the conduct of the users of a

peer-to-peer software, *and secondly, a direct financial interest

in the infringing activity.*

Now, the Court in the *Amazon* case went on and

explained that control over direct infringer occurs when the

party in that case, Google or Amazon, has a legal right to stop

or limit the infringing conduct, as well as the practical

ability to do so.

In the example that your Honor gave, the user of

LimeWire who can get LimeWire from any of a number of different

sources was not under the control of either of the defendants in

this case.  Now we'll just call it CBS Interactive.  CBS

Interactive has no knowledge of who that individual may be.

1    That individual can conduct the unlawful activity without any

2    assistance whatsoever of any sort from my client.

3            The only cases that are actually cited in the brief

4    that address the vicarious infringement issue and are relied

5    upon that come from this circuit -- and by the way, that *Newborn*

6    case that was just cited to you, not only was that not cited in

7    their briefs, but it's a District of -- district court from the

8    District of Columbia case.  And so let's just understand that it

9    either has analysis or not, but merely quoting some language

10   doesn't really advance the ball very much.

11           CBS has no privity at all with these alleged direct

12   infringers.  We don't know who the direct infringers are.

13   They're not alleged in the Complaint as to who they are.  And no

14   right and no practical ability to stop them from infringing.

15   And this is very different from the concert promoter who can

16   stop the concert where the allegedly infringing music was

17   performed in the *Gershwin* case, and it's very different from the

18   swap meet owner who can say sellers of pirated CDs, *You can no*

19   *longer sell CDs here.*  But we don't have that practical ability

20   and we don't have the *de jure* right to stop the primary

21   infringer.

22           Now, with respect to contributory infringement, there

23   are two types.  Let me first focus on the contributory

24   infringement that is not inducement.  We have here the *Napster*

25   case, the *Perfect 10/Amazon* case to look to in this circuit.

1    And the *Perfect 10/Amazon* case says that *a computer system*

2    *operator*, such as Download.com, *could be contributorily liable*

3    *if it has actual knowledge that specific infringing material is*

4    *available using its system,* meaning its website, *and can take*

5    *simple measures to prevent further damage to copyrighted works*

6    *yet continues to provide access to infringing works.*  Well, none

7    of that is happening here, none of those things is happening

8    here.

9         The most that can be said that is happening here is

10   that you can go to Download.com, as you can to many other

11   websites, and in addition to being able to find thousands upon

12   thousands of other software programs, you can also find

13   peer-to-peer programs, and you can then follow a link to the

14   website of a peer-to-peer operator and take it from there, if

15   you choose to, with that peer-to-peer operator's website,

16   including downloading the software from that website.

17        None of that entails any specific infringement of any

18   work of any kind by the Download.com website or the defendants

19   who operate it.  None of it entails any knowledge of any

20   specific acts or infringement by any end user who happens to

21   come to our website first before going to the peer-to-peer

22   website and going on with its activities, and none of it entails

23   that we knew or could have known anything about what people who

24   visit our website do.  What this amounts to is a claim that

25   merely making a link available, together with some editorial

1    content, which I'll get to in a moment -- but focusing on the

2    link for a moment, making a link available to create liability.

3          Now, Google did more than that in the *Amazon* case.

4    Google not only linked to the specific infringing conduct --

5    content, unlike here where we only link to the peer-to-peer

6    software site; we're not linking to any infringing content of

7    any kind.  But Google also had a thumbnail copy of that content

8    on a website that a consumer would then see a copy of Perfect

9    10's copyrighted material but only in a thumbnail form.

10         We don't have any content of any of these plaintiffs

11    on our website at all.  So we are at a more attenuated

12    relationship with the content; in fact, no relationship with the

13    content than was Google.

14         So I think, your Honor, under the elements that have

15    been found as to vicarious infringement and contributory

16    infringement in the Ninth Circuit, it's quite clear that those

17    elements are not satisfied here, which brings me to inducement.

18         The problem with inducement is that the language of

19    the *Grokster* opinion, which deals with a very different set of

20    facts, is, I think we all have to recognize, loose enough to

21    make it possible to make allegations that would seem at first

22    blush to fit within some of that language, and what I now wish

23    to do, your Honor, is argue why the Complaint, which I'm struck

24    with obviously, doesn't do that.  If this case goes forward,

25    there will be questions about the satisfying of Rule 11 with

1    respect to some of those allegations, but I can't make those

2    arguments now.

