BAKER MARQUART LLP
Jaime Marquart (Bar No. 200344)
jmarquart@bakermarquart.com
Ryan Baker ( Bar No. 214036)
rbaker@bakermarquart.com
Christian Anstett ( Bar No. 240179)
canstett@bakermarquart.com
10990 Wilshire Blvd, Fourth Floor
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Attorneys for All Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIE FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, | CASE NO. CV11-9437 DSF (JCx)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF;**<br><br>**DECLARATION OF CHRISTIAN ANSTETT; NOTICE OF MANUAL FILING; AND [PROPOSED] ORDER FILED CONCURRENTLY HEREWITH**<br><br>Hearing Date: February 25, 2013<br>Time: 1:30p.m.<br>Judge: Hon. Dale S. Fischer<br>Courtroom 840<br>Trial Date: none set |

1   JONATHAN SHINHOSTER,
    DIAMOND SMITH, REMINISCE
2   SMITH, GERALD SPENCE, CHRIS
    STOKES, IRENE STOKES,
3   JUANITA STOKES, WILLIAM
    TENNYSON AND THE TENNYSON
4   ESTATE, CARL THOMAS, JEFF
    THOMKINS, RONDELL TURNER,
5   RICKY WALTERS, KEVIN
    WILLIAMS,  YOLANDA WHITAKE,
6   JOSEPH WILLIAMS, RAHEEM
    WILLIAMS, CASE WOODWARD,
7   ATTRELL AND JARRETT CORDES,
    MITCHELL GRAHAM
8
9
            Plaintiffs,
10
11          vs.
12   CBS INTERACTIVE INC., CNET
     NETWORKS, INC.
13
            Defendants.
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on February 25, 2013,[1] at 1:30p.m., or as soon thereafter as the matter may be heard in Courtroom 840, located at 255 E. Temple Street, Los Angeles California 90006, before the Honorable Dale S. Fischer, Plaintiffs Sugar Hill Music, *et al* ("Plaintiffs") will and hereby do move this Court pursuant to Federal Rule of Civil Procedure 65 for a preliminary injunction to restrain Defendants CBS Interactive Inc. and CNET Networks, Inc. ("Defendants") from:

a. directly or indirectly enabling, facilitating, permitting, assisting, soliciting, encouraging or inducing any public consumer of Defendants in downloading a peer-to-peer ("P2P") software program based on the bittorrent protocol, including but not limited to uTorrent, Frostwire, Speedlord, FireTorrent, GetTorrent, TorrentRover, MovieTorrent, Vuze, and WireBooster;

b. hosting, linking to or otherwise providing for download any peer-to-peer ("P2P") software program based on the bittorrent protocol, including but not limited to uTorrent, Frostwire, Speedlord, FireTorrent, GetTorrent, TorrentRover, MovieTorrent, Vuze, and WireBooster; and,

c. encouraging, soliciting or inducing the infringement of copyrighted works, directly or indirectly, through the use of P2P software.

Plaintiffs make this motion on the grounds that plaintiffs are likely to succeed on the merits of their inducement claim as Defendants distribute bittorrent software programs capable of widespread copyright infringement while simultaneously

---

[1] This date was agreed to in advance between counsel to accommodate various holiday schedules of counsel and clients, and a stipulated briefing schedule will follow.  The later hearing date was agreed to with the understanding that the additional time from filing to hearing would not be argued as evidence of delay.

1  demonstrating how to infringe copyrights using that software.  Moreover,

2  preliminary injunctive relief is warranted because serious questions are raised by

3  Plaintiffs' claims and the balance of hardships tips in their favor.

4        Plaintiffs base this motion on this Notice, the Memorandum of Points and

5  Authorities herein, the Declaration of Christian Anstett and Notice of Manual Filing

6  filed concurrently herewith, the papers and records on file in this action, and any

7  evidence and argument presented at the hearing on this motion.

8

9  DATED: November 9, 2012        Respectfully submitted,

10                                 BAKER MARQUART

11

12                          By    /s/   Jaime W. Marquart
                                  Ryan Baker
13                                Jaime Marquart
                                  Attorneys for All Plaintiffs
14

1

## **<u>TABLE OF CONTENTS</u>**

2

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ...................................................................4

    A.    Plaintiffs' Musical Works ...................................................4

    B.    BitTorrent Technology ........................................................5

    C.    Defendants' Distribution and Promotion of Bittorrent .........8

    D.    Defendants Know BitTorrent is an Engine of Infringement.........10

    E.    Defendants' Inducement of Copyright Infringement............12

          1) Pre-Bittorrent P2P Applications ................................12

          2) Bittorrent Applications ..............................................13

    F.    Direct Infringement of Plaintiffs Songs Through Bittorrent Applications Distributed by Defendants ................................14

ARGUMENT ......................................................................................16

    A.    Legal Standard ....................................................................16

    B.    Plaintiffs Are Entitled To a Preliminary Injunction............16

          1.    Plaintiffs Are Likely To Succeed on The Merits........17

          2.    Plaintiffs Will Suffer Irreparable Harm Absent an Injunction ...................................................................20

          3.    The Balance of Harms Tips Decidedly in Favor of An Injunction ...................................................................22

          4.    The Public Interest Favors an Injunction ...................23

          5.    The Injunction Is Narrowly Tailored .........................24

CONCLUSION ...................................................................................24

1

# <u>TABLE OF AUTHORITIES</u>

2

3

F<small>EDERAL</small> C<small>ASES</small>                                                                    P<small>AGE</small>(S)

4

*Apple Computer, Inc. v. Formula Int'l, Inc.*,

5
    562 F. Supp. 775 (C.D. Cal. 1983), *aff'd*, 725 F.2d 521 (9th Cir. 1984) ............ 15

6

*Apple Computer, Inc. v. Franklin Computer Corp.*,

    714 F. 2d 1240 (3d Cir. 1983)........................................................................ 22

7

8

*Arista Records v. Lime Group LLC.*,

    784 F.Supp. 2d 398 (S.D.N.Y. 2011) ............................................................ 19

9

10

*Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*,

    174 F.3d 1036 (9th Cir. 1999) ...................................................................... 15

11

12

*Cadence Design Systems, Inc. v. Avant! Corp.*,

    125 F. 3d 824 (9<small>th</small> Cir. 1997)................................................................... 19,21

13

14

*Columbia Pictures Industries, Inc. v. Fung*,

    2009 WL 6355911 (C.D. Cal. Dec. 21, 2009) ......................................passim

15

16

*Cybermedia, Inc. v. Symantec Corp.*,

    19 F. Supp. 2d 1070 (N.D. Cal. 1998) ...................................................16, 18

17

18

*Datatech Enterprises, LLC v. FF Magnat Ltd*,

    2012 WL 4068624 (N.D. Cal. Sept. 14, 2012) ........................................... 21

19

*Designer Skin, LLC v. S&L Vitamins, Inc.*,

    2008 WL 4174882 (D. Ariz. Sept. 5, 2008) ............................................... 22

20

21

*Diabolic Video Productions, Inc. v. Does 1-2099*,

    2011 WL 3100404 (N.D. Cal. May 31, 2011) .............................................. 5

22

23

*Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*,

    109 F.3d 1394 (9th Cir. 1997)...................................................................... 15

24

25

*EMI April Music, Inc. v. White*,

    618 F.Supp. 2d 497 (E.D. Va. 2009) ........................................................... 21

26

27

*FMC Corp. v. Control Solutions, Inc.*,

    369 F. Supp. 2d 539 (E.D. Pa. 2005)........................................................... 22

28

*Hard Drive Productions, Inc. v. Does 1-188*,
  809 F. Supp. 2d 1150 (N.D. Cal. 2011) ........................................................... 5

