BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
jmarquart@bakermarquart.com
Ryan G. Baker (Bar No. 214036)
rbaker@bakermarquart.com
Christian Anstett (Bar No. 240179)
canstett@bakermarquart.com.com
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIE FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER,

CASE NO. CV11-9437 DSF (JCx)

**DECLARATION OF CHRISTIAN ANSTETT IN SUPPORT OF JOINT STIPULATION OF COUNSEL RE: CBSI'S MOTION TO COMPEL FURTHER RESPONSES TO DISCOVERY**

**DISCOVERY MATTER**

Hearing Date: June 11, 2013
Time: 9:30 a.m.
Ctrm: Courtroom 20, 3rd Floor
Judge: Hon. Jacqueline Chooljian

Discovery Cutoff: 8/30/13
Pretrial Conference: 5/26/14
Trial: 6/24/14

DIAMOND SMITH, REMINISCE SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM

Plaintiffs,

vs.

CBS INTERACTIVE INC., CNET NETWORKS, INC.

Defendants.

BAKER MARQUART LLP
10990 WILSHIRE BOULEVARD, FOURTH FLOOR
LOS ANGELES, CALIFORNIA 90024
Tel: (424) 652-7800 • Fax: (424) 652-7850

I, Christian Anstett, hereby declare as follows:

1. I am an attorney admitted to practice in the State of California. I am of counsel to the law firm Baker Marquart LLP, counsel for Plaintiffs Sugar Hill music *et al.* ("Plaintiffs") in this action. I submit this declaration in support of Plaintiffs' portion of the Joint Stipulation of Counsel re Defendant CBS Interactive Inc.'s ("CBSI's") Motion to Compel Further Responses to Discovery. I have personal knowledge of the facts set forth in this declaration, and if called upon to do so, could and would testify competently thereto.

2. Attached hereto as Exhibit A is a true and correct copy of the Requests for Production served on CBSI on August 27, 2012.

3. Attached as Exhibit B is a true and correct copy of the November 9, 2012 Declaration of Christian Anstett filed in support of Plaintiffs' Application for a preliminary injunction. Paragraphs 4-9 and Exhibits A-F describe the process by which I downloaded software from CBSI's website and used that software to download copies of some of Plaintiffs' works. Paragraphs 12-20, 21-23 and 25-27 and their accompanying exhibits describe CBSI's inducement of infringement. CBSI submitted an opposition and several accompanying declarations and hundreds of pages of exhibits in connection with the preliminary injunction briefing, but has not formally produced any of those documents to Plaintiffs.

4. CBSI has not produced a single document to Plaintiffs.

5. Plaintiffs filed their motion for Preliminary Injunction on November 9, 2012. When Plaintiffs filed that motion, Plaintiffs requested a hearing date of February 25, 2013 in order to accommodate CBSI's request for a longer period of time than the normal notice period.

6. Attached hereto as Exhibit C is a true and correct copy of a December 28, 2012 Second Joint Stipulation Regarding Preliminary Injunction Discovery. In that stipulation, Plaintiffs agreed to produce materials responsive to CBSI discovery requests concerning copyright ownership and direct infringement on the twenty-four

works at issue in Plaintiffs' motion for Preliminary Injunction to CBSI on January 7, 2013, weeks before CBSI's Opposition to the motion was due on January 25, 2013. CBSI explicitly states in the stipulation that "CBSI is not waiving its right to discovery on these or other issues."

7. After exchanging the joint stipulation, CBSI did not further meet and confer with Plaintiffs regarding discovery issues during the pendency of the preliminary injunction motions. CBSI did not take any action with respect to meeting and conferring or any other discovery activity until April 4, 2013, when Jaime Marquart and I participated in a meet and confer phone call with Jennifer Kelly and Erin Simon.

8. After the order on the preliminary injunction was issued, Plaintiffs continued to seek discovery from CBSI, respond to CBSI's discovery, and engage in extensive meet and confer correspondence with opposing counsel regarding discovery issues. On March 28, 2013, Plaintiffs served special interrogatories on CBSI. In April 2013, Plaintiffs served several deposition notices, including a person most knowledgeable notice.

9. Plaintiffs have at all times offered to allow CBSI to conduct twice the number of depositions allowed under the federal rules (20). At first, CBSI insisted on deposing all fifty seven plaintiffs. CBSI refused to accept the twenty deposition offer unless: 1) it retained the ability to seek additional depositions after taking those twenty depositions and 2) Plaintiffs were limited to the ten depositions allowed under the rules. Plaintiffs were unable to accept those conditions. Attached as Exhibit D is a March 3, 2013 letter from me to Erin Simon declining CBSI's counterproposal to depose 20 witnesses provided plaintiffs are allowed to depose 10 witnesses.

10. Attached as Exhibit E is a true and correct copy of a May 10, 2013 letter from me to Erin Simon.

11. Attached as Exhibit F is a true and correct copy of a May 15, 2013 letter from Erin Simon to me.

12. Attached as Exhibit G is a true and correct copy of the Plaintiffs' First Amended Complaint ("FAC") in this matter, filed July 25, 2012.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed on May 17, 2013 at Los Angeles, California.

By ______________________
Christian Anstett

# EXHIBIT A

BAKER MARQUART LLP
Jaime W. Marquart (Bar No. 200344)
jmarquart@bakermarquart.com
Ryan G. Baker (Bar No. 214036)
rbaker@bakermarquart.com
Christian Anstett (Bar No. 240179)
canstett@bakermarquart.com.com
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIE FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER, | CASE NO. CV11-9437 DSF (JCx)<br><br>**PLAINTIFF SUGAR HILL MUSIC'S REQUESTS FOR PRODUCTION AS TO DEFENDANT CBS INTERACTIVE, INC.**<br><br>**Judge: Hon. Dale S. Fischer**<br>**Courtroom: 840**<br>**Complaint Served: December 2, 2011**<br>Trial **Date: June 24, 2014** |

DIAMOND SMITH, REMINISCE SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM

Plaintiffs,

vs.

CBS INTERACTIVE INC., CNET NETWORKS, INC.

Defendants.

PROPOUNDING PARTY: PLAINTIFF SUGAR HILL MUSIC

RESPONDING PARTY: CBS INTERACTIVE, INC.

SET NUMBER: ONE

Plaintiff Sugar Hill Music ("Plaintiff") requests that, in accordance with Rule 34 of the Federal Rules of Civil Procedure, Defendant CBS Interactive, Inc. produce the below-listed documents for inspection and copying at the law offices of Baker Marquart LLP (located at 10990 Wilshire Blvd, Fourth Floor, Los Angeles, CA 90024) within thirty (30) days of receipt of this request.

## DEFINITIONS

1. The words "YOU" and/or "YOUR" and/or "CBS" are intended to include defendant CBS Interactive, Inc. and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

2. The word "DOCUMENT" or "DOCUMENTS" is intended to include those Documents described in Rule 34(a) of the Federal Rules of Civil Procedure and Federal Rule of Evidence 1001, and includes, in the broadest sense possible, but is not limited to, any written, printed, typed, photostated, photographed, recorded, or otherwise reproduced or stored communication or representation, whether comprised of letters, words, numbers, pictures, sounds, or symbols, or any combination thereof. This definition includes copies or duplicates of documents contemporaneously or subsequently created which have any notes or other markings. Without limiting the generality of the foregoing, "document" or "documents" includes, but is not limited to, correspondence, memoranda, notes, records, letters, envelopes, telegrams, messages, studies, analyses, contracts, agreements, working papers, accounts, analytical records, reports and/or summaries of investigations, trade letters, press releases, comparisons, books, calendars, diaries, articles, magazines, newspapers, booklets, brochures, pamphlets, circulars, bulletins, notices, drawings, diagrams, instructions, notes or minutes of meetings, or other communications or any type, including inter- and intra-office communications, questionnaires, surveys, charts, graphs, photographs, photographic recordings, films,

tapes, disks, data cells, print-outs of information stored or maintained by electronic data processing or work processing equipment, including e-mail, text messages, instant messages or chats and all other electronically stored information or information stored in any medium that can be translated if necessary, by YOU into reasonably usable form, including, but not limited to, electromagnetically sensitive stored media such as floppy disks, and magnetic tapes, and any preliminary versions, drafts, or revisions of any of the foregoing.

3. "COMMUNICATION" shall mean and refer to any original and all copies, unless identical, regardless of origin or location, of written, recorded and graphic matter, however produced or reproduced, formal or informal, including, without limitation, correspondence, memoranda, letters, facsimiles, electronic mail ("e-mail"), notes (including stenographic notes), records, letters, envelopes, telegrams, telephone logs, messages (including reports, notes and memoranda of personal or other telephone conversations and conferences), tape or other recordings of conversations, and any other writings or documents of whatever description or kind with the purpose of communicating any message between natural persons or entities, including attachments or other matters affixed thereto and copies of any of the foregoing in the possession, custody or control of YOU, YOUR counsel or any other person acting on YOUR behalf, including, without limitation, any material described above that originally may have been generated by any party hereto and is now in YOUR possession, custody or control.

4. A DOCUMENT that "REFERS TO," "RELATES TO," "PERTAINS TO" or "MENTIONS" a given subject matter is one that, whether directly or indirectly, constitutes, memorializes, contains, concerns, embodies, reflects, identifies, evidences, states, deals with, comments on, responds to, sets forth, describes, analyzes, contradicts, or is in any way pertinent to that subject matter.

5. "VIACOM" shall mean and refer to Viacom, Inc. and any of its present and former investigators, agents, officers, directors, employees, representatives,

parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

6. "LIME GROUP" shall mean and refer to Lime Group LLC and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

7. "BITTORRENT INC" shall mean and refer to BitTorrent, Inc. and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

8. "FROSTWIRE LLC" shall mean and refer to Frostwire, LLC and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

9. "STREAMCAST" shall mean and refer to Streamcast Neworks, Inc. and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

10. "RIAA" shall mean and refer to the Recording Artists of America and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

11. "MPAA" shall mean and refer to the Motion Picture Association of America America and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

12. "LIMEWIRE" shall mean and refer to the Limewire P2P SOFTWARE owned by the LIME GROUP.

13. "KAZAA" shall mean and refer to the KAZAA P2P SOFTWARE.

14. "UTORRENT" shall mean and refer to the uTorrent P2P SOFTWARE owned by BITTORRENT INC.

15. "MORPHEUS" shall mean and refer to the Morpheus P2P SOFTWARE owned by STREAMCAST.

16. "FROSTWIRE" shall mean and refer to the Frostwire P2P SOFTWARE owned by FROSTWIRE LLC.

17. "P2P SOFTWARE" shall mean and refer to any software that allows users to download media files such as music, movies, and games from a computer other than the user's computer, using a software client that searches for other connected computers, including, but not limited to, BitTorrent protocol software and Gnutella protocol software and any other software described as "P2P software" on YOUR website download.com.

18. "PUBLISHER" shall mean and refer to any entity that owns or authors P2P SOFTWARE and any of its present and former investigators, agents, officers, directors, employees, representatives, parents, subsidiaries, divisions, affiliates, predecessors-in-interest, successors-in-interest, trustees, attorneys, and anyone acting for on its behalf.

## INSTRUCTIONS

1. These DOCUMENT requests are continuing so as to require YOU to amend and supplement the responses if YOU obtain further or different DOCUMENTS or information. The DOCUMENTS to which these requests for production relate include any and all DOCUMENTS in YOUR possession, custody or control.

2. Pursuant to Rule 34(b) of the Federal Rules of Civil Procedure, YOUR

responses to these requests for production "shall state, with respect to each item or category, that inspection and related activities will be permitted as requested, unless the request is objected to, in which event, the reasons for objection shall be stated. If objection is made to part of an item or category, the part shall be specified and inspection permitted of the remaining parts." Accordingly, to the extent any objection is made to any of these DOCUMENT requests, YOU must respond to so much of the production objected to and set forth the grounds for each objection.

3. If YOU contend that any of the requested information is protected by the attorney-client privilege, work product doctrine, or any other privilege, please provide a concise statement of the grounds upon which the claim of privilege is asserted. Specifically, for each DOCUMENT withheld by YOU on a claim of privilege, YOU shall identify all of the following: (a) the date the DOCUMENT bears or the date it was prepared; (b) the author(s) of the DOCUMENT; (c) the recipient(s) and/or addressees(s) of the DOCUMENTS; (d) the general subject matter of the DOCUMENT in a manner sufficient to support YOUR claim of privilege; and (e) the factual and legal basis for YOUR claim of privilege.

4. Any DOCUMENT that varies in any way whatsoever from the original or from any other copy of the DOCUMENT, whether by reason of handwritten or other notation or any omission, shall constitute a separate DOCUMENT and must be produced, whether or not the original of such DOCUMENT is within YOUR control.

5. YOU are requested to specify which DOCUMENTS are produced in response to each of the requests for production, separately for each request for production. For DOCUMENTS identified in relation to YOUR answers to interrogatories, YOU shall specify which DOCUMENTS are being produced in connection with which specific interrogatory propounded to YOU.

6. In producing DOCUMENTS in this matter, YOU should bates label them in a manner that identifies that the DOCUMENTS are produced by YOU, as

distinct from the documents produced by any other plaintiff in this matter.

7. DOCUMENTS in electronic form shall be produced in native format on DVD or CD-ROM disks with an index describing the application for which the DOCUMENTS are formatted, the source of the original electronic DOCUMENTS (i.e. the identification of the workstation, server, etc.), the file names, the number of bytes, the disk density, the operating system and version, and translation tables for encoded fields.

8. The DOCUMENTS requested are for the time period of January 1, 2005 through the present.

**REQUESTS FOR PRODUCTION**

**REQUEST FOR PRODUCTION NO. 1**:

All DOCUMENTS that REFER or RELATE TO any contract or agreement between YOU and any PUBLISHER.

**REQUEST FOR PRODUCTION NO. 2**:

All DOCUMENTS that REFER or RELATE TO any contract related to P2P SOFTWARE to which YOU are a party.

**REQUEST FOR PRODUCTION NO. 3**:

All DOCUMENTS that REFER or RELATE TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 4**:

All COMMUNICATIONS that REFER or RELATE TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 5**:

All COMMUNICATIONS that REFER or RELATE TO any lawsuit involving P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 6**:

All COMMUNICATIONS that REFER or RELATE TO any judicial decision involving P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 7:**

All DOCUMENTS that REFER or RELATE TO the distribution of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 8:**

DOCUMENTS sufficient to show the number of copies of any P2P software application file that was downloaded from any website controlled by YOU.

**REQUEST FOR PRODUCTION NO. 9:**

DOCUMENTS sufficient to show the number of copies of any P2P software application file YOU distributed.

**REQUEST FOR PRODUCTION NO. 10:**

All DOCUMENTS that REFER or RELATE TO YOUR approval of any P2P SOFTWARE distributed through any of YOUR websites.

**REQUEST FOR PRODUCTION NO. 11:**

All DOCUMENTS that REFER or RELATE TO YOUR policies regarding the approval of P2P SOFTWARE available on any of YOUR websites.

**REQUEST FOR PRODUCTION NO. 12:**

All COMMUNICATIONS between YOU and the PUBLISHER of any P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 13:**

All DOCUMENTS that REFER or RELATE TO YOUR request for modification of any P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 14:**

All DOCUMENTS that REFER or RELATE TO YOUR advertising or marketing of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 15:**

All agreements of any kind between YOU and any entity RELATED TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 16:**

All DOCUMENTS that REFER or RELATE TO any of YOUR ownership interests in any PUBLISHER of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 17:**

All COMMUNICATIONS between YOU and any third party that REFER or RELATE TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 18:**

All DOCUMENTS that refer or relate to any feature of P2P SOFTWARE designed to search for specific audio files.

**REQUEST FOR PRODUCTION NO. 19:**

All DOCUMENTS that refer or relate to any feature of P2P SOFTWARE designed to frustrate efforts to prevent or detect copyright infringement.

**REQUEST FOR PRODUCTION NO. 20:**

All DOCUMENTS that REFER or RELATE TO copyright infringement accomplished by P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 21:**

All COMMUNICATIONS with any entity or person that REFER or RELATE TO YOUR distribution of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 22:**

All articles and editorial commentary that REFERS or RELATES TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 23:**

All articles and editorial commentary providing instruction on how to use P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 24:**

All articles and editorial commentary comparing and contrasting different types of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 25:**

All articles and editorial content that reviews or rates P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 26:**

All articles and editorial content that REFERS or RELATES TO judicial decisions concerning P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 27:**

All articles and editorial content that REFERS or RELATES to lawsuits concerning P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 28:**

All communications between YOU and the RIAA that REFER or RELATE TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 29:**

All communications between YOU and the MPAA that REFER or RELATE TO P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 30:**

All DOCUMENTS that REFER OR RELATE TO YOUR revenues generated from the distribution of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 31:**

All DOCUMENTS that REFER OR RELATE TO all amounts paid to YOU by any PUBLISHER of P2P SOFTWARE for any reason.

**REQUEST FOR PRODUCTION NO. 32:**

All DOCUMENTS that REFER OR RELATE TO the purchase of priority search listings on YOUR websites by any P2P SOFTWARE PUBLISHER.

**REQUEST FOR PRODUCTION NO. 33:**

All DOCUMENTS that REFER OR RELATE TO the hosting of P2P SOFTWARE on YOUR servers.

**REQUEST FOR PRODUCTION NO. 34:**

All DOCUMENTS that REFER OR RELATE TO an exclusive distribution agreement between YOU and any PUBLISHER of P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 35:**

All DOCUMENTS that REFER OR RELATE TO YOUR testing of any P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 36:**

All DOCUMENTS that REFER or RELATE TO the purchase of upgraded versions of P2P SOFTWARE from YOUR websites.

**REQUEST FOR PRODUCTION NO. 37:**

All DOCUMENTS that REFER or RELATE TO the transfer of P2P SOFTWARE from YOUR servers to any third party website, including but not limited to MegaUpload.com.

**REQUEST FOR PRODUCTION NO. 38:**

All DOCUMENTS that REFER or RELATE TO complaints concerning the ability of minors to download P2P SOFTWARE from YOUR websites.

**REQUEST FOR PRODUCTION NO. 39:**

All COMMUNICATIONS that REFER or RELATE TO the distribution of pornographic or obscene materials through P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 40:**

All DOCUMENTS that REFER or RELATE TO the distribution of pornographic or obscene materials through P2P SOFTWARE that was distributed by YOU.

**REQUEST FOR PRODUCTION NO. 41:**

All DOCUMENTS that REFER or RELATE TO YOUR knowledge of the distribution of pornographic or obscene materials, including, but not limited to child pornography, through P2P SOFTWARE.

**REQUEST FOR PRODUCTION NO. 42:**

All DOCUMENTS that REFER or RELATE TO YOUR firing of any employees because they complained about the use of P2P SOFTWARE to download pornographic or obscene materials, including, but not limited to, child pornography.

August 27, 2012

BAKER MARQUART LLP

By: /s/ Ryan G. Baker
Ryan G. Baker
Attorneys for Plaintiffs

# EXHIBIT B

BAKER MARQUART LLP
Jaime Marquart (Bar No. 200344)
jmarquart@bakermarquart.com
Ryan Baker ( Bar No. 214036)
rbaker@bakermarquart.com
Christian Anstett ( Bar No. 240179)
canstett@bakermarquart.com
10990 Wilshire Blvd, Fourth Floor
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Attorneys for All Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIE FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER, DIAMOND SMITH, REMINISCE

CASE NO. CV11-9437 DSF (JCx)

**DECLARATION OF CHRISTIAN ANSTETT IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Hearing Date: February 25, 2013
Judge: Hon. Dale S. Fischer
Courtroom 840
Trial Date: none set

SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM

Plaintiffs,

vs.

CBS INTERACTIVE INC., CNET NETWORKS, INC.

Defendants.

# DECLARATION OF CHRISTIAN A. ANSTETT

I, Christian A. Anstett, declare:

1. I am an attorney admitted to practice in the State of California. I am of counsel to the law firm Baker Marquart LLP, counsel for plaintiffs in this matter. I submit this declaration in support of Plaintiffs' Motion for a Preliminary Injunction. I have personal knowledge of the facts set forth herein and, if called as a witness, I could and would testify competently thereto.

2. Plaintiff Jalil Hutchins ("Hutchins") was a member of the New York based hip-hop group Whodini. Hutchins owns registered copyright interests in the musical works "It's all in Mister Magic's Wand," "Yours for a Night," "Rap Machine," "Magic's Wand," "The Haunted House of Rock," "Funky Beat," "Echo Scratch," "One Love," "I'm a Ho," "Fugitive," "The Good Part," "Nasty Lady," "Last Night (I had a long talk with myself)," "Friends," and "Five Minutes of Funk" (collectively, the "Whodini Works"). Attached as Exhibit AA are true and copies of printouts from the United States Copyright Office containing the registration information for the Whodini Works.

3. Plaintiff Douglas Davis, professionally known as "Doug E. Fresh" owns registered copyright interest in the musical works "La Di Da Di," "The Show," "Play This Only at Night," "All the Way to Heaven," "Chill Will: Cuttin' It Up," "Leave it Up to the Cut Professor," and "Lovin Every Minute of It" (collectively, the "Fresh Works"). Attached as Exhibit BB are true and copies of printouts from the United States Copyright Office containing the registration information for the Fresh Works.

4. On or about October 31, 2012, I accessed the website www.cnet.com. Using the website's search feature, I performed a search for the term "uTorrent." The first search result returned was for the Windows version of the uTorrent software application. The application received a five-star rating from CNET's editors. The "quick specifications" box on the right-hand side of the screen stated

that there had been 19,250,772 "total downloads" of the uTorrent application, and 60,686 downloads in the last week. At the bottom of the screen, a box titled "more products to consider" contained a box for the uTorrent application and included a "download" button. Attached as Exhibit A are screenshots of the uTorrent application page available at www.cnet.com on or about October 31, 2012.

5. The publisher's description of the uTorrent application available on www.cnet.com states that "uTorrent supports the protocol encryption joint specification." Ex. A. As explained on the uTorrent user forum available at utorrent.com, "protocol encryption is a joint specification between Azureus and uTorrent. It is designed to bypass throttling and/or blocking of BitTorrent traffic by an ISP." Attached as Exhibit B is a true and accurate screenshot of a user forum available on www.utorrent.com on November 5, 2012.

6. I clicked on the "download uTorrent" button available on the uTorrent search result page. After clicking on the button, my browser was immediately redirected to the website www.utorrent.com. The webpage contained a green button labeled "Get uTorrent." By clicking on that button, I was able to download a free copy of the uTorrent software. Attached as Exhibit C are screenshots of the uTorrent website accessible by clicking on the "Download uTorrent" button available on www.cnet.com on or about October 31, 2012.

7. The uTorrent application contains a search feature that allows users to search the internet for torrent files. Using the search function, I performed a search for "Whodini torrents." The first search result returned for that search was a link to the Pirate Bay website titled "Whodini (Whodini, Escape, Back in Black)." Also using the uTorrent search function, I performed a search for "Doug E. Fresh torrents." The first search result returned for the search was a link to the Pirate Bay website titled "Doug E Fresh (2 Albums, 192 kbps) (download torrent)." Attached as Exhibit D are screenshots of the uTorrent.com searches I performed and the search results page on November 5, 2012.

8. On or about November 4, 2012, I accessed the portions of the Pirate Bay websites containing the Whodini and Doug E. Fresh torrent files. The Pirate Bay webpage containing the Whodini torrent file stated that the file was uploaded on March 7, 2008 and had 35 "seeders" and 7 "leeches." The page also lists all of the Whodini songs available by using the torrent and includes all of the Whodini Works. A Pirate Bay user left the following comment concerning the Whodini torrent: "thanks for sharing butcherboys, 100% real deal folks, I grew up listening to this group, brought back alot [sic] of good memories." The Pirate Bay webpage linking to the Fresh torrent file stated the file was uploaded on January 1, 2008 and had 40 "seeders" and 3 "leeches." The page lists all of the Doug E. Fresh songs available by using the torrent and includes all of the Fresh Works. The page also includes a message from the poster that states: "Doug E. Fresh & the Get Fresh Crew's first 2 classic albums. 'Oh My God!' was taken straight from my vinyl copy ... Enjoy these hip-hop classics." Attached as Exhibit E are screenshots from the Pirate Bay website showing the Whodini and Doug E. Fresh torrents taken on or about November 4, 2012.

9. On or about November 4, 2012, I downloaded the Whodini torrent file from the Pirate Bay website. I then used a uTorrent application downloaded from a download button available on www.cnet.com to open the torrent file. In less than five minutes, I downloaded three complete Whodini albums using uTorrent. Among other things, the three albums I downloaded contained all of the Whodini Works. I then downloaded the Fresh torrent file from the Pirate Bay and opened it using uTorrent. Again, in less than five minutes I was able to download two complete Doug E. Fresh albums, containing all of the Fresh Works. The Whodini Works and Fresh Works I downloaded using a uTorrent application downloaded from a download button on www.cnet.com have been manually submitted to the Court as Exhibit F, pursuant to the Notice of Manual Filing, filed concurrently.

10. Attached as Exhibit G are screenshots of user comments for the uTorrent application available on CNET's website on or about November 5, 2012. On March 23, 2012, user D4ed4lus posted the following comment concerning uTorrent: "Cons … Doesn't help to have on your computer during a piracy case." On March 7, 2012, user skyrains2003 posted the following comment concerning uTorrent: "Pros … fast to download movies." On December 2, 2011, user ZeroInteger left the following comment: "It is evident that [other users reviewing uTorrent] you didn't read the directions or that you're shills for the MPAA, etc … Legal recourse against CNET and utorrent for a program that you're going to use to download 'torrents.' Give me a break." On or about October 2011, I accessed the "User Reviews" of the uTorrent application available on www.cnet.com. On October 2, 2011, user W_Peijnaker posted the following comment concerning uTorrent: "Cons: Same cons as with all p2p/torrent programs: Legal issues for uploading copy-right protected material (no way around it if you download it) … Don't forget to check your computers defences [sic] before you start downloading movies and stuff." Attached as Exhibit G are screenshots of user comments for the uTorrent application.

11. On November 5, 2012, I accessed a video on www.cnet.com by CNET senior editor Seth Rosenblatt (Rosenblatt) titled "First Look: uTorrent" originally posted on March 25, 2009. In that video, Rosenblatt demonstrates the use of the uTorrent application by performing a search for the recording artist "Nine Inch Nails." The video then displays the search results, which include copyrighted works. Attached as Exhibit H is a screenshot from the Rosenblatt video showing Rosenblatt entering the phrase "Nine Inch Nails" into the search feature of the uTorrent application. The video has been manually filed with the Court as Exhibit Y.

12. Attached as Exhibit I is a true and correct copy of a printout of a July 15, 2011 article by CNET senior editor Seth Rosenblatt titled "uTorrent Preparing

Paid version." The article states that: "Around 100 million people call uTorrent their preferred torrent manager. To put that number in perspective, the security suite AVG Antivirus Free claims around 110 million active users, while Google CEO Larry Page just revealed that the Chrome browser has about 160 million users." The article includes a graphic showing a screenshot of uTorrent 3.0. In that graphic, the application shows a download in progress titled "Lovedrug – EP – Part 1 …"

13. Attached as Exhibit J is a true and correct copy of a printout of the Wikipedia entry titled "Lovedrug." Wikipedia states that: 1) Lovedrug is an indie rock band from Canton Ohio; 2) the lead singer of Lovedrug is Michael Shepard and 3) "March 2010 saw EP-Part 1, the first installment in a series of three EPs …"

14. Attached as Exhibit K is a true and correct copy of a printout of the Wikipedia entry titled "EP – Part I." Wikipedia states that "EP Part I is the eighth EP by the Canton, Ohio indie rock band Lovedrug." The track listing for the EP is: "Pink Champagne," "Head Down," "We Were Owls," "Premunition," "She's Disaster," "Ladders," "Unlucky," and "Dear Radio."

15. Attached as Exhibit L is a true and correct copy of a printout from the United States Copyright Office showing the registration record for a recorded document titled "Premunition & 8 other titles" including the titles "Premunition," "We Were Owls," "She's disaster," "Pink Champagne," "Head Down," "Ladders," "Unlucky" and "Dear Radio." The registration date listed is October 25, 2010.

16. Attached as Exhibit M is a true and correct copy of a printout from CNET of a May 14, 2012 article by Seth Rosenblatt titled "Download this, Mr. Jones." The articles states: "He noted that even at his band's peak popularity, it didn't attract the 150 million people who now use torrent managers such as <u>BiTorrent mainline (download)</u> and <u>uTorrent (download)</u>." In the online version of the article, the phrases "BitTorrent mainline (download)" and "uTorrent download" were hyperlinks. On November 6, 2012, I clicked on the hyperlinks and was

directed to the uTorrent and BitTorrent download pages available on www.cnet.com.

17. Attached as Exhibit N is a true and correct copy of a printout of the www.cnet.com webpage to which I was directed after clicking on the uTorrent hyperlink in the online version of Exhibit M.

18. Attached as Exhibit O is a true and correct copy of a printout from www.cnet.com of a October 15, 2012 article by Charlie Osborne titled "TorrentFreak pegs top pirating universities in the U.S." The article states that: "It would also be wrong to assume every seeded file is illegal – as the file-sharing protocol itself is not, and can be used to distribute large, legal files. But for students wanting to save their beer tokens, "free" software and films are a continual temptation. Rutgers' most popular downloads, for example, were Microsoft Office, Witcher 2: Assassins of Kings and the movies "Fast Five" and "Pulp Fiction.""

19. Attached as Exhibit P is a true and correct copy of a printout from the Internet Archive Wayback Machine showing a CNET Music Center webpage as it existed on September 12, 2001. The article is entitled "File-sharing smackdown" and states: "In offices, dorms and other high-bandwidth communities around the world, people are talking about which file-sharing service they like the most now that Napster and Scour have been sued into irrelevance. To help you settle arguments around the water cooler or library, CNET Music Center's copy editor Brian Satterfield and I hunkered down to run a simple yet effective test on the top eight file-sharing applications. We ran searches for 18 band names using each of these clients, all of which are flourishing in the absence of Napster." The bands used in the test were Britney Spears, the Strokes, Mogwai, Beatles, Run DMC, Stravinsky, Leonard Bernstein, Randy Newman, Megadeth, Metallica, Pixies, Radiohead, American Analog Set, Miles Davis, Johnny Cash, Yo La Tengo, Rodan, and Delgados. The last sentence of the article is "It's as easy to find copyrighted songs as it was in Napster's heyday, as long as you know what to use."