3            Let me start with what is alleged in the Complaint and

4    what is also conceded by other allegations in the Complaint.

5            So what is alleged in the Complaint is that CBS

6    Interactive maintains the world's most comprehensive directory

7    of software, and that among the software programs that are

8    discussed and to which links are provided -- not to the software

9    program itself, but to the website where the software program

10   can be found -- include some peer-to-peer software programs.

11   There is no question that based on the Complaint that a massive

12   amount of information is available on Download.com and CNET.com

13   that has nothing whatsoever to do with peer-to-peer software at

14   all.

15           But they're focusing on what does have to do with

16   peer-to-peer software.  What they have to satisfy under the

17   *Grokster* language is that the defendants here intended -- and

18   I'm now going to quote from *Grokster* at page 940:  *To bring*

19   *about infringement and distributed a device suitable for*

20   *infringing use*.

21           Now, the Supreme Court was discussing that in the

22   context of *Grokster* and also, I think it's fair to say, a

23   discussion of the prior *Napster* case in which the whole purpose

24   of Napster and then Grokster at issue was to further

25   infringement.  That's what those companies did.  That's what

 1   those programs were for, and there was evidence that literally

 2   millions of infringing works were available through those

 3   networks that were operated by Grokster and its predecessor,

 4   Napster.  There is nothing like that here because Download.com

 5   and CNET.com don't operate anything that has any infringing

 6   content on it, according to this Complaint.

 7           But the other question is did the defendant intend, in

 8   addition, to bring about infringement.  Now, here we get to a

 9   problem because CNET.com is probably the leading source for

10   information about software.  So in addition to trying to find

11   the boundaries of culpability, we also have to take account that

12   we're finding the boundaries of First Amendment protection here.

13           The Complaint concedes that peer-to-peer software is

14   not per se illegal.  That's at Paragraph 154 of the Complaint.

15   And obviously then it follows that there's nothing per se

16   culpable about being a user of peer-to-peer software, and in

17   fact the Court in *Grokster* noted that peer-to-peer technology

18   that enables internet users to share files which can include

19   their own works or public domain works or licensed media files

20   is a great benefit.  So there's nothing wrong with a directory

21   pointing to peer-to-peer software for appropriate uses.  And

22   there's certainly nothing wrong with reporting on how to use it

23   or reporting on which softwares can download files more

24   efficiently.

25           So there has to be more in order to find liability

1 here, and whatever that liability is premised on has to be

2 something from which the Court could draw, you know, a principle

3 that would govern activity particularly in this First Amendment

4 area.

5 　　　　So what do we have on what could constitute culpable

6 conduct that would satisfy the inducement standard?  Really the

7 best way to think about that, I believe, is to look at what the

8 *Global Tech* case, the patent case that was recently decided by

9 the Supreme Court, said about what was at issue in *Grokster*.  So

10 the issue in the *Global Tech* case was the level of knowledge and

11 culpability that was required in order to be liable for patent

12 infringement based on an inducement theory.

13 　　　　And as the Court will remember from reading *Grokster*,

14 the *Grokster* court goes on at great length to describe the

15 various forms of secondary liability at issue in *Grokster*.  Here

16 we have to be tertiary.  *The varios forms of secondary liability*

17 *either derive from the common law or from the patent law.*  So

18 the patent law is a good place to look, and that's why in --

19 what the court said in *Global Tech* I think it's very helpful to

20 try to interpret *Grokster*.

21 　　　　The Supreme Court in *Global Tech* last term reiterated

22 that inducement liability is confined to instances of culpable

23 action requiring knowledge of the existence of the patent that

24 is being infringed.  That's in the *Global Tech* case, 131 Supreme

25 Court at 2068.

```
 1              So here the analog would be that Download.com would
 2     have knowledge of the fact that primary users of its website,
 3     the Download.com website, are using that site to infringe the
 4     plaintiff's specific copyrighted works.  Well, of course, as
 5     I've said, that's not happening at all.
 6              The next level of remove, which I submit is not a
 7     basis for liability at all, is to say that the operators of
 8     Download.com are aware of specific infringing activity occurring
 9     at a peer-to-peer software site, which is not an illegal one.
10     LimeWire, once it's declared illegal, that's another story.
11     That's why it comes down off of our website, but the question is
12     should Download.com be removing all peer-to-peer software since
13     all of them are subject to misuse, just like the Betamax was
14     subject to misuse.
15              The Global Tech court pointed out at page 2070 that in
16     Grokster, the defendants were fully aware of the acts that
17     constitute infringement and violated the rights of copyright
18     holders that were occurring on the Grokster network, and of
19     course they had to be.  That was the whole purpose of the
20     network.
21              That I submit, your Honor, is the standard that's not
22     met here for inducement.  There's no showing -- there's no
23     allegation other than the bald conclusory allegations that don't
24     suffice under the Iqbal case.  There's no specific fact of any
25     kind showing awareness, and that's where I believe the
```

1  inducement claim fails.