*In re Excel Innovations, Inc.*,
  502 F.3d 1086 (9th Cir. 2007) ......................................................................... 15

*Metropolitan Regional Information Systems, Inc. v. American Home Realty
  Network, Inc.*,
  2012 WL 3715350 (D. Md. Aug. 27, 2012) ................................................... 19

*MGM Studios, Inc. v. Grokster*,
  545 U.S. 913 (2005) .................................................................................. passim

*Regents of Univ. of Calif. v. Am. Broad. Cos.*,
  747 F.2d 511 (9th Cir. 1984) ........................................................................... 15

*Tattoo Art, Inc. v. TAT Intern., LLC*,
  794 F. Supp. 2d 634 (E.D. Va. 2011) ............................................................. 19

*Warner Bros Ent. Inc. v. WTV Systems, Inc.*
  714 F.3d 1240 (C.D. Cal. 2011) ................................................................ 20, 22

*WPIX, Inc. v. ivi, Inc.*,
  691 F.3d 275 (2nd Cir. 2012) .......................................................................... 20

## MEMORANDUM OF POINTS AND AUTHORITIES

## INTRODUCTION

As described at length in Plaintiffs' First Amended Complaint (the "FAC"), Defendants CBS Interactive Inc. and CNET Networks, Inc. ("Defendants") are one of the primary facilitators and key participants in the massive global scourge of digital piracy. Defendants distribute free-of-charge to end users the peer-to-peer ("P2P") software applications used by vast networks of pirates to illegally trade copyrighted files (not to mention countless other illegal files, such as child pornography). In furtherance of profits, Defendants shamelessly promote these P2P software applications and encourage their use to infringe copyrights. Also as described in the FAC, Defendants are ruthlessly opportunistic about their promotion of illegal file-sharing. As the legal system began to enjoin the publishers of various P2P applications designed for purposes of infringement liable for the infringement they induced, new P2P applications less susceptible to detection or enforcement of intellectual property rights emerged. Defendants eagerly embraced each successive generation of P2P technology and promoted each new style of P2P network as the state-of-the-art for illegal file-trading. At all times, Defendants hid behind a cynical and incorrect legal theory that they could continue to distribute and promote P2P applications for purposes of infringement as long as no existing court order specifically enjoined a specific P2P application or held it to be infringing.

Due to a recent judicial decision concerning the second wave of Gnutella-based P2P applications that shut down the LimeWire P2P application,[2] the

_____

[2] Defendants were distributors of the LimeWire application prior to the recent order shutting down that P2P application. *See, e.g.*, Declaration of Christian Anstett (the "Anstett Decl.") Ex. W (showing screenshots of Google search containing old, nonfunctional links to CNET LimeWire download pages dated from 2007).

1  technological landscape of infringement has again shifted.  Gnutella based P2P

2  applications and networks have been abandoned in favor of a new, less-detectible,

3  more decentralized (and harder-to-shut down) kind of file-sharing protocol,

4  bittorrent.  True to form, Defendants have enthusiastically embraced this new engine

5  of piracy, distributing over 65 million copies of bittorrent applications and, again,

6  shamelessly promoting their use for purposes of infringement.  Defendants'

7  inducement has sometimes become somewhat more sophisticated and subtle, in that,

8  for example, Defendants now include a mild, disingenuous disclaimer about piracy

9  on some of their web-pages and evidently no longer host certain P2P applications on

10 their servers.  Defendants, however, still expressly and explicitly show users how to

11 use bittorrent programs to find copyrighted files to download.  At all times,

12 Defendants were aware that the bittorent programs they distributed were used

13 overwhelmingly for infringing copyrighted works – primarily music, software,

14 movies and video games.  Although some court cases have found the proprietors of

15 torrent websites liable for secondary copyright infringement,[3] no court case has yet

16 directly involved bittorrent applications and technology itself.  Like a leopard that

17 cannot change its spots and despite this Court's clear admonishment that Defendants

18 cannot simultaneously distribute software applications that they have encouraged to

19 be used for purposes of infringement,[4] Defendants continue to distribute bittorrent

_____

21
22   [3] Bittorrent applications by themselves cannot trade music files directly between
     computers, but rather are used to open a "torrent," a self-executing file that allows
23   for a simultaneous "swarm" download of a copyrighted file from several different
     computers on the network.  Torrent files are generally created and made available
24   for free download on various third party torrent websites like the Pirate Bay.
25   [4] In its ruling dated July 13, 2012, partially granting and partially denying the
     motion to dismiss, the Court stated that "[**t]his is not a particularly close or
26   challenging case for inducement based on the facts alleged**. **Here, Defendants
27   are alleged to have taken the unusual and ill-advised steps of distributing**
28       (footnote continued)

1  applications under the intentionally lazy and under-reactive guise that they cannot

2  be held liable for this activity until a court order specifically prohibits the use of

3  bittorrent technology to infringe Plaintiffs' works.  Although Plaintiffs believe it

4  probable that courts will soon explicitly find the popular bittorrent applications to be

5  secondarily liable for copyright infringement just as Napster and LimeWire were, it

6  is beyond doubt that Defendants' distribution of these programs and concurrent

7  intent to induce infringement subjects Defendants to inducement liability,

8  independent of any further inquiry.  Bittorrent is a clear and present danger to

9  copyrighted works.  From evidence readily available in CNET's own "news"

10  articles, it is clear that bittorrent applications like uTorrent are growing explosively

11  to fill the infringement vacuum left by Gnutella applications.

12       As described more fully below, Plaintiffs' works are continuing to be

13  infringed on a massive scale by bittorrent applications distributed by Defendants.

14  Plaintiffs will be irreparably harmed and the value of their intellectual property

15  further diminished and likely destroyed if Defendants are allowed to continue to

16  distribute bittorent applications and promote their use for purposes of infringement.

17  Liability here is not a close case:  even prior to receiving any significant discovery

18  from Defendants, there is overwhelming evidence of inducement in the form of

19  explicit and implicit exhortations to users to download copyrighted files, promotion

20  of software features designed to facilitate and conceal infringement and the

21  provision of instruction on how to directly infringe using bittorrent applications.