20. Attached as Exhibit Q is a true and correct copy of a printout from the Internet Archive Wayback Machine showing CNET Music Center webpages as they existed on September 12, 2001. The page contains a July 27, 2001 article by CNET senior editor Eliot Van Buskirk titled "MP3 Insider File-Sharing Smackdown." In this feature, CNET "ran searches for 18 band names using each of these [P2P] clients, all of which are flourishing in the absence of Napster."

21. Attached as Exhibit R are true and correct copies of printouts from the Internet Archive Wayback Machine showing CNET webpages from June 6, 2002 and March 5, 2005. The pages are titled "search.com" and contain a search function that allows users to search a number of different search websites. The pages contain pre-set searches that allow users to search for "u2 music mp3 britney spears or madonna."

22. Attached as Exhibit S are true and correct copies of screenshots from the download section of CNET.com's website showing BitTorrent clients available on CNET.com . On November 5, 2012, uTorrent had 19,312,371 downloads; uTorrent Portable had 269,149 downloads; FrostWire had 32,273,646 total downloads; uTorrent Plus had 42,282 downloads; GetTorrent had 181,659 total downloads; FireTorrent had 150,103 total downloads; Movie Torrent had 1,274,961 total downloads; Ares Galaxy had 1,711,574 downloads; Vuze had 9,036,071 total downloads; BitLord had 2,512,478 total downloads; TorrentRover had 13,259 total downloads. The Frostwire publisher's description available on the download portion of CNET's website states "Frostwire is a free open source BitTorrent client, first released as a fork of Limewire. Gnutella support was dropped entirely, and now Frostwire only uses the BitTorrent network ... to share files." The GetTorrent publisher's description available on CNET's website states "You can search and download over 60 million torrent files – Music, movies, games, movies, soft, mp3, iso, dvd." The Movie Torrent publisher's description available on CNET's website states "Movie Torrent is a P2P file-sharing application for music, mp3, movies,

software, documents and games download." The Ares Galaxy publisher's description available on CNET's website states: "Advanced search for all types of media files (Audio, Video, Games, Software ...)." The Vuze publisher's description available on CNET's website states: "Vuze includes a powerful and customizable meta search that will help you find and download torrents. Once you find content that you enjoy you can set up subscriptions so you'll always be notified of new episodic content."

23. Attached as Exhibit T is a true and correct copy of a July 5, 2012 article titled "Are P2P File Sharing Networks Dead?" by Billy Moffat available at http://meercat9.com/news. The article states that "Limewire was officially shut down in October 2010. While the Gnutella network is no longer the de-facto protocol for P2P ... While P2P has taken many forms since its inception, by far the most common and powerful today is the Bittorrent network."

24. Attached as Exhibit U is a true and correct printout of a July 14, 2012 article by Bill Torpy entitled "BitTorrent's popularity leads to copyright litigation" availale at //phys.org/news. The article states: "Since 2010, more than 250,000 people have been accused of illegally downloading movies off the Internet using a technology called BitTorrent."

25. Attached as Exhibit V is a true and correct printout of a October 3, 2012 article titled "Researchers say Gainesville, Fla., is America's 'pirate capital'" by Greg Sandoval available on the website www.cnet.com. The article states: "Musicmetric also reported that of the 97 million BitTorrent files downloaded across the United States in the first half of 2012, about 78 percent were albums and 22 percent were individual songs. The company says that if most albums have 10 songs on them, the number of tunes pirated tops 759 million."

26. Attached as Exhibit W is a true and correct copy of a printout of a November 6, 2012 Google search of the terms "CNET distributor of Limewire."

The first two search results are links to "Limewire downloads on CNET." These links are not "active," and the web pages to which they link are not active.

27. Attached as Exhibit X is a true and correct copy of a July 23, 2003 article titled "New bill would curb P2P companies" by Lisa Bowman available at the website www.zdnet.com.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 9, 2012 at Los Angeles, California.

By ________________________
Christian A. Anstett

# EXHIBIT AA

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 45 of 85 entries

previous | next

Labeled View

***It's all in Mister Magic's wand / Thomas Dolby.***

**Type of Work:** Music
**Registration Number / Date:** PA0000187576 / 1983-05-04
**Title:** It's all in Mister Magic's wand / Thomas Dolby.
**Appears in:** Magic's wand. Jive VJ 12008. c1982. 1 sound disc : 33 1/3 rpm ; 12 in. side 1, band 2
**Publisher Number:** Jive VJ 12008
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd, Street Music, Ltd. & Scale Music & Sound Hits, Ltd.
**Date of Creation:** 1982
**Date of Publication:** 1982-09-29
**Authorship on Application:** music: Thomas Morgan Dolby Robertson p.k.a. Thomas Dolby, & Matthew Seligman.
**Copyright Note:** C.O. correspondence.
**Names:** Robertson, Thomas Morgan Dolby
Seligman, Matthew
Whodini
Zomba Music Publishers, Ltd
Street Music, Ltd.
Scale Music & Sound Hits, Ltd.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 83 of 85 entries

previous | next

---

[illegible]

*Yours for a night / J. Hutchins, Ecstasy, T. Rashad.*

**Type of Work:** Music
**Registration Number / Date:** PA0000234071 / 1984-12-10
**Title:** Yours for a night / J. Hutchins, Ecstasy, T. Rashad.
**Appears In:** Whodini. Jive/Arista JL8-8199, c1983. 1 sound disc : 33 1/3 rpm ; 12 in. side 2, band 2
**Publisher Number:** Jive/Arista JL8-8199
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd.
**Date of Creation:** 1983
**Date of Publication:** 1983-10-13
**Authorship on Application:** words & music: Jalil Hutchins, John Fletcher p.k.a. Ecstasy & Thomas Pearse p.k.a. T. Rashad.
**Other Title:** Whodini
**Names:** Hutchins, Jalil
Fletcher, John
Pearse, Thomas
Rashad, T., pseud.
Whodini
Zomba Music Publishers, Ltd.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 66 of 85 entries

previous | next

Labeled View

*Rap machine / J. Hutchins, Ecstasy, C. Plank.*

| | |
|---|---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0000234072 / 1984-12-10 |
| **Title:** | Rap machine / J. Hutchins, Ecstasy, C. Plank. |
| **Appears in:** | Whodini. Jive/Arista JL8-8199, c1983. 1 sound disc : 33 1/3 rpm ; 12 in. side 2, band 3 |
| **Publisher Number:** | Jive/Arista JL8-8199 |
| **Performer:** | Performed by Whodini. |
| **Copyright Claimant:** | Zomba Music Publishers, Ltd. |
| **Date of Creation:** | 1983 |
| **Date of Publication:** | 1983-10-13 |
| **Authorship on Application:** | music: Conny Plank; words: Jalil Hutchins, & John Fletcher p.k.a. Ecstasy. |
| **Other Title:** | Whodini |
| **Names:** | Plank, Conny |
| | Hutchins, Jalil |
| | Fletcher, John |
| | Whodini |
| | Zomba Music Publishers, Ltd. |

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 56 of 85 entries

previous | next

Labeled View

***Magic's wand ; Magic's wand : special extended mix / Thomas Dolby, J....***

**Type of Work:** Music
**Registration Number / Date:** PA0000175941 / 1983-05-04
**Title:** Magic's wand ; Magic's wand : special extended mix / Thomas Dolby, J. Hutchins, J. Rivas.
**Imprint:** c1982.
**Publisher Number:** Jive VJ 12008
**Description:** on 1 sound disc : 33 1/3 rpm ; 12 in.
**Notes:** (With It's all in Mister Magic's wand).
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd., Street Music, Ltd. & Scale Music & cSound Hits, Ltd.
**Date of Creation:** 1982
**Date of Publication:** 1982-09-29
**Authorship on Application:** words: Jalil Hutchins & John Rivas; music: Thomas Morgan Dolby Robertson p.k.a. Thomas Dolby, & Matthew Seligman.
**Variant title:** Magic's wand
**Names:** Hutchins, Jalil
Rivas, John
Robertson, Thomas Morgan Dolby
Seligman, Matthew
Dolby, Thomas, pseud.
Whodini
Zomba Music Publishers, Ltd.
Street Music, Ltd.
Scale Music & cSound Hits, Ltd.

previous | next

| Save, **Print and Email** (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Copyright United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 37 of 85 entries

previous | next

Labeled View

***The Haunted house of rock.***

**Type of Work:** Music
**Registration Number / Date:** PA0000233182 / 1984-12-10
**Title:** The Haunted house of rock.
**Imprint:** c1983.
**Publisher Number:** Jive T 34
**Description:** 1 sound disc : 45 rpm, stereo. ; 12 in.
**Notes:** 4 versions.
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd.
**Date of Creation:** 1983
**Date of Publication:** 1983-05-06
**Authorship on Application:** words: Jalil Hutchins; music: Nigel Green & Pete Harris.
**Names:** Hutchins, Jalil
Green, Nigel
Harris, Pete
Whodini
Zomba Music Publishers, Ltd.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 32 of 85 entries

previous | next

Labeled View

***Funky beat / Fletcher, Hutchins, Carter, Smith.***

**Type of Work:** Music
**Registration Number / Date:** PA0000289304 / 1986-05-21
**Title:** Funky beat / Fletcher, Hutchins, Carter, Smith.
**Appears in:** Whodini. Jive/Arista JDI-9462, c1986. 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. side 1, band 1, etc.
**Publisher Number:** Jive/Arista JDI-9462
**Notes:** Extended & instrumental versions.
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Enterprises, Inc.
**Date of Creation:** 1986
**Date of Publication:** 1986-03-21
**Authorship on Application:** music: Lawrence Smith & William Drew Carter (p.k.a. Grandmaster Dee); words: Jalil Hutchins & John Fletcher (p.k.a. Ecstasy)
**Other Title:** Whodini
**Names:** Smith, Lawrence
Carter, William Drew
Hutchins, Jalil
Fletcher, John
Grandmaster Dee, pseud.
Ecstasy, pseud.
Whodini
Zomba Enterprises, Inc.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Copyright
United States Copyright Office

Help Search History Titles Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 33 of 85 entries

previous next

Labeled View

*Funky beat : the best of Whodini / by Whodini.*

| | |
|---|---|
| **Type of Work:** | Sound Recording |
| **Registration Number / Date:** | SR0000390469 / 2006-06-08 |
| **Title:** | Funky beat : the best of Whodini / by Whodini. |
| **Copyright Claimant:** | ℗ Zomba Recording, LLC (employer for hire) |
| **Date of Creation:** | 2006 |
| **Date of Publication:** | 2006-05-24 |
| **Previous Registration:** | Preexisting material: basic sounds, basic photos. |
| **Basis of Claim:** | New Matter: compilation of sound recordings & photographic matter. |
| **Copyright Note:** | Cataloged from appl. only. |
| **Names:** | Whodini |
| | Zomba Recording, LLC |

previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 15 of 85 entries

previous | next

Labeled View

*Echo scratch / J. Fletcher, J. Hutchins, L. Smith.*

**Type of Work:** Music
**Registration Number / Date:** PA0000291949 / 1986-05-21
**Title:** Echo scratch / J. Fletcher, J. Hutchins, L. Smith.
**Appears in:** Back in black. Jive/Arista JL8-8407. c1986. 1 sound disc : 33 1/3 rpm ; 12 in. side 2, band 2
**Publisher Number:** Jive/Arista JL8-8407
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Enterprises, Inc., Zomba Music Publishers, Ltd., & Funk Groove Music
**Date of Creation:** 1986
**Date of Publication:** 1986-04-24
**Authorship on Application:** words and music: Lawrence Smith, Jalil Hutchins, & John Fletcher p.k.a. Ecstasy.
**Names:** Smith, Lawrence
Hutchins, Jalil
Fletcher, John
Whodini
Zomba Enterprises, Inc.
Zomba Music Publishers, Ltd.
Funk Groove Music

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 61 of 85 entries

previous | next

Labeled View

*One love / J. Hutchins, L. Smith.*

**Type of Work:** Music
**Registration Number / Date:** PA0000291946 / 1986-05-21
**Title:** One love / J. Hutchins, L. Smith.
**Appears in:** Back in black. Jive/Arista JL8-8407, c1986. 1 sound disc : 33 1/3 rpm ; 12 in. side 1, band 2
**Publisher Number:** Jive/Arista JL8-8407
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Enterprises, Inc., Zomba Music Publishers, Ltd., & Funk Groove Music
**Date of Creation:** 1986
**Date of Publication:** 1986-04-24
**Authorship on Application:** music: Lawrence Smith; words: Jalil Hutchins.
**Names:** Smith, Lawrence
Hutchins, Jalil
Whodini
Zomba Enterprises, Inc.
Zomba Music Publishers, Ltd.
Funk Groove Music

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 42 of 85 entries

previous | next

Labeled View

*I'ma ho / J. Hutchins, J. Fletcher, L. Smith.*

**Type of Work:** Music
**Registration Number / Date:** PA0000291948 / 1986-05-21
**Title:** I'ma ho / J. Hutchins, J. Fletcher, L. Smith.
**Appears in:** Back in black. Jive/Arista JL8-8407, c1986. 1 sound disc : 33 1/3 rpm ; 12 in. side 1, band 4
**Publisher Number:** Jive/Arista JL8-8407
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Enterprises, Inc., Zomba Music Publishers, Ltd., & Funk Groove Music
**Date of Creation:** 1986
**Date of Publication:** 1986-04-24
**Authorship on Application:** words and music: Lawrence Smith, Jalil Hutchins, & John Fletcher p.k.a. Ecstasy.
**Names:** Smith, Lawrence
Hutchins, Jalil
Fletcher, John
Ecstasy, pseud.
Whodini
Zomba Enterprises, Inc.
Zomba Music Publishers, Ltd.
Funk Groove Music

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help Search History Titles Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 34 of 85 entries

previous next

Labeled View

***The Good part / J. Hutchins, L. Smith.***

**Type of Work:** Music
**Registration Number / Date:** PA0000291951 / 1986-05-21
**Title:** The Good part / J. Hutchins, L. Smith.
**Appears in:** Back in black. Jive/Arista JL8-8407, c1986, 1 sound disc : 33 1/3 rpm ; 12 in. side 2, band 4
**Publisher Number:** Jive/Arista JL8-8407
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Enterprises, Inc., Zomba Music Publishers, Ltd., & Funk Groove Music
**Date of Creation:** 1986
**Date of Publication:** 1986-04-24
**Authorship on Application:** music: Lawrence Smith; words: Jalil Hutchins.
**Names:** Smith, Lawrence
Hutchins, Jalil
Whodini
Zomba Enterprises, Inc.
Zomba Music Publishers, Ltd.
Funk Groove Music

previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help Search History Titles Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 59 of 85 entries

previous next

Labeled View

***Nasty lady / J. Hutchins, Ecstasy, C. Plank.***

**Type of Work:** Music
**Registration Number / Date:** PA0000234069 / 1984-12-10
**Title:** Nasty lady / J. Hutchins, Ecstasy, C. Plank.
**Appears in:** Whodini. Jive/Arista JL8-8199, c1983. 1 sound disc : 33 1/3 rpm ; 12 in. side 1, band 2
**Publisher Number:** Jive/Arista JL8-8199
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd.
**Date of Creation:** 1983
**Date of Publication:** 1983-10-13
**Authorship on Application:** music: Conny Plank; words: Jalil Hutchins, & John Fletcher p.k.a. Ecstasy.
**Other Title:** Whodini
**Names:** Plank, Conny
Hutchins, Jalil
Fletcher, John
Ecstasy, pseud.
Whodini
Zomba Music Publishers, Ltd.

previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 51 of 85 entries

previous | next

Labelled View

*Last night (I had a long talk with myself) / J. Hutchins, J. Fletcher, B. New.*

**Type of Work:** Music
**Registration Number / Date:** PA0000291950 / 1986-05-21
**Title:** Last night (I had a long talk with myself) / J. Hutchins, J. Fletcher, B. New.
**Appears in:** Back in black. Jive/Arista JL8-8407, c1986. 1 sound disc : 33 1/3 rpm ; 12 in, side 2, band 3
**Publisher Number:** Jive/Arista JL8-8407
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd.
**Date of Creation:** 1986
**Date of Publication:** 1986-04-24
**Authorship on Application:** words and music: Jalil Hutchins; words: John Fletcher p.k.a. Ecstasy; music: Bryan "Chuck" New.
**Copyright Note:** C.O. correspondence.
**Names:** Hutchins, Jalil
Fletcher, John
New, Bryan
Whodini
Zomba Music Publishers, Ltd.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

http://cocatalog.loc.gov/cgi-bin/Pwebrecon.cgi?v1=51&ti=1,51&Search%5FArg=Whodini... 11/5/2012

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 30 of 85 entries

previous | next

Labeled View

***Friends / Jalil Hutchins, Larry Smith ; [performed by] Whodini. Friends :...***

| | |
|---|---|
| **Type of Work:** | Sound Recording |
| **Registration Number / Date:** | SR0000060859 / 1985-03-01 |
| **Title:** | Friends / Jalil Hutchins, Larry Smith ; [performed by] Whodini. Friends : instrumental / Larry Smith ; [performed by] Whodini. |
| **Imprint:** | New York : distributed by Arista Records, c1984. |
| **Publisher Number:** | Jive JD-1-9227 |
| **Description:** | 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. |
| **Notes:** | (With Five minutes of funk & Five minutes of funk (instrumental)) |
| **Copyright Claimant:** | Zomba Productions, Ltd. |
| **Date of Creation:** | 1984 |
| **Date of Publication:** | 1984-07-20 |
| **Authorship on Application:** | sound recording: Zomba Productions, Ltd., employer for hire. |
| **Names:** | Hutchins, Jalil<br>Smith, Larry<br>Whodini.<br>Zomba Productions, Ltd. |

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Name = Whodini
Search Results: Displaying 21 of 85 entries

previous | next

Labeled View

***Five minutes of funk / Jalil Hutchins, Ecstasy, Larry Smith.***

**Type of Work:** Music
**Registration Number / Date:** PA0000239440 / 1984-11-13
Supplemented by: PA0000248863 / 1985-04-29
**Title:** Five minutes of funk / Jalil Hutchins, Ecstasy, Larry Smith.
**Imprint:** c1984.
**Publisher Number:** Jive JD-1-9227
**Description:** on side 1 of 1 sound disc : 33 1/3 rpm, stereo. ; 12 in.
**Notes:** (With Friends et al.).
**Performer:** Performed by Whodini.
**Copyright Claimant:** Zomba Music Publishers, Ltd.
**Date of Creation:** 1984
**Date of Publication:** 1984-07-20
**Authorship on Application:** music: Lawrence Smith; words: Jalil Hutchins, & John Fletcher, whose pseud. is Ecstacy.
**Copyright Note:** C.O. correspondence.
See also Five minutes of funk; Reg. 29Apr85; PA 248-863
**Names:** Smith, Lawrence
Hutchins, Jalil
Fletcher, John
Ecstacy, pseud.
Whodini
Zomba Music Publishers, Ltd.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

# EXHIBIT BB

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = La di da di
Search Results: Displaying 13 of 34 entries

previous next

Labeled View

*La-di-da-di.*

**Type of Work:** Music
**Registration Number / Date:** PAu000727284 / 1985-05-20
**Title:** La-di-da-di.
**Description:** 1 sound cassette.
**Copyright Claimant:** Mark of Aries Music
**Date of Creation:** 1985
**Authorship on Application:** words & music: Douglas Davis; lyrics: Ricky Walters.
**Previous Registration:** Appl. identifies some words & some music as preexisting material.
**Basis of Claim:** New Matter: "some new words, some new music."
**Names:** Davis, Douglas, 1968-
Walters, Ricky, 1965-
Mark of Aries Music

previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help Search History Titles Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = La di da di
Search Results: Displaying 14 of 34 entries

previous next

Labeled View

***La-di-da-di ; The show / Doug E. Fresh and MC Ricky D.***

**Type of Work:** Sound Recording
**Registration Number / Date:** SR0000267894 / 1999-08-18
**Title:** La-di-da-di ; The show / Doug E. Fresh and MC Ricky D.
**Imprint:** c1985.
**Publisher Number:** Reality Records D-242
**Description:** Sound disc : 33 1/3 rpm ; 12 in.
**Notes:** 3 versions of 2nd selection.
**Copyright Claimant:** ℗ Danya Records, Ltd.
**Date of Creation:** 1985
**Date of Publication:** 1985-08-27
**Authorship on Application:** performance: Douglas Davis (a.k.a. Doug E. Fresh, Human Beat Box & the Get Fresh Crew); production: Dennis Bell (d.b.a. City Slicker Productions)
**Variant title:** La-di-da-di
**Other Title:** The show
**Names:** Davis, Douglas
Fresh, Doug E.
Bell, Dennis
MC Ricky D
Danya Records, Ltd.
Human Beat Box
Get Fresh Crew
City Slicker Productions

previous next

| Save, **Print and Email** (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PAu000727283
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

*The Show.*

**Type of Work:** Music
**Registration Number / Date:** PAu000727283 / 1985-05-20
**Title:** The Show.
**Description:** 1 sound cassette.
**Copyright Claimant:** Mark of Aries Music
**Date of Creation:** 1985
**Authorship on Application:** words & music: Douglas Davis & Ricky Walters.
**Previous Registration:** Appl. identifies some words & some music as preexisting material.
**Basis of Claim:** New Matter: "some new words, some new music."
**Names:** Davis, Douglas, 1968-
Walters, Ricky, 1965-
Mark of Aries Music

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0000318675
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

***Play this only at night / Doug E. Fresh, Chill Will.***

**Type of Work:** Music
**Registration Number / Date:** PA0000318675 / 1987-03-06
**Title:** Play this only at night / Doug E. Fresh, Chill Will.
**Appears in:** Oh, my God! Reality F-9649, c1986. 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. side B, band 3
**Performer:** Performed by Doug E. Fresh & the Get Fresh Crew.
**Copyright Claimant:** Danica Music, Entertaining Music, Inc.
**Date of Creation:** 1986
**Date of Publication:** 1986-11-01
**Authorship on Application:** words & music: Doug E. Fresh, a pseud. for Douglas Davis, & Chill Will, a pseud.
**Other Title:** Oh, my God!
Reality F-9649
**Names:** Davis, Douglas
Will, Chill, pseud.
Get Fresh Crew.
Danica Music
Entertaining Music, Inc.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright United States Copyright Office

Help Search History Titles Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0000302486
Search Results: Displaying 1 of 1 entries

previous next

Labeled View

***All the way to Heaven / Doug E. Fresh.***

**Type of Work:** Music
**Registration Number / Date:** PA0000302486 / 1986-09-15
**Title:** All the way to Heaven / Doug E. Fresh.
**Appears in:** Doug E. Fresh and the Get Fresh Crew, Reality D-264, c1986. 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. side A, band 1, etc.
**Publisher Number:** Reality D-264
**Notes:** Three versions.
**Performer:** Performed by Doug E. Fresh and the Get Fresh Crew.
**Copyright Claimant:** Entertaining Music, Danica Music
**Date of Creation:** 1986
**Date of Publication:** 1986-07-02
**Authorship on Application:** words & music: Doug E. Fresh, a pseud. for Douglas Davis.
**Names:** Davis, Douglas
Fresh, Doug E., pseud.
Get Fresh Crew
Entertaining Music
Danica Music

previous next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Case 2:11-cv-09437-DSF-JC Document 42-3 Filed 11/09/12 Page 23 of 119 Page ID #:621

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = Chill Will
Search Results: Displaying 3 of 6 entries

previous | next

Labeled View

***Doug E's Best.***

**Type of Work:** Music
**Registration Number / Date:** PAu003606927 / 2011-11-16
**Application Title:** Doug E's Best.
**Title:** Doug E's Best.
**Description:** Electronic file (eService)
**Copyright Claimant:** Douglas Davis. Address: 259 W131st Street, New York, NY, 10027, United States.
**Date of Creation:** 2011
**Authorship on Application:** Doug E Fresh, pseud. of Douglas Davis; Domicile: United States; Citizenship: United States. Authorship: music, lyrics, editing.
**Rights and Permissions:** JTC Atlantic Pacific Development, PO Box 1287, New York, NY, 10027, United States
**Copyright Note:** C.O. correspondence.
**Contents:** Nighttime GOD Pt III Remix.
No.
No Doubt.
Ola Ola.
On and On Radio.
On The Mic.
On The Strength.
Original Human Beat Box.
Party.
Plane So High.
Return Remix.
Runaway Love.
She Was The Type Of Girl.
Shine.
Sittin In My Car.
SIXX Minutes.
Specialist.
Spirit.
Summertime.

Supa Emcees.
Take N Uptown.
Teenage Love Affair.
Theres Nothin Better.
Tonites The Night.
Vida Mia.
We Turn It On.
Wheres Da Party At.
Who Got All The Money.
5 Seconds.
Answers.
Bounce.
Chill Will: Cuttin It Up.
Down South Funk.
G's To Gents.
I Can Make You Dance.
I Run This.
Roc The Mic.
Second Chance.
The Original Old School.
The History Interlude.
1,2 Pass It On.
20 Minute Workout.
24 and 7.
Abortion.
Africa (Going Back Home)
After Hours G.O.D. PT III.
Back In The Dayz.
Check It Out.
Breath Of Fresh Air.
Christiansands.
Come Again.
Crazy Bout Cars.
Cut That Zero.
D.E.F. = Doug E. Fresh.
D.O.A. (introduction)
Dance Wit Me.
Damn Thing Keeps Kicking (The)
Doin' What I Got To Do.
Doug E Got It Goin On.
Everybodys Got 2 Get Some.
Everybody Loves A Star.
Freak It Out.
For All Y'all.
Get Da Money.
Get Fresh Crew.
Greatest Entertainer.

Guess? Who?
Hands In The Air.
History.
light.
I Need My Woman Tonight.
Im Getting Ready.
If I Was Your Man.
Imagine Me Just Pumpin It Up.
Its Like That.
Its Really Goin In Here.
Just Havin Fun.
Keep It Goin.
Keep It On The Down Low.
Keep Risin To The Top.
Let Me Clear My Throat Remix.
Love.
Lyrics To The Rhythm.
Millionaire.
Money Grip.
My Drink And My 2 Step.
Nighttime GOD Pt III.

**Names:** Davis, Douglas
Doug E Fresh, pseud.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = leave it up to the cut professor
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

*Leave it up to the cut professor / Barry Bee.*

| | |
|---|---|
| **Type of Work:** | Music |
| **Registration Number / Date:** | PA0000318673 / 1987-03-06 |
| **Title:** | Leave it up to the cut professor / Barry Bee. |
| **Appears in:** | Oh, my God! Reality F-9649, c1986. 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. side A, band 3 |
| **Performer:** | Performed by Doug E. Fresh & the Get Fresh Crew. |
| **Copyright Claimant:** | Danica Music & Entertaining Music, Inc. |
| **Date of Creation:** | 1986 |
| **Date of Publication:** | 1986-11-01 |
| **Authorship on Application:** | words & music: Barry Bee, a pseud. |
| **Other Title:** | Oh, my God! |
| | Reality F-9649 |
| **Names:** | Fresh, Doug E. |
| | Bee, Barry, pseud. |
| | Get Fresh Crew. |
| | Danica Music |
| | Entertaining Music, Inc. |

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Copyright
United States Copyright Office

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Copyright Number = PA0000318674
Search Results: Displaying 1 of 1 entries

previous | next

*Lovin' every minute of it : The Cyclone ride / Doug E. Fresh.*

**Type of Work:** Music
**Registration Number / Date:** PA0000318674 / 1987-03-06
**Title:** Lovin' every minute of it : The Cyclone ride / Doug E. Fresh.
**Appears in:** Oh, my God! Reality F-9649, c1986. 1 sound disc : 33 1/3 rpm, stereo. ; 12 in. side A, band 4
**Notes:** Additional title on copy: Lovin' ev'ry minute of it.
**Performer:** Performed by Doug E. Fresh & the Get Fresh Crew.
**Copyright Claimant:** Danica Music, Entertaining Music, Inc., & Zomba Enterprises, Inc.
**Date of Creation:** 1986
**Date of Publication:** 1986-11-01
**Authorship on Application:** words & music: Doug E. Fresh, a pseud. for Douglas Davis, & R. J. Lange.
**Other Title:** The Cyclone ride
Oh, my God!
Reality F-9649
**Names:** Davis, Douglas
Lange, R. J.
Fresh, Doug E., pseud.
Lovin' ev'ry minute of it.
Get Fresh Crew.
Danica Music
Entertaining Music, Inc.
Zomba Enterprises, Inc.

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

# EXHIBIT A


Download.com
Search
uTorrent
Visit Site
Publisher's Description
uTorrent is an efficient BitTorrent client for Windows. Most of the features present in other BitTorrent clients are present in uTorrent, including bandwidth prioritization, scheduling, RSS auto-downloading, and Mainline DHT. Additionally, uTorrent supports the protocol encryption joint specification and peer exchange. Unlike many torrent clients, it does not hog valuable system resources--typically using less than 6MB of memory, allowing you to use the computer as if it weren't there at all.
Fastest, easiest, and most reliable YouTube downloader app
Three easy steps
1. Click "Start Download"
2. Run the quick scan
3. Scan & Fix up to 100 registry errors
START DOWNLOAD
ARO® 2012
External Download Site
941.39K
19,250,772
60,686
Free
October 04, 2012
Windows XP/Vista/7
See Full Specs
Report a problem
start


uTorrent CNET Download.com Mozilla Firefox
Visit Site
uTorrent
uTorrent 2.0 looks to the future
MORE PRODUCTS TO CONSIDER
uTorrent
FrostWire
BitTorrent
Vuze
Movie Torrent
eTorrent
Access Your Files or Apps from Any Device,
Anywhere. Free!