2        It also fails, we would argue, based on Ninth Circuit

3  law.  In the Ninth Circuit, the Court held in the *Perfect*

4  *10/Amazon* case that the plaintiff must plead and prove that the

5  defendant promoted its own services for the purpose of

6  infringement, and I submit there's no allegation to that effect

7  here nor could there be.  Similar law, your Honor, from the

8  *Luvdarts* case that we also cited, 2011 Westlaw 997199 at page 2,

9  which was the wireless carrier case.

10        And finally, your Honor, if I could discuss the

11  editorial commentary on which they rely.  I don't think it's a

12  fair characterization for counsel to say that Download.com tells

13  the user -- and, I mean, even as alleged in the Complaint --

14  *download this and here's how to use it*.  They have pointed to

15  some editorial commentary that is not on the link page but is

16  just available on the website.  A lot of the editorial

17  commentary they point to is pre-Grokster when it wasn't clear

18  what the status was of even Grokster.  But some of it is

19  post-Grokster.  But it is not as if it is a -- an advertisement

20  to use Grokster coming from the operator of Grokster.  Instead,

21  this is a discussion of the merits of different peer-to-peer

22  softwares coming from an organization whose news gathering

23  includes that sort of commentary.

24        So the question this raises is whether that content

25  can be the basis for distinguishing us from the credit card

1    company, which is their argument.  That's how he began his

2    argument.  And I submit that we're in very dangerous territory

3    if the content is the only basis for liability here.

4          In the *Sony* case, the Court pointed out the reluctance

5    of the judiciary to expand copyright protections without

6    explicit legislative guidance because of the settled principle

7    that the protection given to copyrights is wholly statutory.  So

8    this isn't supposed to be judge-made.  That's at page 417 in the

9    *Sony* case.

10          The Court expressed a need to be circumspect in

11    construing the scope of rights where Congress has not plainly

12    marked the course, page 131.  And then the Ninth Circuit has

13    echoed these concerns that we evaluate, in that case, the

14    Perfect 10 against Visa case.  Perfect 10's claims:  *With an*

15    *awareness that Congress has determined it to be the policy of*

16    *the United States to promote the continued development of the*

17    *internet and the interactive computer services and the other*

18    *interactive media and to preserve the vibrant and competitive*

19    *free market that exists for it.*

20          Your Honor, the problem here is that if CBS

21    Interactive can be liable here, there would be -- on an

22    inducement theory on this Complaint, it would be very difficult

23    to advise a client that wishes to have any commentary about an

24    internet cite.  Suppose I was giving advice to the *Los Angeles*

25    *Times* and they came to me and they said, *We provide links to*

*many different kinds of electronic products, including websites.*

*We provide editorial comment.  Do we need to tailor our*

*editorial comment so that we do not cover software that is*

*highly controversial and may one day be adjudged but has not yet*

*been adjudged to be illegal?*

The result in this case could affect the kind of

advice you give in that situation, and that's why I think that

in analyzing the situation, even on the toughest claim, which is

the inducement claim, the Court should find in this case that

not enough has been alleged to establish the kind of liability

that was present in *Grokster* or the other secondary inducement

cases but instead find that this is much more like the tertiary

liability cases in which the courts have declined to find

liability.

Thank you, your Honor.

THE COURT:  All right.  Thank you.

Mr. Marquart, if you have more than two or three

minutes, we'll take a break.

MR. MARQUART:  I think I can finish it, your Honor.

THE COURT:  Okay.

MR. MARQUART:  First I want to point out that the

*Perfect 10* cases, the Amazon and Google vs. Perfect 10 cases

were decided on preliminary injunctions where the Court had in

front of it the AdSense agreements between Google and the direct

infringer.  That is one example among many of factual arguments

1   that counsel has made here that simply aren't appropriate on a

2   12(b)(6) motion.