22  This intentional conduct, continuing well after the notice of this Court's disfavor of

23  _____

24

25  **software programs that are capable of widespread copyright infringement
    while simultaneously demonstrating how to infringe copyrights using that**

26  **software and evaluating the various programs as to their effectiveness in**

27  **copying copyrighted material**."  *See* 7/13/12 Order at p. 7

28

1   the conduct, evidences intentional wrongdoing that poses substantial harm to
2   Plaintiffs.  In the words of the Supreme Court in a seminal decision on these issues:
3   "The unlawful objective is unmistakable."  *MGM Studios, Inc. v. Grokster*, 545
4   U.S. 913, 940 (2005).  Because Defendants refuse to cease their infringing activities
5   and because of the ever-surging popularity of bittorrent programs since the filing of
6   this action, Plaintiffs Sugar Hill Music, *et al* ("Plaintiffs") request a preliminary
7   injunction preventing Defendants CBS Interactive Inc. and CNET Networks, Inc.
8   ("Defendants") from: (1) directly or indirectly enabling, facilitating, permitting,
9   assisting, soliciting, encouraging or inducing any public consumer of Defendants in
10  downloading a peer-to-peer ("P2P") software program based on the bittorrent
11  protocol, including but not limited to uTorrent, Frostwire, Speedlord, FireTorrent,
12  GetTorrent, TorrentRover, MovieTorrent, Vuze, and WireBooster; (2) hosting,
13  linking to or otherwise providing for download any peer-to-peer ("P2P") software
14  program based on the bittorrent protocol, including but not limited to uTorrent,
15  Frostwire, Speedlord, FireTorrent, GetTorrent, TorrentRover, MovieTorrent, Vuze,
16  and WireBooster; and, (3) encouraging, soliciting or inducing the infringement of
17  copyrighted works, directly or indirectly, through the use of P2P software.
18      Based on evidence obtained by Plaintiffs at this stage of litigation, attached to
19  the supporting Declaration of Christian Ansett and notice of manual filing, the Court
20  should issue the requested preliminary injunction.

## STATEMENT OF FACTS

### A.   Plaintiffs' Musical Works

23      Plaintiffs are songwriters and/or performers of popular music.  They are the
24  legal and beneficial owners of copyrighted works that have been and continue to be
25  infringed through downloading of their songs through, among other things, P2P
26  bittorrent programs distributed and popularized for inducement by Defendants.  This
27  motion is based on the direct infringement of a representative sample of songs by
28  two artists Jalil Hutchins (a member of the musical group "Whodini") and Douglas

-4-

Davis (who performs under the name of "Doug E Fresh").  *See*  Anstett Decl. at ¶¶ 2, 3, Ex. AA and BB.  Hutchins owns registered copyright interests in the musical works "It's all in Mister Magic's Wand," "Yours for a Night," "Rap Machine," "Magic's Wand," "The Haunted House of Rock," "Funky Beat," "Echo Scratch," "One Love," "I'm a Ho," "Fugitive,"  "The Good Part," "Nasty Lady," "Last Night (I had a long talk with myself)," "Friends," and "Five Minutes of Funk" (collectively, the "Whodini Works").  Anstett Decl. ¶ 2, Ex. AA.  Plaintiff Douglas Davis owns registered copyright interest in the musical works "La Di Da Di," "The Show," "Play This Only at Night," "All the Way to Heaven," "Chill Will: Cuttin' It Up," "Leave it Up to the Cut Professor," and "Lovin Every Minute of It" (collectively, the "Fresh Works").  Anstett Decl. ¶ 3 Ex. BB.

As discussed more fully below, the Whodini Works and the Fresh Works can be easily located and infringed in a manner of minutes using free bittorrent software like uTorrent available for free on Defendants' websites.

### B.   BitTorrent Technology

Bittorrent technology is a "peer-to-peer" file-sharing protocol through which users download content directly from the computers of other users instead of from a central server. *Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911, *2 (C.D. Cal. Dec. 21, 2009) (internal citations omitted).  BitTorrent technology relies on a variety of mechanisms in order to accomplish the ultimate downloading of a given file, including: (1) a software application that users download, which is commonly referred to as a "client application"; (2) websites, also known as "torrent sites," which allow users to select "dot-torrent" or "torrent" files that they wish to download; and (3) servers, also known as "trackers," that manage the download process. *Id.*  The client applications and trackers work together through the use of a "BitTorrent protocol" which standardizes the client-client and client-tracker communications. *Id.*; *see also Diabolic Video Productions, Inc. v. Does 1-2099*, 2011 WL 3100404, *1-2 (N.D. Cal. May 31, 2011). These components essentially

-5-

work together to allow individuals to visit a torrent site, download files, and keep track of those downloads (as well as discover additional persons to download from) through the use of trackers. In such a system the downloading of the desired content occurs from multiple source points at the same time, allowing larger downloads to move more expeditiously. During this simultaneous downloading process users form what is known as a "swarm," which allows for quick exchange of the downloading material. *Fung*, 2009 WL 6355911 at *2; *see also Hard Drive Productions, Inc. v. Does 1-188*, 809 F. supp. 2d 1150, 1163 (N.D. Cal. 2011). This swarm process prevents a backlog of users waiting to download from one individual user with the source file. *Id.* at *3.

Users of BitTorrent websites click on a "download torrent" button or link on the website that will begin the downloading process. *Id.* The elements of the downloading process work together to bring the desired content to the user's computer without any further actions by the user. *Id.* In order to download files from others in a BitTorrent network, users must engage in a number of steps. First, users must install a BitTorrent client application. Standing alone, a BitTorrent client application does not possess the ability to search other computers for files. Instead, as part of the second step, users must visit a torrent site for the purpose of locating torrent files containing the content that they wish to download. *Id.* at *2. These torrent sites maintain indexes of available torrent files for download that users may search, or, in the alternative, users may upload torrent files to share with others through the torrent site. *Id.* (internal citations omitted). These torrent files are referred to as "dot-torrent" files in reference to their file extension name. The dot-torrent files do not contain the actual content item searched for; rather, the dot-torrent file contains the data used by the BitTorrent client to retrieve the content through a peer-to-peer transfer. *Id.* In the third step, once the user clicks on the desired dot-torrent file, the BitTorrent client will locate and download the actual content item. This is accomplished through the use of trackers that are contained

within the dot-torrent file. The dot-torrent file contains "hash" values that are used to identify the various pieces of the content file and the location of those pieces in the network. The BitTorrent client application then simultaneously downloads the pieces of the content file from as many users as are available at the time of the request, and then reassembles the content file on the requesting computer when the download is complete. Once a user downloads a given content file, he also becomes a source for future requests and downloads. *Id*.

Although a lot of effort and programming was required to construct the elaborate bittorent system and the technology can seem quite complex, bittorrent programs were also designed to make them as "easy as possible" to use. Anstett Decl. Ex. T. As CNET senior editor Seth Rosenblatt remarked in a video review of uTorrent, "the most difficult aspect of using a torrent client is finding the torrents" – implicitly acknowledging that, after locating the torrent file containing media content (which in practice is usually accomplished by searching torrent sites like the Pirate Bay), actually downloading the content is easily accomplished with a torrent client. Anstett Decl. Ex. Y. Plaintiffs' counsel was able to download several albums worth of Plaintiffs' copyrighted works in less than ten minutes simply by opening torrent files with uTorrent. Anstett Decl. ¶ 9, Ex. F.