- English
Visit Site Visit
- English
- Español

uTorrent

AdChoices




Visit Site Visit Site

Overview CNET Review User Reviews Full Specs



by: Seth Rosenblatt on February 03, 2010

CNET Editors' Rating

Spectacular

**CNET Editors' note:** *You will be taken to a third-party site to complete your download. Using P2P and file-sharing software to distribute copyrighted material without authorization is illegal in the United States and many other countries. CBS Interactive does not encourage or condone the illegal duplication or distribution of copyrighted content.*

Small enough to run off a USB key, but powerful enough to download any torrent in a jiffy (if it's got enough seeders), uTorrent 2.0 is easy on the eyes and smart on your network. The memory footprint for uTorrent is very small, and system resources are barely touched. While you're torrenting, you shouldn't be surprised to find that other programs that use your Internet connection slow down, but the latest version of uTorrent has an answer to that. Called uTorrent Protocol, or uTP, it's a built-in throttling that detects network congestion and slows down the torrent until the traffic jam has dissipated.

Version 2.0 includes a transfer cap, so that users who have had limits imposed by their ISPs can keep track and automatically kill torrenting when that limit is reached. Skins have also been introduced, but there's no skins option in Preferences: instead, you must go to the uTorrent site and download and install them yourself. That's unnecessarily irritating.

The most difficult aspect of using a torrent client is still finding the torrents, but included are both a torrent search bar and a handy RSS feed download function. Subscribe to select feeds, and uTorrent automatically downloads files as they publish. Adding, starting, pausing, and listing torrents takes merely a click each. A speed guide helps you test your ports and adjust system settings for optimal performance, although watch out for the opt-out Ask.com toolbar when you install. Combined with

# EXHIBIT B


File Edit View Favorites Tools Help
Member
Offline
Member
File Find Disable View Images Cache Tools Validate | Browser Mode: IE9 Document Mode: IE9 standards

# EXHIBIT C


µTorrent
Get µTorrent
Super fast. Ultra light.
That means ultra-efficient downloads
of mega-sized files
Get µTorrent
Willis Earl Beal


Protect your computer with integrated antivirus
Get the codecs you need to enjoy HD video
Easily move files to your favorite devices
Free Download
µTorrent Free
µTorrent Plus
Protects against viruses in torrents
Plays more formats than popular free players
Converts files to play on popular devices
Provides secure remote access to your files
lifehacker
PCAUTHORITY
start


µTorrent
Get µTorrent
Congratulations!
You just installed the world's #1 BitTorrent client like a boss.
If your download doesn't begin right now, click here and we'll figure it out.
Step 1 When your download completes, open uTorrent.exe
Step 2 Follow the instructions on screen
Step 3 When the installation is complete, check the taskbar for the µTorrent icon to make sure you have µTorrent running as it should be
Why not treat yourself?
Upgrade to uTorrent Plus for HD viewing, easy syncing with your smart phone, tablet and gaming system, and built-in state-of-the-art antivirus
Go on. You deserve this.
Follow Us.
(Or don't. Whatever.)
start

# EXHIBIT D


µTorrent
Getting Started Is Easy
Three simple steps - find torrents, download content, and enjoy!
1 Find
2 Download
3 Play
Need help? We've got you covered.


Torrenting evolved.
µTorrent
bing
Related searches for whodini torrents


Torrenting
evolved.
µTorrent
bing
doug e fresh torrents
Related searches for doug e fresh torrents
Doug E Fresh Tickets

# EXHIBIT E

://thepiratebay.se/torrent/4067156/Whodini_(Whodini__Escape__Back_In_Black)

## Whodini (Whodini, Escape, Back In Black)

| | | | |
|---|---|---|---|
| Type: | Audio > Music | Quality: | +1 / -0 (+1) |
| Files: | 29 | Uploaded: | 2008-03-07 01:25:49 GMT |
| Size: | 192.91 MiB (202280726 Bytes) | By: | butcherboys |
| | | Seeders: | 35 |
| | | Leechers: | 7 |
| | | Comments | 1 |

Info Hash:
5280B738B9A4A0B63BED822FC8F9AED F31249885

Download — Enjoy Movies, TV Shows, Music and Games on your browser!

DOWNLOAD

PLAY

**GET THIS TORRENT**
(Problems with magnets links are fixed by upgrading your torrent client!)

Three albums from the hip hop/rap artists Whodini.

[img]http://upload.wikimedia.org/wikipedia/en/a/ad/Whodini_album.jpg[/img]

Whodini - Whodini

Release: 1983
Genre: Hip Hop/Rap
Bitrate: 192

Whodini is the self-titled debut album by the hip-hop group Whodini. It was released in 1983 on Jive/Arista Records and spawned two hit singles, "Magic's Wand" and "The Haunted House of Funk". "Magic's Wand" appeared in the videogame Grand Theft Auto: Vice City, on the Wildstyle Pirate Radio radio station.

Track Listing

1. "The Haunted House of Funk"
2. "Nasty Lady"
3. "Underground"
4. "It's All in Mr Magic's Wand"
5. "Magic's Wand"
6. "Yours for a Night"
7. "Rap Machine"
8. "The Haunted House of Funk" (Remix)

[img]http://upload.wikimedia.org/wikipedia/en/a/a0/Whodini_escape.jpg[/img]
Whodini - Escape

Release: 1985
Genre: Hip Hop/Rap
Bitrate: 192

Escape is the second album by hip hop group Whodini, released in 1985 (see 1985 in music) on the Jive label. The album spawned the hit singles "Five Minutes of Funk," "Friends," and "Freaks Come Out at Night". In 1998, the album was selected as one of The Source Magazine's 100 Best Rap Albums.

Track Listing

1. "Five Minutes Of Funk" ??? 5:25
2. "Freaks Come Out At Night" ??? 4:45
3. "Featuring Grandmaster Dee" ??? 5:45
4. "Big Mouth" ??? 2:50
5. "Escape (I Need A Break)" ??? 4:38
6. "Friends" ??? 4:16
7. "Out Of Control" ??? 6:59
8. "We Are Whodini" ??? 1:39

Download Now

03 seconds left

http://thepiratebay.se/torrent/4067156/Whodini_(Whodini__Escape__Back_In_Black)

Doug E Fresh torrents

7. "Rap Machine"
8. "The [illegible] of Funk" (Demix)

[img]http://upload.wikimedia.org/wikipedia/en/[illegible]/Whodini_escape.jpg[/img]
Whodini - Escape

Release: 1985
Genre: Hip hop Rap
Bitrate: 192

Escape is the second album by hip hop group Whodini, released in 1984 (see 1985 in [illegible]) on the Jive label. The album spawned the hit singles "Five Minutes of Funk," "Friends," and "Freaks Come out at Night". In 1998, the album was selected as one of The Source Magazine's 100 Best Rap Albums.

Track listing

1. "Five Minutes Of Funk" [illegible] 5:22
2. "Freaks Come Out At Night" [illegible]
3. "Featuring Grandmaster Dee" [illegible]
4. "Big Mouth" [illegible]
5. "Escape (I Need A Break)" [illegible]
6. "Friends" [illegible] 4:20
7. "Out Of Control" [illegible]
8. "We Are Whodini" [illegible]

[img]http://upload.wikimedia.org/wikipedia/en/[illegible]/Whodini_group_[illegible].jpg[/img]
Whodini - Back In Black

Release: 1986
Genre: Hip hop Rap
Bitrate: 192

Black In Black, released in 1986, was the third album by American hip hop group Whodini. The album spawned three singles, "Funky Beat", "Growing Up" and "One Love". The album was certified platinum by RIAA.

Track listing

1. "Funky Beat" - [illegible]
2. "One Love" - [illegible]
3. "Growing Up" - [illegible]
4. "[illegible]" - 4:06
5. "Now Care You" - 5:46
6. "Fugitive" - [illegible]
7. "Echo Scratch" - [illegible]
8. "Last Night (I Had A Long Talk With Myself)" - [illegible]
9. "The Good Part" - 4:29
10. "Whodini Mega Mix" - [illegible]

Release: 1986
Genre: Hip hop Rap
Bitrate: 192

Total File Size: 132 MB

HIDE DETAILED ARTIST INFO

**Albums by artist**

(non-album tracks)

GET THIS TORRENT

Download

Enjoy Movies, TV Shows, Music and Games on your browser!

**Comments**

gotchatheprate [illegible]

thanks for sharing butcherboys,
100% real deal here folks,
i grew up listening to this group,brought back alot of good memories.

Download Now

02 seconds left

http://thepiratebay.se/torrent/3956243/Doug_E_Fresh_(2_Albums__192kbps)

Doug E Fresh to

Audio Video Applications Games Other All

is torrent

Speed Up Your Mac (Free)

Speed up your Mac In Seconds Increase performance of OS X (Free)

ok

## Doug E Fresh (2 Albums, 192kbps)

| | |
|---|---|
| Type: | Audio > Music |
| Files: | 24 |
| Size: | 151.67 MiB (159032444 Bytes) |

| | |
|---|---|
| Quality: | +2 / -0 (+2) |
| Uploaded: | 2008-01-01 04:11:51 GMT |
| By: | Rhog |
| Seeders: | 40 |
| Leechers: | 3 |
| Comments | 12 |

Info Hash:
160317973A246DA2786B1E855C76189E8C504AE0

Download

Enjoy Movies, TV Shows, Music and Games on your browser!

GET THIS TORRENT
(Problems with magnets links are fixed by upgrading your torrent client!)

Doug E. Fresh & The Get Fresh Crew\'s first 2 classic albums. [illegible] Oh My God! [illegible] was taken straight from my vinyl copy. I also added \"La Di Da Di\", the 12" version of \"The Show\" and the 12" version of \"Play This Only At Night\".

\'The World\'s Greatest Entertainer\' was ripped directly from an original CD.

All tracks are encoded at 192kbps. Enjoy these hip-hop classics.

Oh, My God!
1. Nuthin\'\'
2. The Show (Oh, My God! - Remix)
3. Leave It Up To The Get Professor
4. Lovin\' [illegible] (Cyclone Ride)
5. She Was The Type Of A Girl
6. Abortion
7. Child [illegible]
8. Play This Only At Night
9. All The Way To Heaven
10. La-Di-Da-Di
11. The Show (12\" Vocal Mix)
12. Play This Only At Night (Truth Mix, The Whole Story)

The World\'s Greatest Entertainer
1. Guess Who?
2. Every Body Got 2 Get Some
3. [illegible] - Doug E. Fresh
4. On The Strength
5. Keep Risin\' To The Top
6. Greatest Entertainer
7. [illegible] Gettin\' [illegible]
8. [illegible]
9. The Plane (So High)
10. Ev\'rybody Loves A Star
11. Crazy [illegible]
12. Africa (Goin\' Back Home)

HIDE DETAILED ARTIST INFO

Albums by artist

(non-album tracks)

GET THIS TORRENT

Mac Running Slow?

Speed up your Mac in Seconds Increase performance of OS X (Free)

# EXHIBIT G

uTorrent - CNET Download.com

http://download.cnet.com/uTorrent/3000-2196_4-10528327.html

Q- I want to

Visit Site uTorrent

March 29, 2012 By sigibahr

[illegible] uTorrent 3.1.3

**Pros**

Worked first time.

**Cons**

None yet, still new to this.

Reply to this review

**Was this review helpful?** [illegible]

★★★★★

## "Great but will not protect you"

March 23, 2012 By D4ed4lus

[illegible] uTorrent [illegible]

**Pros**

Free
Fast
Reliable

**Cons**

Always on
No "Clear Complete History" feature
Doesn't help to have on your computer during a piracy case

Reply to this review

**Was this review helpful?** [illegible]

Results 31-40 of 1011

Prev 1 2 3 4 5 6 ... 102 Next

## Add Your Review

[illegible]

**1. Rate this product:**

★★★★★

**2. One-line summary: (10 characters minimum)** **0 of 55 characters**

:om/uTorrent/3000-2196_4-10528327.html

Visit Site uTorrent

Pros

Installed and loaded okay

## Cons

Get no response when trying to download

## Summary

Surely there is a better free program out there.

Reply to this review Read reply (1)

**Was this review helpful?** (0) (0)

★★★★★

# "i like it..."

March 7 2012 By skyrains2003
Version uTorrent 3.2.1

## Pros

fast to download movies.

## Cons

its easy to use.

## Summary

try it!

Reply to this review

**Was this review helpful?** (0) (0)

★★★★★

Case 2:11-cv-09437-DSF-JC Document 42-3 Filed 11/09/12 Page 78 of 119 Page ID #:646



ent/3000-2196_4-10528327.html

Visit Site uTorrent

★★★

## st Around"

er 2, 2011 | By ZeroInterger

uTorrent 3 2 1

nd simple to use.

e aware of "opportunity" to install utorrent toolbars.

## mary

oghis, @NellyPotato, @utorrentspyware - It is evident that you didn't read the installation options or that you're shills for MPAA, etc. NEVER had ANY problems with this product or ing from CNET. Legal recourse against CNET and utorrent for a program that you're going to download "torrents." Give me a break.

y to this review

is review helpful? (4) (0)

★★★


uTorrent Free software downloads and software reviews CNET Download.com/editorsreview Windows Internet Explorer
File Edit View Favorites Tools Help
Favorites
Was this review helpful?
"Very good p2p program."
Concerning the viruses/malware
Was this review helpful?
Reply to this review
0 out of 1 people found this review helpful

# EXHIBIT H


nine inch nails
Seeds
Peers
Down Spee
9 (6267)
3 (2026)
63.5 kB/
0 (0)
0 (0)
c|net

# EXHIBIT I

- Sign in with

- English
  - English
  - Español



Did you buy an **LCD flat panel television, monitor,** or **notebook?**

- CNET
- Download
- The Download Blog
- uTorrent preparing paid version

# uTorrent preparing paid version

Would you pay for uTorrent if it came with exclusive features? That's the unexpected question makers of the lightweight cult-favorite torrent manager are getting ready to ask.

312
153
19
13

More



by Seth Rosenblatt July 15, 2011 1:29 PM PDT

Follow



uTorrent 3.0

(Credit: BitTorrent)

A paid upgrade to the popular torrent manager uTorrent is in the works, the makers of the program announced today.

Less than a month after the release of uTorrent 3.0 (download), the program's parent company, BitTorrent Inc., revealed plans to introduce a paid upgrade called uTorrent Plus. Though it's still in development and unavailable to the public, uTorrent Plus promises to include tools that will eliminate codec problems, convert file formats, and move content between devices, according to the blog post announcing the product.

Also in that blog post, Jordy Berson, director of product management for uTorrent, promised that the free version "will receive the same level of commitment and development resources as it does now."

Around 100 million people call uTorrent their preferred torrent manager. To put that number in perspective, the security suite AVG Antivirus Free claims around 110 million active users, while Google CEO Larry Page just revealed that the Chrome browser has about 160 million users.

"uTorrent Plus is designed for people who are looking for a single solution to find, get, and play content anywhere, on any device," Berson wrote. The price point for uTorrent

## uTorrent Plus on its way

**Would you pay for extra features in uTorrent Plus?**

Yes!

- No way!
- What's a torrent?

Vote Now View results»

Plus has not been announced. The company has also created a sign-up page for people who want more information on uTorrent Plus.

Topics: Mac Software, Windows Software, File Sharing Tags: torrent, uTorrent Plus, BitTorrent, uTorrent

## About Seth Rosenblatt

Seth Rosenblatt is a senior editor at CNET, and has written about nearly every category of software and app available. At CNET since 2006, he currently focuses on browsers, security, and operating systems, with occasional forays into tech and pop culture.

Follow Subscribe 2.2k

DON'T MISS



Apple's taxes on overseas profits last year: Less than 2 percent
CNET



Microsoft Surface available October 26 starting at $499
CNET



Get HDTV for Free (Really)
aarp.org



1 Key Takeaway from Boeing's Earnings
Fool.com

about these links



Netflix preps poison pill to fend off Icahn

Internet & Media



A tale of two execs: Microsoft's Sinofsky and Apple's Forstall

Apple



Yes, Apple will approve Google Maps for iOS

Apple

# EXHIBIT J

# Lovedrug

From Wikipedia, the free encyclopedia

**Lovedrug** is an indie rock band from Canton, Ohio that formed in 2001. The band's name is something of a word play; singer Michael Shepard initially left music to attend film school but his first 'love' of the music medium 'dragged' him back (thus "Lovedrug"; the past participle of a verb, not an aphrodisiac).[1]

**Lovedrug**



**Background information**

| | |
|---|---|
| **Origin** | Canton, Ohio, USA |
| **Genres** | Indie rock |
| **Years active** | 2001 – Present |
| **Labels** | The Militia Group |

**Members**

Michael Shepard
Jeremy Michael Gifford
Thomas Bragg
James Freshwater

## Contents


- 1 History
- 2 Wild Blood
- 3 Members
  - 3.1 Current members
  - 3.2 Former members
  - 3.3 Past touring/studio players
- 4 Discography
  - 4.1 Full Length albums
  - 4.2 EPs
- 5 References
- 6 External links


## History

Lovedrug released their first EP, the Lovedrug EP, with the follow-up EP, the Rocknroll EP, coming in mid 2004. After signing to The Militia Group, an indie-rock label, the band released their first full-length Pretend You're Alive on July 27, 2004. The album was produced by Tim Patalan, and featured dark, guitar-driven art rock. The album became the label's fastest selling debut ever, selling close to 20,000 copies in the first few months of release. The record and band were thus up-streamed to major label parent Columbia Records at the end of 2005,[2][3] though the re-release of Pretend You're Alive, and accompanying radio single for "Spiders", were undercut by tremendous corporate purging that plagued Columbia Records throughout 2005 and 2006.

Lovedrug toured heavily from 2004 through early 2007, including support dates with The Killers, Robert Plant, Switchfoot, and Coheed & Cambria, Matchbook Romance and several headlining runs, establishing a sizable American following.[2] By late 2006, Lovedrug had a new album's worth of material and, to avoid continued upheaval at Columbia,[4] returned to The Militia Group to release Everything Starts Where It Ends, again produced by Tim Patalan, on March 7, 2007. The album was well received, selling close to 30k albums in several months on the back of Japanese and North American touring, including two headline runs and tours with Sparta, Blue October, and The Plain White Ts.[4] The video for "Ghost By Your Side" was added to regular rotation on MTV and the college/indie single "Happy Apple Poison" charted in the top 10.

The band's third album, The Sucker Punch Show, was made with iconic 90's rock producer Michael Beinhorn (Soundgarden, Red Hot Chili Peppers, Mew) at the Red Bull Studios in Santa Monica, CA.[5] Though the October 28, 2008 release coincided with the bankruptcy and collapse of The Militia Group in North America, the album was especially well received when re-released in Europe on June 2, 2009 with Make My Day Records, landing at No. 6 on the Visions summer chart, garnering broad radio play for the single "Only One".[6] The Euro version of The Sucker Punch Show included a full-length alternate version of the album entitled "Sucker Punched (Alt. LP)".[7] The band toured Europe in June and July, playing a number of club shows and festivals with Kings of Leon, Nine Inch Nails, Silversun Pickups, and Eagles of Death Metal.[8][9]

March 2010 saw EP - Part I, the first installment in a series of three EPs collectively logoed "+/-",[10] coinciding with the band's appearances at the South By Southwest conference in Austin Texas and a number of surrounding touring dates including Bamboozle at Giants Stadium.[11][12] EP - Part II followed on June 13, 2010, along with another 3-week headlining tour in the USA. In November the band announced I AM LOVEDRUG, a fan-driven campaign in partnership with PledgeMusic to fund the recording and setup of album No. 4,.[13][14] The band reached its goal over the holiday, released the final EP PART III in January '11, and head into the studio in March & April with producer Paul Moak in Nashville.[15][16]

## Wild Blood

The first two singles from the new album entitled "Wild Blood" were released together as the split-single Pink Champagne / Dinosaur on September 6, 2011.[17] The music video for Dinosaur, written and directed by Shepard, was premiered by Filter (magazine) the following week.[18] At a recent show in Chicago, the band played 3 new songs from the release: "Anodyne", "Revival", and "Wild Blood". The album was produced and engineered by Paul Moak at The Smoakstack and was released to stores on March 6, 2012.[19] The band toured extensively before and after the album release, performing over 50 dates in North American from February through May 2012, and including direct support from The Last Royals, Kingsfoil, and others.

Track Listing:

| No. | Title | Length |
|---|---|---|
| 1. | "Wild Blood" | 3:22 |
| 2. | "Dinosaur" | 4:10 |
| 3. | "Premonition" | 4:17 |
| 4. | "Pink Champagne" | 3:58 |
| 5. | "Girl" | 3:51 |
| 6. | "Ladders" | 4:28 |
| 7. | "Great Divide" | 4:14 |
| 8. | "Your Country" | 3:06 |
| 9. | "We Were Owls" | 3:58 |
| 10. | "Revival" | 3:12 |
| 11. | "Anodyne" | 4:36 |
| **Total length:** | | **43:12** |

# Members

## Current members

- Michael Shepard - Vocals, Guitar, Piano
- Jeremy M Gifford - Guitar, Synthesizer, Piano, BGV
- Thomas Bragg - Bass
- James Freshwater - Drums

## Former members

- Matt Bentley - Guitar, BGV
- Adam Ladd - Bass
- Matthew Putman - Drums
- Dave Owen - Guitar, BGV

## Past touring/studio players

- Joas Miller - Drums
- Matthew Depper - Bass
- Korey Jones - Bass
- Enoch Porch - Bass, Drums

# Discography

## Full Length albums

- Pretend You're Alive (2004) The Militia Group / Columbia Records
- Everything Starts Where It Ends (2007) The Militia Group / Lovedrugmusic
- The Sucker Punch Show (2008/2009) The Militia Group / Make My Day
- Wild Blood (March 6, 2012) Lovedrugmusic

## EPs

- Lovedrug EP (2002)[20]
- Rocknroll EP (2004)
- Everything Starts... EP (October 24, 2006)
- This Is The End EP (2008 - digital bonus tracks with album pre-order))
- Sucker Punched (Alt. LP) (2009)
- Everything Starts Live Tour - bootleg (2010)
- EP - Part I (2010)[21]
- EP - Part II (2010)[21]
- EP - Part III (January 2011)[22]
- Pink Champagne / Dinosaur - single (September 6, 2011)[17]

## References


1. ^ Lovedrug - The Mercury Lounge - New York - NY - May 6, 2010 (http://www.mercuryloungenyc.com/event/4468)
2. ^ [a] [b] http://www.jivemagazine.com/forum/showthread.php?t=10650
3. ^ Lovedrug Get The Best Of Both Worlds - AbsolutePunk.net (http://www.absolutepunk.net/showthread.php?t=91075)
4. ^ [a] [b] Lovedrug: granted release from Columbia Records | Puddlegum (http://puddlegum.net/lovedrug-granted-release-columbia-records/)
5. ^ Punknews.org | Lovedrug (http://www.punknews.org/bands/lovedrug)
6. ^ Niet compatibele browser | Facebook (http://www.facebook.com/discography/?id=5980364631)
7. ^ http://www.makemydayrecords.de/shop
8. ^ http://www.southside.de/bands/damals.php
9. ^ Hurricane Festival 2009 (http://www.efestivals.co.uk/festivals/hurricane/2009/)
10. ^ Amazon.com: EP - Part I: Lovedrug: Music (http://www.amazon.com/EP-Part-I-Lovedrug/dp/B003E2IE4U)
11. ^ Lovedrug: SXSW 2010 - Spinner (http://www.spinner.com/2010/02/28/lovedrug-sxsw-2010/)
12. ^ Lovedrug To Tour This Summer; Band To Release Two New EPs (http://thedeadhub.com/lovedrug-to-tour-this-summer-band-to-release-two-new-eps-2/)
13. ^ Iamlovedrug.Com (http://iamlovedrug.com/)
14. ^ I AM LOVEDRUG: The Making of an Album: Lovedrug Give Fans Unique and Exclusive Access to New Album | MusicThread.net (http://www.musicthread.net/2010/12/02/i-am-lovedrug-the-making-of-an-album-lovedrug-give-fans-unique-and-exclusive-access-to-new-album/)
15. ^ I AM LOVEDRUG (the making of an album): 100% - Thank you, thank you, THANK YOU!! (Now what?) | PledgeMusic (http://www.pledgemusic.com/projects/lovedrug/updates/3204)
16. ^ I AM LOVEDRUG (the making of an album): What's Next (video): Michael works the phone, Jeremy interjects | PledgeMusic (http://www.pledgemusic.com/projects/lovedrug/updates/3402)
17. ^ [a] [b] http://itunes.apple.com/us/album/pink-champagne-dinosaur-single/id458627184?ign-mpt=uo%3D4
18. ^ http://filtermagazine.com/index.php/media/entry/watch_lovedrug_dinosaur_filter_premiere
19. ^ http://itunes.apple.com/us/album/wild-blood/id496739871
20. ^ Connecting to the iTunes Store (http://itunes.apple.com/us/album/the-lovedrug-ep-2002/id359358646)
21. ^ [a] [b] http://www.lovedrugmusic.com/store
22. ^ Lovedrug: I AM LOVEDRUG (the making of an album) | PledgeMusic (http://www.pledgemusic.com/projects/lovedrug)


## External links

- Official Website (http://www.lovedrugmusic.com)
- Facebook (http://www.facebook.com/lovedrug)
- MySpace (http://www.myspace.com/lovedrug)
- Official Lovedrug Purevolume (http://www.purevolume.com/lovedrug)

Retrieved from "http://en.wikipedia.org/w/index.php?title=Lovedrug&oldid=518900973"
Categories: American indie rock groups


- This page was last modified on 20 October 2012 at 17:50.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.

Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT K

# *EP – Part I*

From Wikipedia, the free encyclopedia
(Redirected from EP - Part I)

**EP Part I** is the eighth EP by the Canton, Ohio indie rock band Lovedrug. It is the first EP of a three EP series titled +/-.[1][2] The record broke away from Lovedrug's softer piano rock style to a harder, arena-rock style.[2]

***EP - Part 1***




**Studio album by Lovedrug**

| | |
|---|---|
| **Released** | March 2, 2010 |
| **Genre** | Indie rock |
| **Label** | Street Talk Media[1] |

**Lovedrug chronology**

| | | |
|---|---|---|
| *Sucker Punched* (2009) | *EP - Part I* (2010) | *EP - Part II* (2010) |

**Professional ratings**

**Review scores**

| Source | Rating |
|---|---|
| Alter the Press | ★★★★★[2] |
| Record Rebellion | (Positive)[1] |
| Liquid Hip | (6.2/10)[3] |

## Track listings

1. Pink Champagne
2. Head Down
3. We Were Owls
4. Premunition
5. She's Disaster
6. Ladders
7. Unlucky
8. Dear Radio[4]

## References


1. ^ a b c Inman, Alicia. "Album Review – Lovedrug – +/-" (http://www.therecordrebellion.com/2010/09/19/album-review-lovedrug/) . The Record Rebellion. http://www.therecordrebellion.com/2010/09/19/album-review-lovedrug/. Retrieved 12 January 2011.
2. ^ a b c Issitt, Dan. "EP Part I" (http://www.alterthepress.com/2010/04/album-review-lovedrug-ep-part-1.html) . Alter the Press. http://www.alterthepress.com/2010/04/album-review-lovedrug-ep-part-1.html. Retrieved 12 January 2011.
3. ^ "Lovedrug Gets Grounded With EP - Part I & II" (http://www.liquidhip.com/2010/08/lovedrug-gets-grounded-with-ep-part-i.html) . Liquid [Hip]. http://www.liquidhip.com/2010/08/lovedrug-gets-grounded-with-ep-part-i.html. Retrieved 12 January 2011.
4. ^ "EP-PART I" (http://freefallmediagroup.net/lovedrug/music/lyrics/ep-part-i/) . Lovedrug. http://freefallmediagroup.net/lovedrug/music/lyrics/ep-part-i/. Retrieved 12 January 2011.

Case 2:11-cv-09437-DSF-JC Document 42-3 Filed 11/09/12 Page 64 of 119 Page ID #:662

Retrieved from "http://en.wikipedia.org/w/index.php?title=EP_–_Part_I&oldid=479163549"
Categories: 2010 albums 2010s indie rock album stubs

- This page was last modified on 27 February 2012 at 18:59.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. See Terms of Use for details.
Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

# EXHIBIT L

Copyright United States Copyright Office

The Library of Congress catalogs will not be available this weekend due to scheduled hardware maintenance. The catalogs will be down between 7:00P.M. on Friday, Nov. 9 and 6:00A.M. on Tuesday, Nov. 13. We regret any inconvenience to our users.

Help | Search | History | Titles | Start Over

# Public Catalog

Copyright Catalog (1978 to present)
Search Request: Left Anchored Title = we were owls
Search Results: Displaying 1 of 1 entries

previous | next

Labeled View

Click here to return to the previous screen

***Premunition & 8 other titles.***

**Type of Work:** Recorded Document
**Document Number:** V3595D167
**Date of Recordation:** 2010-10-25
**Entire Copyright Document:** V3595 D167 P1-2
**Date of Execution:** 15Oct10; date of cert.: 15Oct10
**Title:** Premunition & 8 other titles.
**Notes:** By Michael Shepard. Assignment of copyright.
**Party 1:** Michael Shepard by Sayra Molina (Atty)
**Party 2:** Universal Music-MGB Songs & Releasing the Furman Music.
**Links:** List of Titles
**Names:** Shepard, Michael
Universal Music-MGB Songs
Releasing the Furman Music,

previous | next

| Save, Print and Email (Help Page) | |
|---|---|
| Select Download Format Full Record | Format for Print/Save |
| Enter your email address: | Email |

Help Search History Titles Start Over

Contact Us | Request Copies | Get a Search Estimate | Frequently Asked Questions (FAQs) about Copyright | Copyright Office Home Page | Library of Congress Home Page

Case 2:11-cv-09437-DSF-JC Document 42-3 Filed 11/09/12 Page 67 of 119 Page ID #:665

**Copyright**
**United States Copyright Office**

This list contains titles in document **V3595D167**

Document title: Premunition & 8 other titles.