3          Secondly, it is not the content but the intent that is

4   at issue here which is itself, we concede, a factual issue, a

5   deeply-rooted factual issue.  We could present to the Court --

6   it's premature now -- evidence from prior BitTorrent executives,

7   for example, that suggest that there was direct privity where

8   counsel says there was not direct privity.  We need to discover

9   similar instances from others and we haven't had the opportunity

10  to do that.

11         Let me read, though, real quickly from the *Grokster*

12  opinion the two mere elements for inducement.  Notably none of

13  them have anything to do with what I would consider

14  hairsplitting by counsel as to the level of command, as it were,

15  or hairsplitting the actual technical use of particular software

16  and how it's downloaded.  They all have to do with intent.

17         The two elements are that *One distributes a device*

18  *with the object of promoting its use to infringe copyright as*

19  *shown by clear expression or other affirmative steps to foster*

20  *that infringement.*

21         Your Honor, clearly this did not work for LimeWire.

22  LimeWire, Napster, Grokster all said, *Look, we just download*

23  *software from which anyone can do anything they want with it.*

24  Why was that different than the *Sony*/*Betamax*?  Simply because

25  *Sony* in that case did not distribute a two edit VCR with

1   advertisements accompanying it saying, *here's how to download*

2   *Pirates of the Caribbean* and a 40-page guideline as to how to do

3   it written by *Sony* agents.  That's what alleged here.

4          We concede that it's a factual issue, but everything

5   else that counsel has mentioned are factual issues.  And we've

6   clearly -- this Complaint is dripping with fact.  The

7   pay-per-download allegations, the file-sharing smackdown, quotes

8   from screen shots of infringement.

9          We simply submit, your Honor -- and there's really no

10  reason to argue it any further -- that it's unfair

11  hairsplitting.  And the only case that I'd like your Honor to

12  focus on -- I apologize, it's not a Ninth Circuit case, but I

13  think it's very telling and is an interpretation of the *Grokster*

14  opinion -- is the *Fung* case which I will read the citation into

15  the record for your Honor.  It's 2009 WL 6355911.  It's a

16  Central District of California case, your Honor, wherein the

17  defendant merely provided indexing, just the ability to search

18  for various torrent files for known copyrighted movie content.

19  And he claimed to the Court there, *Well, your Honor, I'm only*

20  *providing an index.  I'm only providing people the ability to*

21  *search for these things and then the torrent files exist*

22  *somewhere else.*  He was splitting hairs.

23          What the *Grokster* opinion and all the cases, including

24  the *Grokster* remand opinion, are doing is taking a practical

25  view now and saying if the intent through expression and conduct

1    is shown to be that to induce others to infringe known

2    copyrighted works and if it has that effect and if there's a

3    profit motive, which clearly there is or it's alleged there is,

4    then inducement exists.

5         I will rest upon my original argument, your Honor, as

6    to vicarious liability.  I gave as an example that the privity

7    argument of counsel relied upon *Perfect 10 vs. Google*.  That

8    case had before it the contracts.  We're not at that stage.

9         THE COURT:  Thank you.

10        One minute, if you'd like.

11        MR. KENDALL:  Your Honor, actually all I would like to

12   point out is that I addressed that argument relating to the *Fung*

13   case at page 9 of our reply brief.

14        THE COURT:  All right.  Thank you.

15        We will take a 10-minute recess.

16                     (Recess taken)

17        THE COURT:  Why are you here?

18        MR. MARQUART:  We weren't sure if the matter stood

19   submitted, your Honor.

20        THE COURT:  Yes.  Usually people leave when I'm in the

21   middle of talking to them.

22        MR. MARQUART:  We couldn't get enough today.

23        THE COURT:  Thank you.

24

25                (Proceedings adjourned at 3:09 p.m.)

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
*                      )*
*STATE OF CALIFORNIA   )*

*            I, Pamela A. Batalo, Federal Official Realtime Court*
*Reporter, Registered Professional Reporter, in and for the*
*United States District Court for the Central District of*
*California, do hereby certify that pursuant to Section 753,*
*Title 18, United States Code, that the foregoing is a true and*
*correct transcript of the stenographically reported proceedings*
*held in the above-entitled matter and that the transcript page*
*format is in conformance with the regulations of the Judicial*
*Conference of the United States.*

*Date:  July 5, 2012*

*/s/ Pamela A. Batalo*
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*