On the other hand, the complicated *design* of the Bittorrent network makes it exceedingly hard to regulate or police for piracy. *See*, *e.g.*, Anstett Decl. ¶ 23 Ex. T (Are P2P File Sharing Networks Dead? by Billy Moffit, July 25, 2010 "Due to the nature of how sharing operates on the Bittorrent network, there is no single server, location, company, group or person that can be removed from the network to shut it down. There is no centralized leader or bottleneck in the Bitorrent network, and this makes it difficult, if not impossible, to adequately regulate or police.").

Bittorrent has experienced explosive growth recently and in the wake of the court decision officially shutting LimeWire down has become the *de facto* file-sharing application. *See*, *e.g.*, Anstett Decl. ¶ 23 Ex. T (Article entitled "Are P2P

1  File Sharing Networks Dead?," by Billy Moffit, July 25, 2010, stating, "While P2P
2  has taken many forms since its inception, by far the most powerful and common
3  today is bittorrent.").    As Defendants themselves have noted, the Bittorrent
4  applications uTorrent and Bittorrent available for download on Defendants websites
5  have experienced tremendous growth – these networks now have 150 million users.
6  Anstett Decl. . ¶¶ 12,16 Ex. I, M.  As CNET Editor Seth Rosenblatt stated, "To put
7  that number in perspective, the security suite AVG Antivirus Free claims around
8  110 million active users, while Google CEO Larry Page just revealed that the
9  Chrome browser has about 160 million users."  Anstett Decl. Ex. I.    There are an
10 estimated quarter of a billion monthly active bittorrent users, representing a 400%
11 increase from 2008 levels.  Anstett Decl. Ex. T.  Bittorrent's surge in popularity has
12 been accompanied by increases in the number of bittorrent-related lawsuits related
13 to infringement.   For example, since 2010, more than 250,000 people have been
14 accused of illegally downloading movies off the Internet using Bittorrent.  Anstett
15 Decl. Ex. U.

16        **C.    Defendants' Distribution and Promotion of Bittorrent**

17        By Defendants' own measure, Defendants have distributed over 67 million
18 copies of different bittorrent applications.  In fact, Defendants, website CNET
19 explicitly tracks the number of downloads of each bittorrent application
20 accomplished through Defendants' website.  As of November 5, 2012, Defendants'
21 websites kept the following tally of bittorrent downloads: uTorrent had 19,312,371
22 downloads; uTorrent Portable had 269,149 downloads; FrostWire had 32,273,646
23 total downloads; uTorrent Plus had 42,282 downloads; GetTorrent had 181,659 total
24 downloads; FireTorrent had 150,103 total downloads; Movie Torrent had 1,274,961
25 total downloads; Ares Galaxy had 1,711,574 downloads; Vuze had 9,036,071 total
26 downloads; BitLord had 2,512,478 total downloads; TorrentRover had 13,259 total
27 downloads.   Anstett Decl. ¶ 22, Ex. S.  Defendants have a dedicated portion of their
28 website organized and dedicated to software downloads.  *See*, *e.g.*, Anstett Decl. Ex.

A (showing CNET download.com button on top of CNET website).  Within this download category, Defendants maintain the sub-categories "Internet Software" and "P2P & File Sharing Software."  *Id*. (categorizing the bittorrent application in the Download portion of the website under the sub-categories Internet Software and P2P & File-Sharing).

Downloading a torrent application using Defendants' website is simple.  In connection with this motion, Plaintiffs' counsel accessed Defendants' website and performed a search for "uTorrent."   Anstett Decl. Anstett Decl. ¶ 4, Ex. A.  The first search result returned was for the Windows version of the uTorrent software application.  *Id*.  The application received a five-star rating from CNET's editors. The "quick specifications" box on the right-hand side of the screen stated that there had been 19,250,772 "total downloads" of the uTorrent application, and 60,686 downloads in the last week.  *Id*.  At the bottom of the screen, a box titled "more products to consider" contained a box for the uTorrent application and included a "download" button.  *Id*.  After clicking on the "download" button for uTorrent available on www.cnet.com, counsel's web browser was automatically directed to a webpage from which uTorrent could be downloaded.  Anstett Decl. ¶ 5, Ex. B.

Defendants actively encourage people to download and use bittorrent applications like uTorrent in several ways.  Defendants use a star-rating system to communicate editorial approval of certain bittorrent applications.  The information page on Defendants' website for uTorrent, for example, prominently displays a five-star "spectacular" editor's rating.  Anstett Decl. ¶ 4, Ex. A.  The information pages about each torrent application include "suggested products" boxes that contain "download" buttons for other torrent applications.  *Id*.  Defendants also provide editorial reviews that highlight features of the applications, such as built-in search features that allow users to search for copyrighted files. Defendant's senior editor Seth Rosenblatt extolled uTorrent's "content" search functions in his February 3, 2010 review: "The most difficult aspect of using a torrent client is still finding the

-9-

torrents, but included are both a torrent search bar and a handy RSS feed download function." *Id*.  Defendants also display the number of total downloads of each bittorrent application, which itself communicates to a user the popularity of an application.  Defendants also use the purported "news" arms of their websites to dress up the marketing of bittorrent applications as legitimate news reporting.  For example, CNET editor Seth Rosenblatt (the same individual who authored the five-star review of uTorrent), wrote a May 14, 2012 article published and available on Defendants website titled "Download This Mr. Jones," ostensibly about how the recording artist the Counting Crows had partnered with the software publisher of uTorrent to release their music for free download via torrent.  Anstett Decl. ¶ 16, Ex. M.  In a portion of the article quoting the lead singer of the Counting Crows regarding the 150 million users of uTorrent, Rosenblatt included hyperlinks accompanied by the word "download" to the CNET download pages for uTorrent and BitTorrent. *Id*.

### D.     Defendants Know BitTorrent is an Engine of Infringement

Defendants are aware that the primary reason people download and use the Bittorrent applications available on their websites is for purposes of infringing copyrights.  Defendants own reporting on torrent file-trading evidences that even though hypothetical legitimate uses for torrent applications exist, in reality, defendants know that torrents are primarily used for infringing.  In an October 15, 2012 article concerning a study about the relative torrent downloading habits of American universities, CNET writer Charlie Osborne stated: "It would also be wrong to assume every seeded file is illegal – as the file-sharing protocol itself is not, and can be used to distribute large, legal files.  But for students wanting to save their beer tokens, "free" software and films are a continual temptation.  Rutgers' most popular downloads, for example, were Microsoft Office, Witcher 2: Assassins of Kings and the movies "Fast Five" and "Pulp Fiction."  Anstett Decl. Ex. O.  Defendants also know that Bittorrent technology is overwhelmingly used to pirate

music files.  CNET contributor Greg Sandoval wrote a October 3, 2012 "news" article titled "Researchers say Gainesville, Fla., is America's 'pirate capital'" available on Defendants' website.  Anstett Decl. ¶ 25, Ex. V.  The article states: "Musicmetric also reported that of the 97 million BitTorrent files downloaded across the United States in the first half of 2012, about 78 percent were albums and 22 percent were individual songs.  The company says that if most albums have 10 songs on them, the number of tunes pirated tops 759 million."  *Id*.