The complete document is: **V3595 D167 P1-2**

---

List of titles:

001 Premunition.

002 We were owls.

003 She's disaster.

004 Pink champagne.

005 Head down.

006 Ladders.

007 Unlucky.

008 Dear radio : a.k.a. Dear radio (exclusive)

---

End of titles list for document **V3595D167**

***This is not a legal document.***

**How to obtain a copy of a recorded document: http://www.copyright.gov/circs/circ06.pdf**

***U.S. Copyright Office***

***101 Independence Ave., S.E.***

***Washington, D.C. 20559-6000***

***(202) 707-3000***

# EXHIBIT M






# Download this, Mr. Jones

Counting Crows takes to a new stage, having partnered with BitTorrent to distribute some of its latest songs for free.



by Seth Rosenblatt May 11, 2012 11:06 AM PDT

Follow

0

More



Counting Crows

(Credit: Counting Crows)

Numerous entertainers have had serious flirtations with digital distribution, but the band Counting Crows has taken its infatuation a step further -- straight into the BitTorrent universe. (Legally, that is.)

The Counting Crows BitTorrent bundle (download), released today, includes songs, art, and liner notes from their latest album *Underwater Sunshine*. It's available to torrent freaks everywhere -- with the approval of both the band and its label.

"I don't know why everybody's not doing it," said Counting Crows lead singer Adam Duritz during a phone conversation with CNET. He noted that even at his band's peak popularity, it didn't attract the 150 million people who now use torrent managers such as BitTorrent mainline (download) and uTorrent (download). Torrents, he said, are a great way for musicians to get their music out to a wider audience.

Pretty Lights, a band with a far smaller following than Counting Crows, put out an entire album via BitTorrent and got an astronomically high response. While album sales might not immediately reflect the new followers, concert ticket sales jump.

Counting Crows will follow up the torrent release by headlining a summer tour that will showcase a rotating lineup of bands called The Outlaw Roadshow.

The peer-supported torrent rocketed to popularity after its debut in 2002 as people used it to share files, and it remains one of the best ways to transfer data without requiring an enormous amount of bandwidth. The big challenge for bands these days, Duritz suggested, is not sales but obscurity. "Nobody's got a boombox and nobody's listening to radio," he said.




Cover art for Counting Crows' "Underwater Sunshine."

(Credit: Counting Crows)

"A pipeline is still a pipeline. Just because somebody opened the pipeline at the wrong time doesn't mean it's not there. It's a conduit to the entire world for free, and it's silly to pretend it doesn't exist," said Duritz.

Since the days of Napster, Internet-based services have been radically changing music distribution. "It's not the same world we used to live in," Duritz said. "There used to be a cycle: record a record, release the record, tour. Now it's just this endless world."

Duritz was emphatically enthusiastic about the torrent. He stated that the popularity of torrents points to nothing less than a new path to success for musicians. "We're trying to create a business model for a business that hasn't existed yet: Independent bands doing well. For a new band, I highly recommend giving away the whole record."

The bundle includes only four songs from the record: "Like Teenage Gravity," "Meet on the Ledge," "Hospital," and "Untitled (Love Song)." Duritz said that he originally thought his band was going to give away the entire record, but securing approval was difficult because "Underwater Sunshine," referencing "Underwater Moonlight" by The Soft Boys, is a covers album. To make the bundle more appealing, the torrent includes album art and 45 pages of liner notes, he added.

Duritz says he considered self-distributing the bundle on the Counting Crows Web site, but decided that emulating Louis C.K.'s self-distributed show from earlier this year wasn't the right choice for his band. "You want to go to the biggest marketplace in town, not just sell stuff out of your house. Although we're as popular as we are, we don't have 150 million users."

While many in the music business still struggle with figuring out how to make a living playing music in the age of file-sharing, Duritz remains confident that it will end up helping musicians.

"No tool that connects everyone in the world for free is a bad thing. And the best thing about the Internet is that it's inclusive, not exclusive."

*Editor's note: Using P2P and file-sharing software to distribute copyrighted material without authorization is illegal in the United States and many other countries. CBS Interactive does not encourage or condone the illegal duplication or distribution of copyrighted content.*

Topics: Mac Software, Windows Software, File Sharing Tags: uTorrent, Torrent, BitTorrent, Counting Crows

More

## About Seth Rosenblatt

Seth Rosenblatt is a senior editor at CNET, and has written about nearly every category of software and app available. At CNET since 2006, he currently focuses on browsers, security, and operating systems, with occasional forays into tech and pop culture.

Follow Subscribe 2.2k

DON'T MISS



Top 12 Windows store apps
CNET



iOS 6 adoption hits 61 percent just one month after its release
CNET



Evidently, passive aggressive Wi-Fi names are all the nerd rage
Digital Trends



Should I Buy Tesco?
Fool.com

about these links



Netflix preps poison pill to fend off Icahn

Internet & Media



A tale of two execs: Microsoft's Sinofsky and Apple's Forstall

Apple



Yes, Apple will approve Google Maps for iOS

Apple



Google Nexus 10: Android's most promising iPad alternative

Review

CNET UPDATE

**Facebook pushes you to vote**

# EXHIBIT N


cnet
Download.com
uTorrent
Visit Site
uTorrent is an efficient BitTorrent client for Windows. Most of the features present in other BitTorrent clients are present in uTorrent, including bandwidth prioritization, scheduling, RSS auto-downloading, and Mainline DHT. Additionally, uTorrent supports the protocol encryption joint specification and peer exchange. Unlike many torrent clients, it does not hog valuable system resources--typically using less than 6MB of memory, allowing you to use the computer as if it weren't there at all.

# EXHIBIT O

CNET News

# TorrentFreak pegs top pirating universities in U.S.

## File-sharing remains a thorn in the side of U.S. colleges, with Rutgers and New York University apparently hosting the most pirates.

by **Charlie Osborne** | October 15, 2012 7:36 AM PDT

Restricting access to Web sites such as The Pirate Bay and KickassTorrents has been a long-standing practice for universities in both the U.S. and United Kingdom.

Suffering under the strain of heavy traffic due to students streaming films and downloading gigabytes of data via torrents, academic institutions have attempted -- often in vain -- to curb the trend.

But when the next episode of "Game of Thrones" isn't out for another week and has been broadcast already in another country, the temptation is no doubt difficult to resist.

Universities are not unaware of this and have put in place different guidelines for students to follow. Princeton University may suspend computer privileges for repeat offenders -- as well as **pointing out [http://www.princeton.edu/itpolicy/copyright/]** the potential for criminal charges -- whereas Cambridge **urges its students [http://www.ucs.cam.ac.uk/isss/rules/guidelines.html#section-13]** not to receive or distribute files that may be protected by intellectual property law.

**TorrentFreak [http://torrentfreak.com/college-pirates-u-s-universities-ranked-by-bittorrent-usage-121013]** has compiled a list containing the top college downloaders with help from ScanEye, based on tracking hundreds of thousands of public torrent files. By combing through IP addresses of individual universities, you can see which colleges have "downloaded" the most torrents.

On the table below, Rutgers University leads with 1809 "hits" from November 2011, followed by New York University (986 hits), University Of Houston (795), University of Southern California (776), and Texas A&M University (768).

| # | University | Hits |
|---|---|---|
| 1 | Rutgers University | 1809 |
| 2 | New York University | 986 |
| 3 | University Of Houston | 795 |
| 4 | University of Southern California | 776 |
| 5 | Texas A&M University | 768 |
| 6 | The George Washington University | 767 |
| 7 | University of Minnesota | 720 |
| 8 | State University of New York at Buffalo | 610 |
| 9 | University of Maryland | 602 |
| 10 | Tennessee State University | 530 |
| 11 | Northeastern University | 513 |
| 12 | Michigan State University | 495 |
| 13 | Wayne State University | 488 |
| 14 | Columbia University | 479 |
| 15 | Boston University | 467 |
| 16 | Vanderbilt University | 460 |
| 17 | North Carolina Central University | 450 |
| 18 | University of California, San Diego | 435 |
| 19 | Old Dominion University | 425 |
| 20 | Ohio State University | 395 |

(Credit: TorrentFreak)

However, compare this to Internet provider Comcast, which has logged millions alone, and you can see that the BitTorrent network at these colleges may have indeed been scuppered by anti-piracy protocols. The figures do not include pirates who have set up a virtual private network (VPN) or proxy to cover their tracks -- a practice difficult to measure and increasing in popularity.

It would also be wrong to assume every seeded file is illegal -- as the file-sharing protocol itself is not, and can be used to distribute large, legal files. But for students wanting to save their beer tokens, "free" software and films are a continual temptation. Rutgers' most popular downloads, for example, were**Microsoft Office**

[http://www.cnet.com/microsoft-office/] for Mac [http://www.cnet.com/apple-mac.html], Witcher 2: Assassins of Kings, and movies "Fast Five" and "Pulp Fiction."

[http://www.cnet.com/profile/Charlie_Osborne/]



orne [http://www.cnet.com/profile/Charlie_Osborne/]

ites for ZDNet, SmartPlanet, and CNET. She is based in London and
list, designer, and photographer.

DON'T MISS



More 'pirate' sites face U.K. ISP blocks

CNET

[http://news.cnet.com/8301-1023_3-57537871-93/more-pirate-sites-face-u.k-isp-blocks/]




Indie film legend accuses Apple, Google of Web piracy

CNET

[http://news.cnet.com/8301-1023_3-57531238-93/indie-film-legend-accuses-apple-google-of-web-piracy/]



Android tip: 5 gotta-know Google Maps tricks

heresthethingblog.com

# EXHIBIT P

INTERNET ARCHIVE WaybackMachine BETA http://music.cnet.com/music/0-1652424-8-6699285-2.html Go
2 captures 12 Sep 01 - 13 Sep 01
AUG SEP OCT Close
12
2000 2001 2002 Help






## File-sharing smackdown

In offices, dorms, and other high-bandwidth communities around the world, people are talking about which file-sharing service they like the most now that Napster and Scour have been sued into irrelevance. To help you settle arguments around the water cooler or the library, CNET Music Center's copy editor Brian Satterfield and I hunkered down to run a simple yet effective test on the top eight file-sharing applications. We ran searches for 18 band names using each of these clients, all of which are flourishing in the absence of Napster. According to CNET Download.com, the eight most popular file-sharing programs are: Gnotella, KaZaa, LimeWire, BearShare, Gnucleus, Audiogalaxy, MusicCity Morpheus, and WinMX. It's important to mention that we couldn't include Aimster in our testing, which took place behind a firewall (Aimster hates firewalls). However, from my testing at home, I'd wager that Aimster would have performed admirably had it been included.

Before you check out the numbers, here are the rules that we used for our testing:

- All search results from each term were counted, even if they were incorrect or duplicates.
- Only MP3 search results were counted.
- We limited our search times to one minute.
- The latest version of every program was used, and the apps were installed with default options.
- Testing commenced after programs were fully connected to their networks (important for the Gnutella clients: Gnotella, BearShare, Gnucleus, and LimeWire).
- All programs were set to return 100 results.

### The results

| | Gnutella-based | | | | Centralized network | | | |
|---|---|---|---|---|---|---|---|---|
| Searches | Gnotella | LimeWire | BearShare | Gnucleus | Audiogalaxy* | MusicCity Morpheus | WinMX | KaZaa |
| Britney Spears | 7,655 | 684 | 125 | 194 | 23,114 | 151 | 2,337 | 117 |
| The Strokes | 104 | 19 | 5 | 132 | 141 | 124 | 45 | 119 |
| Mogwai | 424 | 84 | 14 | 366 | 1,501 | 135 | 30 | 116 |
| Beatles | 23,929 | 803 | 455 | 10,231 | 48,557 | 103 | 2,528 | 101 |
| Run DMC | 2,835 | 221 | 103 | 1,496 | 3,429 | 128 | 528 | 148 |
| Stravinsky | 237 | 62 | 11 | 64 | 1,275 | 69 | 12 | 62 |
| Leonard Bernstein | 90 | 4 | 7 | 107 | 856 | 62 | 7 | 48 |
| Randy Newman | 746 | 86 | 70 | 501 | 1,447 | 114 | 120 | 155 |
| Megadeth | 1,451 | 54 | 47 | 812 | 6,345 | 111 | 447 | 137 |
| Metallica | 14,486 | 947 | 1,160 | 6,439 | 38,571 | 115 | 3,228 | 183 |
| Pixies | 344 | 338 | 276 | 1,415 | 3,651 | 112 | 237 | 126 |

Rumors, hot topics, and hype from the online music community.

**Who has the time?**
As evidenced by this site, there are many people who have time to perform karaoke versions of all their favorite songs, using spoken words downloaded from dictionary Web sites.
**Dictionaraoke.org**

**Will play to food**
Pop stars make big money, some small bands make enough to buy ramen noodles, and lots of musicians go hungry. Then there's this guy, who will play not for food, but *to* food.
**We salute you, sir**

**Yet more corruption in radio**
If you think traditional radio is about anythingo other than the labels bribing the stations to get their clients' songs on the air, this article will set you straight.
**Salon.com's feature**

**Not having to be the New Originals**
Don't let Spinal

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Radiohead | 10,337 | 1,544 | 640 | 6,917 | 23,442** | 137 | 1,106 | 200 |
| American Analog Set | 10 | 0 | 0 | 5 | 1 | 10 | 10 | 14 |
| Miles Davis | 3,318 | 579 | 159 | 2,324 | 4,217 | 139 | 242 | 111 |
| Johnny Cash | 4,536 | 198 | 273 | 3,913 | 5,425** | 125 | 526 | 120 |
| Yo La Tengo | 1,023 | 103 | 25 | 414 | 1,403 | 131 | 23 | 103 |
| Rodan | 221 | 13 | 8 | 87 | 77 | 1 | 1 | 0 |
| Delgados | 64 | 1 | 0 | 29 | 107 | 20 | 13 | 15 |
| Displayed statistics | Connected to 10 hosts, 4,900 hosts visible | Connected to 1,000 hosts, 321,000 files, 20TB available | Connected to 3 hosts | Connected to 4 hosts, 5TB available | Connected to server 257 | 506,639 users | N/A | 550,443 users, more than 60 million files available |

*In Audiogalaxy, some percentage of search results are not downloadable due to copyright-based blockades, so these numbers are a bit higher than they should be.

**Radiohead and Johnny Cash in particular have the vast majority of their search results blocked on Audiogalaxy.

From the numbers alone, it looks like Audiogalaxy takes the brass ring. But some users don't like having to disable the three spyware applications that try to install themselves on your machine along with Audiogalaxy. When you add the fact that some Audiogalaxy results are blocked due to copyright, I think you have to give the edge to Gnotella. It returned tons of results, did well with the more obscure stuff, and can't be shut down as easily as network/client programs such as Audiogalaxy, which has centralized servers routing files from user to user.

It's an amusing side note that there are so many Metallica songs on these networks, as if the first people to embrace them were those looking for a way to get what they couldn't find on Napster. (Metallica, as you might remember, was the first band to ban itself from Napster.) Everyone involved in the next-generation major-label online music services (MusicNet and Pressplay) would do well to heed this information. The same goes for the folks who thought it was such a good idea to stamp out Napster without even contemplating offering the company compulsory licenses. When Napster offered to pay $30 million in fees, the record companies should have jumped at the chance to license their content for file sharing. Now, while the suits pay the lawyers to clog up the courts and the major labels cluelessly lumber toward the present, programmers and users have happily moved on. It's as easy to find copyrighted songs as it was in Napster's heyday, as long as you know what to use.

Back to intro

Tap's initial naming problems plague your fledgling band. use this site to figure out if there's another band by the same name before you get started.
**Bandname.com**

**Watching paint dry**
Ever wonder what Sonic Youth's remodeling of its studio looks like? Well wonder no more. For behold, I bring to you this Webcam, which will quench all of your Sonic Youth studio-remodeling curiosity.

**Sonic Youth studio-remodeling Webcam**

**Go to Music Beat**

Click now! Online offers from our sponsors

**Music resources**

- Search for MP3s
- How-tos and guides
- Product reviews
- Check latest prices on CDs
  from mySimon, a CNET Networks company
- Music news
- Music software downloads
- Electronics
- Internet radio stations

Got something to say about the Music Center? Send us feedback

# EXHIBIT Q

INTERNET ARCHIVE WayBackMachine http://music.cnet.com/music/0-1652424-8-6699285-1.html Go
3 captures 12 Sep 01 - 13 Sep 01
AUG SEP OCT 2000 12 2001 2002 Close Help





# MP3 Insider

An opinionated take on MP3 and the audio revolution.

## File-sharing smackdown

By Eliot Van Buskirk
Senior editor
(7/27/01)

In offices, dorms, and other high-bandwidth communities around the world, people are talking about which file-sharing service they like the most, now that Napster and Scour have been sued into irrelevance. To help you settle arguments around the watercooler or the library, CNET Music Center's copy editor Brian Satterfield and I hunkered down to run a simple yet effective test on the top eight file-sharing applications. We ran searches for 18 band names using each of these clients, all of which are flourishing in the absence of Napster. According to CNET Download.com, the eight most popular file-sharing programs are: Gnotella, KaZaa, LimeWire, BearShare, Gnucleus, Audiogalaxy, MusicCity Morpheus, and WinMX. It's important to mention that we couldn't include Aimster in our testing because it took place behind a firewall (Aimster hates firewalls). However, from my testing at home, I'd wager that had Aimster been included, it would have performed admirably.

OK, enough of my nattering, on to the results chart.

### MP3 Nugget: Add audio shortcuts

One of my most well-received MP3 Nuggets was the one on how to add Winamp controls to the top of every window on your computer. People who multitask on their computer while listening to audio (which is about 99 percent of us, I have a feeling) really like the way they can work on whatever they're working on without futzing around with volume settings and skipping bad songs in playlists. Well this week, I found a way to control these functions without even using your mouse. Download a free program called Global Audio Control, and you'll see what I'm talking about. Using an interface that even our president would understand, you can, for example, assign Alt-V to raise the volume and Ctrl-E to end your audio program. Winamp users will also get the ability to specify shortcuts for functions such as play and pause, but as the name indicates, this program functions globally across all of your programs, because it controls Windows' own master volume.

Download Global Audio Control

Take me to CNET Music Center

MP3 Insider archive

Click now! Online offers from our sponsors




Rumors, hot topics, and hype from the online music community.

**Who has the time?**
As evidenced by this site, there are many people who have time to perform karaoke versions of all their favorite songs, using spoken words downloaded from dictionary Web sites.
**Dictionaraoke.org**

**Will play to food**
Pop stars make big money, some small bands make enough to buy ramen noodles, and lots of musicians go hungry. Then there's this guy, who will play not for food, but *to* food.
**We salute you, sir**

**Yet more corruption in radio**
If you think traditional radio is about anythingo other than the labels bribing the stations to get their clients' songs on the air, this article will set you straight.
**Salon.com's feature**

**Not having to be the New Originals**
Don't let Spinal

# EXHIBIT R

INTERNET ARCHIVE Wayback Machine http://www.search.com/search?channel=4&cat=74 [Go]
28 captures 24 Oct 00 - 2 Jun 10
FEB JUN AUG Close
6
2001 2002 2003 Help

CNET | Price comparisons | Product reviews | Tech news | Downloads

cnet Search.com

Search.com . Music . MP3s

## Search MP3s

What are you searching for? [Go!] Help

Find: u2 · mp3 · music · britney spears · madonna

**Tip: Select sites to search from the list below.**
Remember selections [restore defaults]

- ☑ 2Look4.com http://www.2look4.com
- ☑ 3pmmp3 http://www.3pmmp3.com
- ☑ AltaVista http://www.altavista.com/
- ☑ AudioPhilez http://www.audiophilez.com/
- ☑ Cutedoggy http://www.cutedoggy.com/
- ☑ EMusic http://www.emusic.com
- ☑ Epitonic http://www.epitonic.com/
- ☑ Lycos MP3 Search http://mp3.lycos.com/
- ☑ MP3.com http://www.mp3.com/
- ☑ Musicgrab.com http://www.musicgrab.com/
- ☑ Open Directory http://www.dmoz.org/
- ☑ Overture Search Partners http://www.overture.com/
- ☑ eMP3Finder http://www.emp3finder.com/



The ingredients for a digital darkroom
Build your own digital photo lab for less. We pick the camera, printer, and software that you need.

**Search Guides**
- Customization
- Submit your site
- Find a job
- Tech help now!
- Track down tunes
- Add search to your site
- Plan your vacation

**Choose another channel:**
The Web [Go!]

Make Search.com your home page

**Featured services:** Live tech help | Software upgrades | Windows XP tips | Editors' Choice awards | New tech jobs

**CNET Networks:** Builder | CNET | GameSpot | mySimon | TechRepublic | ZDNet

About CNET

Contact us | Corrections | How to advertise | Support | CNET Jobs
Copyright ©1995-2002 CNET Networks, Inc. All rights reserved Privacy policy

INTERNET ARCHIVE WayBackMachine BETA
http://www.search.com/search?channel=4&cat=74 Go
28 captures
24 Oct 05 - 27 Jun 10
DEC MAR FEB
2004 5 2005 2006

× SEARCH.COM

Music : MP3s

Web | Downloads | Shopping | Games | more »

Search

preferences · help · research by topic

find: u2 · mp3 · music · britney spears · madonna

☐ Remember selections (restore defaults)

☑ AltaVista
http://www.altavista.com/

☑ AudioPhilez
http://www.audiophilez.com/

☑ Epitonic
http://www.epitonic.com/

☑ Lycos MP3 Search
http://mp3.lycos.com/

☑ MP3.com
http://www.mp3.com/

☑ Open Directory
http://www.dmoz.org/

☑ eMP3Finder
http://www.emp3finder.com/

Choose another channel: Music Go!

CNET.com | CNET Download.com | CNET News.com | CNET Reviews | CNET Shopper.com

GameSpot | MP3.com | mySimon | Search.com | TechRepublic | Webshots | ZDNet | International Sites

Copyright ©2005 CNET Networks, Inc. All Rights Reserved. Privacy Policy | Terms of Use

About CNET Networks

# EXHIBIT S







{00054997.DOCX - v1}


cnet
Download.com
Did you buy an LCD flat panel television, monitor, or notebook?
uTorrent Portable
Visit Site
Publisher's Description
Creativity has no boundaries.


cnet
Download.com
Allstate VALUE PLAN
Allstate
FrostWire
Download Now
Publisher's Description
Start Download


cnet
Download.com
Did you buy an LCD flat panel television, monitor, or notebook?
uTorrent Plus
Visit Site
Norton 360
From BitTorrent: uTorrent Plus is designed for people who live beyond the PC. It's a single solution to find, get and play content anywhere, on any device. No more hassles with codecs or conversion, and easy sharing of content to devices. It features built-in antivirus protection to protect your computer with integrated antivirus, HD Media Player to get the codecs you need to enjoy videos and converter for Apple and Android for moving files to your favorite devices.
42,282
840
Purchase
December 08, 2011


cnet
Download.com
Get money back from a $1.1 Billion settlement fund
uTorrent Regulator
Download Now
Publisher's Description
This application is intended only for use with uTorrent (version 1.0 or above), which is a free peer-to-peer file sharing application distributed by BitTorrent, Inc. This application can regulate the Global upload and download speeds of uTorrent on the basis of Network based Process based and/or Time based rules. Any one or all three features may be used.
uTorrent Regulator can act as a regulatory mechanism in each network computer to increase or decrease the global download and upload limits of uTorrent on the basis of the number of computers connected to the network. It scans the network at periodic intervals to check for
TREND MICRO
Free







{00054997.DOCX - v1}


cnet
Download.com
Did you buy an LCD flat panel television, monitor or notebook?
uTorrent Control
Download Now
AntiVirus Free Trial
CNET Editors' Review, September 2011
Norton 360 Version 6.0
Start Download
QUICK SPECIFICATIONS
Publisher's Description
From BitTorrent


cnet
Download.com
SpeedLord
Download Now
AntiVirus Free Trial
CNET Editors' Review, September 2011
Norton 360 Version 6.0
Start Download
QUICK SPECIFICATIONS
Publisher's Description


cnet
Download.com
Did you buy an LCD flat panel television, monitor, or notebook?
uTorrent Web UI for iPhone
Visit Site
Start Download


cnet
Download.com
Get money back from a $1.1 Billion settlement fund
Movie Torrent
Download Now







{00054997.DOCX - v1}







{00054997.DOCX - v1}







{00054997.DOCX - v1}




{00054997.DOCX - v1}

# EXHIBIT T

HTTP://MEERCAT9.COM/NEWS/12-05-07-ARE-P2P-FILE-SHARING-NETWORKS-DEAD.PHP

# ARE P2P FILE SHARING NETWORKS DEAD?

By Billy Moffat (07/05/2012)

Tags editorallawnewstechnologytorren (Keep reading, 2092 words should take about 10 minutes

*Are peer to peer file sharing networks dead or are they about to evolve into something else?*

To declare the peer to peer file sharing networks to be anything other than thriving is ludicrous. In the last few months, peer to peer file sharing networks have gained considerable notoriety in the more general media. This is mostly due to increased levels of resistance they are receiving from governments, lobby groups and international trade agreements. Despite the great push to prevent these platforms through the guise of counter-piracy, these measures are ultimately fruitless. To understand why, it's important to understand how peer to peer file sharing has evolved, how it operates as a complex independent supply chain, and how limiting its use would require restrictions and laws that are arguably worse than the problem of piracy itself. Essentially, to understand the future it's most helpful to analyse the past.

The first generation flagships of peer to peer sharing (also known as P2P), Napster and Kazaa have long been shut down. As ABC News (2001) pointed out, it wasn't even clear at the time if services like Napster were infringing on intellectual property, noting "Napster argued that personal copying of music is protected by federal law". These services still exist today as legitimate online stores for music and other multimedia, not dissimilar to Apple's iTunes service. While they were shut down permanently after relatively little time, these services pioneered the paradigm of sharing files over the internet.

The main reason that Napster (and other services like it) failed was due to the centralised system that bundled the unfiltered search engine with the software that uploaded and downloaded the data. This made it easy to prosecute Napster for the intentional and willing loss of revenue to the recording industries. Unlike the networks of today, there was little chance for the owners of Napster to claim it was merely a legitimate service with negative consequences.

The second generation of P2P was mostly centred on the wildly popular Gnutella network. This protocol gained traction after the death of Napster and rose very quickly to nearly two million active users in 2005. By late 2007, the Gnutella network - with Limewire as its software client poster child - had over 40% of the file sharing "market".

Originally an open-source project, Limewire had many forks (i.e. groups branching an existing code-base to make a new, similar program) that spawned other sharing clients operating within the same Gnutella network. This method of de-cetralisation was the key to preventing an immediate closure from the legal threats of the Motion Picture Association of America (MPAA) and the Recording Industry Association of America (RIAA). While the search engine was still relatively integrated and centralised, the open-source nature of the project coupled with the large number of alternative clients and shadow backups of the Gnutella index meant that the eventual death of Limewire wasn't the end.

Limewire was officially shut down in October 2010. While the Gnutella network is no longer the de-facto protocol for P2P, it is still widely used today, due to many of the open source clients it spawned. There is even a "Limewire Pirate Edition" that was made freely and publicly available within a month of Limewire's demise, complete with all of Limewire's features. It's difficult to attribute the significant drop in usage of the Gnutella network to the take-down of Limewire, or the rise of the superior torrent system. While P2P has taken many forms since its inception, by far the most common and powerful today is the Bittorrent network.

The Bittorrent network is a heavily versatile protocol that offers many advantages, standing on the shoulders of what fell before it. On its own, the software client is completely legal and has no inherent infringement on copyright. This means that torrent clients can be easily distributed publicly on the internet without any fear of prosecution. Some are open-source, some are free (but ad-supported), and some (similar to Limewire) even charge money for "pro" features (such as µTorrent Pro).

Some torrent clients have search functionality, but the results are taken from third-party websites. Because of this, torrent clients can claim complete immunity for any infringement that takes place with their software because of their independent structure. This is the same way that Microsoft isn't liable if people use Windows Media Player to view pirated movies, or Google isn't liable if their search engine is used to find tutorials on how to create a home-made bomb. This freedom from the law means that it can actually be easier and faster to install the software required to use the full power of the Bittorrent network, than a web browser.

Since there is no centralised search engine, third party websites are needed to host torrent files. These files are de-centralised from the content themselves in that they only contain meta-data about the location of the content. Since the torrent files only contain online location addresses and other descriptive information and not the content themselves, torrent files are usually quite small and manageable to store in large volumes. There is significant ambiguity over whether torrent files themselves are illegal if they contain links to copyrighted material. Many countries are yet to make a definitive ruling. Most torrent files are around 100KB in size (About.com). On modern internet connections, this would take less than one second to download.

In short, sharing files using the Bittorrent network is done with four parties. The host servers (such as zoink or torrentz) store torrent files that point to trackers (starting points for finding connections). The search engines (such as The Pirate Bay, Isohunt, or a custom search in Google) allow users to find these torrent files based on keywords. The Bittorrent client (such as Vuse, µTorrent or Transmission) uses the information in the torrent file to connect the user to trackers, and then peers and seeds to download parts of the files where available. Finally, the seeders (which are other users that connect to the internet like the average consumer) keep stored copies of the requested files on their hard drives and upload (also known as seeding) to people who request it. Users who have downloaded the finished files (or even incomplete files) are able to become seeders themselves, giving back by uploading (sharing) what they have almost immediately. To get this intricate system in place, a lot of technology, programming, evolution and construction have gone into developing the Bittorrent network to be as resilient, de-centralised, and easy as possible.

Due to the nature of how sharing operates on the Bittorrent network, there is no single server, location, company, group or person that can be removed from the network to shut it down. There is no centralised leader or bottleneck in the Bittorrent network, and this makes it difficult, if not impossible, to adequately regulate or police. Generally the weakest link, both legally and physically in the supply chain of the Bittorrent network is the series of independent, but centralised, servers that host the torrent files. This is because they host incredibly large volumes of torrent files that are tagged with names (which in many cases show that the files are intended to contain intellectual property). These servers often contain login information for users that upload torrent files, and can possibly store IP address logs for visiting traffic. As such; they are usually the best targets of any legal action.

Prominent torrent search engine The Pirate Bay has been raided multiple times and had its servers seized (only to be restored to full operation less than a week later). Isohunt was forced to modify its search algorithm to be more of a general search engine (like Google) for US users (though still remains a functional torrent search engine depending on the IP address of the user). Mininova, arguably the most popular torrent site at the time, was shut down in 2009 in a similar manner to Isohunt. The Pirate Bay is blocked (in some form) in over 13 countries, including the UK, and people affiliated with the creation and management of the site have been found guilty in the Swedish courts of breaching intellectual property on a mass scale. Despite the attention, The Pirate Bay remains open and fully-functional with the slogan "The galaxy's most resilient Bittorrent site".