Defendants' websites also contain user comments discussing the infringement carried out through bittorrent applications.  On March 23, 2012, user D4ed4lus posted the following comment concerning uTorrent: "Cons … Doesn't help to have on your computer during a piracy case."  Anstett Decl. ¶ 10, Ex. G.  On March 7, 2012, user skyrains2003 posted the following comment concerning uTorrent: "Pros … fast to download movies."  *Id*.  On December 2, 2011, user ZeroInteger left the following comment: "It is evident that [other users reviewing uTorrent] you didn't read the directions or that you're shills for the MPAA, etc. … Legal recourse against CNET and utorrent for a program that you're going to use to download 'torrents.' Give me a break."  *Id*.  On October 2, 2011, user W_Peijnaker posted the following comment concerning uTorrent: "Cons: Same cons as with all p2p/torrent programs: Legal issues for uploading copy-right protected material (no way around it if you download it) … Don't forget to check your computers defences [sic] before you start downloading movies and stuff."  *Id*.

The publisher's descriptions of bittorrent applications available in the Download section of Defendants' website also contain discrete but unmistakable references to illegal file-sharing of copyrighted material.  The Frostwire publisher's description available on the download portion of CNET's website states "Frostwire is a free open source BitTorrent client, first released as a fork of Limewire.  Gnutella support was dropped entirely, and now Frostwire only uses the BitTorrent network … to share files."  Anstett Decl. Ex. S.  The GetTorrent publisher's description

-11-

available on CNET's website states "You can search and download over 60 million torrent files – Music, movies, games, movies, soft, mp3, iso, dvd." *Id*. The Movie Torrent publisher's description available on CNET's website states "Movie Torrent is a P2P file-sharing application for music, mp3, movies, software, documents and games download." *Id*. The Ares Galaxy publisher's description available on CNET's website states: "Advanced search for all types of media files (Audio, Video, Games, Software …)." *Id*. The Vuze publisher's description available on CNET's website states: "Vuze includes a powerful and customizable meta search that will help you find and download torrents. **Once you find content that you enjoy** you can set up subscriptions so you'll always be notified of new episodic content." *Id*. (emphasis added).

Defendants' websites also prominently advertise features of bittorrent applications designed to facilitate infringement and/or help infringers evade detection. The publisher's description of the uTorrent application available on www.cnet.com further evidences inducement, stating that "uTorrent supports the protocol encryption joint specification." *Id* at ¶ 5. In the uTorrent user forum available at utorrent.com, it is stated that "protocol encryption is a joint specification between Azureus and uTorrent. It is designed to bypass throttling and/or blocking of BitTorrent traffic by an ISP." *Id.,* Ex. B (screenshot of a user forum available on www.utorrent.com on 11/5/12).

**E.**    **<u>Defendants' Inducement of Copyright Infringement</u>**.

**1) Pre-Bittorrent P2P Applications**

Defendants' inducement of copyright infringement goes back well over a decade and continues to present. From about 2000 to 2005, there is substantial evidence of Defendants' purposeful inducement of copyright infringement. *See* Anstett Decl. at ¶¶ 19-21. Among other things, Defendants made explicit and implicit exhortations to their audience encouraging infringement, and rated various file-sharing programs with respect to their efficacy for finding and downloading

-12-

copyrighted music.  Defendants also incorporated a search feature into their website that allowed users to search for copyrighted files – and, just in case Defendants intent were not obvious enough, Defendants included pre-set searches for popular recording artists such as U2, Britney Spears and Madonna.  Anstett Decl. ¶ 20, Ex Q.

Several internet-archived articles from 2000 and 2001 contain statements of CNET employees boasting of the use of P2P programs for illegal infringement.  *Id*. One such article that was posted on the CNET Music Center webpage as it existed on September 12, 2001 is entitled "File-sharing smackdown."  The article states:

> In offices, dorms and other high-bandwidth communities around the world, people are talking about which file-sharing service they like the most now that Napster and Scour have been sued into irrelevance.  To help you settle arguments around the water cooler or library, CNET Music Center's copy editor Brian Satterfield and I hunkered down to run a simple yet effective test on the top eight file-sharing applications.  We ran searches for 18 band names using each of these clients, all of which are flourishing in the absence of Napster.

*Id*, Ex. P.  The bands used in the test were Britney Spears, the Strokes, Mogwai, Beatles, Run DMC, Stravinsky, Leonard Bernstein, Randy Newman, Megadeth, Metallica, Pixies, Radiohead, American Analog Set, Miles Davis, Johnny Cash, Yo La Tengo, Rodan, Delgados.  *Id*.  The article closes with the observation: "It's as easy to find copyrighted songs as it was in Napster's heyday, as long as you know what to use."  *Id*.

### 2) Bittorrent Applications

Defendants' reviews and instructional materials related to the bittorrent application uTorrent continue Defendants practice of promoting applications for infringement and teaching users how to use the applications to download copyrighted materials.  In March 2009, CNET published a video demonstration of

the uTorrent program titled "First Look: uTorrent" in which CNET senior editor
Seth Rosenblatt demonstrates to CNET users how the application works.  During the
video, Rosenblatt demonstrates uTorrent's built-in feature that allows users to
search for torrent files. In the video, Rosenblatt entered the name of alternative rock
performer "Nine Inch Nails" as a sample search and obtained search results.  Anstett
Decl. at ¶ 11.  Rosenblatt's sample search results displayed in the video include
copyrighted works.  *Id*., Ex. G (screenshot from the Rosenblatt video); *see also*
Notice of Manual Filing, Ex. H (copy of the video itself).  In yet another 2011
article authored by Rosenblatt concerning a paid version of the uTorrent software,
Defendants displayed a screenshot of the uTorrent program showing the download
of a copyrighted work by the band "Lovedrug" that is 75% complete.  Anstett Decl.
Ex. I.

### F.      Direct Infringement of Plaintiffs Songs Through Bittorrent Applications Distributed by Defendants

The bittorrent clients distributed by Defendants allow users to easily and
quickly infringe Plaintiffs' copyrights.  In connection with this motion and to
demonstrate Plaintiffs' ongoing irreparable injury, Plaintiffs' counsel downloaded
for free the bittorrent application uTorrent from a "download" button available on
Defendants' website.  Anstett Decl. ¶¶ 4, 6 Ex. A.