Piracy is getting increasing attention from legislators as lobby groups like the MPAA and RIAA push for increased censorship provisions to fight sharing on the internet. These measures have all failed to reduce the activity of file sharing networks. In the month that the Stop Online Piracy Act (SOPA) was to be voted upon - a piece of US legislation that was deemed so destructive that many major websites including Wikipedia blacked-out in protest - the Bittorrent network boasted over 150 million users. This is a 400% increase from the level of activity in 2008. There are an estimated quarter of a billion monthly active users, with consistently high rates of growth.

With the boost in usage on the Bittorrent network, lobby groups supporting SOPA argued that there have been multiple studies into the revenue loss to the economy as a result of piracy. While piracy is clearly a concern for the revenue streams of multimedia companies, there is evidence to suggest there is a gross

exaggeration. According to IT World (Fogarty 2012), the figures quoted are usually around $250 billion loss of revenue and 750,000 jobs lost per year. After Julian Sanchez challenged the validity (and existence) of these studies, the MPAA eventually dropped their estimate of global revenue loss to $6.1 billion, based on another study that couldn't be found. A Government Accountability Office Report (GOA, 2010) sided with Sanchez in estimating that at least 80% of pirated content wouldn't have been purchased if the price wasn't essentially free. This pushes the estimated figure well below a billion. Regardless of which amount is closer to the truth, there is extreme support behind the closure of torrent sites to prevent revenue loss from piracy.

Despite the incredible pressure facing torrent sites, there is a way to decentralise the distribution of torrent files even further to remove the large legal target. Magnet links are a type of protocol over a decade old, but have only relatively recently become widely used for P2P sharing. A magnet link is a type of hyperlink that lets a user download a torrent file from the peers and seeds. The magnet link is a 32-bit string that represents the SHA-1 hash of the torrent file. Given this, modern torrent clients can connect to the swarm and retrieve the torrent file without going through a centralised server.

Notorious torrent site The Pirate Bay has pioneered a shift in the way Bittorrent operates. Beginning March 2012, the website stopped hosting torrent files. All downloads from the site are processed using magnet links. This means the entire database (millions of different torrent files that take up millions of gigabytes of files) can be compressed into a 90MB file. This has already led to many mirror sites (as opposed to proxy servers) giving access to The Pirate Bay's database to those in countries where it's otherwise unavailable. The transition for all torrent sites and clients to move to magnet-only configurations won't be quick, but once completed, will ensure that the Bittorrent network will become even more difficult - and theoretically impossible - to control. Future legislation such as the Protect Intellectual Property Act (PIPA), and trade agreements like the Anti-Counterfeiting Trade Agreement (ACTA) could restrict the widespread nature of file sharing, but restricting P2P without damaging the mainstream internet will be a challenge that governments worldwide will need to address.

Peer to peer file sharing has evolved from basic, legally-oblivious beginnings to an underworld sub-culture hiding under the radar, to one of the largest public ecosystems on the internet. It's continually evolving and as recently as this month, taking significant steps to become the ultimate source of

Case 2:11-cv-09437-DSF-JC Document 42-3 Filed 11/09/12 Page 104 of 119 Page ID #:702

decentralized information. The extreme growth in popularity of the Bittorrent network shows that as long as P2P is plausible, it will be popular. Despite the legal and lobbyist attention that has exploded in the last few years toward the piracy behind file sharing, no reasonable measures have dented the flow of data. With the recent steps being led by sites such as The Pirate Bay, it is clear that unless the world's governments mutually agree to police the internet and its people to an Orwellian extreme; the only way to kill peer to peer file sharing is to destroy the internet itself.



Author - Billy Moffat

Owner and sole developer of Meercat9.com, he attends university full time but has a passionate addiction to the internet, particularly programming. Due to the lack of other developers for the site, he is often forced to write about himself in the third person.

# EXHIBIT V

CNET News

# Researchers say Gainesville, Fla., is America's 'pirate capital'

Gainesville, home of the University of Florida, is also home to some of the most eager music pirates, says a data-tracking group.

by **Greg Sandoval** | October 3, 2012 6:50 AM PDT



No metro area in America pirates more music than Gainesville, Fla., on a per capita basis, according to data-tracking firm **Musicmetric [http://www.musicmetric.com/]**.

Musicmetric also reported that of the 97 million BitTorrent files downloaded across the United States in the first half of 2012, about 78 percent were albums and 22 percent were individual songs. The company says that if most albums have 10 songs on them, the number of tunes pirated tops 759 million.

## Related stories

- Obama faces piracy, privacy tests in his second term [http://www.cnet.com/8301-13578_3-57546170-38/obama-faces-piracy-privacy-tests-in-his-second-term/]
- MegaUpload redo is shut down even before debut [http://www.cnet.com/8301-1023_3-57546132-93/megaupload-redo-is-shut-down-even-before-debut/]
- Two members of piracy group IMAGiNE get prison terms [http://www.cnet.com/8301-1023_3-57544669-93/two-members-of-piracy-group-imagine-get-prison-terms/]
- U.S. says Kim DotCom swore not to recreate MegaUpload [http://www.cnet.com/8301-1023_3-57543971-93/u.s-says-kim-dotcom-swore-not-to-recreate-megaupload/]
- MegaUpload will be reborn as Me.ga in January [http://www.cnet.com/8301-1023_3-57543543-93/megaupload-will-be-reborn-as-me.ga-in-january/]

Gainesville, located in north Florida, is home to about 124,000 people. The city is also home to the University of Florida, which has nearly 50,000 undergraduate and graduate students. Who do you think (wink-wink) is doing most of that downloading?

Albany, Ga., Fairbanks, Alaska, Lexington, Ken., and Tallahassee, Fla. filled out the rest of the top U.S. metro areas per capita for BitTorrent downloads in the first half of the year.

London-based Musicmetric said the study "tracked the actual downloads, not the share or the torrent file itself" and " tracked the files and locations of downloaders, but not their identities."

Without considering population size, Musicmetric said the top U.S. metro areas for piracy were New York (7 million downloads), Los Angeles (6.2 million), Chicago (3.2 million), Atlanta (2.6 million), and Philadelphia (2.5 million).

The company also ranked the top states, which were ranked by downloads per capita. They were as follows: No. 1 Georgia (3.8M downloads), No. 2 New York (6.6M), No. 3 Kentucky (1.5M), No. 4 Louisiana (1.5M) and No. 5 Florida (6.2M). The bottom five states were No. 46 Hawaii (299,000), No. 47 Nebraska (388,000), No. 48 South Dakota (153,000), No. 49 Iowa (750,000), and, in last place, No. 50 Minnesota (905,000).

**Update 7:50 a.m. PT:** I've heard from some students from U of F. These Gators say the university scans computers on the university's network and will crack down if they catch anyone uploading unauthorized files. But they apparently can't catch people downloading songs and there are other ways to avoid detection when uploading. I think my question about who is doing all the pirating in Gainesville has been answered.

[http://www.cnet.com/profile/sandonet/]



andoval
ıet.com/profile/sandonet/]

ts media and digital entertainment for CNET News. Based in New York, Sandoval is a former reporter for The Washington Post and the Los Angeles Times.

[http://plus.google.com/107414072672616197316/]

DON'T MISS



Facebook launches real-time visualization of voters

CNET

[http://news.cnet.com/8301-17938_105-57545820-1/facebook-launches-real-time-visualization-of-voters/]



iTunes now accepts donations for Hurricane Sandy relief

CNET



Quantitative Easing: Are People Finally Figuring Out It Doesn't Work?

Profit Confidential

[http://www.profitconfidential.com/michaels-personal-notes/quantitative-easing-are-people-finally-figuring-out-it-doesnt-work/]

Accenture: Eight-Country Health Survey Shows Agreement and Divides

big4

[http://www.big4.com/news/accenture-eight-country-health-survey-shows-agreement-and-divides/]

about these links

@CBS Interactive. All rights reserved.

# EXHIBIT U

- Telecom
- Energy & Green Tech
- Computer Sciences
- Hi Tech & Innovation
-
- Reading Phys.org on your mobile device? Enjoy a convenient format at your fingertips. Phys.org can now be found on Google Currents (Android and iOS). Read more...

# BitTorrent's popularity leads to mass copyright litigation

July 14, 2012 By Bill Torpy

**Last year, Robin Mason got letters alleging her computer was flagged for downloading a pornographic movie and that she was being sued in federal court. She said she was also informed she could make the embarrassing case go away for a settlement of several thousand dollars.**

Ads by Google

IVC Filter Lawsuit - 1 out of 4 IVC Filters Fracture. You may be entitled to compensation - lopezmchugh.com/IVC-filter-lawsuit

The accusation stunned the single mother from Rome, Ga., who is still flustered when recounting the moment.

"It freaked me out," she said. "I never even watched a porno. I'm not that kind of person."

Mason was one of 5,829 John and Jane Does across the nation who were sued by West Coast Productions Inc., the purveyors of "Booty Talk," and many more titles unprintable in a family newspaper. In an interview, Mason was too embarrassed to mention the title, laughing nervously and saying it was "too nasty."

Since 2010, more than 250,000 people have been accused of illegally downloading movies off the Internet using a technology called BitTorrent, which makes transferring large files easier.

"We have a lot of consumers out there who think that getting something for free is OK, that it isn't stealing," said Elizabeth Morgan, an Atlanta attorney who handled the case for the movie makers when it was refiled in federal court in Georgia. "New technology like BitTorrent makes piracy easier. It facilitates piracy. It's a new way to steal."

Others contend the lawsuits are a new way for lawyers to make money. The cases are dubbed "trolling lawsuits" for the way they encourage lawyers to dig up thousands of potential defendants and sue them, often in one fell swoop. Many are so-called John Doe suits, filed against people unknown to the movie makers and their attorneys.

In 2010, Voltage Pictures, makers of the Academy Award-winning "The Hurt Locker," filed suit in federal court against "Does 1-24,583." Law firms hire techies to track down those who have allegedly downloaded movies over the Internet by uncloaking the anonymity of their Internet Protocol address, or IP address, a unique numeric identifier assigned to their computer modem.

Ads by Google

CA Judgment Collection - Collection Experts (Min Size $25K) You Pay Nothing Unless We Collect! - Judgment-Collections-Ca.com

While transmitting or receiving data, each computer leaves a trail through its IP address. The attorneys then go to court to subpoena the user's Internet provider to get the name of the person behind that address. If the court allows that to happen - and there has been mixed success in that - then the computer user generally gets an email or a letter threatening a lawsuit if he or she doesn't pay a settlement.

Settlement figures vary, but are usually in the $2,000-$5,000 range. Atlanta attorney Blair Chintella, who defended Mason, said the amounts have been honed over the past couple years to pressure people to settle quickly.

"It's a price point," said Chintella. "It's about or slightly below what it takes to hire an attorney."

The amount, he said, is a figure that people will often pay because they are frightened or embarrassed, even if they did not download the movie. In essence, Chintella said, the method is legal extortion.

"In porn cases, they use that as a bargaining tool," said Chintella, who has defended about 90 such cases. His clients include: "People worried about security clearance. People who are looking for a job worry that it will come up (during a Google search of their name). A client who is a minister is worried to have his name associated with this." Chintella said people can be wrongfully accused if they have unsecured wireless at their homes or several people using the same computer.

Mason said she was threatened by a negotiator. "They said it'll be in the newspaper. They said the whole community would know."

Her case was later dropped, although the judge did not allow her to recoup the $2,000 retainer she paid Chintella or the thousands in fees he incurred (but was not paid for) in pursuing her case. Chintella argues the legal system's unwillingness to dock plaintiffs' attorneys allows them to keep pursuing such cases, knowing there is little downside to their actions.

The lawsuits against BitTorrent users represent the latest round of copyright-related legal action media companies are using to stem the onslaught of unauthorized downloads of their products.

The technology facilitates the transfer of large files by breaking down data into smaller pieces and sending it to the computer seeking them, where the data is reassembled as a whole. Each member of the network uploads and downloads, and they are unknown to each other. The California company that created the network claims more than 100 million users worldwide.

BitTorrent technology makes it harder for media companies to track who is stealing their content because there is no central clearinghouse distributing the data, as there was a decade ago with Napster, the site that facilitated illegal downloading of music before it was shut down.

John Steele, a Chicago attorney who has sued 30,000 people (or, more precisely, 30,000 IP addresses), isn't apologetic toward those sued for allegedly downloading movies.

"I don't feel sorry for them," he said. "For many years they got away with it. They are upset because they are completely busted."

Steele represents adult movie makers and calls those he is suing "thieves" and "bad guys." The lawsuits, he said, are a simply a matter of right or wrong. "We have to make a decision: Do we let people steal whatever they want? Or do we fight them? It's easy as hell to steal. The only thing holding (people from illegally downloading) is their sense of right and wrong."

He laughed off accusations the settlement offers are extortion. "Settling is what attorneys do. It's 'You did something wrong. Now we need to come to a resolution.' "

Several courts have ruled that the John Doe mega-cases are an abuse of the system, holding that attorneys are improperly trying to shoehorn a load of disparate instances into one case, and using one filing fee to pursue a suit, instead of paying 300 - or even 24,528 fees. In the past year, two federal judges in Atlanta have broken up Doe cases, telling the attorneys to file smaller, more specific cases.

So the plaintiffs' attorneys are suing in smaller batches. And they are still using the courts to identify IP users, so they can be named and sued.

Ernesto Van Der Sar, who runs TorrentFreak.com, a blog that discusses how copyright issues affect BitTorrent, said many people are stunned to receive notice of the downloading.

"People think they are anonymous on the Internet," he said. "Most don't know they have an identifiable IP address. They're surprised to find out."

TyAnna Herrington, a Georgia Institute of Technology professor who teaches intellectual copyright law, acknowledges that getting users to pay for digital content is a vexing problem, but sees the suits "as an opportunity to cast a wide net and see what pops up.

"I don't see this as a way to fight copyright abuse," she said. "It's more a way to make a lot of money real quick."

Still, the criticism hasn't deterred the likes of Steele, who estimates most cases eventually settle. And more are coming. "We just filed a couple hundred more cases," he said.

*(c)2012 The Atlanta Journal-Constitution (Atlanta, Ga.)*
*Distributed by MCT Information Services*

# EXHIBIT W

+Kelly Search Images Maps Play YouTube News Gmail Drive Calendar More ·

CNET distributor of LimeWire

Ke[redacted] 0 Share

Web Images Maps Shopping Videos More ▾ Search tools

Jan 1, 2000 – Dec 31, 2007 Sorted by relevance ▾ All results ▾ Clear

[LimeWire downloads on CNET]
www.cnet.com/topic-software/limewire.html
Nov 5, 2007 - Results 1 - 7 of 7 – Come to CNET for the software downloads related to LimeWire.

[LimeWire news and downloads on CNET]
www.cnet.com/topic/limewire.html
Oct 24, 2007 - Results 1 - 19 of 19 – Come to CNET for the latest news stories and articles, and software downloads related to LimeWire.

[Lime Wire, squeezed, files countersuit - CNET News]
news.cnet.com/Lime-Wire .../2100-1030_3-6119846.html
Sep 26, 2006 - A CNET article by Dawn Kawamoto, Staff Writer, CNET News. ... In its countersuit, Lime Wire states that the record labels launched their own digital-distribution ...

[Lime Wire going legit? | Digital Noise: Music and Tech - CNET News]
news.cnet.com › News › Digital Noise: Music and Tech
Aug 15, 2007 - Unsurprisingly given their ongoing legal dispute with the RIAA, Lime Wire's distribution partners, IRIS and Nettwerk, represent small independent labels and ...

[Dangers of Limewire - CNET Mac OS X Forums]
forums.cnet.com › Forums › Mac forums › Mac OS X
30 posts - 9 authors - Jan 20, 2006
Mac OS X: Dangers of Limewire - Read Mac OS X discussions and get tips and advice on this topic and others on CNET Forums

- [how to transfer downloaded music from limewire to itunes ...] - Jan 19, 2012
- [limewire pro-legal or not? - CNET PC utilities Forums] - Dec 11, 2011
- [TELL ME A STEP BY STEP GUIDE OF DELETING ...] - Nov 24, 2011
- [Is peer-to-peer software such as LimeWire legal and safe to use ...] - Nov 12, 2011

More results from forums.cnet.com »

[Which Is Better: LimeWire Vs. FrostWire | eHow.com]
www.ehow.com › Internet
Sep 15, 2004 - FrostWire began development in September 2004 by several members of the LimeWire open source community. It was started after the distributor of LimeWire ...

[About LimeWire Pro | eHow.com]
www.ehow.com › Internet
Sep 15, 2001 - Limewire Pro is the premium version of the popular peer-to-peer (P2P) file ... in anti-competitive practices designed to suppress any form of distribution of music that it ... CNet: Record Labels Send More Letters to P2P Services · Pike & Fischer ...

[LimeWire video - CNET TV]

cnettv.cnet.com/limewire/9742-1_53-
Jun 21, 2007 - 2 min
Watch LimeWire videos on CNET TV. LimeWire is the world's fastest P2P file- sharing application for all ...

More videos for CNET distributor of LimeWire »

[CNET sued for giving kids LimeWire - Security | DSLReports Forums ...]
www.dslreports.com/ .../r25824938-CNET-sued-for-giving-kid
20 posts - 8 authors - Jul 7, 2002
Again, not Limewire (the app)'s fault if users download and malware and infect ..... and that CNET's Download.com was the "main distributor" of the software.

MGM Studios, Inc. v. Grokster, Ltd. - Wikipedia, the free encyclopedia
en.wikipedia.org/wiki/MGM_Studios,_Inc._v._Grokster,_Ltd.
Jun 28, 2005 - Briefly stated, it has to be shown that the distributors of the program have advertised and/or ... A lawsuit was brought against LimeWire in Arista Records LLC v. ... Musil, Steven (2005-03-27). "Mark Cuban to finance Grokster defense". CNET.

1 2 3 4 Next

Advanced search Search Help Give us feedback

Google Home Advertising Programs Business Solutions Privacy & Terms About Google

# EXHIBIT X

# New bill would curb P2P companies

***Summary:** A new Congressional bill would require file-swapping companies to get parental permission before allowing minors to use their services.*

By Lisa M. Bowman | July 28, 2003 -- 13:21 GMT (06:21 PDT)

**A bill introduced Thursday in Congress would require file-swapping companies to get parental permission before allowing minors to use their services.**

The bill, called the Protecting Children from Peer-to-Peer Pornography (P4) Act and sponsored by Reps. Joe Pitts, R-Pa., and Chris John, D-La., would require the Federal Trade Commission to regulate peer-to-peer networks and take steps to ensure that children aren't accidentally coming across porn.

The bill's sponsors said as many as 40 percent of all files traded on the networks are porn.

"Our legislation gives parents the tools they need to protect their children from pornography and threats to privacy posed by peer-to-peer file-trading networks," Pitts said in a statement. "By working together to protect children, we are building a broad and bipartisan coalition."

The bill calls on the FTC to require peer-to-peer companies to get parental permission before minors use their services. It also would require peer-to-peer companies to honor the wishes of parents who have put a "do not install" beacon in their computers, indicating that they don't want file-swapping software on their children's machines. However, such technology has yet to be developed, and it's unclear how such a beacon would work.

The proliferation of porn on peer-to-peer networks has been on the government's radar screen for some time. In the spring, the General Accounting Office and the House Government Reform Committee released separate reports (http://news.com.com/2100-1028-992371.html) that document the issues that surround porn on peer-to-peer networks in anticipation of a Government Reform Committee hearing entitled "Stumbling Onto Smut." The committee's report found that file-blocking software didn't do enough to filter out porn files. The General Accounting Office report found that typing in words such as "underage" or "pre-teen" yielded numerous images of child porn.

The bill is one more example of increased scrutiny of peer-to-peer networks, which also have come under fire from copyright holders for allowing people to trade unauthorized copies of songs or movies without paying. The recording industry has begun sending out hundreds of subpoenas in an attempt to identify file swappers and possibly file lawsuits against them, nabbing all types of music fans in the process.

In response to the scrutiny, peer-to-peer companies are starting to take a more active role in the political process. Representatives of peer-to-peer companies Grokster and Sharman Networks, which is the distributor of Kazaa (http://news.com.com/2100-1027-1022811.html) , are starting separate lobbying groups (http://news.com.com/2100-1027-1023545.html) to represent the interests of file-swapping companies.

Adam Eisgrau, the new executive director of P2P United, the Grokster-backed trade group, said crackdowns on peer to peer are "not a good use of public policy."

"It is regrettable that people engaging in criminal conduct with regards to pornography have found these systems to be efficient, but these systems have dramatic and much larger uses in society," he said, adding

that peer-to-peer systems can be used for trading research and other academic files. "Any tool can be used for good or bad."

Eisgrau said he had not yet met with the backers of the bill introduced Thursday, but he hoped to in the near future.

*Topic: Tech Industry*

# EXHIBIT C

BAKER MARQUART LLP
Jaime Marquart (Bar No. 200344)
*jmarquart@bakermarquart.com*
Ryan Baker (Bar No. 214036)
*rbaker@bakermarquart.com*
Christian Anstett (Bar No. 240179)
*canstett@bakermarquart.com*
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850
Attorneys for All Plaintiffs

KENDALL BRILL & KLIEGER LLP
Richard B. Kendall (90072)
*rkendall@kbkfirm.com*
Laura W. Brill (195889)
*lbrill@kbkfirm.com*
Richard M. Simon (240530)
*rsimon@kbkfirm.com*
10100 Santa Monica Blvd., Suite 1725
Los Angeles, California 90067
Telephone: 310.556.2700
Facsimile: 310.556.2705

Attorneys for CBS Interactive, Inc.
(f/k/a CNET Networks, Inc.)

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| ALKIVIADES DAVID, SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIAM FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN | Case No. CV11-9437 DSF (JCx)<br>**SECOND JOINT STIPULATION REGARDING PRELIMINARY INJUNCTION DISCOVERY**<br>Crtrm.: 840 |

"JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER, DIAMOND SMITH, REMINISCE SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM,

Plaintiffs,

v.

CBS INTERACTIVE INC., CNET NETWORKS, INC.

Defendants.

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd
Suite 1725
Los Angeles, CA 90067

WHEREAS, on November 9, 2012, Plaintiffs filed a motion for a preliminary injunction, which is set for hearing on February 25, 2013;

WHEREAS, by agreement of the parties, CBSI's opposition to the motion is due January 25, 2013,

WHEREAS, on December 14, 2012, counsel for the parties met and conferred regarding Plaintiffs' objections to outstanding discovery requests on the issues of copyright ownership and direct infringement;

WHEREAS, in order to reduce discovery disputes relating to the preliminary injunction motion, Plaintiffs will conduct a reasonable and diligent search for documents and items responsive to CBSI's Request for Production No. 2 as it concerns the twenty-four works at issue in Plaintiffs' Motion for Preliminary Injunction, and produce such documents and items, to the extent they are found, to CBSI by January 7, 2013. Further, Plaintiffs will not seek to introduce any evidence relating to ownership of the works at issue other than the evidence in their moving papers and materials relating to ownership produced by Plaintiffs to CBSI by January 7, 2013. CBSI will refrain from moving to compel discovery on the issue of ownership in advance of reviewing Plaintiffs' additional January 7, 2013 production.

WHEREAS, in making this agreement, CBSI is not waiving its right to discovery on these or other issues, and Plaintiffs are not waiving their right to introduce evidence on these issues at a later stage of the proceedings.

WHEREAS, in the event Plaintiffs learn of additional information as to the issue of ownership after January 7, 2013, and before the deadline for Plaintiffs to file their reply brief, which could not with reasonable diligence have been obtained on or before January 7, 2013, the parties will meet and confer to discuss whether any modification of this stipulation and the schedule for the preliminary injunction

Kendall Brill & Klieger LLP
10100 Santa Monica Blvd
Suite 1725
Los Angeles, CA 90067

motion and associated briefing is appropriate, and, if they are unable to agree, will cooperate in promptly bringing any resulting disputes to the Court's attention.

NOW, THEREFORE, IT IS HEREBY STIPULATED, Plaintiffs will not seek to introduce any evidence concerning the issue of ownership of the works at issue, in connection with the pending preliminary injunction motion, other than the evidence in their moving papers filed November 9, 2012 and materials produced by Plaintiffs to CBSI by January 7, 2013.

IT IS SO STIPULATED.

Dated: December 28, 2012 BAKER MARQUART LLP

By: ____________________
Jaime Marqaurt
Attorneys for All Plaintiffs

Dated: December ___, 2012 KENDALL BRILL & KLIEGER LLP

By: ____________________
Richard Simon
Attorneys for CBS Interactive, Inc.
(f/k/a CNET Networks, Inc.)

# EXHIBIT D

# BAKER MARQUART LLP

ATTORNEYS

May 3, 2013

WRITER'S DIRECT DIAL NO.
**(424) 652-7811**

WRITER'S INTERNET ADDRESS
**canstett@bakermarquart.com**

**VIA E-MAIL ONLY**

Erin Simon
esimon@fenwick.com
Fenwick and West LLP
555 California Street, 12th Floor
San Francisco, CA 94104

**Re: *Sugar Hill Music, et al. v. CBS Interactive, Inc.*, USDC Case No. CV11-09437**

Dear Erin:

This letter responds to your May 1, 2013 letter regarding depositions. Plaintiffs will respond to your May 2, 2013 discovery letter early next week.

**Hutchins and Davis Depositions**

CBSI has not met and conferred with Plaintiffs in good faith regarding the scheduling of depositions. CBSI's unreasonable and legally indefensible positions and unreasonable, unilateral deadlines are significantly slowing the meet and confer process. For example, CBSI's refusal to accept Plaintiffs' reasonable compromise on the number and locations of depositions has made it impossible for Plaintiffs to effectively plan or schedule depositions with so much in the air. Among other things, it is impossible for plaintiffs' counsel to know which plaintiffs to discuss availability with when CBSI has only noticed the deposition of two plaintiffs. Although there has been some movement in this regard, as discussed below CBSI has *still* not set forth an acceptable or reasonable proposal for deposition number and location.

CBSI's position on holding the depositions of Mr. Hutchins and Mr. Davis in Los Angeles makes little sense in the context of the overarching deposition proposal. Both Mr. Hutchins and

Mr. Davis are based on the East Coast and it makes sense in terms of economics and efficiency to conduct their depositions in connection with the other depositions CBSI desires to take. CBSI has supplied no justification for why these two depositions are so especially exigent that they could not be conducted along with the other New York depositions. Is CBSI willing to pay for the travel costs for these plaintiffs to appear for depositions in Los Angeles prior to the depositions held in New York City?

To the extent that CBSI supplies some justification for deposing these two plaintiffs in Los Angeles, Plaintiffs will provide deposition dates as early as possible, noting that CBSI's insistence on holding the depositions in Los Angeles impacts Mr. Hutchins and Mr. Davis' availability. That said, plaintiffs will likely be able to provide these two witnesses by the late-May deadline discussed in your letter.

**Deposition Number**

Plaintiffs disagree that the authority supplied by CBSI supports the proposition that CBSI is entitled to fifty-seven depositions in this case – and by CBSI's recent change in position regarding Plaintiffs' proposal, CBSI seems to tacitly agree. Plaintiffs also strongly disagree that their letter of April 25, 2013 "tacitly concedes that every Plaintiff possesses potentially discoverable information" that would best or least burdensomely be obtained by deposition. Plaintiffs do not believe that this case calls for the deposition of more than ten plaintiffs but have remained willing to compromise that number. Plaintiffs, however, do not wish to make tactical discovery choices for CBSI. CBSI can notice whichever plaintiffs it wishes. If CBSI does not care which 20 plaintiffs it deposes, then Plaintiffs will be happy to pick plaintiffs for deposition. If CBSI is amenable to that arrangement, please let me know in writing that CBSI consents to Plaintiffs deciding which plaintiffs will sit for deposition and will not argue any prejudice from that arrangement. If CBSI wishes to decide which plaintiffs to depose, then please simply notice those depositions and plaintiffs will work with CBSI to schedule them for the mutual convenience of the parties. Further, if information on where the particular plaintiffs reside will help CBSI make these decisions, Plaintiffs will endeavor to supply a list to CBSI next week.

CBSI's counterproposal is also not presently acceptable to plaintiffs, because CBSI has proposed an asymmetric expansion of deposition numbers. Plaintiffs will not agree to such imbalanced proposals. Among other things, in addition to the CBSI writers, editors and executives with knowledge of CBSI's role in P2P, Plaintiffs expect potentially to depose a number of third party publishers of P2P software that was available on CBSI websites. As CBSI is aware, dozens of such software programs were distributed by CBSI. If CBSI is willing to make the deposition number extension mutual, Plaintiffs will accept the counterproposal. Plaintiffs will not agree to give CBSI more depositions but be forced to move to extend the number for plaintiffs. Plaintiffs also see no need to agree to further meeting and conferring after each side has taken depositions.

Absent a showing of extraordinary circumstances, which Plaintiffs cannot at present envision, this would be a rule-swallowing exception.

Plaintiffs' counsel will need to confer with each deponent (after CBSI informs Plaintiffs whether it wants to select the specific 20 plaintiffs) to determine whether the dates proposed by CBSI are workable and, if not, what alternate dates might work. Plaintiffs do not necessarily object to the timing of Plaintiffs' witnesses' depositions but note that it is impossible to schedule depositions when CBSI has not indicated who it wants to depose.

Given the state of the meet and confer process and the complexity of discovery in this case, and the fact that both parties conducted minimal discovery during the pendency of the preliminary injunction, Plaintiffs again suggest the possibility of extending the discovery deadline a number of months to allow time to reasonably work out our schedule. Please let me know if CBSI is willing to do so.