The uTorrent application contains a search feature that allows users to search
the internet for torrent files, including torrent files of copyrighted works.  Plaintiffs'
counsel used the uTorrent application downloaded from a download button on
Defendants' website to perform a search for the copyrighted Whodini Works.
Anstett Decl. ¶¶ 7, Ex. D.  The first search result returned was a link to the Pirate
Bay website titled "Whodini (Whodini, Escape, Back in Black)."  *Id.*  Plaintiffs'
counsel also performed a search using uTorrent for "Doug E. Fresh torrents" for
songs of Plaintiff Douglas Davis.  *Id.*  The first search result recently returned for
such a search was a link to the Pirate Bay website titled "Doug E Fresh (2 Albums,

-14-

1  192 kbps) (download torrent)." *Id., Ex. D.*   Plaintiffs' counsel used the results

2  returned by the uTorrent searches to access the torrent website the Pirate Bay.  *Id.* ¶¶

3  8-9; Ex. E.  From the Pirate Bay website, Plaintiffs' counsel was able to download

4  torrent files, open those torrent files with the uTorrent application obtained through

5  Defendants' website and then directly download the Whodini Works and the Fresh

6  Works in less than ten minutes.  *Id.*  Plaintiffs have manually submitted the actual

7  copyrighted music files downloaded using software distributed by Defendants

8  concurrently with this Motion.

9         The Pirate Bay website evidences not only the ongoing infringement that can

10  be accomplished using Defendants' software, but also the prior infringement of

11  Plaintiffs' copyrighted works using bittorrent networks.  For example, the Pirate

12  Bay webpage containing the Whodini torrent file stated that the file was uploaded

13  on March 7, 2008 and 35 "seeders" and 7 "leeches."  Anstett Decl. ¶ 8.  This means

14  that **at minimum** 35 users on the network had complete copies of the Whodini

15  Works on their machines available for file-sharing and seven users had partial

16  copies of the Whodini works on their machines.  The page also lists all of the

17  Whodini songs available by using the torrent and includes all of the Whodini Works.

18  A Pirate Bay user left the following comment concerning the Whodini torrent:

19  "thanks for sharing butcherboys, 100% real deal folks, I grew up listening to this

20  group, brought back alot [sic] of good memories."  The Pirate Bay webpage linking

21  to the Fresh torrent file stated the file was uploaded on January 1, 2008 and had 40

22  "seeders" and 3 "leeches."  The page lists all of the Doug E. Fresh songs available

23  by using the torrent and includes all of the Fresh Works.  The page also includes a

24  message from the poster that states: "Doug E. Fresh & the Get Fresh Crew's first 2

25  classic albums.  'Oh My God!' was taken straight from my vinyl copy … Enjoy

26  these hip-hop classics."  Anstett Decl. ¶ 8; Ex. E.

27

28

1

**ARGUMENT**

2

    **A.**   **Legal Standard**

3

       Plaintiffs are entitled to a preliminary injunction if they establish either: (1) a

4

combination of probable success on the merits of its claims and the possibility of

5

irreparable harm, or (2) the existence of serious questions going to the merits of its

6

claims and that the balance of hardships tips sharply in its favor. *Brookfield*

7

*Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999);

8

*Dr. Seuss Enter., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1396 n.1 (9th

9

Cir. 1997).  These two standards "are actually not separate tests but are the 'outer

10

reaches' of a single continuum; the greater the balance of hardships tips in favor of

11

the moving party, the less likelihood of success on the merits must be shown."

12

*Apple Computer, Inc. v. Formula Int'l, Inc.*, 562 F. Supp. 775, 783 (C.D. Cal. 1983),

13

*aff'd*, 725 F.2d 521 (9th Cir. 1984).  The Ninth Circuit also recognizes the

14

"traditional test," which permits the moving party to satisfy its burden by

15

demonstrating: (1) a strong likelihood of success on the merits; (2) that the balance

16

of irreparable harm favors the movants; and (3) that the public interest favors

17

granting the injunction.  *Regents of Univ. of Calif. v. Am. Broad. Cos.*, 747 F.2d 511,

18

515 (9th Cir. 1984); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1093 (9th Cir.

19

2007) (stating that the third factor applies only in "certain cases").  These standards

20

apply where a preliminary injunction is sought as relief from alleged acts of

21

copyright infringement.  *See, e.g., Cybermedia, Inc. v. Symantec Corp.,* 19 F. Supp.

22

2d 1070, 1073 (N.D. Cal. 1998).

23

    **B.**   **Plaintiffs Are Entitled To a Preliminary Injunction**

24

       Plaintiffs here satisfy the requirements for preliminary relief[5] based upon the

25

---

26

27

     [5] Plaintiffs' application is timely.  Although not filed at the earliest possible stage, Ninth Circuit courts have held that "a reasonable delay caused by a plaintiff's (footnote continued)

28

undisputed facts that:  (1) Plaintiffs own registered copyright interests in the Fresh and Whodini Works; (2) Defendants continue to provide for free download bittorrent applications capable of illegally downloading Plaintiffs' works in a manner of minutes; (3) Defendants know that the bittorrent applications they distribute are being used to infringe musical works on a massive scale; and (4) materials readily available on Defendants' websites provide clear instruction on how to use bittorrent applications for purposes of infringement.  These facts demonstrate a strong likelihood of success on the merits of Plaintiffs' inducement claim. Defendants' conduct evinces a brazen intent to continue their misconduct even after the Court's July 13, 2012 ruling and the strong admonishment that accompanied it. Plaintiffs will suffer irreparable harm absent a preliminary injunction due to, *inter alia*, lost revenue, reputational harm and loss of control over their works.  The balance of hardships tips decidedly in Plaintiffs' favor given the strong likelihood of success on the merits.  Finally, the public interest will be well served by the issuance of a preliminary injunction, to protect important interests in copyright.  As there are no countervailing arguments or defenses that can outweigh these factors, Plaintiffs are entitled to immediate injunctive relief.

## 1.    Plaintiffs Are Likely To Succeed on The Merits

On the facts established at this stage of Plaintiffs' investigation, Defendants have clearly induced infringement.  Under inducement liability, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is

---

good faith efforts to investigate an infringement will not rebut the presumption." *See Cybermedia*, 19 F. Supp. 2d 1070 at 1078.  Plaintiffs have been engaged in good faith efforts to investigate and support their claims, a task complicated by the rapidly changing technological landscape and efforts of digital pirates (and their software distributors) to evade legal liability.

liable for the resulting acts of infringement by third parties." *MGM Studios, Inc. v. Grokster*, 545 U.S. 913, 936-37 (2005). The "classic" instance of inducement is "by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." *Id* at 937. Importantly, inducement liability "may attach even if the defendant does not induce a specific act of infringement" where a court may "infer a patently illegal objective from statements and actions showing what [the defendant's] objective was." *Columbia Pictures Industries, Inc. v. Fung,* 2009 WL 6355911 at *10 (C.D. Cal. 2009) (citing *MGM Studios, Inc. v. Grokster*, 545 U.S. 913, 936-37 (2005). Inducement liability "goes beyond" liability based on specific prior acts encouraging inducement:

> [I]t is not only that encouraging a particular consumer to infringe a copyright can give rise to secondary liability for the infringement that results. Inducement liability goes beyond that, and the **distribution of the product itself can give rise to liability where evidence shows that the *distributor intended and encouraged the product to be used to infringe*.**

*MGM v. Grokster*, 545 U.S. at 940 n. 13. The evidence cited in support of this motion demonstrates that Defendants have distributed a number of products including bittorrent applications they intended and encouraged to be used for infringement, and that such infringement has resulted on a wide scale.