Very truly yours,

/s/ Christian A. Anstett

Christian A. Anstett

cc: Jennifer Kelly
JKelly@fenwick.com
Laurence Pulgram
LPulgram@fenwick.com

# EXHIBIT E

BM

**BAKER MARQUART LLP**
ATTORNEYS

WRITER'S DIRECT DIAL NO.
**(424) 652-7801**

WRITER'S INTERNET ADDRESS
**rbaker@bakermarquart.com**

VIA E-MAIL ONLY

Erin Simon
esimon@fenwick.com
Fenwick and West LLP
555 California Street, 12th Floor
San Francisco, CA 94104

**Re:** ***Sugar Hill Music, et al. v. CBS Interactive, Inc.*, USDC Case No. CV11-09437**

Dear Erin:

This letter responds to your May 2, 2013 letter regarding discovery, as well as your April 19, 2013 letter regarding discovery. If Plaintiffs do not hear back from CBSI on this issue by next Wednesday or receive assurance that CBSI will produce the documents discussed below, Plaintiffs will simply prepare their portions of the joint stipulation discussed below. Jaime Marquart was in a mediation all day today and was not able to review the draft of this letter before your unannounced Joint Stipulation was filed; thus, much of this letter constitutes our response to your Joint Stipulation.

With respect to Plaintiffs' agreement to accept some of CBSI's compromise positions: that agreement does not reflect assent to the underlying legal or factual positions advanced by CBSI and does not waive Plaintiffs' rights to advance contrary legal and factual arguments. Nor does that agreement waive Plaintiffs' right to move to compel on those topics in the future.

**Issues in the May 2, 2013 letter of Erin Simon**

**A. Ownership Documents (RFPs 1, Interrogatory 1)**

Plaintiffs disagree that they need to produce actual certificates of registration filed with the Copyright Office unless those certificates are within the possession, custody or control of Plaintiffs. Plaintiffs do expect to produce additional documents relevant to ownership. Some of those documents

can be produced after the Protective Order is entered by the Court as they contain confidential information. Plaintiffs will produce all remaining documents relevant to Mr. Davis and Mr. Hutchins at least seven days prior to their depositions and likely much sooner than that. Plaintiffs will produce the remaining documents on a rolling basis.

Plaintiffs need to further clarify statements regarding Mr. Spence and Mr. Bendross. While it is true that both act as managers for other plaintiffs in some capacity, as is common in the music industry, many plaintiffs are represented by a number of various professionals in different capacities. Mr. Spence and Mr. Bendross do not maintain full paper or digital archives containing all responsive documents that CBSI has requested. Counsel has instructed plaintiffs to produce all the relevant records in their possession, custody or control or in the possession, custody or control of any of their agents / people working at their direction.

**A. Evidence of Direct Infringement**

Plaintiffs confirm they are not presently in possession, custody or control of direct infringement evidence that has not been produced or submitted to the Court in conjunction with Plaintiff's motion for a preliminary injunction with the following caveat. Plaintiffs are informed and believed that their works have been infringed (as have almost all musical works of any value) on various popular P2P networks that are comprised and accessed through software distributed by CBSI. Plaintiffs believe that some documents in their possession, such as royalty statements, provide indirect evidence of the infringement of Plaintiffs' works on P2P networks. Plaintiffs will produce information regarding direct infringement as they are obtained from CBSI.

**B. Plaintiffs' Awareness of Facts Relevant to the Suit (RFAs 12-16, 18)**

Plaintiffs continue to dispute the relevance of these RFAs for reasons already articulated in prior letters.

**C. Documents Relating to CBSI (Request for Production 20, 29)**

Plaintiffs maintain that all documents regarding CBSI's purported distribution of P2P software and CBSI's statements regarding P2P software are in CBSI's possession, custody or control. Plaintiffs reserve the right to cite any such materials. Plaintiffs' investigation of CBSI's role in the distribution of P2P software is ongoing and Plaintiffs reserve the right to supplement their production in the future. Plaintiffs have requested these documents from CBSI, and here CBSI appears to shift the burden of complying with discovery requests back to Plaintiffs. Plaintiffs understand that they will have to disclose the documents they intend to rely on at trial to CBSI prior to trial.

**D. Plaintiffs' Financial Documents (Requests for Production 33-38, 57)**

Plaintiffs are not sure what CBSI means by the phrase "the financial information underlying the information in their tax returns." Plaintiffs dispute that CBSI is entitled to financial information unrelated to the works at issue. Plaintiffs understand that CBSI expect the information at least a week prior to any deposition and believe that request is reasonable and workable. Plaintiffs believe such production can be accomplished by all plaintiffs within 6 weeks of entry of the protective order.

**Issues in the April 19, 2013 letter of Erin Simon**

**I. Plaintiffs' First Set of RFPs**

**A. Timing**

As CBSI as demanded, Plaintiffs expect to receive documents relevant to any noticed deposition one week prior to the deposition. To the extent CBSI does not honor this request, Plaintiffs reserve the right to re-notice the deposition in question. Can CBSI commit to producing all relevant documents in its possession, custody or control within six weeks of entry of the Protective Order? If not, Plaintiffs intend to prepare a joint stipulation on this topic.

**B. CBSI's General Objections**

Plaintiffs understand CBSI's concerns regarding breadth of definitions of third party entities here, with an important caveat. To the extent that, say, CBSI had some contractual relationship with an affiliate of Lime Group LLC that related to P2P software, Plaintiffs believe that contract is relevant and should be produced. The broader definition of third party entities is relevant in the context of plaintiffs' specific requests for production. Plaintiffs do not believe that answering these requests involves any exercise by CBSI in determining all of the entities acting on behalf of Viacom, but rather simply to produce any documents in its possession, custody or control responsive to Plaintiffs' requests. Plaintiffs concern is simply to avoid a situation where CBSI withholds documents on a hypertechnical claim that the document in question was not implicated by a particular RFP because it concerns a corporate affiliate of an entity described in Plaintiffs' request and not the entity itself.

CBSI's proposed compromises regarding Limewire, Kazaa, etc. and P2P Software/Publisher are acceptable.

**2. Documents Equally Available to Plaintiffs'**

Plaintiffs disagree that documents on CBSI's website are "equally available" to Plaintiffs for a number of reasons. Plaintiffs have access only to CBSI's websites as they exist now, not as they exist as all relevant points in the past. Plaintiffs are also ignorant of how CBSI's website implements

searches or the best ways to search all portions of its websites. Plaintiffs are also curious as to why CBSI "cannot" claim that it can produce all responsive documents from its own website. Plaintiffs expect CBSI to produce relevant documents on its website.

**C. Specific Objections**

**RFP 7**:

Plaintiffs and CBSI disagree over the meaning of the term "distribution." Please see Plaintiffs' Reply in Support of Motion for Preliminary Injunction at p. 12 for Plaintiffs' position on the definition of "distribution." Plaintiffs do not agree that the definition of the term "distribution" in the Copyright Act supplies the definition for the term "distribution" as articulated in the inducement cases. Plaintiffs also continue to believe that CBSI's conduct constitutes distribution in either laymen's or a technical understanding and that CBSI's websites and past statements admit as much. Is CBSI willing to provide a verification under oath that it never hosted P2P software on servers that it owned or controlled at any point in time?

Please explain why CBSI cannot perform an automated search of its public web sites.

**RFPS 8 and 9:**

Plaintiffs disagree with CBSI's proposed three year rationale. Plaintiffs have already explained why earlier statements are relevant to CBSI's present intent and also provided legal authority supporting that position. *See*, *e.g.*, Plaintiffs' Reply in Support of Motion for Preliminary Injunction at p. 8-9. Plaintiffs believe that CBSI's past conduct is relevant evidence to determine its present intent. Plaintiffs do not believe further dialogue on this issue is productive, and will move to compel production of relevant documents if CBSI will not agree to produce documents in its possession, custody and control from at least 2002.

**RFPs 9 and 10:**

Plaintiffs do not understand CBSI's response on this topic. Is it CBSI's position that no P2P software programs were ever submitted to downloads.com for review? Did CBSI ever "approve" any P2P software for its website? If so, Plaintiffs expect CBSI to produce all documents related to the review and approval of these P2P programs. If CBSI will not agree to produce these documents, Plaintiffs will move to compel their production.

**RFPs 12-29; 31-37:**

The electronic search terms have been discussed extensively in separate correspondence. Plaintiffs requested a redlined version of CBSI's last proposed list of search terms some time ago and only today received a response. Plaintiffs will respond to that separately.

As discussed above, CBSI's time restrictions are unreasonable and Plaintiffs will move to

compel the production of documents prior to November 4, 2008.

**RFP No. 30:**

Plaintiffs understand CBSI's position that it does not "auction advertising keywords or search rankings, or receive payments per download, from P2P publishers." Will CBSI provided a verified statement under oath so stating?

Plaintiffs and CBSI disagree about CBSI's distribution of P2P software and reserve all rights in that respect, but will accept CBSI's compromise for the time being.

Very truly yours,

/s/ Christian A. Anstett

Christian A. Anstett

cc: Jennifer Kelly
JKelly@fenwick.com
Laurence Pulgram
LPulgram@fenwick.com

# EXHIBIT F

Fenwick
FENWICK & WEST LLP
555 CALIFORNIA STREET, 12TH FLOOR SAN FRANCISCO, CA 94104
TEL: 415.875.2300 FAX: 415.281.1350 WWW.FENWICK.COM

May 15, 2013

ERIN SIMON

EMAIL ESIMON@FENWICK.COM
Direct Dial (415) 875-2369

**VIA E-MAIL (CANSTETT@BAKERMARQUART.COM)**

Christian Anstett
Baker Marquart LLP
10990 Wilshire Boulevard, Fourth Floor
Los Angeles, CA 90024

Re: *Sugar Hill Music, et al. v. CBS Interactive, Inc.*
USDC Case No. CV 11-09437

Dear Chris:

This letter responds to your letter of May 10, 2013. Your letter asserts that Plaintiffs' "agreement to accept some of CBSI's compromise positions... does not waive Plaintiffs' right to move to compel on those topics in the future." CBSI does not see the purpose of an ostensible agreement that is merely a smokescreen for a subsequent motion to compel. Such an "agreement" is nothing of the kind; CBSI does not want to reach what it believes are acceptable compromises only for Plaintiffs to turn around and undercut that compromise by moving to compel. If Plaintiffs intend to move to compel on any issue to which they have previously accepted our offer to compromise, please let me know immediately. We compromise to avoid disputes, and we reserve the right to maintain our pre-compromise positions should you choose not to accept any compromise.

## I. PLAINTIFFS' DISCOVERY RESPONSES

### A. Ownership Documents (Requests for Production 1–4, Interrogatory 1)

Thank you for your confirmation that Plaintiffs will produce documents in the possession, custody, or control of their agents and other persons working at their direction, and your confirmation that Plaintiffs will produce all documents relating to Messrs. Davis and Hutchins at least seven days prior to their depositions. We accept your offer to produce these documents subject to the terms of the protective order even though it has not yet been entered.

Given Plaintiffs' refusal to commit to producing certificates of registration for the asserted works, CBSI will maintain this issue in its joint stipulation.

**B. Evidence of Direct Infringement (Requests for Production 5, 21, 22, 26–28, 30–32, Interrogatory 2)**

Given your representation that Plaintiffs do not possess any evidence of direct infringement other than the royalty statements Plaintiffs have not yet produced and the evidence submitted in conjunction with the preliminary injunction motion, CBSI will continue to include these matters in the joint stipulation on the motion to compel.

**C. Plaintiffs' Awareness of Facts Relevant to the Suit (Requests for Admissions 12–16, 18)**

As CBSI's explanation of its position has not persuaded Plaintiffs to drop their meritless objections, CBSI will keep these requests for admissions at issue in the joint stipulation.

**D. Documents Relating to CBSI (Request for Production 20, 29)**

As CBSI has explained, while the articles on its website are public, and therefore available to both CBSI and Plaintiffs, Plaintiffs' beliefs about which articles are inducing are not public. Until Plaintiff identifies which articles its lawsuit and claims are based on as purportedly inducing, CBSI has no way to know. Contrary to your letter, it is Plaintiffs who seek to shift the burden of supporting their infringement claim onto CBSI. Plaintiffs cannot "reserve the right" to identify such materials at the last minute, thus denying CBSI the opportunity to prepare a complete defense.

During our conversation on May 13, 2013, you stated that there were specific articles Plaintiffs believed induced infringement that they had not yet identified in response to CBSI's interrogatory on the subject. Please confirm that you will supplement your interrogatory responses and document production to identify any and all statements by CBSI that Plaintiffs contend induce infringement no later than May 24, 2013.

**E. Plaintiffs' Financial Documents (Requests for Production 33–38, 57)**

CBSI does not seek Plaintiffs' financial information unrelated to the works at issue, but it expects the complete production of all documents reflecting financial information that is related to the works at issue. If that information can be found in documents other than Plaintiffs' tax returns, CBSI does not require the tax documents. Please let me know if Plaintiffs require further confirmation of this topic.

**II. CBSI'S DISCOVERY RESPONSES**

**A. Timing of Document Production**

CBSI is also agreeable to producing documents for depositions at least seven days prior to the deposition, with the possible exception of the 30(b)(6) deposition of CBSI, which is currently noticed for June 10, 2013. Given that we can only just now begin running the searches

(and there may be motion practice over whether we need to run further searches with the additional search terms we could not reach agreement on), we cannot commit to having all documents produced prior to that deposition unless it is rescheduled We assume that Plaintiffs prefer to have CBSI's documents prior to this deposition, and thus propose rescheduling that deposition for no earlier than the last week of June.

Please confirm that Plaintiffs will also abide to the 7 day rule for depositions once scheduled, and also timely produce documents for those Plaintiffs whose depositions have not yet been noticed. (We do not view the "7 day minimum" as in any way extending the time for production that should already have occurred.)

With respect to the timing of CBSI's document production generally, CBSI will attempt to produce all documents within a short time of entry of the protective order, but given that the parties have still not agreed upon electronic search terms, it is not in a position to commit to a date certain for the completion of that production.

**B. CBSI's General Objections**

CBSI will not withhold information relating to affiliates of P2P software publishers whom it knows to act on behalf of the P2P publisher. But CBSI cannot "simply… produce any documents in its possession, custody or control responsive to Plaintiffs' requests" if it does not know which entities are included within those requests.

**C. Documents Equally Available to Plaintiffs**

CBSI does not have the technological capability to perform an automated search of its live website, so it is in the same position as Plaintiffs with respect to searching using Google or the search functionality on the site. CBSI has undertaken to produce those webpages which it can locate in this manner, but it does not purport to make a comprehensive production of its entire website.

**D. Specific Objections**

***Request for Production No.*** *7*: Since the outset of its hosting of third-party software on download.com, CBSI has had a policy of not hosting peer-to-peer file-sharing products. Because the P2P category contained products intended for limited personal distribution, for example of home movies and photos, however, the category as a whole was not completely barred from hosting. It is possible that some peer-to-peer file-sharing software accidentally got through this process and onto the site for a short amount of time before CBSI became aware of it and removed it. CBSI can confirm that it never knowingly allowed peer-to-peer file-sharing software to be hosted on its site.

Regarding the automated search of the public website, please see Section C above.

***Request for Production Nos. 8 and 9:*** Although CBSI continues to believe that this information is irrelevant, in the interest of resolving the parties' dispute it is willing to offer a compromise of providing documents, other than financial information, dated prior to November 4, 2008. Please let us know if you accept this compromise.

***Request for Production Nos. 9 and 10:*** Request No. 9 seeks "DOCUMENTS sufficient to show the number of copies of any P2P software application file YOU distributed." Request No. 10 seeks "All DOCUMENTS that REFER or RELATE TO YOUR approval of any P2P SOFTWARE distributed through any of YOUR websites." As it has repeatedly explained, CBSI does not "distribute" peer-to-peer software. These requests ask for documents that do not exist. Your letter attempts to substantially broaden these requests—for example, by asking not only about software CBSI distributed but about all software that anyone ever "submitted to downloads.com for review." The requests concern distribution of P2P software, which CBSI does not do.

***Request for Production Nos. 12-29 and 31-37:*** CBSI is willing to compromise by providing documents, other than financial information, dated prior to November 4, 2008. Please let us know if you accept this compromise.

***Request for Production No. 30:*** CBSI provided a verified response on this topic to Interrogatory No. 5.

It is not clear what you mean when you write that you disagree with CBSI's position and "reserve all rights in that respect, but will accept CBSI's compromise for the time being." Please explain whether CBSI's compromise position is acceptable to Plaintiffs or not.

Sincerely,

FENWICK & WEST LLP

*/s/ Erin Simon*

Erin Simon

# EXHIBIT G

COPY

FILED
CLERK, U.S. DISTRICT COURT
2 5 2012
3:55
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

BAKER MARQUART LLP
Jaime Marquart (Bar No. 200344)
jmarquart@bakermarquart.com
Ryan Baker (Bar No. 214036)
rbaker@bakermarquart.com
Christian Anstett (Bar No. 240179)
canstett@bakermarquart.com.com
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
Telephone: (424) 652-7800
Facsimile: (424) 652-7850

Attorneys for All Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ALKIVIADES DAVID, SUGAR HILL MUSIC, SOLID PRODUCTIONS, STEVEN BATIZ, TONY BELL, DETRON BENDROSS, DERRICK BRAXTON, REGINALD BROOKS, ELIJAH BROWN, HORACE BROWN, OSCAR BROWN, LUTHER CAMPBELL, JONATHAN CARLTON, SOLOMON CONNER, DAYQUAN DAVIS, DOUGLAS DAVIS, KAREEM DAVIS, SOLAMIN DAVIS, EMMANUEL RAMONE DEANDA, DREW CARTER, NACOLBIE EDWARDS, VANCITO EDWARDS JOHN FLETCHER, WILLIE FINCH, ISAAC FREEMAN, JR., DARRYL GIBSON, JALIL HUTCHINS, EMANON JOHNSON, KEITH JONES, ORAN "JUICE" JONES, TARSHA JONES, NAILAH LAMEES, DANA MCCIEESE, BARRY MOODY, JEFF REDD, QUAME RILEY, ANTHONY ROBINSON, NICHOLAS SANCHEZ, JONATHAN SHINHOSTER, DIAMOND SMITH, REMINISCE SMITH, GERALD SPENCE, CHRIS STOKES, IRENE STOKES, JUANITA

CASE NO. CV11-9437 DSF (JCx)

FIRST AMENDED COMPLAINT FOR:

(1) INDUCEMENT OF COPYRIGHT INFRINGEMENT;

JURY TRIAL DEMANDED

STOKES, WILLIAM TENNYSON AND THE TENNYSON ESTATE, CARL THOMAS, JEFF THOMKINS, RONDELL TURNER, RICKY WALTERS, KEVIN WILLIAMS, YOLANDA WHITAKE, JOSEPH WILLIAMS, RAHEEM WILLIAMS, CASE WOODWARD, ATTRELL AND JARRETT CORDES, MITCHELL GRAHAM

Plaintiffs,

vs.

CBS INTERACTIVE INC., CNET NETWORKS, INC.

Defendants.

Plaintiffs, for their Complaint against Defendants CBS Interactive Inc. ("CBS Interactive") and CNET Networks, Inc. ("CNET," collectively with CBS Interactive, the "Defendants"), allege as follows:

**SUMMARY OF THE ACTION**

1. Over the last decade, countless websites and "file sharing" or peer-to-peer ("P2P") software programs – from Napster, in 2001, to LimeWire in 2010 – have been sued into oblivion because a multitude of courts have found that they were essentially engines of infringement, designed with the specific aim of knowingly encouraging, inducing and/or assisting others in direct copyright infringement of artists' works, and profiting thereby. As a result of these lawsuits, an overwhelming number of these file-sharing sites are now completely inactive and their founding companies are bankrupt. Yet, for most if not all of this time, one

particular group of businesses – led by Defendants CBS Interactive and CNET – have knowingly and willingly participated in and profited mightily from the same massive infringement that engendered large copyright suits against Napster and LimeWire and that ultimately crippled them financially. And they have done so with impunity. In fact, because they owned a number of the most heavily-visited sites in the world for downloading software of all types, Defendants did more to further this massive infringement than Napster or LimeWire ever could by falsely legitimizing it and popularizing it to the masses. As recently as 2010, one could access a legitimate portion of Defendants' sites and download non-infringing, licensed software such as Quickbooks accounting software or Adobe Acrobat, and could *during the same shopping session* download the LimeWire infringement engine, which was clearly intended to be downloaded for infringing purposes. This ambiguity worked even further to Defendants' advantage by making it seem to the casual consumer that a Limewire download had the same legitimacy as a download of licensed office software. In essence, Defendants have taken music piracy from the dorm room to the board room. Thus, while other companies faced heavy statutory penalties and went bankrupt, and music labels banded together to levy practically unconscionable penalties on unemployed college students and housewives, Defendants quietly made billions by inducing those same individuals to break the law, by providing them the software to do it, and then by giving even the least computer-savvy a step-by-step guide as to how to do it. No one has held Defendant accountable for this. Until now.

2. For over a decade, Defendants have shamelessly distributed a vast array of P2P software programs ("P2P clients") to the global public for free, including the now notorious LimeWire software as well many of the most popular and controversial P2P clients, including KaZaa, Morpheus, BitComet, AudioGalaxy and Frostwire. At all times, Defendants knew that these P2P clients were used primarily for purposes of copyright infringement and in many cases were actually designed

specifically to facilitate, conceal and promote copyright infringement. Indeed, much of the P2P software distributed by Defendants includes features designed and intended exclusively for purposes of facilitating infringement and avoiding enforcement. For example, one BitTorrent client presently distributed by Download.com, BitComet, includes a built-in feature that automatically allows users to search for media on the Pirate Bay. As the name suggests, the Pirate Bay is a Swedish website that is literally built to steal. It is described by *The Los Angeles Times* as "one of the world's largest facilitators of illegal downloading" and "the most visible member of a burgeoning international anti-copyright or pro-privacy movement." Defendants' widespread distribution of BitComet and similar programs has helped the Pirate Bay become the 88th most popular website in the world as of July 2011.

3. Defendants furthered the massive infringement carried out through the P2P applications they distributed and popularized by providing detailed reviews that included information regarding the suitability of the clients for copyright infringement as well as instructions and tips on how to use the P2P software to infringe. On cnet.com, Download.com, and other CBS Interactive-owner websites, the Defendants offered videos, articles, and other media that instructed how to use P2P software to locate pirated copies of copyrighted works and remove electronic protections placed on digital music files in order to prevent infringement.

4. If copyright law ever allowed Defendants to play the part of innocent purveyor of seemingly legitimate copying and "sharing" tools (and it is questionable that it ever would have here), modern copyright jurisprudence certainly will afford Defendants any such relief. Defendants are decidedly *not* innocent parties distributing a technology meant for legal means that just happens to be used by a few malevolent wrongdoers to infringe. *See, e.g.*, Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 104 S. Ct. 774 (1984). Nor is this a case where a defendant simply linked users to a website where infringement occurred or

for which it provided advertising and had no feasible means of preventing the infringement. *See, e.g.*, Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701 (9th Cir. 2007). Here, Defendants directly provided users that they knew to be actively and unlawfully copying Plaintiffs' works with the tools necessary to accomplish that infringement, along with instructions on how to most effectively use those tools. But they did not even stop there – Defendants actually encouraged the infringement in web postings, videos and radio shows. Defendants are also not innocent third parties only tenuously connected to infringement; rather, they have actively distributed a vast array of software, based upon various different technologies, but all with the object of promoting infringement. *See, e.g.*, Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd., 125 S. Ct. 2764 (2005). By their own independent acts, Defendants intentionally encouraged a particular, infringing form of use by the users of the "file sharing" platforms Defendants distributed. *See, e.g.*, Arista Records LLC v. Lime Group LLC, 2011 WL 1742029 (2011); Columbia Pictures Industries, Inc. v. Fung, 2009 WL 6355911 (C.D. Cal). Far from being innocent purveyors of "sharing" technologies co-opted by an international piracy community, Defendants were in fact among the architects and developers of that international piracy community and received billions in profits from their efforts.

5. The underlying irony in this case is that, despite its endemic inducement of the infringement of Plaintiffs' songs, Defendants' parent, CBS, does not hesitate to cast itself as a defender of intellectual property rights when it concerns its own financial interests. For example, Defendants' parent company, CBS, routinely harasses individuals and small websites which post small portions of its own programming with "cease and desist" letters threatening crushing litigation. When that does not work, it does not hesitate to sue. For, example CBS has sued a company owned by one of the Plaintiffs in this case, claiming that the website's mere streaming of a portion of its U.S. news broadcasts has caused "loss of control over the distribution of plaintiff's broadcast signals and copyrighted programming,"

and asking for an order barring the website from streaming the shows. Of course, in that case CBS ignored the relevant legal distinction between that conduct and the conduct alleged herein – namely, that Section 111 of the Copyright Act authorizes "secondary transmissions of copyrighted works embodied in primary transmissions" and so is in no way like Defendants' promotion of file-sharing technology. Still, CBS's hypocrisy could not be clearer. CBS's and its subsidiaries' conduct in this instance goes beyond mere inducement to infringe; CBS's selective ignorance of copyright laws through CNET combined with its readiness to abuse the same laws and its superior market power to put smaller companies out of business for legitimate, protected rebroadcasts of its own programs, constitutes unfair and/or anti-competitive business practices as well. Though it is referenced in this Complaint only to add context and foundation to the claims here, this latter point is the subject of an investigation being conducted by smaller re-broadcasters such as plaintiff Alki David's FilmOn into potential additional actions for anti-competitive claims and/or unfair business practices on the part of CBS and/or its affiliates.

6. Defendants' willingness to talk out of both sides of their mouth with respect to intellectual property rights – at once fiercely defending intellectual property rights when it benefitted them and targetting a laissez faire pro-infringement community when it was more profitable to do so -- is illustrated by the conduct of CNET's co-founder and former CEO, Shelby Bonnie. Bonnie served on CNET's Board of Directors until March 2007 and was an executive and Board member at CNET from 1993 to 2006. As discussed below, during Mr. Bonnie's tenure with CNET, CNET made a fortune distributing millions of copies of Limewire and other file-sharing software designed to infringe, providing how-to guides on using file-sharing software for infringement, thereby targeting *and* growing a community of piracy. In 2005, Mr. Bonnie also began to serve on the Board of Directors for Warner Music Corporation, a position he held until 2010. In 2006, the RIAA, of which Warner Music Corporation is one of the most influential

members, instituted the massive litigation against Limewire that resulted in the 2010 Kimba Woods injunction. During the course of that litigation, Warner Music Corp.'s CEO, Edgar Bronfman Jr., was an outspoken critic of LimeWire and claimed LimeWire caused "devastating" damages to Warner Music Group. Bronfman has been quoted by Bloomberg as stating that he hoped the 2005 Supreme Court ruling against Grokster would see LimeWire shut down voluntarily rather than remain active: "When LimeWire kept operating it frustrated me greatly. It was devastating frankly." Yet, while Bronfman pursued litigation against LimeWire through the RIAA, the co-founder (and for a time still-Board member) Bonnie also served on Warner Music Group's Board. In fact, Warner Music Group recently received a $12 million payment from LimeWire LLC as part of the $105 Settlement negotiated by the RIAA in the LimeWire litigation.

7. As the Courts and private entities such as the RIAA and MPAA have found ways to limit the infringement wrought by P2P systems through extensive and expensive litigation and other security measures, Defendants have continued to promote and distribute the "next wave" of P2P technology designed specifically to provide the newest and most effective way of defeating the efforts to prevent this massive infringement – at all times knowing that the "new" P2P clients and technologies they distributed were being used primarily for the same purposes of continuing and furthering the massive infringement scheme as previous versions. When courts have found specific software publishers or applications that Defendants distributed liable for indirect infringement, Defendants have at best been minimally reactive and have taken the most minimal steps necessary to foster the illusion of compliance with the law. In reality, Defendants know they are aiding and inducing the same old offense, they are just making it harder for the infringer to get caught. For example, after a recent court decision in 2010 holding LimeWire liable for copyright infringement on a virtually unprecedented scale, Defendants stopped distributing LimeWire and <u>some</u> of its more popular sister Gnutella applications

from its website. Defendants, however, continued to promote and distribute extremely popular BitTorrent P2P clients that Defendants knew were, in light of LimeWire's court-ordered demise, the new "next wave" of preferred P2P infringement. Defendants were aware that massive users of LimeWire simply shifted their infringing activities from the LimeWire network to the BitTorrent network. In addition, even after the LimeWire decision, Defendants promoted and sold programs that accessed and used the vast Gnutella network created by LimeWire that survived the court decision.[1]

8. As described more fully below, Defendants' essential role in the massive infringement of Plaintiffs' works renders Defendants liable for that infringement on any of the three doctrines of indirect or secondary liability as articulated and developed in recent precedents concerning P2P technology. Defendants at all times had the ability to control the actions of the direct infringers by refusing to distribute and otherwise promote the software platforms Defendants knew were the engines of the infringers' massive infringement. Defendants at all times also could have ceased their efforts to instruct users as to the means of copyright infringement through this new software, but, in naked pursuit of the dramatic profits they made from that distribution, Defendants chose not to do so. Defendants are also subject to contributory liability, because they had ongoing and specific knowledge of the massive infringement carried out through the P2P software and materially contributed to that infringement by distributing and promoting the software, providing instruction as to its use and relative efficacy for purposes of infringement and ensuring the direct infringers had access to the most

[1] As Defendants were and are well aware, after the litigation concerning Napster and other P2P applications, P2P software developers switched to design strategies that made the networks nearly impossible to disassemble after they were created to ensure that the massive copyright infringement could continue even as Courts found specific P2P applications indirectly liable for infringement.

recent and least detectable infringing technologies. In addition, Defendants induced direct infringement by clearly and purposefully targeting and catering their services to the P2P infringement community. In fact, on information and belief, Defendants specifically encouraged CNET editors to promote and encourage P2P software and, in general, the culture of copyright infringement that evolved in the P2P community. Defendants' promotion of this massive piracy culture has been continuous and long-running – in fact, Defendants publicized and promoted digital piracy even before the advent of modem P2P software and then played a major role in promoting the explosion of piracy caused after Defendants publicized Napster and the rest of the first wave of P2P programs.