Defendants have broadcast and solicited users to use P2P applications to infringe copyright, and have specifically broadcast and solicited users to use bittorrent applications like uTorrent to infringe. Anstett Decl. ¶¶ 11-16, 19-22, Exs. H-M,P-S. Defendants continue to distribute bittorrent applications despite their continued exhortations to use those applications to infringe. Anstett Decl. ¶¶ 4-6, 22, Ex. A-C, S. Defendants know that these bittorrent applications are designed and marketed to be used for infringement <u>and</u> that these applications are, in fact, used primarily to infringe copyrights on a staggering scale. Anstett Decl. ¶¶ 10, 16, 18-

19, 22, 25 Ex. O, P, S, V.   Defendants' distribution of these devices and promotion of their use for infringement has resulted in the infringement of Plaintiffs' works.

Plaintiffs Hutchins and Davis have registered the songs at issue in this motion prior to the documented infringement.  *See* Anstett Decl. at ¶¶ 2, 3, Ex. AA and BB; *see also* Notice of Manual Filing.  Evidence of registration creates a rebuttable presumption that copyrights are valid.  *See, e.g., Cybermedia, Inc.,* 19 F. Supp. 2d 1070 at 1073.  As shown by Plaintiff's counsel's sampling, Plaintiffs copyrighted works may be efficiently and easily located and downloaded by using the bittorrent applications available for free on Defendant's website.  Anstett Decl. at ¶¶ 4-10, Exs. A-G.  Plaintiffs conducted the same kind of uTorrent search for copyrighted content demoed by CNET Seth Rosenblatt in his "First Look" video produced in 2009 (but still available on Defendants' website) and downloaded copyrighted files in the same way as demonstrated in the uTorrent screen shot from the Rosenblatt article.  *See*, e.g. Anstett Decl. ¶¶ 11,12.  Plaintiffs' sampling also uncovered evidence of extensive past infringement of the Fresh and Whodini Works on the bittorrent networks that Defendants continue to help construct and popularize for infringement.  Anstett Decl. at ¶ 8, Ex. E.  Absent immediate injunctive relief, Plaintiffs' copyrights will continue to be infringed by software products distributed by Defendants.

Plaintiffs' entitlement to injunctive relief is clear.  Prior to receiving <u>any</u> discovery from Defendants, Plaintiffs have already marshaled inducement evidence of the kind that prior courts have used to shut down notorious inducers.  In 2009, the Central District ruled in favor of plaintiff Columbia Pictures, granting summary judgment against defendant Gary Fung on plaintiff's inducement claim.  *See Columbia Pictures Industries, Inc. v. Fung,* 2009 WL 6355911 (C.D. Cal. 2009). The facts were parallel to those presented in *Grokster* and here.  Fung's websites were "an evolutionary modification of traditional 'peer-to-peer' sharing sites such as Napster and Grokster. . . . Through use of the Fung sites, which are commonly

-19-

1   known as 'BitTorrent' or 'torrent' sites, users download content directly from the
2   computers of other users and not directly from the servers of the Defendants . . . ."
3   *Id* at*1-2.  The Court found that defendant had disseminated a message designed to
4   stimulate others to commit infringement, assisted users engaging in infringement
5   and implemented technical features promoting infringement.  *Id*. at *11-15.

6      Just last year, a court in the Southern District of New York ruled in favor of
7   plaintiff copyright holders by granting summary judgment against the publisher of
8   the LimeWire P2P gnutella software on inducement grounds.  *See Arista Records v.*
9   *Lime Group LLC*., 784 F.Supp.2d 398 (S.D.N.Y. 2011).  There, the court
10  considered the following factors in finding defendants guilty of inducement:
11  awareness of substantial infringement by users of LimeWire; efforts to attract
12  infringing users; efforts to enable and assist users to commit infringement;
13  dependence on infringing use for the success of its business; and failure to mitigate
14  infringing activities.  *Id*. at 426.  As discussed above, Plaintiffs have supplied the
15  same kind of evidence in connection with the present motion.

16      **2.     Plaintiffs Will Suffer Irreparable Harm Absent an Injunction**

17      Although irreparable harm is no longer presumed in intellectual property
18  cases, the Ninth Circuit has held that a strong showing of likelihood of success on
19  the merits will lessen the need of a strong showing of irreparable harm, *see, e.g.,*
20  *Cadence Design Systems, Inc. v. Avant! Corp*., 125 F. 3d 824, 827 (9th Cir. 1997).
21  Irreparable injury is frequently found in cases where intellectual property rights are
22  violated: "[i]rreperable injury often derives from the nature of copyright violations,
23  which deprive the copyright holder of intangible exclusive rights."  *Metropolitan*
24  *Regional Information Systems, Inc. v. American Home Realty Network, Inc*., 2012
25  WL 3715350 at *16 (D. Md. Aug. 27, 2012) (citations omitted); *Tattoo Art, Inc. v.*
26  *TAT Intern., LLC*, 794 F. Supp. 2d 634, 660 (E.D. Va. 2011) ("allowing defendants
27  to continue to distribute plaintiff's copyrighted tattoo designs … particularly when
28  the record reflects that plaintiff has not licensed the [development] would

-20-

1   significantly diminish the intangible value of the property to plaintiff in a manner

2   that could not be cured by damages alone").  In copyright cases, courts have held

3   that irreparable harm is established where an infringing defendant's activities

4   threaten to impair a copyright owner's control over its copyrighted works, threaten

5   the goodwill and business reputation of the plaintiff, or threaten to cause the loss of

6   business or business opportunities.  *See, e.g., WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275,

7   285-87 (2nd Cir. 2012); *Warner Bros. Entm't Inc. v. WTV Systems*, 824 F. Supp. 2d

8   1012-13 (C.D. Cal. 2011).

9       Here, Plaintiffs have demonstrated sufficient irreparable harm to warrant

10  issuance of a preliminary injunction.  Plaintiffs have presented evidence that

11  Plaintiffs' copyrighted songs have and continue to be infringed using the bittorrent

12  applications distributed by Defendants.  Defendants' contribution to the growth of

13  bittorrent has been substantial – Defendants have distributed over 67 million copies

14  of bittorrent applications.  Anstett Decl. ¶ 22.  Plaintiffs' economic injuries and lost

15  revenue are obvious and substantial.  Further, due to the scale of the infringement

16  accomplished through software distributed by Defendants, Plaintiffs only "practical

17  alternative" here is to attempt to stop the distribution of those devices.  *See, e.g., See*

18  *Grokster* at 939 ("When a widely shared service or product is used to commit

19  infringement, it may be impossible to enforce rights in the protected work

20  effectively against all direct infringers, the only practical alternative being to go

21  against the distributor of the copying device for secondary liability").