9. Defendants have been the main distributor of several of the most prominent P2P software platforms. Defendants promoted these P2P systems in order to directly profit from wide-scale copyright infringement. For example, Internet users downloaded more then *220 million* copies of LimeWire software from Defendants' website, Download.com, prior to its belated removal from Defenants' website after a federal injunction effectively shut LimeWire down. This consisted of 95 percent or more of all copies of LimeWire that were downloaded until LimeWire was shut down by Court Order. Download.com also was and is a major source for other P2P software applications, including Audiogalaxy, KaZaa, Grokster, Morpheus (174 million downloads), Phex, BitComet and FrostWire (32 million downloads). Defendants received massive amounts of revenue from P2P providers pursuant to a "Pay Per Download" program and also from advertising revenues generated by advertisements placed on the download screens for P2P software. Defendants' business model has been so dependent upon P2P and file sharing applications that entire pages of Download.com are designed specifically to list and categorize these software offerings. In fact, Defendants were well aware that these software applications were used overwhelmingly to infringe when they

first partnered with LimeWire and other P2P providers, but ignored this fact in exchange for a steady stream of income.

10. Defendants furthered and enabled the massive P2P piracy scheme by shepherding users from old technologies facing legal trouble to the most recent and hardest to detect P2P technology. For example, after the court order against the early P2P platform Napster, on March 29, 2001, CNET published an article titled "You Don't Need Napster to Keep the Music Playing." The article notes that "music lovers" should be feeling "besieged" because "teams of supervillains" such as the RIAA were "working hard to prevent you from sharing your favorite music online." The article asks whether, after Napster becomes a fee-based service, "downloaders hungry for free music find MP3s outside of the famous feline file-sharing application." CNET's "PowerDownloader" laments that it "may be too late to save Napster" but suggests various P2P alternatives to Napster that "will let you download and share music to your heart's content." PowerDownloader then suggests LimeWire and the Gnutella application Bearshare as viable P2P alternatives to Napster.

11. CNET often attempts to cast itself as merely a "news" outlet that publishes articles concerning technology and consumer electronics. However, particularly with respect to the infringing file-sharing software it distributed and promoted, CNET was most certainly not a neutral "journalist" passively and objectively reporting on new technology. To the contrary, CNET abandoned all plausible claims to any kind of "news" function – which legitimate function might entail, for example, merely reporting on how Bittorrent and LimeWire were being used for infringement by others – and instead chose to target the infringement community, actively distribute and promote the infringing file-sharing software, and profit heavily from doing so. Inducing infringement, not reporting on it, was Defendants' business model. As described further below, Defendants' words and

deeds show a clear purpose to cause and profit from third-party acts of infringement. As the United States Supreme Court held in its groundbreaking *Grokster* opinion:

> Inducement liability goes beyond [encouraging a particular consumer to infringe copyright], and the distribution of a product can itself give rise to liability where evidence shows that the distributor intended and encouraged the product to be used for infringement. In such a case, the culpable act is not merely the encouragement of the infringement but also the distribution of the tool intended for infringing use. 545 US 940.

In this case, Defendants' culpable acts included, among others described in detail below, both the distribution of the infringing tool and the promotion of their infringing uses. This is not the function of legitimate journalism.

12. As in the *Grokster* opinion, here Defendants' unlawful objective is unmistakable and "goes beyond distribution as such and shows a purpose to cause and profit from third-party acts of infringement." Id at 941. As the district court noted on remand in the *Grokster* case, "Plaintiffs need not prove ... specific actions, beyond product distribution, that caused specific acts of infringement. Instead, Plaintiffs need prove only that ... [Defendants] distributed and product with the intent to encourage infringement." 454 F Supp 2d 966, 984 (CD Cal 2006). There is no doubt that there is evidence of infringement on a massive scale here. There is also <u>overwhelming</u> evidence of Defendants unlawful objective and intent to encourage infringement. Through the articles and reviews described in detail below that provided instructional manuals for using P2P software to infringe copyrights, Defendants broadcasted (and continue to broadcast) a message designed to induce others to infringe copyrights. In addition to that direct evidence, there is a mountain of evidence from which an unlawful objective is clearly and readily inferred. Defendants' promotional efforts, advertising efforts, actual advertising and communications expressed (and continue to express) an intent to target the illegal, infringing part of the P2P community. In particular, throughout its history, Defendants have targeted former users of prior, "dead" infringing technologies like Napster and actively promoted the "next wave" of new, as-of-yet not shut down, technologies. As Defendants and the world are well aware, a significant part of the

P2P file-sharing community exists with the sole purpose of finding new ways to infringe after old technologies are ruled by courts to be illegal and shut down. This community was not only encouraged and aided in its purpose through Defendants' distribution network, it became among Defendants' most loyal (and most profitable) group of customers. Defendants' intent to target this infringing group is at least implicit, if not explicit, in the reviews and "file-sharing smackdowns" published by CNET, and on information and belief was an express goal clearly articulated in internal communications and advertising designs. Defendants never took any affirmative steps to diminish the use of P2P software for infringement (aside from the self-serving action of ceasing to distribute certain technologies after they were held infringing by a court and the posting of meaningless and ineffectual messages). In addition, Defendants' business model depended on the high-volume distribution of file-sharing software that was overwhelmingly used for infringement. Defendants furthermore provided instructions on how to use the software it distributed for infringing purposes, such as how to locate and download copyrighted material. The software products distributed by defendant were developed and designed to ensure their use for infringing purposes. Defendant was aware of these design goals and indeed, touted and promoted features of the programs designed for infringement. At times under the guise of "editorial comment," and the additional promotion of certain technologies, Defendants also took active steps to protest and frustrate the enforcement efforts of copyright holders.

13. Nothing about Defendants' promotion of P2P and digital piracy is accidental or incidental. Defendants made conscious business decisions to find ways to profit from the massive copyright infringement taking place over P2P networks, and indeed did their best to popularize and expand P2P networks in order to increase their profits. Defendants' activities vis a vie P2P software is especially egregious, given that CBS' Defendants own the rights to a massive catalog of television programming and other intellectual property that has been and continues

to be persistently infringed over the same P2P networks it helped assemble and grow through CNET and Download.com. Defendants made a cynical decision to attempt to recapture whatever profits lost through the infringement arising from P2P networks by profiting from the popularity of those networks through Download.com and CNET P2P revenues. By helping construct, expand and preserve the P2P networks, Defendants did much more than "recoup" their (self-inflicted) losses from digital piracy, but rather directly and massively profited from the infringement of all the artists whose work was illegally shared on P2P networks. Defendants never offered to share any of the income made from their promotion of infringement with Plaintiffs or anyone other copyright owners whose work was persistently infringed by P2P systems distributed and promoted by Defendants.

14. Plaintiffs are artists who work in the fields of music and film. They wrote, produced, distributed, sold and/or licensed songs, movies and other copyrighted works that have been infringed by Defendants, including without limitation through Defendants' distribution and promotion of P2P software that has been used to copy and distribute Plaintiffs' works. Defendants must compensate Plaintiffs for the damages they caused and be ordered to cease future infringement.

## JURISDICTION AND VENUE

15. The Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1338(a).

16. The Court has personal jurisdiction over Defendants because each resides and/or may be found in California, does systematic and continuous business in California, and has performed acts directed at and causing harm in California which give rise to this Complaint.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c) and 28 U.S.C. § 1400(a).

Case 2:11-cv-09437-DSF-JC Document 31 Filed 07/25/12 Page 14 of 49 Page ID #:428

## PARTIES

### Plaintiffs

18. As set forth in Plaintiffs' November 14, 2011 and July 2, 2012 Notices AO 121 Report on the Filing or Determination of an Action or Appeal Regarding Copyright filed in this action, Plaintiffs are the legal and beneficial owners of copyrighted works that have been infringed by Defendants.

19. Plaintiff Alkiviades David is a citizen of the United Kingdom and resident of the State of California.

20. On information and belief, Plaintiff Sugar Hill Music is or was at relevant times a corporation organized under the laws of the State of New York with offices in New York and California.

21. Plaintiff Solid Productions is a resident of the State of California with its principal place in Los Angeles, California.

22. Plaintiff Steven Batiz, professionally known as DJ CMS, is a citizen and resident of the State of New York.

23. Plaintiff Tony Bell, professionally known as TC Izlam, is a citizen and resident of the State of California.

24. Plaintiff Detron Bendross is a citizen and resident of the State of Florida.

25. Plaintiff Derrick Braxton is a citizen and resident of the State of New York.

26. Plaintiff Elijah Brown, professionally known as DJ Chipman, is a citizen and resident of the State of Florida.

27. Plaintiff Horace Brown is a citizen and resident of the State of New York.

28. Plaintiff Oscar Brown is a citizen and resident of the State of New York.

29. Plaintiff Luther Campbell is a citizen and resident of the State of Florida.

30. Plaintiff Jonathan Carlton, professionally known as Lord Piff, is a citizen and resident of the State of New York.

31. Plaintiffs Attrell and Jarrett Cordes, professionally know as PM Dawn, are citizens and residents of New Jersey.

32. Plaintiff Solomon Conner is a member of the hip hop group H-Town and is a citizen and resident of the State of Texas.

33. Plaintiff Dayquan Davis, professionally known as Droptop Slim, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

34. Plaintiff Douglas Davis, professionally known as Doug E Fresh, is a citizen and resident of the State of New York.

35. Plaintiff Kareem Davis, professionally known as Manson Batez, is a citizen and resident of the State of New York.

36. Plaintiff Solamin Davis, professionally known as Trips, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

37. Plaintiff Emmanuel Ramone DeAnda is a member of the R&B group Pretty Ricky and a citizen and resident of the State of Florida.

38. Plaintiff Drew Carter, professionally known as Grandmaster Dee, is a citizen and resident of the State of New York.

39. Plaintiff Nacolbie Edwards, professionally known as GLAM.I.ROCK, is a citizen and resident of the State of California.

40. Plaintiff Vancito Edwards, professionally known as Dr. Luv, is a citizen and resident of the State of New York.

41. Plaintiff John Fletcher, professionally known as Ecstasy, is a citizen and resident of the State of New York.

42. Plaintiff Willie Finch, professionally known as Chill Will, is a citizen and resident of the State of North Carolina.

43. Plaintiff Isaac Freeman, Jr., professionally known as Fat Man Scoop, is a citizen and resident of the State of New York.

44. Plaintiff Darryl Gibson, professionally known as Positive K, is a citizen and resident of the State of South Carolina.

45. Plaintiff Mitchell Graham, professionally known as Peso 131, is a citizen and resident of New York.

46. Plaintiff Jalil Hutchins is a member of the hip hop group Whodini and is a citizen and resident of the State of Georgia.

47. Plaintiff Emanon Johnson, professionally known as Emanon, is a citizen and resident of the State of New York.

48. Plaintiff Oran "Juice" Jones is a citizen and resident of the State of Texas.

49. Plaintiff Tarsha Jones, professionally known as Miss Jones, is a citizen and resident of the State of New Jersey.

50. Plaintiff Nailah Lamees, professionally known as Nicole Lyles, is a citizen and resident of the State of California

51. Plaintiff Dana McCleese, professionally known as Dana Dane, is a citizen and resident of the State of New York.

52. Plaintiff Barry Moody, professionally known as Barry Bee, is a citizen and resident of the State of New York.

53. Plaintiff Jeff Redd is a citizen and resident of the State of New York.

54. Plaintiff Quame Riley, professionally known as Lil' Vicious, is a citizen and resident of the State of New York.

55. Plaintiff Anthony Robinson, professionally known as Pretty Tone Capone, is a citizen and resident of the State of New York.

56. Plaintiff Nicholas Sanchez, professionally known as Nick Gleamz, is a member of the hip hop group Square Off and is a citizen and resident of the State of New York.

57. Plaintiff Jonathan Shinhoster, professionally known as "J-Shin," is a citizen and resident of the State of Florida.

58. Plaintiff Diamond Smith, professionally known as "Baby Blue," is a member of the R&B group Pretty Ricky and a citizen and resident of the State of Florida.

59. Plaintiff Reminisce Smith, professionally known as Remy Ma, is a citizen and resident of the State New York.

60. Plaintiff Chris Stokes is a citizen and resident of the State of California.

61. Plaintiff Irene Stokes, professionally known as Mama, is a citizen and resident of the State of California.

62. Plaintiff Juanita Stokes is a citizen and resident of the State of California

63. On information and belief, William Tennyson is deceased and the Tennyson Estate is located in the State of Georgia.

64. Plaintiff Carl Thomas is a citizen and resident of the State of New York

65. Plaintiff Jeff Thomkins, professionally known as JT Money, is a citizen and resident of the State of Florida.

66. Plaintiff Rondell Turner, professionally known as Ron Brownz, is a citizen and resident of the State of New Jersey.

67. Plaintiff Ricky Walters, professionally known as Slick Rick, is a citizen and resident of the State of New York.

68.

69. Plaintiff Yolanda Whitaker, professionally known as Yo Yo, is a citizen and resident of the State of California.

70. Plaintiff Joseph Williams, professionally known as Just-Ice, is a citizen and resident of the State of New York.

71. Plaintiff Case Woodward, professionally known as Case, is a citizen and resident of the State of New York.

**Defendants**

72. Defendant CBS Interactive, Inc. is a Delaware corporation with its principal place of business at 235 Second Street, San Francisco, California 94105.

73. Defendant CNET Networks, Inc. is a Delaware corporation and a fully-owned subsidiary of CBS Interactive. CNET's principal place of business is 235 Second Street, San Francisco, California 94105.

74. Each Defendant acted in concert with each other and as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of copyright infringement alleged by Plaintiffs.

## FACTS

**P2P File Sharing Systems**

75. P2P file sharing networks are systems which allow users to connect to one another and transfer files located on each other's hard drives. In order to participate in these networks, each user must download and install on the user's computer a software program—commonly known as a "client"—that facilitates the file transfers. Examples of P2P clients include Napster, Aimster, KaZaa, Morpheus, Grokster and LimeWire.

76. P2P clients provide an interface for users to search and obtain copies of files located on their respective file sharing networks. Depending on which P2P client is employed, users can filter results by type of file (*e.g.*, audio or video), file name, artist and other identifying information. Many P2P clients, including those found liable in some of the most infamous copyright infringement cases of the past decade, are (or were) specifically designed to locate music files by name of the song

or artist and are (or were) targeted at audiences well-known for their desire to infringe copyrights.

77. File sharing networks depend on users to actually "share" their files. P2P clients are specifically designed to facilitate this process. In most cases, the client automatically searches a user's computer for "shareable" files, typically audio and video files. Clients also often penalize users with slower download speeds or other decreased functionality if they do not share "enough" files with other users on the network. The purpose of this functionality is clear: users must share files if they wish to enjoy the full benefits of the P2P network, and the client will make all files available for sharing unless the user specifically opts out of this option.

78. As Napster's one-time success proved, there is a large demographic of internet users who seek to obtain free copies of their favorite music regardless of copyrights. The sheer size of this group demonstrated that P2P clients could generate massive revenues if they designed a user experience that expressly catered to copyright infringement, thereby drawing users to their advertisements and pay services. When Napster was shut down due to court-ordered injunction, numerous P2P clients stepped in to fill the void, a fact well known and highlighted by Defendants to their users. These P2P clients, including but not limited to Aimster, Grokster, KaZaa, Morpheus and LimeWire, actively marketed themselves to Napster's former customers, a task that Defendants aided at every step. Now that LimeWire has been shut down, another generation of P2P clients based on the BitTorrent technology, including BitComet, BitTorrent and uTorrent, have stepped in to fill the void left by LimeWire – again, a fact well known to Defendants and its users. Here again, the BitTorrent clients are actively marketing themselves to the same infringement community that used LimeWire and other Gnutella clients and here again, these clients have received Defendants' aid at every step.

**LimeWire and the Gnutella Network**

79. To use just the most recent P2P client found liable for copyright infringement, the LimeWire began providing its P2P network in or around August 2000. In order to attract users to their service, LimeWire advertised on other P2P networks and made statements comparing LimeWire's user experience to other file sharing clients. Above and beyond mere advertisements, LimeWire specifically designed its client to be highly efficient at finding and downloading copies of copyrighted sound recordings.

80. There were two forms of the LimeWire software (updated in several versions over the years, each of which was made available on Download.com). The first was "LimeWire Basic," a free version of the P2P client. The second was "LimeWire PRO," which sold for approximately $19 and ostensibly provided purchasers with faster downloads. Both forms of LimeWire were compatible with each other, and users could share files with each other no matter which form of LimeWire they possessed.

81. When a user first installed LimeWire, the program automatically searched their hard drive for media files and made them available for other users to download via the P2P network. In order to ensure that the maximum number of files were "shareable" at any given time, LimeWire was designed to automatically open when a user started their computer. This meant that turning on one's computer automatically logged the user into the P2P network and made the selection of files across that network as vast as possible.

82. Another method that LimeWire employed to ensure the maximum amount of available files—thereby increasing LimeWire's reputation as a desirable copyright infringement tool—was to maximize the number of available shared files by automatically saving them in a "shared" folder on the user's hard drive. If a user turned off this feature or opted to have their files saved in a non-shared folder, they were labeled a "freeloader" by the LimeWire software and ran the risk of being refused future downloads by other users who could choose to block sharing with

freeloaders. LimeWire actively discouraged freeloaders on its website, stating, for example, "If you're not sharing enough files, users with certain connection preferences won't let you connect to them for downloading. For this reason, we recommend all LimeWire users share generously with one another." In other words, share files or you will not be able to infringe as easily.

83. LimeWire also designed itsinterface to maximize users' ability to quickly locate and obtain copies of copyrighted materials. Users could search by music genre, song name, artist name or album name. When searches yielded multiple sources for the same copyrighted materials, LimeWire displayed the connection speed of each source (*i.e.*, how fast that user's internet connection was) so that the searching user could choose the fastest download option. Using these features in combination, LimeWire users were able to locate and download copyrighted sound recordings in the shortest amount of time possible.

84. On May 25, 2010, in the United States District Court for the Southern District of New York, Judge Kimba Wood found LimeWire liable for massive copyright infringement. Later that same year, Judge Wood permanently enjoined LimeWire from all further infringement activities. In doing so, the Court found that, among other things:

- LimeWire "intentionally encouraged direct infringement" by its users;
- the LimeWire software application was used "overwhelmingly for infringement" and allowed for infringement on a "massive scale";
- LimeWire and its principals knew about "the substantial infringement being committed" by LimeWire users;
- LimeWire marketed itself to Napster users, who were known copyright infringers, and promoted LimeWire's infringing capabilities to those users;
- LimeWire employed a business model that depended on mass infringement, relying on "massive user population generated by" the LimeWire software's "infringement-enabling features"; and

- LimeWire "actively assisted infringing users" in their infringement efforts and tested the LimeWire client software by searching for copyrighted material.

85. It was only *after* the order issued by judge Kimba Wood in *Arista Records LLC v. Lime Group LLC*, 2010 WL 4256219 (S.D.N.Y.)(stipulated injunction) – which required LimeWire to disable the "searching, downloading, uploading, file trading … and/or all functionality" of the software and ordered LimeWire to do its best to disable copies of the software already on the market – that Defendants removed LimeWire and certain other popular Gnutella applications from their websites. However, even then, Defendants *at the very least* were grossly negligent in their efforts to cleanse their web sites of Gnutella-based applications, and vestigial references to Gnutella-based applications and even references to LimeWire-based technology remain on Download.com. Ironically, on October 26, 2010, CNET reported on the injunction against LimeWire in an article by Greg Sandoval titled "Judge slaps Lime Wire with permanent injunction." A commenter on that article noted "Limewire is So 2001. All the real Pirates moved on to bt [Bittorrent] or slsk [soulseek, another P2P technology]."

86. Of the many P2P clients that remain in existence, most include features nearly identical or identical to those found in LimeWire. Phex, as just one example, is an open source, multiplatform, spyware free Gnutella client. The publisher's description available on Download.com emphasizes its suitability for file-sharing activities: "You can search for, download, and share all types of file formats … it is compatible with LimeWire, BearShare, Morpheus and all other P2P Gnutella clients." Phex users continue to trade copyrighted material, including works belonging to Plaintiffs, over the Gnutella network constructed and promoted by Defendants and others.

**BitComet and the BitTorrent Network(s)**

99. BitTorrent is another kind of P2P file-sharing protocol developed after

the Gnutella protocol. As with Gnutella and P2P protocols, BitTorrent users download content directly from the computer of other users and not directly from a centralized server. Unlike other earlier protocols, however, BitTorrent introduced a novel method of downloading content. BitTorrent works by downloading discrete pieces or parts of a digital file from a number of other computers simultaneously. That is, the file being shared is not downloaded from a central server or even a specific peer node as in the Gnutella network. Rather, BitTorrent allows users to join a "swarm" of hosts to download and upload from each other at the same time. A user who wants to upload a file first creates a small "torrent" file that describes the content they wish to share and then distributes that torrent by conventional means such as email or making it available for download from a website. Then, the user makes the content-containing file itself available by acting as a "seed." Those who obtain the torrent descriptor file can then give it to their BitTorrent nodes which, acting as peers, download it by connecting to the seed and/or other peers. The file being distributed is divided into segments called pieces. As each peer receives a new piece of the ultimate file it becomes a potential source of that piece to other peers, thereby freeing the original seed of the need to transfer a copy of the file to every user who wants a copy. By this means, BitTorrent spreads the task of distributing a digital file among all users who want that file. Using BitTorrent, it is possible for the original seed to send out only one single copy of the file itself but thereby enable an unlimited number of distributions to other users. BitTorrent technology relies on a number of mechanisms to accomplish the download of a given file, including: 1) a software application that users use to download the content called a client; 2) "torrent websites" which allow users to search for and then download the torrents they desire; and 3) servers, known as "trackers," which manage the download process. In a BitTorrent system, the downloading of content occurs from multiple sources at the same time, thereby allowing for larger downloads to be completed more efficiently. BitTorrent clients and trackers work in

tandem to allow users to visit a torrent site, download digital files, keep track of those downloaded files, as well as discover additional persons from which to download the file.

100. BitTorrent has become an extremely popular means of transferring files over the Internet. It is now one of the most common protocols for transferring large files and numerous BitTorrent clients are available for a variety of computing platforms. By some estimates, approximately 50% of all Internet traffic is BitTorrent activity. BitTorrent has also been widely adopted among digital pirates and has become one of the preferred means of digital piracy, particularly in the wake of the recent court decision shutting down LimeWire and impacting the Gnutella network. A simple Google search of "torrent music" yields a half billion results and page after page of websites providing copyrighted music and movies via torrent. Features of the BitTorrent technology readily lend itself to illegal file-sharing. For example, the sharing of numerous discrete portions of files makes it harder for ISPs to track and block file-sharing activity. Many BitTorrent clients are specifically designed to locate music files, disguise the download of copyrighted material and were targeted at notorious copyright-infringing audiences.

101. Through its website Download.com, Defendants have been one of the premier distributors of BitTorrent software. The programs uTorrent, Frostwire and BitTorrent have collectively been downloaded approximately a hundred million times from Download.com. The PC-version of uTorrent was downloaded over 90,000 times in the first week of October 2011. Defendants have actively promoted the download of BitTorrent clients. For example, at the bottom of the Download.com web-page containing a link to download uTorrent , CNET provides an section called "MORE POPULAR P2P & FILE-SHARING SOFTWARE DOWNLOADS." The five programs listed in this section on October 5, 2011 were all BitTorrent protocols: uTorrent, BitTorrent, BitComet, Frostwire and Movie Torrent. The section provides links to the download page for each application, as

well as a link that invites users to "See all P2P & File-Sharing Software downloads." BitComet's website displayed and still displays a "Download Now" button directly linking to Download.com. Even Defendants removed certain popular Gnutella clients from its website in the aftermath of the court decision concerning LimeWire, it has continued to provide nearly unrestricted access to the BitTorrent applications that were designed for the same infringing purposes as the Gnutella clients and continue the massive program of piracy carried out by those applications.

102. At all times, Defendants were aware that BitTorrent clients were designed for and marketed toward the illegal downloading of copyrighted music. Defendants have known about BitTorrent's use for massive infringement since the very inception of the technology. On January 5, 2005, CNET News staff writer John Borland penned an article entitled "A New Hope for BitTorrent?" The article concerns changes to the BitTorrent protocol specifically enacted to respond to litigation initiated by copyright-owners. "Just weeks after legal attacks crippled the popular BitTorrent file-swapping community, an underground programmer from its ranks has stepped forward to announce new software designed to withstand future onslaughts." The article remarked on the "shifting loyalties … now familiar phenomenon in the peer-to-peer world, as lawsuits from the record industry or Hollywood studios have repeatedly driven users away from once-popular [peer to peer networks] … in each case, new services have eagerly risen to take their place, despite legal risks" (emphasis added). The litigation initiated by copyright holders against BitTorrent "raise[d] the potential of mass migration for millions of people around the world who have grown accustomed to using the technology to download movies, TV shows, music and software." At that time, BitTorrent was "uniquely vulnerable" to legal attacks from copyright owners, because it has required that links to torrents be posted on websites. The article notes that BitTorrent responded to the threat of litigation by transforming BitTorrent "into a decentralized, searchable

network similar to KaZaa or eDonkey." Defendants knew, then, that BitTorrent's very network architecture reflected a conscious decision to shield copyright infringement from legal process. Defendants were also aware that, after BitTorrent's architecture re-design and decentralization, the network remained a massive engine of software infringement. In 2008, the publisher's description of BitComet available on CNET.com stated that "BitComet's software client allows you to quickly download high-quality digital content such as video, music & games … it leverages a community of over 70 million users to securely deliver files to your PC faster than anything else out there." A June 18, 2007 news article available on CNET, stated "while the technology remains a really great way to take the burden off servers and put it onto the user, it <u>remains a hotbed for piracy of music, movies, software, and other intellectual property</u>" (emphasis added).

103. BitComet and uTorrent incorporate a number of features designed to facilitate and enable copyright infringement:

- BitComet recently introduced a VIP feature that adds support for "Anonymous Downloads." The service expands BitComet's paid subscription service which provides for accelerated downloading of copyrighted content. In April of this year, BitComet expanded the service to include an option to download all torrents anonymously, in order to facilitate the downloading of copyrighted material. The "anonymous" downloads are handled by BitComet's own servers exclusively, hiding the IP address of the user. A "BitComet Spokesman" explained the VIP service to the Website Torrentfreak (the self proclaimed website where "breaking news, BitTorrent and copyright collide"): "If VIP members enable anonymous downloads our remote servers will initiate all peer and tracker communications and download the data on behalf of the VIP member, so the member's actual IP address isn't shared with any of the peers or trackers."

BitComet provides VIP plans for $4.99 for a 10 GB plan and a 100 GB plan for $19.99.

- uTorrent contains a feature that allows users to enable a "Protocol Encryption" that allows users to circumvent restrictions designed in part to prevent piracy. Some Internet Service Providers ("ISPs") actively interfere with P2P activities by reducing their bandwidth requirements. This causes uTorrent and other file sharing download speeds to become slow. To avoid this, uTorrent and other clients developed an encryption protocol to prevent ISPs from identifying BitTorrent traffic.
- The Publisher's Description of BitComet available on Download.com notes that BitComet incorporates an "IP Filtering" function. IP filtering is a software feature that protects copyright infringers by blocking the IP addresses of entities such as the RIAA and MPAA that conduct investigations of P2P networks looking for users sharing copyrighted files without permission. IP Filtering software helps pirates evade detection by maintaining a list of the IP addresses used to conduct these investigations while still allowing pirates to communicate and exchange files with "safe" IP addresses.
- The BitComet website contains a section listing popular torrent websites that are ranked by the number of votes they have received from BitComet users. Each torrent website contains a short description. These descriptions unabashedly advertise the availability of copyrighted material. The website "I Love Torrents" is described as "top quality torrents, one of the 1st to get all the very latest movie and audio torrents." "GunNer TorRemTs" provides BitComet users with "Anything u want, anything u need! Just visit us and we promiss you

won't be disappointed." Many of the torrent sites are located in foreign jurisdictions notorious as digital piracy havens.

- Like LimeWire, uTorrent employs various methods to ensure the maxiumum amount of available files (and thereby increasing uTorrent's reputation as a desirable copyright infringement tool) by encouraging users to "seed" files. According to uTorrent's website, "Seeding is where you leave your BitTorrent client open after you've finished your download to help distribute it (you distribute the file *while* downloading, but it's even more helpful if you continue to distribute the full file even after you have finished downloading.) Chances are that most of the data you got was from seeds, so help give back to the community! It doesn't require much – uTorrent will continue seeding until the torrent is removed … Proper practice is to seed until the ratio of upload:download is at least 1:1." After downloading a file, uTorrent automatically makes the user a "seed" for other downloads. On information and belief, both uTorrent and BitComet employ various measures to discourage users from "leeching" (downloading files without making them available for upload).

104. Defendants continue to provide numerous BitTorrent clients for download and remains an active advocate of the primary uses of the software for infringement. An October 2, 2011 user review of Version 3.0 of uTorrent posted on Download.com listed as a "con" of the program that "Legal issues for uploading copy-right protected material (no way around it if you download it)." In fact, CNET provides a link to a third-party website to download a BitTorrent client named "Offsystem Anonymous Torrent Download." Next to the Download button, Download.com displays a screenshot from the application showing the P2P

application in operation. In the screenshot, a number of copyrighted music files are readily visible, including Black Sabbath's "The Wizard," "Lay All Your Love on Me" by Erasure, "I'll be a long time" by the Offspring and even the software program Microsoft Office 2007. CNET's sister site ZDNet.com describes the program as a "next generation" P2P platform even more undetectable than existing BitTorrent technology: "The idea of the Offsystem is to be [sic] online storage solution all over the world by a constantly growing peer-to-peer network: Upload a file into the Offsystem in Asia, turn off the computer and download it from the Offsystem network with another machine in America a few weeks later. The file will still be available in the Offsystem. That is the library of the future for any kind of media and allows anonymous downloading of files. No tracking of the IP is possible, as only blocks are shared, not files." Offsystem promises a new kind of P2P system that guarantees anonymity to its users.

**Defendants' Participation In And Profiteering From Infringement**

105. Download.com, found at http://download.cnet.com, is one of Defendants' stable of websites. As the name implies, Download.com offers programs and applications for download. In addition to this service, the site also provides reviews written by CNET editors, allows program-specific comments from users, and is organized in such a way as to maximize a user's ability to find and obtain copies of the program or application they desire.