22      The unauthorized download and distribution of Plaintiffs' works, through

23  software distributed by Defendants and as a result of Defendants' inducement, not

24  only destroys Plaintiffs' ability to derive revenue from their works, but also deprives

25  Plaintiffs' of the ability to control the distribution of their music and exposes them

26  to potential reputational harm and a kind of intangible damage for which money

27  damages cannot compensate.

28

For example, Plaintiffs works are presently being distributed on the same P2P networks that also distribute vile and even illegal pornography – as Defendants were aware of *nine years* ago.  A July 28, 2003 article by Lisa Bowman available on one of Defendant's websites reported on a finding by the United States General Accounting Office and the House Government Reform Committee that "typing in words such as 'underage' or 'pre-teen' [to P2P software] yielded numerous images of child porn."  Anstett Decl. Ex. X.  The article also noted that the same report found that file-blocking software "did not do enough" to filter out porn files.  *Id*. The article described proposed legislation that called on the FTC to require P2P companies to get permission before minors use their services.  *Id*.  Were it up to them, Plaintiffs would not allow their works to be distributed in such a cesspool and the value of Plaintiffs' musical compositions are irreparably damaged by being traded (and pulled up in search results) in a "wild wild west" of pornography.

### 3.   The Balance of Harms Tips Decidedly in Favor of an Injunction

Even if Plaintiffs had not shown both a likelihood of success on the merits and irreparable injury, plaintiffs nevertheless would be entitled to preliminary injunctive relief here.  Plaintiffs easily can satisfy the alternative test for such relief, *i.e.*, the existence of serious questions going to the merits of Plaintiffs claims and the fact that the balance of hardships tips sharply in its favor.  Where the facts clearly support injunctive relief of copyright infringement, the balancing of hardships weighs in favor of the moving party. *See generally Datatech Enterprises, LLC v. FF Magnat Ltd*, 2012 WL 4068624 at *6 (N.D. Cal. Sept. 14, 2012) ("That Magnat can no longer operate its allegedly infringing website or access funds allegedly derived from illegal activities weighs little, if at all, in the balance of equities.") (citing *Cadence Design Systems*, 125 F. 3d at 824, 829-30 (9th Cir. 1997)).  The same is true here.  Plaintiffs' interest in protecting their copyright interests dramatically outweigh any hypothetical interest Defendants have in maintaining their illegal activity.  In *EMI April Music, Inc. v. White*, 618 F.Supp. 2d 497, 511 (E.D. Va.

-22-

1 2009) the Court permanently enjoined Defendant from publicly performing any
2 music in the ASCAP repertory and observed:

3        It is easy to understand that the public interest reflected in the
4        Constitutional protection of copyright, and the congressional enactment
5        of the Copyright Act, is enhanced by issuance of permanent injunction
6        where copyright infringement has taken place.  On the other hand, it is
7        difficult to conceive of how such a permanent injunction will harm a
8        defendant who has willfully violated the copyright law.

9 (Internal citations omitted).

10     **4.**     <u>**The Public Interest Favors an Injunction**</u>

11       The public interest factor, the last factor in the Ninth Circuit's "traditional"
12 test for injunctive relief, also weighs in favor of Plaintiffs as courts have long held
13 that "[p]rotecting a company's rights to its intellectual property is in the public
14 interest." *FMC Corp. v. Control Solutions, Inc.*, 369 F. Supp. 2d 539, 578 (E.D. Pa.
15 2005); *see also Designer Skin, LLC v. S&L Vitamins, Inc.*, 2008 WL 4174882 at *6
16 (D. Ariz. Sept. 5, 2008), citing *Apple Computer, Inc. v. Franklin Computer Corp.*,
17 714 F. 2d 1240, 1255 (3d Cir. 1983) ("Finally, the public interest in protecting the
18 exclusive rights conferred upon a copyright holder will be served by issuing an
19 injunction").   In cases where copyright interests are threatened, "it is virtually
20 axiomatic that the public interest can only be served by upholding copyright
21 protections and correspondingly, preventing the misappropriation of skills, creative
22 energies, and resources which are invested in the protected work." *Warner Bros.*
23 *Ent. Inc. v. WTV Systems, Inc.*, 824 F.Supp. 2d 1003, (C.D. Cal. 2011) (citing *Apple*
24 *Computer Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1255 (3rd Cir. 1983).
25       In the precise context of P2P software cases, public interest more strongly
26 favors injunctive relief for the reasons announced by the Supreme Court in a leading
27 decision: "In sum, where an article is 'good for nothing else' but infringement,
28 [citation omitted] there is no legitimate public interest in its unlicensed availability,

and there is no injustice in presuming or imputing an intent to infringe." *Grokster*, 545 U.S. 913 at 932.  As discussed above, although bittorrent technology *potentially* has non-infringing uses, Defendants are well-aware that its <u>primary</u> use is for infringing copyrights and it is this use alone which Defendants have promoted, encouraged, instructed and profited from.  In past briefing, Defendants have attempted to assert purported First Amendment interests at issue in this litigation. Defendants' inducement activity implicates no First Amendment interest.  *Columbia Pictures Industries, Inc. v. Fung*, 2009 WL 6355911 at *13 (C.D. Cal. Dec. 21, 2009) (statements which promote infringement "are evidence of the 'intent to induce' which is the underlying wrongful act.  It is well-established that such statements are not protected by the First Amendment.").

**5.    <u>The Injunction Is Narrowly Tailored</u>**

Plaintiffs have demonstrated their entitlement to injunctive relief under the Copyright Act and governing decisional authorities.  Accordingly, all defendants, as well as all persons acting under the direction, control, permission, or authority of defendants, or any of them, and all persons acting in concert therewith, should be preliminarily enjoined from:

a.   directly or indirectly enabling, facilitating, permitting, assisting, soliciting, encouraging or inducing any public consumer of Defendants in downloading a peer-to-peer ("P2P") software program based on the bittorrent protocol, including but not limited to uTorrent, Frostwire, Speedlord, FireTorrent, GetTorrent, TorrentRover, MovieTorrent, Vuze, and WireBooster,

b.   hosting, linking to or otherwise providing for download any peer-to-peer ("P2P") software program based on the bittorrent protocol, including but not limited to uTorrent, Frostwire, Speedlord, FireTorrent, GetTorrent, TorrentRover, MovieTorrent, Vuze, and WireBooster

c.  encouraging, soliciting or inducing the infringement of copyrighted works, directly or indirectly, through the use of P2P software.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the motion for preliminary injunction be granted in all respects, and the order for leave to serve expedited discovery be granted immediately.

DATED:  November 9, 2012          BAKER MARQUART LLP


By    /s/    Jaime W. Marquart
Ryan Baker
Jaime Marquart

Attorneys for All Plaintiffs