106. Software publishers must be approved to have their software listed on Download.com. In order to do so, they first go through an application process on Upload.com, found at https://upload.cnet.com. On this site, Defendants advertise that software publishers should "[p]romote your software on the *largest distribution network in the world*." As they further state, "Upload.com is the central destination to submit and promote your software on CNET Download.com and other sites in our growing distribution network."

107. After a software publisher creates a developer account, which requires Download.com staff approval, they may submit their program for review. In this application, the publisher categorizes the program and fills out a detailed explanation of its features and purpose. After reviewing this application, Download.com's staff decides whether to permit the program on Download.com and where to place it on the website.

108. As developers release new versions of their software, they must also update their application to Download.com. Included in this update are explanations of new features, new functionality, improvements in user interface and experience, and any other difference between the new and previous version. As with the initial application, the Download.com staff reviews and decides whether to allow the listing.

109. At each step in the initial application and subsequent update process, Download.com possessed the ability to refuse to list the publisher's software, thereby conferring upon Download.com the ability to supervise and control any infringing activity taking place on its website. If Download.com staff did not believe the software should be accepted, they could either outright refuse to list it or mandate changes to the program itself. At no point was Download.com obligated to list programs submitted for approval to Upload.com. Further, Download.com was within its full rights to *remove* listings at its discretion. Defendants also could have simply stopped reviewing the software being used to carry out large-scale infringement in ways that informed users of the best and least detectable ways of downloading copyrighted material, deleted user comments or reviews that also highlighted infringing uses of software and declined to publish materials that encouraged the "wild west" mentality of the pirate community. The only thing preventing Download.com from publishing and disseminating information that enabled copyright infringement was Defendants' own policy of promoting and profiting from such infringement.

110. Defendants generate revenue from Download.com in several ways. First, software publishers have the option to pay for a "Basic" or "Premium" listing package on Upload.com. Although there is also a "Free" option, the former two types of package offer increased benefits for a monthly subscription fee.[2] Second, companies may advertise directly with Download.com and seek to place their ads on popular download listings. Third, Defendants advertise their other websites on Download.com, driving traffic and revenue to those sites. Fourth, Defendants offer a program called Pay-Per-Download ("PPD"), which they push heavily on Upload.com and which offers several unique options.

111. PPD is described as a "performance-based program that allows you to increase downloads by up to 150 percent, while maintaining control of your costs." Participants in the program obtain a "top-five 'sponsored' listing" for their product in their respective Download.com category, out-of-category promotional rotation on Download.com pages, including on "post-download pages and other placements in [Defendants'] network," and 10 additional keywords to enable Download.com users to find the publisher's program. Participants also have the option to pay only for initiated downloads from unique users and the ability to choose "the bid amount and monthly spending cap for your campaign."

112. PPD is designed to offer adaptable advertising options for software publishers and generate strong cash flow for Defendants. On information and belief, several P2P client publishers, including LimeWire , used and use the PPD program and generated substantial revenues for Defendants. In 2009 alone, Juniper Research estimated that Defendants generated $10 billion in revenues from the PPD program. At the time, LimeWire was and had been Download.com's top download for years.

---

[2] In the past, Defendants also offered different listing packages, including "Silver" and "Platinum" packages. These packages offered increased benefits akin to their current iterations, the Basic and Premium Upload.com accounts.

Case 2:11-cv-09437-DSF-JC Document 31 Filed 07/25/12 Page 32 of 49 Page ID #:446

Several other P2P clients were variously in Download.com's "Top" downloads in the same period.

113. Defendants also derived substantial revenues from advertisements of which they were aware on Download.com and other CBS Interactive websites that urged users to infringe copyrights by downloading P2P clients from Download.com. In May 2011, for example, users who searched for LimeWire, FrostWire, KaZaa, LuckyWire, and other P2P clients on Download.com found advertisements saying "Download Music for Free," "Free Music Download," and "Download Music Free," "100% Free Music Downloads," and "Download Free MP3s." Substantively similar advertisements were available and prevalent on Download.com and other CBS Interactive websites from at least 2000 through the present, and they generated substantial revenues for Defendants from users who were seeking copyright infringement tools.

114. At all relevant times, Defendants possessed the right and ability to prevent these advertisements and/or require that they not urge users to infringe copyrights. As CBS Interactive states in its "Advertiser Acceptance Policy," "CBS Interactive reserves the right to: (a) refuse any advertising/advertisers; ... (c) take down ads it deems inappropriate; and (d) make changes or additions to this policy." It further states that "Final and ongoing approval of all creative material [*i.e.*, advertisements] is at the sole discretion of CBS Interactive." Despite this control and review, however, Defendants never opted to ban advertisements calling for infringement and, instead, supported these ads because they drew in substantial revenue. At all times relevant to this dispute, Defendants were aware that the ads on Download.com and its affiliate websites promoted copyright infringement via LimeWire, BitTorrent and other P2P clients.

115. Additionally, due to P2P clients' popularity, publishers of other types of software advertised heavily on P2P download screens, thus generating additional revenue streams for Defendants due to P2P client listings on Download.com.

Case 2:11-cv-09437-DSF-JC Document 31 Filed 07/25/12 Page 33 of 49 Page ID #:447

116. Download.com hosted copies of LimeWire for download on its servers. It also has variously hosted other such notorious infringers as Napster, Morpheus, KaZaa, BearShare, BitTorrent and uTorrent. Today, even after the United States District Court's recent infringement findings and permanent injunction against LimeWire, Download.com *still* hosts and promotes download links for P2P clients it knows are meant for copyright infringement. Upon information and belief, Defendants have generated and continue to generate substantial fees from the P2P client publishers themselves and advertisers who wish to have their programs listed on P2P client download screens. Defendants also generate revenues by cross-promoting their websites on P2P client download screens.

117. Because the Defendants own the "largest [download] distribution network in the world," they were particularly valuable partners in the dissemination, promotion, and popularity of the biggest P2P copy infringement tools from the past decade. LimeWire, which was one of Download.com's top downloaded programs for the past 10 years, owed its success to the distribution and promotion it received through Download.com. Upon information and belief, approximately 95 percent of LimeWire downloads occurred via Download.com. Download.com has provided BitComet for download since November 10, 2009. As of October 24, 2011, BitComet was listed as the third most popular "P2P and File-Sharing Software downloads" with 39,298 downloads – trailing only uTorrent and BitTorrent in terms of popularity. It seems that, in the wake of LimeWire's court-ordered demise, Defendants are determined to ensure that the bit torrent family of programs become the latest go-to programs of choice for copyright infringement.

118. In fact, LimeWire's own website displayed a "Download Now" button from CNET that redirected users *to* Download.com when they attempted to download the client. Other infamous P2P client publishers like BitComet include(d) similar "Download Now" buttons that redirected users from their home websites to Download.com. As Defendants explained in advertisements for the "CNET Button

Program" (as it was called), this created a useful symbiotic relationship between the P2P publishers and CNET:

> [T]he [Download Now] button will allow visitors to download your program quickly and easily and increase your exposure to users on CNET Networks. Users frequently zero in on and download software found on CNET Download.com's Most Popular lists. By placing Download Now buttons on your site that direct users to your product details page on CNET Download.com, you will increase the number of people who click the Download Now button on the product details page. This, in turn, will increase your count on our Most Popular list. Once your software appears on these lists, more users will see your title and download it. And, in effect, the more traffic you send to CNET, the more likely you are to increase your visibility on these valuable pages.

119. Due at least in part to the CNET Button Program, LimeWire and other P2P clients specifically designed and promoted for copyright infringement increased their count on Download.com's "Most Popular" list, thereby further increasing their exposure to Defendants' users. With Defendants' help—including measures discussed below and throughout this Complaint—the P2P clients' success fed on itself and bolstered LimeWire, BitComet and other P2P clients' popularity for years. The P2P clients' success, in turn, benefited Defendants tremendously in terms of revenues, exposure, and opportunities to cross-promote other CBS Interactive websites.

120. At all relevant times, Defendants not only knew that LimeWire, BitComet and other P2P clients were meant and designed for copyright infringement, they also worked with the publishers of these programs to maximize infringement. For each version of LimeWire, for example, Download.com staff corresponded with the LimeWire representatives regarding the features in the client program. These features demonstrated that LimeWire was explicitly designed for

copyright infringement. For example, LimeWire (a) included search capabilities that focused on music title, artist, music genre, and other identifying factors of copyrighted sound recordings; (b) provided a "preview" function for the audio player so users could confirm that audio files they wished to download were the actual files they were searching for; (c) punished users who did not share enough files; and (d) in later versions, included a copyright filter but set the default upon installation to "off." Nevertheless, Download.com did not refuse to list LimeWire on its site and did not require that LimeWire include filters or other protections against copyright infringement. Other P2P clients underwent a similarly-streamlined approval process for their infringement software.

121. Although the Defendants' distribution was critical to the infringing P2P systems' success, that was not the extent of their involvement. Defendants also actively promoted the P2P clients on Download.com, explained how users could infringe copyrights to the greatest degree possible, and specifically demonstrated the P2P clients' infringing purpose. Defendants took all of these steps with the intent to encourage and promote copyright infringement.

122. One way that Defendants promoted copyright infringing P2Ps was to write "reviews" of the program and apply a rating on a five star scale. These reviews discussed the program's functionality, features, strengths, and weaknesses. In many instances, they also discussed the purpose of the program and advertised to user demographics already known for copyright infringement that the programs were meant to serve as replacements for other copyright infringement tools. LimeWire and BitComet similarly posted self-serving and targeted explanations of their programs on Download.com in order to promote their product.

123. For example, the Defendants posted a "CNET Editors' Review" on LimeWire on February 12, 2009. CNET editor Seth Rosenblatt noted from the start that LimeWire was a "post-Napster clone" that had evolved into a "leading role as the quintessential Gnutella [protocol] client." He also noted that "LimeWire is the

highest-profile P2P application." At the time Defendants posted this review, they knew that LimeWire was embroiled in a lawsuit accusing it of massive copyright infringement, that Napster users were largely interested in copyright infringement, and that several other P2P clients that Download.com hosted over the years and promoted had already been shut down for their own infringement. Nevertheless, the Defendants did not issue a warning that users should refrain from using LimeWire to infringe copyrights. Instead, they pointed out that it was a useful Napster replacement and gave it four-and-a-half stars out of five.

124. Similarly, although Defendants now include a "CNET Editors' note" above its "CNET Editors' review" of BitComet that provides a lukewarm statement that "CBS Interactive does not encourage or condone the illegal duplication or distribution of copyrighted content." Defendants are clearly talking out of both sides of their mouth, as the CNET editors review essentially does the opposite of what the editors' note expressly says CNET does not do, i.e. encourage and condones the illegal duplication of copyrighted material. In its review of BitComet, the CNET editors again highlight features of the program obviously designed to enable infringement, such as "including [BitComet's] links to torrent-aggregating Web sites." Again, as discussed above, here "torrent aggregating websites" is really a euphemism for "websites notorious for allowing the illegal downloading of copyrighted material" – BitComet links users directly to notorious hubs of illegal downloading activity like the Pirate Bay. CNET awarded the program three and half stars (a "very good") and stated "Overall, we think BitComet is worth trying and could become a major torrent app in the future."

125. Download.com users who commented on LimeWire demonstrated that they understood that Defendants were encouraging them to commit infringement. As one user stated, LimeWire's main "Pro" was "free music all day long." Another simply stated that it was "music for free." Another was more detailed, stating "Huge peer base - you can literally find anything you could imagine. No song is

impossible." Similar user comments exhibiting the same understanding were posted in response to the many iterations and versions of LimeWire that Download.com hosted for the past decade. Download.com users who commented on BitComet also demonstrated the same understanding. For example, on July 19, 2011 a user said a "Pro" of BitComet was: "Since I mostly download music, I find everything quick and easy to find and download either full albums or singles with no problem ... I always recommend [BitComet] to everyone who wants to get music or anything that requires downloading." This same user titled his review of BitComet "Easy for me to use and download content."

126. Furthermore, as part of their review process, the Defendants tested the software that they reviewed and, in the case of P2P clients, *infringed copyrights to do so*. They then posted details of this infringement on CBS Defendant websites to encourage users to download the clients and infringe themselves.

127. For example, in a "First Look" video that Download.com posted to its website, Defendants reviewed LimeWire 5 and demonstrated how it worked to Download.com users. The video shows a close up of the LimeWire search screen as the CNET reviewer enters "Nine Inch Nails," a popular band, and then shows the search results, which include many of the band's copyrighted songs. Later in the video, as the viewer looks at a screen demonstrating another sample search, they see a list of copyrighted works from artists including Will.I.Am, Usher, Trick Daddy, Nas, Ray Styles, and many others. Several non-video LimeWire reviews exhibited the same usage and encouragement, displaying screenshots Download.com editors took as they tested the application. These screenshots regularly displayed search results with well-known bands whose songs were avilable on the LimeWire network. For example, in a review for LimeWire "Classic" for Mac—a version of the client designed to run on Mac computers—the screenshot shows search results with bands such as Led Zeppelin, Offspring, Paul Revere & The Raiders, Queens of the Stone Age, Seether, Temple of the Dog, and Van Halen.

128. In another "First Look" video, this time for FrostWire, the CNET reviewer, Mr. Rosenblatt, discusses how the client is a "fork" of the LimeWire PRO code and again zooms in on the search bar while he enters "Nine Inch Nails," thereafter showing the results for this search, which again include an extensive list of the band's copyrighted songs. The video review mentions several times that FrostWire operates the same as LimeWire, and produces the same results. In making this comparison, Defendants appealed to LimeWire's users in the same way LimeWire appealed to Napster's users, and to the same effect.

129. In a November 7, 2008 review of MP3 Rocket, described as yet another "LimeWire source code fork," the Defendants attached screenshots of the P2P client in action to demonstrate its features. These screenshots, which remained on Download.com until at least December 2010, showed search hits and available files for download from artists including Madonna, Lady Gaga, Alicia Keys, Usher, Michael Jackson, Rihanna, Queen, Eminem, Omarion, Dire Straits, Gorillaz, Pink, 50 Cent, and many others.

130. In a November 11, 2009 review of LuckyWire, which was described as "almost exactly like LimeWire," the "CNET staff" noted that "[i]f you've seen LimeWire, you've seen LuckyWire; they're virtually indistinguishable." In order to compare the two programs, the CNET staff constructed an "informal experiment" where "we chose a song—Nirvana's 'Heart-Shaped Box,' if you're curious—and downloaded the same copy of it from Gnutella using both LimeWire and Luckywire." After comparing the download speed results from both applications, the staff concluded that LuckyWire was "worth giving [] a try," and concluded their review by saying, "*We recommend this program to all users.*"

131. In a November 24, 2009 review of ZapShares (that was recently removed from Download.com), the CNET staff described the application as "an innovative program that seeks to protect users from copyright infringement lawsuits resulting from peer-to-peer file sharing. ... The program is based on the theory that

the people who tend to get sued for copyright infringement are the ones who make files available for download, not the ones who do the downloading. ZapShares protects users by making sure that file sharing is disabled in their peer-to-peer software; files can come in, but they can't go out." After describing how this process works, the CNET staff then went on to say, "*We downloaded a song with LimeWire while ZapShares was running.*" They then opined on the "fairness" of using ZapShares, considering the model upon which P2P networks operate is massive, unchecked copyright infringement:

> We will leave it to you to decide whether it's fair that some users on a P2P network are assuming all of the legal liability to provide files to other users who aren't sharing the risk; after all, if everyone uses a program like ZapShares, there wouldn't be any content on P2P networks to begin with. If your conscience allows it, ZapShares appears to be a good way to keep your downloaded files to yourself.

Again—incredibly—the CNET staff concluded their review by saying, "*We recommend this program to all users.*"

132. Older reviews further demonstrate Defendants' long-running call to their users to infringe copyrights. In one of the earliest LimeWire reviews, dated November 28, 2001, CNET reviewer Justin Eckhouse explained how he used the program to search for songs by the band, Radiohead. A similar review of KaZaa, one of LimeWire's competitors, dated September 24, 2002 displayed a screenshot of the program wherein the reviewer showed how he used the program to search for songs by REO Speedwagon, a well-known band. The same review noted that users had the ability to flag, as undesirable, "a particularly bad cut of a Britney Spear video" found on the network, the implication of which was that users could, should, and would download such copyrighted works for free from the network.

133. Other reviews, articles, and materials posted on the Defendants' websites from throughout the decade noted the difference between various file-

Case 2:11-cv-09437-DSF-JC Document 31 Filed 07/25/12 Page 40 of 49 Page ID #:454

sharing applications and directed users toward the P2P clients that would provide them access to the most copyrighted works. For example, in a December 12, 2001 review of AudioGalaxy, CNET reviewer Justin Eckhouse noted that Audiogalaxy was designed to promote independent artists and unknown bands because it "employs copyright restrictions to keep you from downloading most popular songs." Accordingly, he recommended to users "if you thrive on the mainstream [music] beat, turn to LimeWire or KaZaa."

134. The message from Defendants' many videos, reviews, and screen shots of P2P clients in action was (and is) that LimeWire and similar applications are really great at infringing copyrights. Furthermore, as their call to conscience in the ZapShares review indicated, Defendants discouraged Download.com users from impeding the strength and vitality of the rampant infringement made possible by P2P clients available through Download.com.

135. Defendants also provided various newsletters and articles that cross-compared and recommended downloading P2P clients that were better at infringement than others. For example, one newsletter the Defendants provided on a monthly basis was called the "File-sharing smackdown." This newsletter compared results from the most popular P2P clients—determined by looking at the most popular downloads on Download.com—and made recommendations on each client's ability to download copyrighted works for CNET users. As CNET columnist Eliot Van Buskirk noted in his initial post, the purpose of the newsletter was to "settle arguments" over which was the best file-sharing service. In order to do so, he and a fellow CNET employee cross-compared eight different P2P clients, including LimeWire, KaZaa, Morpheus, BearShare, AudioGalaxy, by "[running] searches for 18 band names using each of these clients." The bands included Britney Spears, The Strokes, The Beatles, Run DMC, Metallica, Radiohead, Johnny Cash, and several other well-known artists.

136. The "File-sharing smackdown" continued for years, each time comparing results based on searches for well-known artists. A running commonality in almost every version of this newsletter and others—including the similarly-named "File-sharing blowout"—was that LimeWire was one of the test subjects. Indeed, from 2001 through the present—the entire time Defendants kept the newsletter on their websites and cross-linked to it in reviews or posts regarding P2P clients, or in articles regarding file-sharing in general—LimeWire was mentioned again and again as one of the top infringement tools available.

137. CNET's promotion of various file-sharing applications directly impacted the behavior of P2P users. For example, on October 9, 2008, a user of the P2P application FrostWire posted a comment on a user-forum available on FrostWire's website responding to the question "[Poll] how did you first hear about FrostWire": "I was using LimeWire Pro, and read a review about FrostWire on C Net. I changed to Frostwire."

138. Another example of the Defendants' encouragement to infringe comes from Download.com's affiliate site, ZDNet.com. In an article entitled "Dave's Top 9 Ways for File-sharing Music Lovers to Break The Law," ZDNet highlighted various infringement tools and noted that "If file-sharing has a future, it's peer-to-peer, a la Gnutella [*i.e.*, LimeWire's protocol]. Bypass the central server with open source software like this, and there's nobody to sue, nobody to shutdown." In the same article, ZDNet dismissively ridiculed a legal notice one P2P client provided regarding copyright infringement by rhetorically asking, "What the &%$# else are people using these file sharing programs for?" Another ZDNet article discussing the Gnutella protocol compared it to Napster and noted that a large user base is "a giant factor when you're considering file-sharing tools," the implication of which was that a larger user base meant more copyrighted songs available for free download. This message was repeated in various articles and reviews throughout the years.

139. Gnutella's decentralized network was also specifically and repeatedly stressed as useful for copyright infringement because it meant that the network could not be shut down. In an August 5, 2000 review of Gnutella, for example, CNET reviewer R. Scott Macintosh noted that the Gnutella network, unlike Napster, was decentralized. As he further explained, "[N]o matter how the legal wrangles over copyright violations impact companies such as Napster, Gnutella—and similar software—will undoubtedly survive."

140. Defendants also provided several "how to" guides for many different P2P clients that encouraged infringement, including LimeWire itself. For example, CNET provided a guide called "Search Gnutella and LimeWire Effectively." It also provided a guide on Gnutella, pitching the guide as the "scoop on how to download, install, and use this open-source variation of Napster." Another guide was entitled "How-To Use Gnutella Effectively." In yet another, they offered a "CNET Tip" on how to get around firewalls when using Gnutella and still obtain the files users wanted, a problem "with any file-sharing program."

141. Defendants also offered guides on *Napster* and, after it became clear Napster was in serious legal trouble, how to find a Napster "replacement." Regarding the former, Defendants offered guides explaining how to use Napster and that a user needed "a lack of morals" to use the service, or should "take care not to break the law (too often)." Regarding the latter, Defendants provided a guide called "Find an Alternative to Napster." As Defendants pitched this guide: "Worried that Napster's servers will be shut down some day? Don't despair. Lots of apps are looking to fill the void, some of which are impervious to the legal attacks now threatening the free-music phenomenon. Find the best choices in our tutorial." Of course, the "best choices" were all available via Download.com and directly benefited Defendants.

142. This latter theme—*i.e.*, helping CBS Defendant users find Napster "alternatives"—arose again and again on Defendants' websites. As noted

previously, Download.com's most recent available LimeWire review *still* references its "post-Napster clone" origins. Several articles that remain available on CBS Interactive websites today also question, discuss, and, most importantly, *recommend* the "next Napster," "Napster clone[s]," and Napster "improvements." In the days when LimeWire and other Gnutella clients first entered the scene, the Defendants' promotion of these P2P services was crucial to their taking hold, and Defendants' recommendations propelled several P2P clients to prominence.

143. For example, Defendants provided a how-to guide for Morpheus that not only explained how to infringe using the service, but also noted that a larger user base made the file-sharing service more valuable. After observing that MusicCity, Morpheus' parent organization, seemed to be waving a "big red flag in front of the RIAA saying, 'Sue me! Sue me!'", Defendants pitched their guide by saying, "Will this program be the next Napster? Only if you try it out. Learn to use Morpheus."

144. Defendants also provided a guide to Scour Exchange that noted it was signing deals with Hollywod studios and artists to promote approved files, but that "the community of Scour Exchange users continue to share copyright-protected materials without permission." In this guide, Defendants pointed out that Scour Exchange's user agreement put the responsibility for determining which files were copyrighted on the users, but followed that up with "This is a standard disclaimer among the file-sharing programs and, *truthfully, one that is currently ignored by most users*." Defendants then urged their users to click the link for the next page of the guide, "Now Go Get Those MP3's!" thus encouraging their users to obtain materials on a network they just admitted was used primarily for copyright infringement.

145. Actively promoting LimeWire and similar products as infringement tools, however, was not the extent of Defendants' encouragement. They also actively recommended *against* users downloading and employing P2P clients that prevented infringement. For example, in a February 1, 2002 version of the

"smackdown" newsletter entitled "File-sharing smackdown, part *deux*," Mr. Van Buskirk noted that the first "winner" of his smackdown, Audiogalaxy, had apparently implemented copyright restrictions as a "token effort to appease the big record companies." As he explained, "Unfortunately, this smackdown isn't about pleasing anyone except for MP3 downloaders, so obstructing these files pretty much disqualifies Audiogalaxy from the contest. ... Overall, I can't recommend a program to the general populace that blocks access to the songs most people want." The program that did receive Mr. Buskirk's recommendation? LimeWire, with *Morpheus and Grokster* as a "close second."

146. Download.com staff also acknowledged in public interviews that they knew P2P clients hosted on their site were intended for copyright infringement. In an interview discussing LimeWire, for example, Mr. Rosenblatt, the editor who wrote some of the previously-mentioned LimeWire reviews, noted that file sharing is primarily used for copyright infringement. And in a February 21, 2010 video reviewing CNET's top 5 downloads for the week, a CNET editor drolly deadpans after seeing LimeWire at number one: "What a surprise...LimeWire."

147. To this day, Download.com still hosts and promotes P2P clients for copyright infringement. As noted previously, Defendants continued to provide a download for FrostWire after the injunction was entered against LimeWire. FrostWire is, of course, the open source version of LimeWire that Download.com pointed out was "practically indistinguishable" from its willfully infringing cousin. In the wake of the injunction against LimeWire, FrostWire became an increasingly popular substitute for P2P infringement due to its close similarity to LimeWire. Seeing the writing on the wall for LimeWire-like applications, the most recent version of FrostWire has re-styled itself as a torrent-based P2P client and no longer accesses the Gnutella network. As both its publishers and Defendants are well aware, the new torrent-based version of FrostWire continues to serve primarily as a means of direct infringement just like its previous versions did. Consistent with its

policy of guiding P2P users to the "next wave" of P2P clients in the wake of legal decisions shutting down P2P technologies found to be infringing, Download.com still distributes the torrent-based version of FrostWire. Over 30,000 copies of the most recent version of FrostWire were downloaded from Download.com the second week of October 2011.

148. Further, as Download.com's users demonstrate with their comments, they continue to understand that the Defendants are encouraging them to infringe copyrights with Frostwire and similar reviews. For example, regarding the Gnutella-based version of FrostWire available after the injunction entered against LimeWire (and prior to FrostWire's most recent torrent incarnation), users pointed out on Download.com, "Frostwire is basically LimeWire replaced! ... I'm glad that this is a lot like LimeWire because then I don't have to learn anything new." Although the Defendants now include a belated, stock warning against copyright infringement on their website, this tepid disclaimer fools no one. Download.com users understand and are encouraged by the real messages promoted not two lines under this and similar disclaimers: download this P2P client because it will enable you to infrigne copyrights and obtain free music.

149. Plaintiffs' copyrighted works were and are available on P2P file sharing networks developed, distributed, and promoted by Defendants. Defendants accordingly are liable for copyright infringement.

## COUNT 1

## INDUCEMENT OF COPYRIGHT INFRINGEMENT

150. Plaintiffs incorporate as if set forth herein the allegations made in Paragraphs 1 through 149.

151. Individuals using P2P client software that Defendants distributed and promoted, including LimeWire, BitComet and others, have directly infringed and are directly infringing Plaintiffs' copyrights by, for example, creating unauthorized reproductions of Plaintiffs' copyrighted works and distributing copies of such works

to the public in violation of Plaintiffs' exclusive rights under the Copyright Act, 17 U.S.C. §§ 106, 501.

152. Defendants are liable for inducing the copyright infringement of Download.com users. Defendants distribute and promote several P2P clients, including but not limited to the LimeWire client and current offerings such as FrostWire, BitComet, and Phex. In distributing and promoting these P2P clients, Defendants inform and informed their users that the clients were optimized for the unauthorized copying and transmission of copyrighted sound recordings, thereby actively facilitating, encouraging and enticing Download.com users to engage in the infringement.

153. Defendants have induced and continue to induce infringement by, for example, aiming to satisfy a known source of demand for copyright infringement, including the market comprising users of other infringing services that were shut down or compelled to block access to Plaintiffs copyrighted works, such as Napster, Morpheus, Grokster, KaZaA, and now LimeWire.

154. Defendants further have induced and continue to induce infringement by, for example, continuing to provide downloads for P2P that clients that fail to block or diminish access to infringing material even though there are technological means to do so – means that are known to Defendants and the P2P client publishers, and some of which have been employed by P2P clients who operate legally.

155. Defendants further have induced and continue to induce infringement by, for example, building and maintaining a business model to profit directly from the demand for infringing P2P clients.

156. Defendants' infringement is and has been willful, intentional, purposeful, in disregard of the rights of Plaintiffs, and has caused substantial damage to Plaintiffs.

157. As a direct and proximate result of Defendants' infringement, Plaintiffs are entitled to damages and their costs, including reasonable attorneys' fees,

pursuant to 17 U.S.C. § 505. Defendants' conduct has caused, and unless enjoined by the Court, will continue to cause Plaintiffs great and irreparable injury that cannot be fully compensated or measured in money. Plaintiffs have no adequate remedy at law. Pursuant to 17 U.S.C. § 502, Plaintiffs therefore also are entitled to injunctive relief to prohibit further infringement of Plaintiffs' copyrights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for the following relief:

a. For damages, including without limitation, actual and statutory damages, for Defendants' infringements of Plaintiffs' copyrights;

b. For injunctive relief requiring that Defendants and Defendants' agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all persons acting in concert or participation with each or any of them, cease infringing, whether directly or indirectly, and cease causing, enabling, facilitating, encouraging, promoting, inducing, contributing to, and participating in the infringement of, any of Plaintiffs' respective copyrights;

c. For pre-judgment and post-judgment interest;

d. For Plaintiffs' costs and disbursements in this action, including reasonable attorneys' fees; and

e. For such other and further relief as the Court deems proper and just.

July 25, 2012

Respectfully submitted,

By /s/
Jaime Marquart
Ryan Baker
BAKER MARQUART LLP
10990 Wilshire Blvd., Fourth Floor
Los Angeles, California 90024
(424) 652-7811
(424) 652-7850k (facsimile)

Attorneys for Plaintiffs

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 10990 Wilshire Blvd., Suite 400, Los Angeles, California 90024.

On **July 25, 2012,** I served true copies of the foregoing documents described as

**FIRST AMENDED COMPLAINT FOR: INDUCEMENT OF COPYRIGHT INFRINGEMENT; JURY TRIAL DEMANDED**

on the parties in this action as follows:

**Richard B. Kendall, Esq.**
**Laura W. Brill, Esq.**
**Richard M. Simon**
**Cassie D. Palmer**
**KENDALL BRILL & KLIEGER LLP**
**10100 Santa Monica Blvd., Suite 1725**
**Los Angeles, CA 90067**
**Fax: (310) 556-2705**

**BY MAIL:** I enclosed the foregoing into a sealed envelope addressed as shown above, and I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid.

**BY FACSIMILE:** On July 25, 2012, I transmitted the document(s) by facsimile pursuant to Rule 2008 of the California Rules of Court. The telephone number of the sending facsimile machine is 424-652-7850. The document was transmitted by facsimile and properly issued a transmission report confirming that the transmission was complete and without error.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on **July 25, 2012,** at Los Angeles, California.

Lauren Stevens